IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
ERIE DIVISION

CARI GOODWINE,                    :
             Plaintiff,       : Case No. 04-142E
                    :
                    : HONORABLE SEAN J. McLAUGHLIN
PHB DIE CASTING,          :
            Defendant     :

## BRIEF IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions of file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.  Fed.R.Civ.P 56( c).  A genuine issue of material fact exists only when the evidence is such that a reasonable jury could return a verdict for the non-moving party.  The movant bears the initial burden of demonstrating the absence of genuine issues of material fact.  Upon the movant satisfying the initial burden, the non-moving party must set forth specific facts showing that there is a genuine issue for trial.  Fed.R.Civ.P. 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548 (1986).

The Plaintiff's action under Title VII is predicated upon claims of a hostile work environment and disparate treatment given his race.  The Defendant seeks the entry of summary judgment based its characterization of the evidence as insufficient to support the respective claims.  In order to maintain a viable action under Title VII for a hostile work environment, the Plaintiff is required to prove the following:  (1) he suffered intentional discrimination because of his race; (2) the discrimination was pervasive and

regular; (3) the discrimination detrimentally affected him; (4) the discrimination would detrimentally affect a reasonable person of the same race in that position; and (5) the existence of respondeat superior liability.  Kunin v. Sears Roebuck & Co., 175 F.3d 289, 293 (3d.Cir. 1999).

The Defendant contends that the totality of the evidence produced in the discovery stage of this litigation indicates that the Plaintiff was not subjected to a hostile work environment because of his race.  The Defendant portrays the Plaintiff as being hypersensitive and unreasonably imparting racial undertones to what are isolated and innocuous incidents not borne from racist attitudes or proclivities of his co-workers and management.  To the contrary, the Plaintiff has presented clear and compelling evidence of a workplace with a history of a racially charged environment, which has continued in an unabated fashion resulting in pervasive and regular discrimination perpetrated upon the Plaintiff and other African-American workers.  The Plaintiff is his initial pleading and his own deposition testimony has offered a complete and credible account of his employment tenure in excess of four years with the Defendant, which account is replete with ongoing episodes of racial discrimination which are patently offensive and demeaning to a black male of ordinary sensibilities under the same circumstances.

The Plaintiff described a course of conduct of a foreman, Gary Gebhardt, involving unwarranted oversight of his work as well as his discernment of statements made by Gebhardt that the white employees were supposed to make it hard on them [the black employees].  (Goodwine deposition, 1-29-05, p. 54).  The Plaintiff was made aware of another foreman, Gordy Phillips, making statements as to exposing Goodwine to hot water from a valve with underlying racial overtones and impetus.  (Goodwine deposition,

1-29-05, p. 77-79).  Cari Goodwine was also the subject of a comment by Bill Donnell, the maintenance supervisor.  Another employee inquired of Donnell regarding a backhoe that was being used to dig a large hole in the floor and what was going in the hole. Donnell responded "Cari Goodwine" and then quickly retorted "whoops, I shouldn't have said that."  (Goodwine deposition, 1-29-05, p, 122-123; Affidavit of James Henry).  The Plaintiff further describes various instances of being asked to perform tasks of general maintenance and to work with unsafe machinery, which was known to pose risk of serious injury or even death.  This general racial climate and regular course of conduct was observed and confirmed by other workers.  See, Deposition and Affidavit of James Henry; Deposition of George Arrington.

James Henry proffered an affidavit in regard to the conduct of Bill Donnell as well as deposition testimony.  James Henry recounted that the first time he met with Bill Donnell and Ben Hancock, after reporting Donnell's threat as to Cari Goodwine, Donnell denied ever saying it.  During the second meeting, Donnelly admitted making the statement, but said what he "meant" to say was to throw "dead weight" into the hole.  Henry deposition, page 26, line 21 through page 27, line 7).  Hence, Donnell has presented conflicting accounts as to the intent and context of his statement.  However, regardless of the intent of the statement as now asserted by Donnell, the clear and reasonable conclusion of the connotation of his statement was not subject to misperception and his sudden change in his purported intent is suspect in that upon conceding that he made the statement he was then subject to potential disciplinary sanction.  Hence, the content and intent of the initial statement should stand as the actual nature of the statement with a specific threat made against the personal safety and well-being of Cari Goodwine.

James Henry was present at the initial statement of Donnell and privy to the nature and tenor the statement as communicated and thus in the most conducive position to adjudge the character of the statement.  James Henry was questioned "did you truly believed Mr. Donnell was threatening physical harm against Mr. Goodwine?"  Henry responded:  "sure do, I believe it."  (Henry deposition, page 29, line 1-8).  Henry was questioned:  "has any other employee made a racial slur in your presence?"  Henry responded: "a lot."  (Henry deposition, page 29, line 22-24).  Henry was questioned: "who are these people?"  He answered:  "it could be….it's a shop."  (Henry deposition, page 30, lines 18-19).

James Henry referred specifically to a joke communicated by Gordy Phillips.  (Henry deposition exhibit "2").  Gordy Phillips stated" do you know why niggers don't have nightmares?  The last one that did got shot."  (Henry deposition, page 33, lines 2-6). Henry did not see it as a joke, but rather as a patently offensive comment.  (Henry deposition, page 36, lines 15-16).  It can fairly be discerned from James Henry's whole deposition that he was being retaliated against because of his affidavit and complaint regarding Donnell's threat about placing Goodwine in the hole.  (See, particularly page 41, lines 3-21).   Henry was sprayed with kerosene as retaliation.  (Henry deposition, page 51, line 19 through page 52, line 16).  Henry was regularly exposed to comments from other employees that "that black guy (Goodwine) got Gary (Gebhardt) fired." (Henry deposition, page 63 lines 11-12).  James Henry was questioned  "what other ones [racial comments] were there?"  Henry answered:  "well, you know, the black jokes, you know, just daily things out there."  (Henry deposition, page 66, lines 16 through 25).

James Henry confirms that racism is pervasive at PHB among workers and management and that the timeframe and the penalty (after reporting incidents) don't' match. (Henry deposition, page 25, lines 2-4). Moreover, Henry evidences that PHB is not serious about dealing with discrimination and penalties and disciplinary measures are not taken seriously. (Henry deposition, page 25, lines 12-15; page 27 lines 10-22).

The ramifications of the underlying course of conduct involving Gary Gebhardt relative to Cari Goodwine and Gebhardt's ultimate termination is that the employees at PHB believed that Gebhardt would not have been fired if Goodwine had not initiated this lawsuit. PHB would have done nothing otherwise in response like it would do in other instances of discrimination claims including Tom Thompson. (Henry deposition, page 28, lines 2-23). Moreover, the general feeling is that PHB did not do enough to discipline Tom Thompson. (Henry deposition, page 29, line 24). James Henry confirmed that PHB gives harder job assignments to blacks and females even though Henry told supervisors about his concerns as to the disparate assignment of machines and jobs. (Henry deposition, page 31, line 2 through page 32, line 7).

George Arrington also corroborated the existence of a pervasive and continuing climate of racial animus and discrimination in the PHB workplace. Arrington observed racial graffiti in the workplace restrooms while working at PHB. Arrington would periodically see the Ku Klux Klan, things such as that and the word "niggers" spelled out on the bathroom walls. (Arrington deposition, page 8, lines 13-23). Arrington observed this more than once and found it alarming to see something like that in his workplace. (Arrington deposition, page 10, line 8). The issue of the racial graffiti was brought to the attention of the management. Moreover, it was on the walls and the stalls and you

couldn't help but see it thereby affording notice and knowledge to other workers as well as management. (Arrington deposition, page 12, lines 15-20). Arrington noticed a lot of racial slurs right there inside the bathroom stalls. (Arrington deposition, page 12, lines 22-23).

Arrington specifically recalled seeing graffiti referencing the KKK, which was alarming when placed in the context of rumors surfacing around the workplace that there were KKK rallies taking place out in the counties. Upon disseminating these rumors, other workers would ask Arrington in a smart remark if he was attending one of them. (Arrington deposition, page 17, lines 8-14). Arrington heard directly about the KKK rallies from Clyde Porter, Bill Diehl, Chuck Merritt, and Scott Reichert, who was in charge of maintenance. (Arrington deposition, page 14, lines 23-25). Arrington even heard remarks made by Butch Smith as well with him exclaiming: "hey George, you going out there to that rally." (Arrington deposition, page 15, line 21 through page 16, line 1). The statements were reported by Arrington to his supervisor, Mike Pretz. Arrington also went directly to Pretz to advise him about being called a "nigger" by Bill Diehl, who continues to work at PHB. (Arrington deposition, page 17, lines 4-16; page 18, lines 9-12). Arrington indicated that there have been numerous racial incidents in the workplace. (Arrington deposition, page 18, line 25). Arrington recounted how Bill Diehl made statements as to the fact of you guys eating watermelons right there, "do you guys still eat watermelons and chitlings?" (Arrington deposition, page 25, lines 15-18). There have been repeated instances where Bill Diehl openly made comments about niggers, which prompted others to remark to George Arrington how they were offended by the racial remarks. (Arrington deposition, page 25, lines 23-24; page 26, line 24 through

page 27, line 1).  Diehl made racial remarks to Arrington many times, more than 10 occasions with the racial comments made to Arrington in the crib, the lunchroom, maintenance area.  The remarks of Diehl were regularly overheard by other workers including Vernon Duck and Tim Norton.  (Arrington deposition, page 28, lines 17-19; page 29, lines 4-5; page 29, line 19).  George Arrington noted that it was just the shop right there; these were men from a different era and the manner that they spoke was reminiscent of pre 1960's and that era and therefore they referred to black workers in whatever way they did so in that era such as "boy" and this climate still existed throughout the entire shop.  (Arrington deposition, page 39, lines 2-17).  Arrington stated that being called a "boy" by these co-workers was like having a knife stabbed in your back.  (Arrington deposition, page 42, lines 4-6).

Arrington noted that the racial attitudes existed throughout the shop and was not limited to just one individual.  A lot of individuals for instance would ask the question, "where your bro's at?"  (Arrington deposition, page 46, lines 3-7).  There were additional comments that blacks did bad things which were made right there by the same individuals.  These workers indicated that because they never had that many black families out there, so it was new grounds for them to experience and the only experience they had of black people were things they saw on television, which were bad.  (Arrington deposition, page 49, lines 14-19).

George Arrington, after being injured on the job was relegated to light duty and was ultimately laid-off by PHB who then challenged his unemployment claim and his workmen's compensation claim and put someone to work at light duty who had less seniority than Arrington.  After Arrington prevailed as to the claims, PHB then hired him

back at a light duty job. (Arrington deposition, page 50, line 1 through page 57, line 19). Arrington noted the disparity that when white workers were laid off by PHB a collection would be taken among the workforce to help the person out financially, but when a black worker was laid off no such collection was taken or any show of concern given by the employees. (Arrington deposition, page 58, line 3 through page 21, line 20). Arrington was subject to harassment and disparate treatment in that PHB management would blame him for problems in the tool crib that originated on other shifts caused by white workers and that employees would spit things on his floor and hide inventory so that he would be blamed. (Arrington deposition, page 62, line 1 through page 63, line 7). Arrington was regularly and inexplicably accused of lying. When he brought in a doctor's excuse for time off work, Ben Hancock told him it was a lie. The Defendant would call Arrington in and reprimand him about his doctor's excuses concerning his health and stated that his doctor was lying. (Arrington deposition, page 63, lines 8-13; page 64, lines 9-15). Arrington was involved in an incident with Ben Hancock in 2000 or 2001 wherein Arrington perceived that Hancock had shown him disrespect and considered him to be a liar. All Arrington did was ask for assistance from PHB as had been directed and Hancock proceeded to evaluate Arrington's value with reference to his injury and ability. (Arrington deposition, page 65, line 25 through page 68, line 1). Arrington was finally let go by PHB after being injured on the job and advised that "they didn't need his services." Arrington discovered that soon after PHB brought a young lady that was in maintenance to fill his position, which PHB indicated was no longer a position for Arrington. (Arrington deposition, page 65, lines 17-19)

The Plaintiff's allegations of exposure to a racially charged environment where he was subject to racial animus, the recipient of derogatory jokes and statements; and veiled threats of physical harm must be considered in the context of the totality of the evidence presented including the aforementioned evidence proffered by James Henry and George Arrington, who experienced the same work environment as Cari Goodwin during his tenure with PHB, and other evidence corroborating the racial discrimination present in the particular work environment. The Defendant has gone to great lengths to portray the Plaintiff as overreacting to neutral and innocuous comments or situations and mistakenly imparting racial undertones to what are isolated incidents not actionable under Tile VII. Moreover, the Defendant avers that several of the incidents or comments were not experienced firsthand by the Plaintiff and instead the nature of the conduct or comments was relayed to him by other parties who were present or privy to the dissemination of the racial comments.

The Defendant characterizes Cari Goodwine as willing to ascribe racial overtones or motivations to non-racial comments and routine interaction and conflicts with his fellow employees. Thus, the Defendant discerns Cari Goodwine's allegations as subjective and unreasonable. Thus characterization and argument exemplifies the fundamental inquiry material to this case and other cases of this nature. The Plaintiff as the party exposed to the comments and incidents in their totality views the conduct in one way while his Defendant employer views the same circumstances in a different light with each party ascribing different underlying motives and attitudes to the same set of actors. The Defendant advances its argument and position on the ground of unreasonable subjectivity on the part of Cari Goodwine. However, the Defendant's own unreasonable subjectivity

must be measured with the ultimate determinant constituting an objective means to weigh the actionable nature of the instant cause of action.

The competing subjective considerations of the respective parties can best be viewed through the incident, which bears a significant means of disclosing the actual undercurrent within the workplace at issue in this case. The Plaintiff has asserted evidence involving comments made by Gary Gebhardt that "we have to make them work harder" involving a disparate treatment dynamic in the workplace as to black employees. The Plaintiff perceived this comment as expressly racist in nature and invoking an underlying dichotomy between black and white workers from this foreman as to disparate treatment and an underlying racist proclivity. Given his immediate perception of this comment, the Plaintiff reported the incident to Human Resources, which precipitated an investigation and subsequent meetings to resolve the matter. However, during the aftermath of that incident and during the course of this litigation, the Defendant has steadfastly relied on the fact that the statement was not made directly to Cari Goodwine and that the comment is ambiguous as to any potential racial overtones. The Defendant essentially sought to dismiss the incident as evidence of any discrimination or indicating that there were some racial attitudes existent in the workplace management. However, thereafter, it was discerned that Gebhardt had made certain explicit racist comments and made physical threats against a black co-worker outside of the workplace, which therefore provided clear evidence of his racist attitudes and thus also placed into proper context his prior comments which were no longer so ambiguous even from the Defendant's perspective.

Hence, the Defendant's initial and ongoing response to the Gebhardt incident displayed an unwarranted subjective interpretation with the assumption that the statement was ambiguous or innocuous being false. Thus, the Plaintiff and Defendant had diametrically opposite responses to what on its face was not an explicit racist comment, but subsequent extraneous evidence showing the actual racist attitudes of the foreman Gebhardt placed the former comment in a context where racist overtones could readily be attached and confirming Cari Goodwine's "subjective" response to the incident. Thus, there were competing subjective interpretations of the same incident evolved from the distinct positions, experiences and motivations of Cari Goodwine and his employer with Goodwine's interpretation ultimately bearing more credibility given the corroboration unwittingly provided by the declarant Gebhardt himself.

The review of the Gebhardt incident and the ultimate assignment of racial overtones to his statement exemplifies the fundamental determinate of the instant dispositive motion. The Defendant takes various comments and incidents and "subjectively" imparts its interpretation of the rationality and reasonableness of Goodwine's reaction. The Defendant is essentially challenging the Plaintiff as "subjective" and unreasonable while in furtherance of that same argument applying its own subjectivity. Therefore, who is to be the final arbiter of the reasonableness as to perception of racial overtones ascribed to conduct and comments in the workplace? The Plaintiff has cited the Gebhardt incident as compelling evidence of a hostile workplace, which was effectively corroborated by Gebhardt himself, which circumstance is improbable where a person is going to blatantly reveal their racist attitudes thereby displaying racist overtones to prior conduct or statements. Hence, the instant case presents other comments and incidents perceived by

Cari Goodwine in the same manner as the Gebhardt incident while dismissed by the Defendant as having any racial overtones.   In the absence of direct and express corroboration as provided by Gebhardt, an objective consideration of the perceptions gleaned from the comments or incidents must rest upon the incidents placed in the context of evidence of racial overtones exhibited in the workplace as a whole.

The Defendant argues that many of the comments or incidents were not directly witnessed by Goodwine nor was he a direct participant.  The Defendant views this fact as shielding Goodwine from exposure to the discrimination and thereby precludes any actionable claim under Title VII.  However, the evidence of a racially charged workplace environment as a whole places the Goodwine claims in proper context and afford corroboration to the credibility of Goodwine's purported subjective and unreasonable perceptions and interpretations.  Moreover, the fact that Goodwine did not hear firsthand the discriminatory comments several of which he was the subject of and that said comments were repeated to him does not diminish or defuse the discriminatory impact or personal toll on him.

The Defendant's recital of the discovery and the interpretation of the deposition testimony is merely a continuation of the subjective interpretation and limitation of the evidence proffered in support of the Plaintiff's claims.  The affidavits provided by the Defendant collectively amount to self-serving statements and representations that bear no materiality as to the reasonableness of Goodwine's perceptions as to workplace conduct and comments.

The EEOC has been involved in prior claims of workplace discrimination as to the Defendant.   Moreover, the union representing the employees of the Defendant including

Cari Goodwine previously filed a grievance in regard to discriminatory conduct in the workplace on behalf of all black employees including Cari Goodwine. In the course of the EEOC investigation and the grievance, substantial statements and reports were obtained in regard to racist and discriminatory conduct in the Defendant's workplace, which can reasonably be characterized as regular and pervasive and constituting a hostile workplace. The body of evidence secured through the EEOC investigation bears significant import as to adjudging the credibility and impact of the allegations of Cari Goodwine in the context of other persons' experience in the same workplace. The EEOC is a neutral and objective arbiter of the facts and acts as a collector of evidence without the subjective filters impacting on perception of the racial content of incidents seen as innocuous or ambiguous by the Defendant employer. In reviewing the EEOC record of the Defendant's workplace and the Plaintiff's instant allegations, the Defendant workplace is a maelstrom of discrimination with a culture of racism propagated and permitted to continue by the inaction of the Defendant's management. (See EEOC Documents, Exhibit 5.)

The Defendant has displayed a consistent ignorance or dismissal of its obligations as to notice, oversight and discipline regarding discrimination in the workplace. In his deposition testimony, the owner and President of the Defendant company, William Hilbert, was unable to articulate what the discrimination policy is at his company. Mr. Hilbert ultimately discussed discriminatory oversight and discipline of any offenders as a subjective exercise where discrimination is what he or his management perceives it to be without any reference to express and defined standards. (Hilbert deposition, page 10, lines 8-19.) Hence, again similar to the Defendant's posture as to the credibility of the

Plaintiff's allegations and the reasonableness of his perceptions of the workplace environment, the Defendant freely seeks to admittedly apply a subjective standard as to the identification and sanctioning of discrimination in its workplace.

The Plaintiff has further posited that he had been victimized by disparate treatment in the workplace based upon his placement on a "bad boy" list for record of attendance and that he and other black employees are regularly assigned to the most difficult operations within the workplace. The Plaintiff has further averred that he has been retaliated against given his pursuance of discrimination charges in that he was compelled to undertake maintenance duties beyond the scope of his job duties for the purposes of denigrating and humiliating him. The Defendant has sought to refute these allegations by positing that the Plaintiff's placement on the "bad boy" list characterized as a dysphemism by the Defendant's counsel was warranted based upon the application of the terms of the collective bargaining agreement. Moreover, the Defendant has presented a purported statistical analysis of the work assignments of all employees including the Plaintiff and the respective assignments to specific machines in the workplace. Finally, the Defendant has provided affidavits purporting to evidence that the assignment of the Plaintiff to clean or degrease shot monitors was not retaliatory, but that everyone had to share in that unwelcome duty at some point.

The collective responses raised by the Defendant to the foregoing claims of the Plaintiff all present a macro view of the functioning of the Defendant's workplace. However, the Plaintiff claims must be viewed and considered from a micro perspective as to the actual regular functioning within the workplace where despite the general overview of the evidence certain exceptions and modifications are engendered and

employed by co-workers and management personnel within the workplace. The actual creation and use of a "bad boy" list with a pejorative connotation bears definitive relevance as to disparate and discriminatory treatment with a design to taint a person including the Plaintiff and thereby precipitate certain attitudes that are known to have developed in the workplace. An "us versus them" dynamic existed in this workplace between white and black workers and Cari Goodwine was caught up and impacted by that dynamic and his placement on the "bad boy" list contributed to that atmosphere regardless of the prima facie basis for his placement on that list from a macro view as to the application of the collective bargaining agreement. Moreover, the Plaintiff has presented credible evidence substantiating that his attendance record was the product of medical problems whereby he was placed on light duty and compelled to miss significant periods of work.

The Defendant has submitted a print-out of the work assignments and a statistical overview of machine assignments as to white and black employees during the Plaintiff's tenure. This macro view of the workplace lacks any meaningful evidentiary value as to the Plaintiff's claim of disparate treatment. The Plaintiff has alleged that management regularly assigned black employees including him to the more difficult machines. The more difficult jobs involved faster cycle times, bigger parts and more workstations, which required more attention to detail and greater preparation. (Goodwine deposition, 1-29-05, p. 69-70). The harder jobs involved particular machines or making particular parts. The machines were not solely determinative of the level of difficulty of the job as the task could be made more difficult based on what was decided to be placed in the machine thereby affecting the level of detail. (Goodwine deposition, 1-29-05, p. 71)

Therefore, the actual administration of the workplace is controlled at the most basic level by the foremen. The Plaintiff has asserted that the difficulty and thus desirability of work assignments could vary based upon the nature of the work or the assignment of a certain machine. Thus, the difficulty of the task was highly variant and the mere sterile and general overview of general assignments to machines over an extended period through computerized analysis does not provide compelling evidence to refute the allegations of disparate assignments without specific designations as to each specific assignment as to the nature and parameters of each assignment. The mere recital of the machine assignments as to black and white employees fails to denote the variant difficulty of the assignment involving the variant factors of machine size, nature of the assignment and substance decided to be placed in the machine and the required meticulousness mandated. Instead, the Plaintiff has presented his own account and the statements of other black employees that dependent upon the nature of the work assignments on a regular basis the more difficult assignments were consistently given to black employees again corroborating the "us versus them" dynamic of this workplace. The computer printout offered by the Defendant does nothing to refute the Plaintiff's actual experience where certain machines and assignments presented variant challenges and the disparate assignment to blacks cannot be traced by a mere computer analysis of the machine assignment as that is not the sole determinant of the difficulty of a particular assignment.

The Defendant has further asserted through affidavits that everyone was expected to share in the task of cleaning or degreasing the shot monitors regardless of the distaste for that job. The Defendant has provided statements that everyone had to partake in that task at some point. However, these self-serving statements fail to address the timing of the

Plaintiff's assignment to this task. During the Plaintiff's entire tenure with the Defendant, he was never assigned to this maintenance task which is beyond the scope of his job duties. Moreover, there is no credible basis to conclude that this task was regularly shared by workers. Instead, only subsequent to his initiation of the claims of discrimination was the Plaintiff assigned to this task, which can reasonably be perceived as retaliation intended to denigrate and humiliate him. Cari Goodwine never previously had to perform this task and suddenly after the commencement of his claims against his employer he is forced to perform this task before this co-workers with an evident retaliatory motive.

Thus, the respective explanations and evidence offered by the Defendant relative to the disparate treatment claims again purport to present racially neutral and non-discriminatory bases for the actions. However, these allegations must also be placed and considered in the context of the Plaintiff's allegations regarding regular discriminatory conduct in the workplace resulting in a hostile workplace. The overwhelming and endemic culture of discrimination which had infected this workplace served to govern the conduct and attitudes of co-workers and management including disparate treatment consistent with the "us versus them" dynamic. The Plaintiff has presented his account of his treatment and other black employees have corroborated and amplified his allegations of discrimination. The Defendant's blanket disavowal of any disparate treatment predicated upon evidence of appearance discounts the actual functioning and management of the workplace as experienced by Cari Goodwine and his fellow black co-workers.

The Defendant has offered various affidavits from company employees, which set forth self-serving statements which lack any meaningful basis to refute the claims of the Plaintiff. The Defendant further seeks to parse the deposition testimony and supporting statements offered by the Plaintiff and ignore or discount the totality of the evidence supporting that racial discrimination was rampant and endemic in this workplace. Moreover, the Plaintiff has set forth clear and convincing evidence of incidents, statements and threats that were regular and pervasive in the workplace against him and the class of black employees. The Plaintiff has provided additional evidence consisting of testimony and statements of other black employees, which serves to corroborate and buttress his claims of discrimination through disclosing the regular racially charged environment within this workplace. (See EEOC Documents, Statements of Employees, Exhibit 5.)

The totality of the evidence produced in discovery and secured through prior related proceedings in regard to discriminatory practices of the Defendant reveals a pervasive and continuing culture of lack of responsibility as to monitoring and rectifying instances of workplace discrimination and conduct exhibiting a blatant disregard for the rights of this Plaintiff and the other black employees of PHB Die Casting. The Defendant is decidedly limited by the focus of its ownership and management as to discernment of discrimination in the workplace committed by its management and workforce as a whole and the installment of a functioning policy to combat the discrimination. The Defendant's hierarchy of management from the owner on down seeks to dismiss any discriminatory practices while displaying an utter inability to cite a policy or the means of applying the policy in any meaningful or objective fashion. The

owner of the company, William Hilbert, offered deposition testimony that he does not know the discrimination policy of his company. (Hilbert deposition, page 10, lines 8-17). Mr. Hilbert revealed that he defers those matters to the "personnel guy" [Ben Hancock] and that claims of discrimination are investigated and the merits decided by him. However, admittedly that process is not pursued pursuant to any set policy to which the ownership and management are readily conversant, but on a subjective basis not per objective standards. The application of a purely subjective standard is also conceded by Hancock in his deposition testimony. This informal and unstructured procedure as to workplace discrimination is even more incomprehensible given the mandates of a prior settlement agreement executed arising out of a prior discrimination claim before this Court whereupon the Defendant was mandated to permanently post a written discrimination policy in the workplace thereby affording the workforce and management with the opportunity to be conversant with the policy. However, that posting was never accomplished by the Defendant in disregard of the settlement agreement and consent decree of the prior case. Various employees have testified in their depositions and affidavits that they never observed the posting of a discrimination policy. Moreover, prior counsel for the Defendant opined that the mandated posting was limited to a thirty (30) or sixty (60) day period, which is inconsistent with the permanent mandate of the settlement decree.

William Hilbert further conceded that he has no idea of how many training (discrimination) classes each employee has to attend. (Hilbert deposition, page 10, lines 16-19). Hilbert admitted that there are no blacks in supervisory positions with the Defendant company. (Hilbert deposition, page 17, lines 1-5).

The fact that the discrimination experienced by the Plaintiff and other black employees in the Defendant's workplace is of a pervasive and prolonged nature is corroborated by the former union grievance filed on behalf of all black employees including the Plaintiff within that aggrieved class. That union grievance incorporates the collective experience of all black employees of the Defendant including Cari Goodwine's tenure involving the allegations set forth by him. This collective grievance evidences that Goodwine's contentions are not subjective and overblown as characterized by the Defendant, but that his experiences are shared by other black employees who have been similarly situated as to bearing the brunt of discriminatory practices impacting upon their abilities to perform their employment. (A copy of the union grievance filed on behalf of all black employees including Cari Goodwine during his employment tenure is appended hereto).

The Plaintiff proffers the evidentiary record established in the former workmen's compensation proceeding of Dayved Woodard in which the discriminatory practices of the Defendant was material. The deposition testimony of Patrick Camp of February 22, 2005 is instructive as to the absence of any company discrimination policy and procedures. Patrick Camp was a line foreman and union steward at PHB who worked the same shift as Cari Goodwine. (Camp deposition, page 20, lines 7-9). As union steward and line foreman, Camp worked at PHB for a nine year period. (Camp deposition, page 4, line 17). Moreover, Camp is unaware of any policy at PHB in regard to discrimination. (Camp deposition, page 22, lines 12-14). Camp does not know of any discrimination policy as of February 22, 2005 when the deposition testimony was taken. (Camp deposition, page 22, lines 19-22). Camp testified that as a foreman in a

supervisory role he would be aware of any company-wide policy on discrimination and believes that one was put into place around September, 2004, but he has no knowledge of any such policy prior to that.  (Camp deposition, page 23, lines 1-10).   Hence, no standard procedures were followed for a claim of racial discrimination until September, 2004.  (Camp deposition, page 23, lines 11-19).

The workman's compensation hearing testimony of Christopher McCullum corroborates the Plaintiff's assertions of disparate assignment of machines while creating unsafe conditions for him.  McCullum offered deposition testimony dated January 27, 2005 in regard to a workman's compensation proceeding.   Christopher McCullum worked at PHB from June, 2000 to September, 2000.  (Hearing transcript, page 5, lines 12-13).  McCullum testified that while he remained on probation, he was assigned to a machine that supervisors knew was defective and had been shut down because it posed a risk of injury.  Upon operating the machine, it started emitting sparks and it crashed.  The supervisors blamed him and stated that he tore up the machine and it was his fault.  However, when McCullum spoke with the first shift operator of the machine, she said that it had been shut down for days.  Furthermore, the second shift foreman advised McCullum that he had written a note to his third shift foreman advising him that it was down, but the foreman never apprised Chris of the condition of the machine and notwithstanding the note assigned Chris to operate the machine.  Given the know serious hazards posed by the machine, McCullum could have been killed.  (Hearing transcript, pages 10-11, lines 2-21 and 1-15). McCullum testified that he felt unsafe or uncomfortable on the job and that he was treated differently that his co-workers, who

were all white.  (Hearing transcript, page 19, lines 13-21; page 20, lines 1-21; page 21, lines 1-6).

During the course of the same workman's compensation proceeding, Ron Sayers, a foreman at the Defendant company, offered testimony as to his knowledge of company policy.  Sayers was questioned as follows:  "Is there a written policy on racial slurs being made by either employees and/or foremen?"  Sayers answered "written policy, I don't believe so."  (Hearing transcript, page 99, lines 12-15).  Attorney Wayne Johnson continue to examine Sayers:  "You're not aware that they (EEOC) found that there was graffiti in the bathroom of a burning cross?" Sayers responded:  "no, I've heard and read that, but I, you know, know nothing else about it."  (Hearing transcript, page 114, lines 10-12).

The workman's compensation judge took judicial notice of and admitted the EEOC file and findings for purpose of the Woodard workman's compensation proceeding.  (Hearing transcript, page 113, lines 6-21; page 114, lines 1-21).  It was further discerned through the workman' compensation record that Gary Gebhardt had problems throughout his employment with the Defendant, but he was only disciplined after the EEOC complaint had been filed.

Upon conclusion of examination by Attorney Wayne Johnson counsel for the claimant, Dayved Woodard, Judge Lugo pursued a lengthy course of examination.  Judge Lugo stated to Ron Sayers, supervisor of the Defendant company, "Now, you indicated that discrimination is not tolerated, but there's no specific written policy within the employee handbook addressing discrimination to your knowledge."  Ron Sayers answered:  "not to my knowledge, not that I recall."  (Hearing transcript, page 146, lines

12-19). Judge Lugo continued: "Does PHB have annual or biannual meetings where they discuss such thing as racial discrimination or sex discrimination or gender discrimination or age discrimination, that those things are not really tolerated and the employees are trained on…" Sayers responded "no." (Hearing transcript, page 146, lines 20,21; page 147, lines 1-8).

The examination by Wayne Johnson further explores the nature of the Defendant's compliance with the mandates of the consent decree and settlement in the former Jackson discrimination claim before this Court. Wayne Johnson questioned Rex Ryan, a supervisor of the Defendant company: " After suit was filed by Mr. Jackson on the complaint to the EEOC made by Mr. Woodard, did PHB do anything? Were there meetings with you or other supervisors in regards to allegations of discrimination or how you should conduct yourself or how employees should be made to act?" Rex Ryan answered: "not that I remember." (Hearing transcript, page 170, lines 13-21). This response directly contradicts or evidences that the Defendant never posted the written policy within the workplace as mandated by the consent decree and directed and agreed with this Court relative to the Jackson claim. The failure to abide by the terms of the consent decree and settlement as mandated by this Court corroborates the Defendant's blatant disavowal of any obligations relative to discrimination in the workplace.

Attorney Johnson examined Loren Smith, the manager of the die cast division of PHB and a plant engineer in the workman's compensation proceeding. Counsel questioned: "is there a written procedure for an employee to follow if they have complaints about racial slurs or problems with discrimination." Loren Smith answered: "well, at that time, I'm not aware of any policy at that time. We have a harassment policy now at the shop."

Attorney Johnson: "but there was nothing in place during the time?" Loren Smith: "I wasn't aware of any, no." (Hearing transcript, page 204, lines 14-21, page 205, lines 1-2). The record further evidences that Loren Smith made subjective decisions to dismiss or accept allegations of discrimination based upon his own views, not any guidelines. (Hearing transcript, page 207, lines 7-21, page 228, lines 1-21, page 209, lines 1-10). Moreover, Ron Sayers and Rex Ryan deal with most complaints of racial discrimination without passing them on. (Hearing transcript, page 209, lines 13-21, page 210, lines 1-21, page 211, lines 1-21, page 212 lines 1-21, page 213, lines 1-3). This testimony contradicts the contentions of Ben Hancock, who stated that he make decision about whether discrimination exists, yet the actual policy and practice that exists indicates that they is a prior filtering conducted by Sayers and Ryan with many allegations of discrimination never getting past their review and determination.

Judge Lugo questioned Loren Smith at page 219, lines 1-21; page 220, lines 1-21; page 221, lines 1-21; page 222, lines 1-21; page 223, lines 1-21; page 224, lines 1-21; page 225, lines 1-21; page 226, lines 1-12. This line of examination disclosed that Gary Gebhardt was fired for allegedly making only one racial slur in 30 years and that even though Loren Smith was the manager of the die cast division, he was not allowed to take part in deciding if Gebhardt would be dismissed and the decision was entirely Ben Hancock's and Smith has no idea of exactly why Gebhardt was fired. Further, no reports were made or given to complainants regarding information concerning complaints of racial discrimination.

Attorney Johnson examined the Rodney Berry, a janitor at PHB: "and you never received any direction from any of your supervisors telling you to paint over any racially

derogatory picture?"  Berry answered:  No."  (Hearing transcript, page 244, lines 2-6).
Rodney Berry described seeing drawings of burning crosses on walls of 2 bathrooms in
the Defendant workplace and that management knew about the graffiti.  (Hearing
transcript, pages 229-244).  A copy of the Woodard hearing transcript is appended in its
entirety in corroboration of the allegations of the Plaintiff as to the nature and conduct of
the Defendant workplace and the wholesale limitations as to any effective monitoring
and sanctioning of employee misconduct in a fair, meaningful and objective fashion.

   The deposition transcript of Ben Hancock sets forth numerous compelling instances of
inconsistency and contradiction and the disparity of the Defendant's practice and
procedures as to workplace discrimination.  Moreover, the totality of the Hancock
deposition testimony renders his credibility as suspect and the underlying efficacy of his
involvement in the claims set forth by Cari Goodwine.  In responses to the Plaintiff's
interrogatories, the Defendant answered that 19 employees were interviewed regarding
Cari Goodwine's complaints ands the company found nothing to substantiate the claims.
However, Ben Hancock conceded that  he didn't interview all 19 employees, only some
and that he wasn't present during all the interviews.  (Hancock deposition, page 5, line
12-page 6, line 15).  Ben Hancock was unable to identify when the complaint of Cari
Goodwine came to him.  (Hancock deposition, page 8, lines 7-12).  Hancock revealed
that another employee, William Diehl, told a black person wearing a rag looked like Aunt
Jemima whereupon the only response from Hancock was to speak to Diehl with no
disciplinary action taken.  (Hancock deposition, page 12, line 21 through page 13, line
15).

According to Hancock, the discrimination policy of the company was posted for a couple of years in the workplace. (Hancock deposition, page 16, lines 4-12). This contention is refuted and contradicted by the respective supervisors as recited in the Woodard workman's compensation proceeding hereinbefore. Ben Hancock was unable to identify who told Attorney Zamboldi to prepare PHB's discrimination policy. (Hancock deposition, page 17, lines 6-8). Ben Hancock was compelled to concede that there were numerous reports of racial slurs in the workplace. (Hancock deposition, page 19, line 11 through page 21, line 9). As to the significant instance of Gary Gebhardt's exhibition, Hancock indicated that Gebhardt was ordered and scheduled to take diversity training classes, but that he never did as the class was cancelled and PHB made no effort to reschedule. (Hancock deposition, page 21, line 9 through page 22, line 24). Hancock stated that a harassment training session was conducted in October, 2003, but there had been no other before or since. (Hancock deposition, page 22, line 25 through page 23, line 17). Hancock continued that "meetings are held" regarding harassment/discrimination and notes taken, but the notes are gone. (Hancock deposition, page 23, lines 17 through page 24, line 4).

Ben Hancock acknowledged that PHB was compelled to post a notice of a written policy arising out of the Jackson lawsuit, but he had no idea as to the content of that notice or the duration of its posting. (Hancock deposition, page 25, line 18-25). Moreover, Hancock didn't know how long the notice was mandated by court decree to be posted. (Hancock deposition, page 26, lines 1-5). During examination by counsel, Ben Hancock found a question as to whether he knew of racially harassing statements, stereotypical comments, ridicule or joking in the workplace to be unduly vague as he

didn't know what those terms denoted. (Hancock deposition, page 27, line 8 thorugh page 28, line 11). Thus, Hancock effectively conceded that he lacked the experience, perspective and comprehension required to discern and determine the basic predicates for workplace discrimination. Hancock sought to describe the PHB discrimination policy as not saying anything racially against minorities, to discriminate against employees. (Hancock deposition, page 17, lines 22-25). Thus, Hancock knows nothing about the content and application of the purported policy.

Ben Hancock clearly states that after admitting that he finds the words "racially harassing statements', "stereotypical comments," and "ridicule or joking" to be vague, that PHB's policy regarding racial statements and discrimination is not objective but rather is subjective according to his own perceptions, sensibilities and comprehension. In actuality, Ben Hancock is the sole and final arbiter of discrimination claims and that he adjudicates when discrimination occurs based upon his own subjective scale and not any specifically enumerated and definite policy. (Hancock deposition, page 27, line 8 through page 29, line 19.) The employment of the subjective "Hancock" scale is the formal and official barometer used by the Defendant company notwithstanding his assertion that the factual predicates for discrimination as to racially harassing statement, stereotypical comments and or racial ridicule and joking are unduly vague. The Defendant company essentially deferred the efficacy of any discrimination policy and procedures relative to Cari Goodwine and other aggrieved black employees to Ben Hancock, who has revealed the fundamental deficiencies of his perspective resulting in a materially flawed final arbiter as to discrimination complaints raised in the Defendant workplace.

Ben Hancock indicated that he discussed racial problems with Jamal Shields but that they happened "years ago" and he didn't do anything in response to the contentions raised by Shields. (Hancock deposition, page 30, lines 10-17). However, Jamal Shields in his deposition testifies that there is pervasive racism throughout the shop and that PHB does not adequately punish wrongdoers and more needs to be done. (Shields deposition, page 23 line 10 through page 26 line 20.)

The Defendant seeks to refute and defuse the Plaintiff's allegations of a hostile workplace and disparate treatment by characterizing his perceptions as subjective and unreasonable and that he is prone to take ambiguous and innocuous statements out of context and improperly assign racial overtones or motives. However, it is evident that the Defendant has sought to impose its own subjective interpretation and spin on the various incidents and comments established through discovery and the preceding EEOC investigation. In terms of consideration of the instant Motion for Summary Judgment, the Defendant's subjective overview of the evidence and the parsing and disavowal of the Plaintiff's evidence fails to establish a basis for entry of summary judgment. The totality of the facts must be set forth before a neutral and objective trier-of-fact to consider whether there a hostile workplace and disparate treatment arose in this workplace relative to Cari Goodwine and whether his perceptions were reasonable in nature. There exist remaining material facts in dispute, which should be submitted to a trier-of-fact as a neutral and objective arbiter of the totality of allegations in the instant case. The entry of summary judgment is not warranted in this case as the Plaintiff's claims and evidence have evidenced that a reasonable jury could return a verdict in his favor based upon the quantum of evidence.

Respectfully submitted,

CONNELLY LAW OFFICE


By_____/s/ Jeff A. Connelly_____
     Jeff A. Connelly, Esquire
     824 Hilborn Avenue, Suite 1
     Erie, Pennsylvania 16505
     (814) 464-9500

     Attorney for the Plaintiff,
     Cari Goodwine

THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CARI GOODWINE, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Case No. 04-142E |
| | ) | |
| PHB DIE CASTING | ) | |
| | ) | |
| Defendant | ) | |

## VERIFICATION

I hereby verify that I am counsel for the Plaintiff, Cari Goodwine, in the above matter; that I am authorized to make this Verification on behalf of said Plaintiff; that the facts set forth in the foregoing Brief in Opposition to Defendant's Motion for Summary Judgment are true and correct to the best of my knowledge, information and belief. This statement is made subject to the penalties of 18 Pa. C.S.A. Section 4904 relating to unsworn falsification to authorities and is given pursuant to the provisions for verification of pleadings as defined and provided for in Rule 1024 of the Pennsylvania Rules of Civil Procedure.


_____/s/ Jeff Connelly_____
Jeff A. Connelly, Esquire
Attorney for Plaintiff
824 Hilborn Avenue, Suite 1
Erie, Pennsylvania 16505
(814) 464-9500


Date: _____7/25/05_____

THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

CARI GOODWINE,                    )
                                  )
            Plaintiff             )
                                  )
      v.                          )          Case No. 04-142E
                                  )
PHB DIE CASTING                   )
                                  )
            Defendant             )

## CERTIFICATE OF SERVICE

I, hereby certify that this date a true and correct copy of the Brief in Opposition to Defendant's Motion for Summary Judgment was served upon the following in the manner noted below in accordance with the rules of Pa. Court.

Richard A. Lanzillo, Esquire                    Hand Delivery
Knox McLaughlin Gornall and Sennett
120 West 10th Street
Erie, PA 16501

                                   Respectfully submitted,

                                   CONNELLY LAW OFFICE


                                   ___/s/ Jeff Connelly_____
                                   Jeff A. Connelly, Esquire

Dated:  __7/25/05_____