1                    IN THE UNITED STATES DISTRICT COURT
                 FOR THE WESTERN DISTRICT OF PENNSYLVANIA
2

3    CARI GOODWINE,              :
                     Plaintiff  :
4                               :
                     v.          :     Case No. 04-142E
5                               :
     PHB DIE CASTING,            :
6                     Defendant  :

7

8

9

10

11           Deposition of JAMES HENRY, taken before

12      and by Carol A. Holdnack, RPR, Notary Public

13      in and for the Commonwealth of Pennsylvania,

14      on Friday, March 25, 2005, commencing at 10:00 a.m.,

15      at the offices of Knox McLaughlin Gornall & Sennett,

16      P.C., 120 West Tenth Street, Erie, PA.

17

18

19   For the Defendant:

20      Richard A. Lanzillo, Esq.
        Knox McLaughlin Gornall & Sennett, P.C.
21      120 West Tenth Street
        Erie, PA 16501
22

23

24              Reported by Carol A. Holdnack, RPR
              Ferguson & Holdnack Reporting, Inc.
25

1                          I N D E X

2

3    JAMES HENRY

4          Direct Examination by Mr. Lanzillo . .  3

5

6

7    EXHIBITS:

8          Henry Deposition Exhibit 1 . . . . . . 15
           (Retained by Counsel)
9

10         Henry Deposition Exhibit 2 . . . . . . 32

11         Henry Deposition Exhibit 3 . . . . . . 37

12         Henry Deposition Exhibit 4 . . . . . . 39

13         Henry Deposition Exhibit 5 . . . . . . 43

14         Henry Deposition Exhibit 6 . . . . . . 45

15         Henry Deposition Exhibit 7 . . . . . . 48

16         Henry Deposition Exhibit 8 . . . . . . 49

17         Henry Deposition Exhibit 9 . . . . . . 50

18         Henry Deposition Exhibit 10  . . . . . 53

19

20

21

22

23

24

25

1          J A M E S   H E N R Y, first having been

2          duly sworn, testified as follows:

3

4                         DIRECT EXAMINATION

5     BY MR. LANZILLO:

6

7          Q.   Good morning, Mr. Henry.  My name is Rich

8     Lanzillo.  I represent PHB Die Casting in a lawsuit filed by

9     Cari Goodwine.  During the course of discovery in that case,

10    counsel for Mr. Goodwine provided your name to me as someone

11    who may have knowledge relevant to the case, and he also

12    provided me with a copy of an affidavit relating to --

13    potentially relating to the subject matter of the case.

14              That prompted me to schedule your deposition

15    simply to ascertain what information you may have that could

16    be relevant to the issues we're dealing with here.  Let's

17    get started with having you state your full name for the

18    record.

19         A.   James Curt Henry.

20         Q.   Okay.  And what's your address?

21         A.   7727 Grubb Road.

22         Q.   Have you ever had your deposition taken before?

23         A.   No.

24         Q.   Okay.  Let me tell you a little bit about what

25    goes on in a deposition.  And also, for the record, Attorney

1    Connelly is not here today.  He's advised me that he's aware

2    of the deposition, that he will not be attending, and simply

3    asked that I provide him with a copy of the transcript.  I

4    also provided notice of this deposition to Wayne Johnson,

5    Junior who represents David Woodard in another proceeding.

6         Mr. Henry, what happens here today is I simply ask

7    you questions.  Both my questions and your answers will be

8    taken down by Carol, our court reporter, and ultimately

9    transcribed in a booklet form.  To ensure that there's a

10   clear transcript from this proceeding, I will need you to

11   verbalize all of your responses as opposed to shaking your

12   head or nodding your head because Carol might miss that.

13        A.   Okay.

14        Q.   And if you're going to respond to my question with

15   a yes or no, if you could use those words, that's clearer

16   than if you say um-hum or hum-um.  That can be ambiguous on

17   the record.  And, finally, and most importantly, if at any

18   time you don't understand one of my questions or you don't

19   hear me clearly, I need you to tell me that so that I can

20   repeat or rephrase the question.

21        A.   Okay.

22        Q.   Is that fair enough?

23        A.   Yes.

24        Q.   All right.  What's your date of birth?

25        A.   12/7/57.

1      Q.    Are you married?

2      A.    No, divorced.

3      Q.    What's the extent of your education?

4      A.    12th grade.

5      Q.    Did you graduate from high school?

6      A.    Yes.

7      Q.    Where did you go to high school?

8      A.    McDowell.

9      Q.    And I understand you're currently employed at PHB

10   Die Casting.

11     A.    Yes.

12     Q.    Okay.  How long have you worked for PHB?

13     A.    A little over 15 years.

14     Q.    What's your current position?

15     A.    Die cast utility.

16     Q.    When you say die cast utility, what does that

17   involve?

18     A.    Cleanup, moving stuff, painting.  Putting up

19   supplies and chemicals.  I'm not on a machine and I don't

20   run metal.  But, generally, when all these foremen need

21   something done, they'll come to me because I'm pretty much

22   not locked down on something.

23     Q.    Okay.  Have you ever been a machine operator?

24     A.    For a very short time, but I --

25     Q.    Go ahead.

1        A.    I didn't like it.

2        Q.    Okay.  When was that, Mr. Henry?

3        A.    Oh, probably my tenth year there.  And it was only

4   for a short period of time.

5        Q.    When you say short period of time, a couple weeks,

6   couple days?

7        A.    No, three months.

8        Q.    Three months.  Didn't like it, and did you ask to

9   be transferred?

10        A.    Yeah.  I went up to talk to Ben Hancock, and they

11   put me back on running metal.

12        Q.    Okay.  And when you say running metal, is that --

13        A.    Delivering hot metal to the machines.

14        Q.    Okay.  Is that part of the responsibility as a die

15   cast utility person?

16        A.    No

17        Q.    Okay.  I don't want to take you all the way back

18   15 years ago, but let's start with your current position as

19   a die cast utility person.  Just kind of walk me backwards

20   in terms of the positions you've held.  And let's begin, how

21   long have you been a die cast utility man?

22        A.    When I first started there, I was a metal man for

23   nine years, went to a machine for roughly three months.

24   Don't hold me to that.  And then I've been a utility man

25   ever since.

```
 1        Q.    Okay.  So you've been a utility man for about six
 2   years, then?
 3        A.    Yeah.
 4        Q.    Okay.
 5        A.    Yes.
 6        Q.    And do you work any particular shift or shifts?
 7        A.    First shift.
 8        Q.    How long have you been on first shift?
 9        A.    Probably the length of time of utility.
10        Q.    Okay.  So about six years?
11        A.    Yeah.
12        Q.    Any particular supervisors that you have assigned
13   to you?
14        A.    Anybody that's a foreman on the floor.  Like I
15   said, I'm kind of like universal.  I do different things
16   different days.
17        Q.    So you don't have a particular shift supervisor.
18   Whoever might be on a particular line that day might ask you
19   to do things?
20        A.    Anybody at any time.
21        Q.    Okay.
22        A.    I got to go.
23        Q.    So then I take it you've worked with Gordy
24   Phillips, Ron Sayers?
25        A.    Yes.
```

1    Q.    Did you work at all with Gary Gebhardt?

2    A.    Yes.  I was sorry to see him go.

3    Q.    Why is that?

4    A.    He was a nice guy.

5    Q.    Was he?  Have you ever worked with Cari Goodwine?

6    A.    Yes.  Not directly with him.  You know, because

7    he's on a machine, but, you know, we've worked the shift

8    together.

9    Q.    Okay.  Was he first shift?

10   A.    No, he was mostly second because of his time

11   served.  But now and then he would be on first for the

12   weekends, or fill in, or maybe due to lack of work there was

13   a voluntary layoff, he got his time, put him on first.

14   Q.    But most of the time that you worked that he was

15   there and, then, obviously you were there at the same time,

16   you would have been on different shifts?

17   A.    Different shifts.

18   Q.    Okay.

19   A.    I believe toward the end of his employment that he

20   bid out into the trim or washer area.

21   Q.    Right.

22   A.    Which I think put him on first till his last day.

23   Q.    Okay.  And when he was in the trim area or

24   wherever it was, how often would you see him?  In other

25   words, did your job responsibilities overlap to an extent

1    that you would see him very often?

2         A.   No, just a jitney drive-by.

3         Q.   Okay.  Would it be fair to say that because of the

4    different shifts you worked and your different

5    responsibilities, that you very rarely saw Cari?

6         A.   Very rarely.

7         Q.   All right.  So that would be accurate?

8         A.   Till his last day, he came and found me.

9         Q.   Okay.

10        A.   And shook my hand and said, I'm going.

11        Q.   Okay.

12        A.   That was it.

13        Q.   So he came and bid you farewell?

14        A.   I told him good luck.

15        Q.   Yeah.  Did you talk at that time?

16        A.   Not a whole lot, because Rex Ryan was there, and I

17   had to go.

18        Q.   What did Cari tell you when he was -- when he

19   talked with you?  Did he tell you where he was going?

20        A.   He didn't tell me where he was going.  He just

21   said he found a different job, lower paying, and that he

22   said today was his last day.  But then that weekend I saw

23   him in there.  And then I didn't see him after Monday, so I

24   think he might have signed up for overtime, worked it, and

25   then left.  I'm not sure what day it was.

1      Q.    Okay.  Do you remember him telling you anything

2  else when he took off?

3      A.    No.

4      Q.    Okay.

5      A.    Like I say, my boss was standing right next to me

6  there, and he said bye to Rex too, so.

7      Q.    Oh, he did?

8      A.    Yeah.

9      Q.    Okay.  Can you remember him saying anything else

10 to Rex when he left?

11     A.    Rex said good luck, take care, something like

12 that.  And that was it.  Like I said, it was short.

13     Q.    Okay.  Have you seen or spoke with Mr. Goodwine

14 since he left the company?

15     A.    Honestly, I really haven't.  I don't know where he

16 lives.  Never been to his house.

17     Q.    How about by telephone?

18     A.    He called me shortly after, you know, this came

19 out, this came about.  And he confronted me at work and he

20 says, well, if you ever need to talk, call Jeff Connelly.

21 So I called Jeff Connelly.  And he said, why don't you come

22 in and tell me what you heard.  And I did.

23         And then I saw Cari at work.  I said, give me your

24 phone number in case I have any questions or something else

25 follows up with this.  But since then, I tried to get a hold

1    of him, let him know that I went to see Jeff for the third

2    time, and that I was coming here.  And the phone didn't

3    work, phone number didn't work.

4        Q.   Which phone number was that?

5        A.   I believe it was a cell.

6        Q.   Oh, Jeff Connelly's phone?

7        A.   No, Cari's.

8        Q.   Oh, Cari's.  Okay.  So I think I'm following your

9    testimony.  Are you telling me that you haven't spoken with

10   Cari Goodwine since he left PHB?

11       A.   Right.  I called him one time to tell him what was

12   going on.  And, like I said, I don't know whether it said

13   out of order, or disconnected area, or I can't remember

14   that.

15       Q.   In any case --

16       A.   I couldn't get through.

17       Q.   All right.  And you haven't seen him in person,

18   you haven't spoken to him by telephone?

19       A.   No.

20       Q.   Okay.

21       A.   I couldn't pull into his driveway to this date.  I

22   don't know where he is.

23       Q.   Now, you indicated that you've seen Jeff Connelly

24   three times.

25       A.   Yes.

1      Q.    When was the first time that you met with Jeff
2  Connelly?
3      A.    When?
4      Q.    Yeah.
5      A.    I couldn't give you the date.  He would have it.
6      Q.    Was it while Cari was still employed?
7      A.    Oh, yeah.
8      Q.    Okay.
9      A.    Yes.
10      Q.    And the second time that you met with Attorney
11  Connelly, was that while Cari was still employed also?
12      A.    No.
13      Q.    Okay.  Do you remember approximately when that
14  was?
15      A.    I don't recall.  You know, I should have wrote the
16  dates down.  I wrote everything else, but I didn't think it
17  was going to go this far.  And I stopped in to see Jeff last
18  Friday.  And he was ill.  And they told me to call on
19  Monday.  And I did, I spoke with Jeff this week Monday.
20      Q.    So a week ago this past Monday you stopped by to
21  see him.  Did you have an appointment or just stopped?
22      A.    No, no.  No, I stopped in to see him that Friday.
23      Q.    Oh, Friday.
24      A.    And he was off work sick.  And his secretary told
25  me to call back 3:30 Monday when I got out of work.

1      Q.    Okay.

2      A.    And I only spoke to him on the phone.  I didn't

3   see him.

4      Q.    Did you have an appointment with him?

5      A.    No.

6      Q.    What was the reason you were stopping by to see

7   him?

8      A.    I had some more stuff being said to me, and he

9   told me it was going to happen.  He told me, you know, when

10  this comes out and it gets on the floor, that these people

11  are going to run up on you.  And it did.  You know, I didn't

12  expect anything else.

13     Q.    So Jeff Connelly told you that -- when you say

14  people would run up on you, what do you mean?

15     A.    Just things that they're saying to me.

16     Q.    Okay.  We'll go through it.

17     A.    I feel that it was over the line.  You don't have

18  to swear at me to get me to do something there.

19     Q.    All right.  Well, we'll cover all that.  And you

20  say you've got some documents with you today?

21     A.    I have, but Jeff told me to kind of like stick to

22  the Cari thing.  I mean, I brought them, you know.

23     Q.    Okay.  Well, then, maybe we can take a look at

24  those, then, because I want to know if you're having a

25  problem.  I want to know about it.  All right.  So you met

1    with Jeff three times and then you had the telephone call?

2        A.    No, twice and then the telephone.  I went in there

3    Friday to see him, but I didn't know he wasn't there.  I

4    just went in right after work on Friday.

5        Q.    And what did you talk about on the telephone call?

6        A.    That I got a couple more, couple more things said

7    to me that I wrote down; times, places and who said it, or

8    times and dates.  And I took them into his office and his

9    secretary made copies of it.

10       Q.    Is he your lawyer?

11       A.    Not directly.  He's Cari's lawyer.

12       Q.    Are you talking to him about a claim potentially?

13       A.    Not potentially, but he's telling me to keep track

14   of everything in case it does get out of hand.

15       Q.    All right.  Let me go back to when Cari was

16   working at PHB.  Do you recall anything about the extent he

17   was absent from work?

18       A.    I don't know his attendance.

19       Q.    Okay.  And that's largely because you were on

20   different shifts?

21       A.    Different shifts.

22       Q.    Different jobs?

23       A.    I mean, there's a lot of people that work out

24   there.  Cari and I weren't directly -- had to bump into each

25   other every day, you know.  If I saw him, you know, if I was

1    walking off the floor and he was on the machine down that

2    aisle, wave, and that was it.

3        Q.    Yeah.  That was about the extent of it?

4        A.    That was it.

5            (Henry Deposition Exhibit 1 marked for

6             identification.)

7        Q.    All right.  Mr. Henry, let me show you what I've

8    marked as your Deposition Exhibit 1.  This appears to be an

9    affidavit signed by you.  And let me ask you first, where

10   did you sign this?

11       A.    Jeff's office.

12       Q.    Okay.  Do you remember what date you signed it?

13       A.    No, I don't.  He would have that too.

14       Q.    The last time you were physically in Jeff's

15   office, though, would have been while Cari was still

16   employed, right, or not?

17       A.    I don't believe so.

18       Q.    Do you think you were -- I'm just -- I'm trying to

19   figure out if this was sent by mail to you and then you

20   signed it and sent it back or whether you came in the

21   office.

22       A.    He called me.

23       Q.    Okay.  And other than the visit on Friday that you

24   told me about where you went there and Jeff was sick and

25   couldn't meet with you, have you been in his office since

1   the beginning of the year, 2005?

2       A.   I think I was in there after that before -- during

3   2005 to sign this.

4       Q.   Okay.  Were you in there in December?

5       A.   I believe so.

6       Q.   Okay.  So you've been -- you think you've been in

7   Jeff's office in December 2004 and you think you were there

8   in --

9       A.   First of the year.

10      Q.   Okay.

11      A.   And then I went there last Friday.  And then we

12  had spoke on the phone Monday.

13      Q.   But you told me earlier you had been there before

14  Cari left PHB as well, or did I get that wrong?

15      A.   I believe he was gone the second time I saw Jeff,

16  but like I said, I can't remember the date.  I should have

17  wrote it.  I don't know why this isn't dated.

18      Q.   Well, there's a date here.  It says May 27th,

19  2004.

20      A.   Yeah.

21      Q.   What date is that?

22      A.   That must have been the day I gave the statement

23  about what was read here.  This came way after I told Jeff

24  about this.  And his secretary called me and said he wants

25  you to come in and sign a paper, so I did.

1      Q.    All right.  So the secretary called.  They had

2  prepared this affidavit for you?

3      A.    Right.

4      Q.    You came in and signed it?

5      A.    Yeah.  Alls I did was go to his desk, I signed it.

6  He said, how's things going out there?  I said, well, I'm

7  getting things said to me but it's not a very big deal, I

8  mean.

9      Q.    And do you think that you came in and signed it on

10  May 27th, 2004?

11     A.    I can't answer that.  I don't know.

12     Q.    All right.  Was that date on the document when you

13  signed it?

14     A.    I believe so.

15     Q.    And who was in the room with you when you signed

16  it?

17     A.    Just Jeff and I.

18     Q.    I guess I'm just trying to figure out.  I mean,

19  did you sign this as early as May 27, 2004?

20     A.    No.  It must been when the statement came out,

21  because this had been ongoing with Cari for a little bit of

22  time, hasn't it?

23     Q.    Well, I don't understand what you mean by a

24  statement.  Is that something different from the affidavit?

25     A.    No, that's exactly what I --

1      Q.    Okay.  So you have -- I guess, do you have any

2   idea where the May 27, 2004 date comes from?

3      A.    No.  Not unless that was the time that I told him

4   what I had heard at work from Bill Donnell, what he said

5   about Cari.  And that's when he wrote this paper up.  But I

6   just signed it.

7      Q.    Now, were you -- there's another date here,

8   December 21, 2004, which is, you know, a few days before

9   Christmas this past year.  Were you in Jeff Connelly's

10  office a few days before Christmas; is that the date when

11  you signed it?

12     A.    I believe it was.

13     Q.    All right.  And it was you and it was Attorney

14  Connelly in the office, no one else was there?

15     A.    No one else.

16     Q.    All right.  Let me ask you about the substance of

17  the affidavit.  It says, "On or about the first of

18  January 2004, I was inquiring regarding construction taking

19  place in the plant and a backhoe that was in the building

20  near a large hole in the floor."  Let me ask you first,

21  Mr. Henry, to whom were you inquiring about this hole?

22     A.    Bill Donnell.

23     Q.    All right.  And what shift was it?  What time was

24  it?

25     A.    It was Saturday, about -- I don't know, about

1    quitting time.  About a little after 2:00.

2        Q.    So Saturday, January 1, 2004.  And what time is

3    quitting time, when is the shift over?

4        A.    3:00.  But Bill is -- one of the union guys was up

5    on a scaffold, and Bill was standing next to the jitney

6    getting ready to let him down.  They were putting in air

7    pipe.  And, you know, I questioned the hole because I didn't

8    know what was going in there, whether it be a setting for a

9    beam for a crane, or a machine leg, they had to dig down

10   deep.  You know, I just --

11       Q.    Who is Bill Donnell?

12       A.    He's supervisor of maintenance.

13       Q.    Is he your supervisor?

14       A.    No.

15       Q.    How often do you work with Bill Donnell?

16       A.    I really don't.  He started this when he come in

17   here on overtime on Saturday, come see me directly and I'll

18   assign you.  Well, that's -- I work in die cast, I don't

19   work in maintenance.

20       Q.    Okay.

21       A.    So that got --

22       Q.    All right.  So Saturday, January 1, 2004 around

23   3:00 you're having a conversation with Bill Donnell; is that

24   right?

25       A.    Yes.

1    Q.   All right.  Is anyone else there?

2    A.   Who were in the room was Mike Berry, who was, like

3  I said, next to a jitney that was running.  And then Willy

4  Randall was on another jitney in the far corner of the

5  building.  He didn't hear anything.

6    Q.   Okay.  Mike Berry, Willy Randall, they were in the

7  room but they were not in the conversation.

8    A.   Right.

9    Q.   All right.  You don't think they overheard your

10  exchange?

11    A.   Well, I made a comment to Mike after Bill got done

12  saying that.  I said, did you hear what he said, did you

13  hear what he just said.  And Mike said, I heard a mumble or

14  I heard him say something, but I couldn't make it out.

15    Q.   All right.  When you came into Attorney Connelly's

16  office to execute this affidavit, Exhibit 1, did you read

17  it?

18    A.   Yes.

19    Q.   Because the next sentence here says, "I asked Bill

20  Hilbert --

21    A.   I don't --

22    Q.   -- what's going in the hole."

23    A.   I just see that just now.

24    Q.   And Bill Hilbert wasn't even there, right?

25    A.   No.

1      Q.    Who is Bill Hilbert?

2      A.    The owner.

3      Q.    Okay.  Bill Hilbert never said anything like

4   what's attributed to him in this affidavit.

5      A.    No, sir.  No, sir.  This is wrong.  I just

6   realized it just now.  Because before I signed this, Jeff

7   read it to me.  He was holding it, reading it to me.  And

8   alls he did was turn it.  He goes, sign this so we have your

9   statement down.  I just see this now, sir.  This is wrong.

10     Q.    When he read it to you, did he read Bill Hilbert's

11  name?

12     A.    No.

13     Q.    I take it that this was -- the words chosen here

14  were chosen and put down by Attorney Connelly, you didn't

15  handwrite anything for him.

16     A.    No, I didn't.

17     Q.    All right.  This states, "I asked Bill Hilbert,

18  what's going in the hole.  Bill responded, Cari Goodwine,

19  whoops, I shouldn't have said that."  All right.  So that

20  wasn't Bill Hilbert who said these things.

21     A.    No, sir.  This paper here is wrong.

22     Q.    Okay.  That's Bill Donnell?

23     A.    Yes.

24     Q.    And did Mr. Donnell say anything else to you at

25  that point?

1          A.    No.

2          Q.    Did you say anything to him?

3          A.    No.  Like I said, when he got done saying what he

4    said, I went to Mike and said, did you hear what he just

5    said.

6          Q.    Who is Mike Berry?  That's Mike Berry, right?

7          A.    Yes, he's a --

8          Q.    What's his position?

9          A.    Maintenance, union worker.

10         Q.    And Willy Randall, what's his position?

11         A.    Maintenance, union worker.

12         Q.    And you said to Mike Berry, did you hear what he

13   just said.  He said, I heard a mumble or words --

14         A.    Something.

15         Q.    So basically said --

16         A.    He didn't hear it.

17         Q.    All right.

18         A.    But.

19         Q.    Now, I -- and Bill Donnell did not say anything

20   else to you other than the comment, Cari Goodwine, whoops, I

21   shouldn't have said that?

22         A.    That was it.

23         Q.    Have you ever -- did you talk to Bill Donnell

24   about this statement at any time after?

25         A.    No, I didn't.

1          Q.   Has Bill Donnell ever made any other comments

2    regarding Cari Goodwine in your presence, to you or around

3    you?

4          A.   No, no.

5          Q.   Has Bill Donnell ever made any comment in your

6    presence, to you or to someone else where you were in a

7    situation where you could hear it, that involved any type of

8    a racial slur?

9          A.   No.

10         Q.   Have you ever heard Bill Donnell ever threaten

11   violence against anyone?

12         A.   No.

13         Q.   Have you ever seen Bill Donnell act in a violent

14   fashion?

15         A.   Since he got this position, he's been getting

16   vociferous, a little bit louder, a little bit more stern.  I

17   mean, he's come off on me a couple times.

18         Q.   But he's -- let me just make sure I understand

19   here.  So Mr. Donnell, since he's had his position, has --

20   he's raised his tone of voice?

21         A.   Yeah.  He's acting a little bit more in charge, I

22   guess you would call it.  Wants to run the whole -- all the

23   departments out there.

24         Q.   So you find he's getting a little big for his

25   britches; is that it?

1    A.    Yeah.

2    Q.    All right.

3    A.    And a lot of the guys on the floor have complaints

4  about him.  I mean, he comes out in the die cast and he is

5  saying, you know, don't you have somewhere to be, and don't

6  you have a machine to run, can't you clean that up.  Well,

7  we have foremen on die cast floor that handles that, not

8  Bill.  He doesn't have to stop and voice his opinion on what

9  anybody is doing in other departments.  Keep it in

10 maintenance.  Keep track of your crew.

11   Q.    And so he's -- if I'm following you correctly,

12 he's starting to act like everybody's boss.

13   A.    That's right.

14   Q.    All right.  And it's your perception that that's

15 starting to or has irritated people other than yourself.

16   A.    Oh, yeah.  There's a lot of comments about that

17 man.

18   Q.    Yeah, okay.  But we can agree, can't we,

19 Mr. Henry, that that might make him annoying or come across

20 as arrogant, but nothing he's said to you has indicated a

21 propensity for violence, has it?

22   A.    For violence?

23   Q.    Violence.

24   A.    No, sir.

25   Q.    Okay.  And nothing he's done has indicated a

24

1    violent disposition?

2        A.    No, sir.

3        Q.    All right.  So what I'm saying is correct.

4        A.    Yes, sir.

5        Q.    Okay.  Now, this next sentence, you know, I see

6    that the -- in the preceding sentence we have the incorrect

7    reference to Bill Hilbert.  Now, the next sentence says, "I

8    understood this to be a death threat against Cari, and may

9    have involved the threat of some harm against his person."

10       A.    And this is -- this was said shortly after Gary

11   was fired.

12       Q.    Cari, right?

13       A.    Gary.

14       Q.    Oh, Gary.

15       A.    Gary Gebhardt.

16       Q.    Oh, I got you.  All right.

17       A.    So it was still on, you know, on the company --

18   couple of the company people's minds, that there's -- seem a

19   little mad at it, at the situation and how everything

20   unfolded.

21       Q.    Okay.  So it was your -- it was your belief that

22   some people weren't happy that Gary Gebhardt had gotten

23   fired.

24       A.    Exactly.

25       Q.    All right.  In fact, you were -- I think you

1  indicated you were sorry to see him go.

2       A.   That's right.

3       Q.   All right.

4       A.   I mean, Gary was outgoing, spoke his mind, didn't

5  keep too much in, but he was a lot of fun to work with.  You

6  know.  He was a company foreman.  But in his own way, you

7  know, he was kind of like fun to be around.

8       Q.   I understand.  And I understand that this was

9  prepared for you when you came in and you read it or it was

10 read to you.  But Mr. Henry, in all fairness, you didn't

11 believe that Mr. Donnell or Mr. Hilbert were truly

12 threatening Cari Goodwine with death, did you?  That

13 they -- there was some threat that they were going to -- I

14 mean, this indicates, the words here, indicate that there

15 was a threat by Mr. Donnell of killing Mr. Goodwine.

16      A.   I took it him -- I took him, as he said, throwing

17 Cari in the hole.  That's the way I took it.  And to get off

18 this -- to get into the two meetings I had -- Bill Hilbert

19 is not involved on this.  I don't like this.  I don't know

20 why the error was made.

21           But Bill Donnell, the first meeting I had with

22 Bill Donnell, Ben Hancock, Cari Goodwine, myself and Jay

23 Smith, Ben Hancock said, Bill Donnell does not recollect

24 saying anything like this.  The second meeting that I got

25 called up front for the same situation, which Jeff

1    Connelly -- and I feel that it was badgering.  Ben Hancock

2    says, and Bill Donnell says, that what I meant was to say

3    throw the dead weight in the hole.  Now, there's two

4    conflicting meetings.  The first meeting, he don't recollect

5    saying it.  The second meeting, I meant to say throw the

6    dead weight in the hole.  Well, now, he's talking about

7    other people.

8         Q.   Well, I guess my question is, though, regardless

9    of whether, you know, it was exactly as you've recounted

10   here, that Cari Goodwine, whoops, I shouldn't have said

11   that, didn't you perceive that to be a statement of

12   displeasure or disgust or disapproval of Mr. Goodwine or his

13   behavior in -- you know, in saying figuratively, basically,

14   I would like to throw Cari in the hole?  I mean, let me

15   accept your version of this.

16        A.   You're asking about Bill Donnell?

17        Q.   Yes.

18        A.   I'm not -- I got involved.  I don't want to be,

19   and I am.

20        Q.   I understand.

21        A.   So I got to go through this.  But being a

22   supervisor, it's not the way to even approach people and

23   talk to them.  Like I said, this Bill Donnell just speaks

24   his mind and says whatever he wants to people.  Yeah, this

25   is the way I took it.  The way it's written is the way I

1   took it, and I didn't like it.  And it didn't have nothing

2   to do about Cari Goodwine.  It could have been a woman union

3   worker, it could have been another supervisor.  You don't go

4   around saying stuff like that.  I don't talk to Bill Donnell

5   like that.

6        Q.    Did you consider going to the police?

7        A.    No.

8        Q.    Why not?

9        A.    Like I said, I didn't think it was going to go

10  this far.  Cari confronted me in the back room one day.  He

11  come in -- you know, he come on the floor early, before I

12  left.  He said, you can tell me now or you can tell me in

13  court.  Well, now it's involved.  A couple days later the

14  union committee man come up to me and says, well, it's up

15  front that that is going to come out.  I'm like, fine.

16       Q.    So you considered it to be an unprofessional

17  comment; is that fair?

18       A.    Very much so.

19       Q.    All right.

20       A.    That's not even supervision material.

21       Q.    I want you to tell me what you really think here.

22  But I'm having a hard time accepting, based on the other

23  information that you've given me, that you truly believed

24  that this was a death threat.  And that's my question.  And

25  if you truly believed it was a death threat, that's fine.

1    But I guess I'm asking you directly, you know, is that --

2    did you truly believe that there was a threat that --

3        A.    How else do you take that statement --

4        Q.    You have to wait until I finish my question.

5        A.    Okay.

6        Q.    Did you truly believe that Mr. Donnell was

7    threatening physical harm up to death against Mr. Goodwine?

8        A.    Sure I do.  I believe it.  And you don't talk

9    about somebody like that, like I said.  And he just got done

10   saying at the end of the statement, whoops, I shouldn't have

11   said that.  You're right, you shouldn't have said that.

12           And it doesn't -- this is -- one of the damaging

13   things about some of the company people out there, because

14   other company people said stuff about Cari, but it wasn't

15   so -- you know, he got Gary Gebhardt fired out of this.  It

16   happens.

17       Q.    All right.  That's fine.  Have you ever seen any

18   racial graffiti anywhere in the plant?

19       A.    Like on walls, or?

20       Q.    Anywhere.

21       A.    No.

22       Q.    Has any employee ever used a racial slur in your

23   presence?

24       A.    A lot.

25       Q.    Okay.  Tell me who they were.

1        A.    Gordy Phillips said a racial joke.

2        Q.    Let me get the names, and then I'll come back and

3    ask about each one.  Gordy Phillips.  Anyone else?

4        A.    Not that I -- the rest have just been, you know,

5    referring to them as blacks.  But, you know, when you read

6    the newspaper, it says black man arrested for.  So I don't

7    see where that was stepping over the line.  This, I felt,

8    was over the line.

9        Q.    I understand.  And, again, don't be defensive

10   about it, Mr. Henry.  I'm just asking for information.  And

11   all I'm asking you to do is tell me the best of your

12   recollection what you recall.  That's all I can ask.  So you

13   mentioned Gordy Phillips.  Was there anyone else who used

14   what you believed to be or understood to be a racial slur in

15   your presence?

16       A.    Yeah, but, you know, it's -- like I said, it's

17   black jokes, it's --

18       Q.    Who are these people?

19       A.    It could be -- it's a shop.

20       Q.    Can you think of the name of any person?

21       A.    No, I really can't.  I can't put a finger or name

22   on it, you know, to have it documented.  I can't answer

23   that.  Like I said, the one was Gordy Phillips.  He said a

24   joke about.

25       Q.    Okay.  And I'll come back to that.  The other

1    employees, though, you can't think of any particular

2    individual who used a racial slur?

3        A.    Not that I feel comfortable saying anybody's name

4    to.

5        Q.    But here's the thing.  You know, we're in a

6    deposition.  I know you would prefer not to be involved, but

7    you are.  And all anyone is asking of you is that you just

8    provide truthful information here in the deposition.  And

9    while you may prefer not to provide certain information, it

10   really is your obligation and duty to do so.

11       A.    I understand that.  I can't give names and feel

12   straight about it.

13       Q.    When you say you can't feel straight, you're not

14   sure.

15       A.    I'm not sure, so I'm -- there's no reason for me

16   to even try to come up with something.

17       Q.    All right.  So the reason you're not giving me

18   names is because you're not comfortable with the accuracy of

19   what you're giving.

20       A.    Exactly.

21       Q.    All right.  It's not a situation where you know

22   names --

23       A.    If I had a name and had a statement, you would

24   have it.

25       Q.    All right.

1        A.    You know, it just --

2        Q.    Okay.  That's fair.  It's important that you

3    understand, though, that if you have information --

4        A.    That's right.  And I don't.

5        Q.    You understand that based on the oath you've

6    taken, it would be your obligation to supply it to me.

7        A.    That's right.

8        Q.    All right.  So the reason you're not supplying it

9    to me is because --

10        A.    I can't tell you who, what was said, times, date,

11    place.  I can't.

12        Q.    Okay.  Well, times, date and place, I'm not as

13    concerned about that.  It's who and roughly what was said.

14    But you can't recall anything --

15        A.    Nothing -- nothing right off the top that I could

16    be good telling you, you know, I can't.

17        Q.    All right.  Gordy Phillips, tell me what the

18    racial joke was.

19        A.    I can't remember word for word, so I wrote it

20    down.  Let's see if I got it here.  Here it is, there.

21            MR. LANZILLO:  For the record, the witness is

22            handing me a photocopy of a note on a PHB tablet

23            page.  I'll photocopy this and make it Mr. Henry's

24            Exhibit 2.

25            (Henry Deposition Exhibit 2 marked for

1          identification.)

2      Q.   And there's handwriting on it that states Sunday,

3   6/6/04, June 6th, 2004, 9:05 a.m.  Gordy Phillips.  Quote,

4   "Do you know why niggers don't have nightmares?  The last

5   one that did got shot," close quote.  Did I read that

6   correctly?

7      A.   Yes.

8      Q.   I don't get it.  Well, who -- did Mr. Phillips say

9   this to you?

10     A.   Yes.

11     Q.   Was anyone else present?

12     A.   No.

13     Q.   Okay.  So it was just the two of you.  Where were

14  you?

15     A.   Inspection area.

16     Q.   Okay.

17     A.   We passed each other.  And he called me back, told

18  me the joke, and that was it.

19     Q.   Do you guys swap jokes on a regular basis?

20     A.   Gordy gets around the shop a lot.  I think he's --

21  Gordy's fun to work with, he's my supervisor.  Yeah, he

22  tells quite a few jokes.

23     Q.   Is this the only racial joke he's told you?

24     A.   Yes.

25     Q.   All right.  Was there any other conversation

1  besides just the joke?

2      A.   No.  That's what he does; he'll stop, tell you a

3  joke and walk off.

4      Q.   Has he told you a lot of jokes over the years?

5      A.   Oh, yeah.

6      Q.   All right.  And did you record this the same day?

7  When I say record it, did you write it down?

8      A.   Yes.

9      Q.   What did you do with this document, Exhibit 2,

10  after you handed it -- I mean, after you wrote it down, the

11  information?

12      A.   What did I do with it?

13      Q.   Um-hum.

14      A.   I just kept it till I heard from Cari Goodwine's

15  lawyer.  And he said, I would like to have a conversation

16  with you, come on in.  So I took these papers in.

17      Q.   Okay.  Had you heard from Jeff Connelly by this

18  point?  Had you spoken with him at all?

19      A.   He's got the original.  That's why I have the

20  copy.

21      Q.   I understand.

22      A.   Yeah, I talked to him.  Like I said, on the phone

23  this past Monday he just said, how's things going out there.

24      Q.   Oh, sure.  No, but I'm using a time here.  This is

25  dated Sunday, June 6th, 2004.  And my question is, had you

1    spoken with Attorney Connelly before you prepared this

2    document, Exhibit 2?

3         A.   Again, I can't tell you.  I didn't write down the

4    times that I met with Connelly.  That was just, come into my

5    office.  And I did.  I should have wrote them down, but I

6    didn't.

7         Q.   That's all right.  You don't have to explain.

8         A.   I can't answer yes or no to when or about -- I was

9    in his office over that.

10        Q.   All right.  And the reason I ask, though, is on

11   Exhibit 1, you'll see that there's a date of May 27, 2004.

12        A.   Um-hum.

13        Q.   Does that refresh your recollection as to whether

14   you had met with Attorney Connelly before Exhibit 2 was

15   prepared?

16        A.   I probably took all those papers in on that date.

17        Q.   Well, you couldn't have taken this one in, could

18   you?  When you say that date, are you talking about May 27?

19        A.   Probably not that one, no.  No, sir.

20        Q.   In fact, that would have been impossible?

21        A.   Right.  Right.  That would have been after that

22   date.

23        Q.   All right.  So I'll ask you again.  Do you think

24   you had met with Attorney Connelly before you wrote up

25   Exhibit 2?

1    A.   Again, I can't tell you the date that I saw Jeff

2  Connelly.  But that came after this, but I didn't sign this

3  until the last time I was in his office.  He said come on

4  in, sign this piece of paper.

5    Q.   Okay.  In addition to Attorney Connelly, have you

6  provided this document to anybody else?

7    A.   No.

8    Q.   Did you meet with any company personnel concerning

9  this joke?

10   A.   No.

11   Q.   Did you report it to anyone?

12   A.   No.

13   Q.   And when I say joke, you know, it's --

14   A.   It's --

15   Q.   I don't see it as a joke.  It's just an offensive

16  comment.

17   A.   That's why I wrote it down.  Jeff said, write

18  everything that you feel is -- and I have been.

19   Q.   Now, but go back to my question.  After Gordy

20  Phillips told you this so-called joke, I take it, then, from

21  your testimony you did not go to see Ben Hancock or anyone

22  else in the company.

23   A.   Not at all.

24   Q.   All right.

25   A.   It's just something that I wrote down to keep

1    reference what was being said to me.

2        Q.   What else do you have with you today?  For the

3    record you got a -- you pulled this statement out of a --

4    looks like a grocery bag.  Are there other things that

5    you've recorded?

6        A.   Yeah.

7        Q.   May I see them?

8        A.   There's two in here that just have phone numbers

9    on.  They're nothing.  But these are.

10            MR. LANZILLO:  For the record, the witness is

11            handing me some of the documents.  I'll go through

12            these by date.  What I would like to do -- why

13            don't you keep your originals.  We can just make

14            photocopies and I can mark them as exhibits.

15            (Henry Deposition Exhibit 3 marked for

16             identification.)

17        Q.   The first one -- and I'm not taking these in

18    chronological order, just the order in which they were

19    handed to me.  The first document is, again, on a PHB tablet

20    page.  It's dated 11/24/04, 12:22 p.m.  And I take it this

21    is your handwriting, Mr. Henry?

22        A.   Yes.

23        Q.   All right.  It states, "I asked Bill Donnell if I

24    was still allowed to do" -- something work.

25        A.   "Maintenance work."

1      Q.    Thank you.  "He said, quote, I don't know why you

2    asked.  You" -- it looks like -- "don't do anything anyway,"

3    close quote.  Okay?

4      A.    Yes.

5      Q.    You're quoting Mr. Donnell.

6      A.    Yes.

7      Q.    And the witness is -- it says witness, Clyde

8    Porter, Bill Cherry.

9      A.    Bill Cherry.

10     Q.    Okay.  12/24/04, 1:16 p.m.  You're going to have

11   to help me with your handwriting here.  Could you read what

12   follows that entry.

13     A.    "Fitting was leaking at the central spray.  I

14   asked."

15     Q.    Slowly, please, for Carol.

16     A.    "Fitting was leaking at the central spray.  I said

17   I will fix it to Rex Ryan.  Said, don't have -- don't have

18   him fix it, he'll just F it up."

19     Q.    You can say it.  He'll just fuck it up?

20     A.    "He'll just fuck it up."

21     Q.    Okay.  For interest of having an accurate record,

22   it's better -- is the word written?

23     A.    Yes, it is.

24     Q.    All right.  So that's what it says on the page.

25   All right.  So, I'm sorry, who was the supervisor that said

1    that?

2        A.    Rex said it.

3        Q.    Okay.

4        A.    My supervisor.

5        Q.    Said it to you or to someone else?

6        A.    Said it to me.  But I believe Ron Sayers and Ron

7    Butler were there, because, you know, it was leaking.

8        Q.    And who ended up fixing the leaking fitting?

9        A.    I don't know that.  I think he turned it in to

10   maintenance.

11       Q.    On Wednesday, March 5, 2003 -- I'm sorry.  Before

12   I start reading this.  I'm now on to the next tablet page,

13   which we'll mark as Exhibit 4.

14              (Henry Deposition Exhibit 4 marked for

15               identification.)

16       Q.    This one says, "On Wednesday, 3/5/03, 9:20 a.m., I

17   went into main office and asked for Dodge truck keys.

18   Foreman said Lou had the Dodge and he would be back in 15

19   dash 20 minutes.  As I was at the doorway, Scott Sedler" --

20       A.    Yes.

21       Q.    -- "came out of his office and asked if Butch

22   Smith was here.  Bill Donnell said" --

23       A.    "What".

24       Q.    -- "what."  Okay.  "Scott said is Bill Smith" --

25       A.    "Butch Smith."

1     Q.   Butch Smith -- "Scott said is Butch Smith was

2  here."?

3     A.   "Is here."

4     Q.   Is here?

5     A.   Yeah, he said it twice.  Because Bill Donnell

6  asked him, what.

7     Q.   Oh, I got you.  "Bill Donnell, while sitting in

8  his chair, turned to me, looks into his -- into my face, and

9  said, quote, yeah, he's here, wipe" --

10     A.   "Your".

11     Q.   -- "your face" --

12     A.   "Off".

13     Q.   The word mouth is written over face.

14     A.   Yeah.

15     Q.   It says face, and then above it says mouth, off.

16  "And took his four fingers and wiped his mouth and then

17  laughed.  And I said look -- looks like" --

18     A.   "I won't be doing anything during maintenance

19  shutdown."

20     Q.   "He told me, you won't be working" --

21     A.   "Any more shutdown."

22     Q.   Okay.  "I walked out of office.  Witness, Jess

23  Fellows."

24     A.   Jessie Fellows is a committee man for the union.

25     Q.   Could you explain to me what happened here.  I

1  generally understand what's written, but maybe you could

2  elaborate a little bit.

3      A.    Like I said, they were sending me out of the

4  building.  I went to get the keys for the Dodge.  And Scott

5  Sedler come out of his office and asked twice if Butch Smith

6  was here.  And Bill Donnell sat there with his arms folded.

7  And swung and looked at me, and he goes, yeah, he's here,

8  whatever the paper says.  He says, and wipe your mouth off

9  and he went like this (indicating).

10     Q.    Did you have something on your mouth?

11     A.    No.

12     Q.    Did you understand the comment?

13     A.    Oh, yeah.

14     Q.    Oh.  Explain how you interpreted the comment and

15  the motion.  I mean, obviously, it meant something to you.

16     A.    Just the way Jessie signed it and witnessed it, he

17  took it the same way.

18     Q.    But how did you take it?  Carol is a big girl, she

19  can handle it.  Just tell us how you took it.

20     A.    I took it as he was wiping semen off, because I'm

21  Butch's boy, I'm Rex's bitch.  I mean.

22     Q.    Okay.  And you thought that was unprofessional.

23     A.    Very much so.

24     Q.    All right.  Now, this thing about shutdown, what

25  is that about?

1      A.    Well, we shut down like when Whirlpool shuts down,

2   you know, and close the departments.  And they bring a bunch

3   of us in to work maintenance.

4      Q.    Okay.

5      A.    So I made a comment back to him.  And I walked

6   out.  I waited for Lou to bring the truck back.

7      Q.    Okay.  Why did you say, "Looks like I won't be

8   doing anything during shutdown."?

9      A.    Because I felt that that was a sexual-related

10  remark.  And if he's going to sit there and be all that, to

11  say something like that to me, then I'm going to say

12  something back to him.  Like if you're going have me in

13  here, I won't do nothing.  And he didn't make a comment

14  about that.

15     Q.    Then what did he say back in response?

16     A.    You have the paper.

17     Q.    It says on the paper -- well, it says on the

18  paper, "He told me you won't be working any more shutdown."

19     A.    Yeah.

20     Q.    Okay.

21     A.    Which he meant by -- he's not going to have me

22  come in directly, but if my seniority takes me there, I come

23  in.

24     Q.    Okay.  Did you work any more shutdown after that?

25     A.    Yeah.

1      Q.    In other words, Bill Donnell had no power to deny

2  you.  I mean, if your seniority allowed you to work

3  shutdown --

4      A.    Exactly.

5      Q.    Okay.  So if your seniority allowed you to work

6  shutdown, and you wanted to work shutdown, you could work

7  shutdown.

8      A.    I could work shutdown.

9      Q.    And there's not a darn thing that Bill Donnell

10  could do about it, right?

11      A.    No.

12      Q.    I'm sorry.  I said right, you said no.  Is my

13  statement correct?

14      A.    Right.

15      Q.    Yes.

16      A.    Yes.

17      Q.    All right.  So I'm correct that, based on your

18  seniority, if you wanted to work shutdown, Bill Donnell had

19  nothing to say about it.

20      A.    He couldn't stop it.

21      Q.    Okay.

22      A.    If there was so many people they wanted on first,

23  second and third, and I didn't have enough seniority to work

24  first, then they could have me work second.

25          (Henry Deposition Exhibit 5 marked for

1                identification.)

2        Q.    There's another sheet of paper here, we'll call

3   this Exhibit 5.  Again, it's just another tablet page, PHB

4   tablet page.  It says, "Monday, March 14, 2005.  Rick Baker

5   asked me to sweep up that zinc on the floor, sweep out my

6   office, and shine my shoes.  10:22 a.m."  Who is Rick Baker?

7        A.    Foreman.

8        Q.    Okay.  Did you end up shining his shoes?

9        A.    No.  Well --

10       Q.    Was he joking?

11       A.    You know what I did?  So I wouldn't get

12   insubordination on that order and, you know, later I found

13   out that he told Mike Whetter (phonetic) I was just joking

14   about it.  But I went and I got the big vacuum.  It's a

15   rider.

16       Q.    Yeah.

17       A.    It sweeps the floor.  It's got a brush on the

18   front that spins.  I pulled up to him.  I said, there's your

19   shoe shine, just wiped his shoes on the brush.  So I did

20   shine them.

21       Q.    Did you guys laugh?

22       A.    I did.

23       Q.    Okay.  Did he?

24       A.    Yeah, he grinned and then said thanks.  I looked

25   at him and said, hey, I just didn't want to get

```
 1    insubordination out of this.
 2         Q.   I mean, you knew he didn't expect you to go down
 3    and shine his shoes, right?
 4         A.   Right.
 5              (Henry Deposition Exhibit 6 marked for
 6               identification.)
 7         Q.   All right.  The last pad, Monday, March 14, 2005,
 8    same day, "Bob Barko told me Jake Henipren" --
 9         A.   Heffern.
10         Q.   Heffern.  -- "told him the best part of Henry ran
11    down his mother's leg.  11:42 a.m."
12         A.   Now, there's two --
13         Q.   Who is Bob Barko?
14         A.   Foreman.
15              (Discussion held off the record.)
16         Q.   That was an offensive comment to you?
17         A.   Yes.
18         Q.   All right.  Are these the type of comments that
19    sometimes are made in a shop environment?
20         A.   Daily.  You know, and I can't tell you what
21    happened in a meeting.  Because I believe that Bill Hilbert
22    and a lawyer had a meeting with his company people and says
23    he wants the sexual harassment, the harassment to stop, he's
24    tired of the lawsuits.  And I don't blame the man.  But, you
25    know, why do people have to talk to people like this.
```

1      Q.    I'm sorry, I know I asked you this, but who is Bob

2   Barko again?

3      A.    Foreman.

4      Q.    Foreman.  All right.  Was he your foreman?

5      A.    Well, like I said, I'm universal.  Everybody

6   that's blue coat there is my boss.

7      Q.    Now, Bob Barko told you about this comment, but

8   the comment was apparently made by Jake Heffern.

9      A.    Heffern, yes.

10     Q.    Who is he?

11     A.    Foreman.

12     Q.    Did Jake say it to you?

13     A.    No.

14     Q.    Now, there were some other documents you had

15   that --

16     A.    Those are just phone numbers to get a hold of

17   people.  My sister's cell.  You know.

18     Q.    Nothing relating to the case?

19     A.    Nothing to the case.

20     Q.    All right.  No phone numbers for Cari Goodwine or

21   Jeff Connelly or anything like that?

22     A.    Yes, yes.

23     Q.    Could I just see the ones that have any relation

24   to the parties in the case.

25     A.    There's Jeff and Cari's.  Here's Cari's and my

1  sister's cell, like I said.

2      Q.   The fact that --

3      A.   Oh, here's where I wrote down Jeff's -- the time I

4  had to go see him.

5      Q.   Does this refresh your recollection as to when you

6  were at Jeff's office?  It says Tuesday, December 20, '04 at

7  3:30.

8      A.   Yes, it does.

9      Q.   That's when you were at his office?

10     A.   Yes.

11     Q.   All right.  And the only reason your sister

12 Linda's telephone number is on this sheet is just

13 happenstance, right?  Does she have --

14     A.   No, no.  She's not involved on this.

15     Q.   Okay.

16     A.   The paper was there on the counter, and I used it.

17     Q.   Fair enough.  I'm looking at the sheet of paper

18 that has Jeff Connelly's number on it, it appears to be some

19 sort of a PHB form.

20     A.   Yeah.

21     Q.   Did you write this up at work?

22     A.   Yes.

23     Q.   Okay.  Did Cari Goodwine give you this

24 information?

25     A.   Yes.

1    Q.   All right.  I don't need copies of that.  Thanks.

2    You've also produced a -- what appears to be some sort of a

3    notice.  Any time you talk about a document in a deposition

4    it's a good idea to have it designated so people know what

5    you're talking about.  So I'm going to call this No. 7,

6    Exhibit 7, and I will give you all your originals back.

7              (Henry Deposition Exhibit 7 marked for

8               identification.)

9    Q.   Exhibit 7, Mr. Henry, has a heading, Maintenance

10   Department Personnel Changes.  "After many years of loyal

11   service, Scott Sedler, maintenance manager, will be leaving

12   our company to pursue other career interests.  His last day

13   of work will be Friday, March 14.  We hope that everyone

14   will join us in wishing Scott both happiness and prosperity

15   in his future endeavors.  Bill Donnell will be assuming the

16   top leadership role of the department for the present.

17   Please offer your help and support to Bill as we" -- it says

18   more forward, I think it should be move forward into the

19   future.

20            And it's got a signature line, human resources

21   department, March 4, 2003.  And I take it you -- am I

22   correct, you provided this to me to help explain what you

23   told me earlier about Bill Donnell kind of getting kind of a

24   big head about him.

25   A.   Yes.

1      Q.    Any other significance to this document?

2      A.    Just had a copy.

3            (Henry Deposition Exhibit 8 marked for

4             identification.)

5      Q.    Okay.  Exhibit 8 is a copy of another PHB memo

6    pad.  The date here is Wednesday, June 2nd, 2004, 10:15 a.m.

7    It says Terry -- looks like Throw?

8      A.    Throop.

9      Q.    Throop.  Oh, okay.  Terry Throop.  And then

10   there's a statement below his name.  "You get yourself into

11   more shit around here.  You better be careful."  Is that

12   something Mr. Throop said to you?

13     A.    Yes.

14     Q.    Who is Mr. Throop?

15     A.    Foreman.

16     Q.    Did you have any further conversation with

17   Mr. Throop on this occasion?

18     A.    Over that?

19     Q.    On this occasion -- I want to know if there's any

20   other context to this statement.

21     A.    No, no.  But we talked daily.  I mean, he's

22   another one of my bosses, he -- I do work for him too.

23     Q.    Do you get along okay with him?

24     A.    Yes.

25     Q.    Did he treat you all right?

1       A.    Yes.

2             (Henry Deposition Exhibit 9 marked for

3              identification.)

4       Q.    The next document, Exhibit 9, is a page from a PHB

5   memo pad again.  This one has the name, Mike Thorr, list.

6   Is that right?

7       A.    Yes.

8       Q.    Is that a person's name?

9       A.    Mike Thorr.

10      Q.    Okay.  Now, his name happens to be written next to

11  the words To, colon.  Is that -- were you sending this to

12  him, or is that just --

13      A.    No, that's just the way I wrote it.

14      Q.    Yeah, that's fine.

15      A.    I mean, these guys don't even know I have this.

16      Q.    That's what I thought.  Okay.

17      A.    Nobody but you and Jeff Connelly.

18      Q.    Okay.  So it's Mike Thorr, list.

19      A.    Yeah.

20      Q.    Wednesday, May 7, 2003, 2:10 p.m.  "Mike and

21  Mike "--

22      A.    "Black."

23      Q.    -- "Black were at the north wall of plant talking,

24  and Mike Black was smoking with him."  Okay.  And what's the

25  significance of that?

1     A.    He didn't get a pink slip out of it.

2     Q.    Okay.

3     A.    Supervisor to a union employee.

4     Q.    Okay.  Thursday, May 22, 2003, 10:40.  "Mike

5 sprayed kerosene on my back with spray" -- Sam?

6     A.    "Spray gun."

7     Q.    Okay -- "spray gun from PP"?

8     A.    "Punch press."

9     Q.    "Him and Mike Black laughed about it."  Chet,

10 Butch -- Check or Chet?

11     A.    Chet.

12     Q.    "Chet, Butch, Terry, Gordy."

13     A.    Yeah.

14     Q.    All right.  What is the significance of those four

15 names?

16     A.    They were standing there.

17     Q.    How did Mike come to spray kerosene on your back?

18 What happened?

19     A.    I pulled up to the machine, did something where my

20 back was faced -- my back was facing the punch press.  And I

21 heard the spray gun go off.  And I felt my shirt kind of

22 like tuck in and get a little wet.  I turn around, and here

23 he's like this (indicating), he's pulling his hand away with

24 the spray gun in his hand.  So he sprayed kerosene on my

25 back.

1       Q.    Do you know whether it was an accident?

2       A.    No, it was no accident.

3       Q.    Okay.

4       A.    Because they stood there and laughed about it as I

5    drove off.

6       Q.    Okay.  And --

7       A.    Because --

8       Q.    Who is Mike?

9       A.    Mike --

10      Q.    Mike Thorr.

11      A.    Mike Black.

12      Q.    Mike Black.

13      A.    Mike Thorr is the one that squeezed the spray gun.

14   Now, his back is facing the punch press, so we're both

15   facing the same direction.  That spray gun should be facing

16   the punch press in there spraying, but it wasn't.

17      Q.    So it was Mike Black who sprayed you, or Mike

18   Thorr?

19      A.    Mike Thorr, supervisor.  Mike Black is a union

20   worker, and they both stood there and laughed as I left.

21      Q.    And who's Butch?

22      A.    Butch Smith.

23      Q.    What's his position?

24      A.    He's plant engineer now, I believe.

25      Q.    Okay.  What was he then?

1      A.    He was head of all the departments.

2      Q.    How about Terry?

3      A.    Terry Throop.

4      Q.    What's his position?

5      A.    Well, he was line foreman.  Then they moved him to

6   setting up the new robots.  They got pretty involved.  And

7   he got real good at it.  But now I believe they put him back

8   to line foreman.

9      Q.    And Gordy, is that Gordy Phillips?

10     A.    Yes.

11           (Henry Deposition Exhibit 10 marked for

12            identification.)

13     Q.    All right.  Last one, No. 10.  It says Friday,

14   May 28, 2004, 8:12 a.m.  Mike Thorr.  And then below that it

15   says, "Bill Donnell is "--

16     A.    "Trying."

17     Q.    -- "trying to --"

18     A.    "Conder."

19     Q.    -- "conder up something to fire you."  Now, Bill

20   Donnell is not your supervisor, is he?

21     A.    No.

22     Q.    This was May of -- May 28, 2004, correct?

23     A.    Yes.

24     Q.    You haven't been fired.

25     A.    No.

1      Q.    You still work with the company.  Okay.  This is

2   just something that Mike Thorr told you?

3      A.    Yes.

4      Q.    All right.  Have you been disciplined at all in

5   the last year?

6      A.    No.

7      Q.    Have you filed any grievances in the last year?

8      A.    No.

9      Q.    Have you ever been disciplined?

10      A.    No.

11      Q.    And, obviously, I'm talking about at PHB.

12      A.    Yeah.

13      Q.    Work is going okay for you?

14      A.    Sure.

15      Q.    No problems?

16      A.    Other than these comments.  And, like I said, I'm

17   just jotting them down.

18      Q.    Okay.  But as far at the terms and conditions of

19   your employment, I mean, you're --

20      A.    There's been no changes.  It got a little bit more

21   boisterous on the floor as far as what you've seen.

22      Q.    And that's what this is, right?

23      A.    Yeah.

24      Q.    I mean, other than what we've talked about that

25   you've written down here, is there anything else that's been

1  a problem?

2      A.    No.

3      Q.    Going back for a moment to Exhibit 1 here.  This

4  is your affidavit.  We've already talked about the language,

5  about the death threat, and the threat of some harm against

6  Cari Goodwine's person.

7          But then the affidavit continues, and I'm quoting

8  now, "At the time Mr. Goodwine was being subjected to

9  ongoing harassment and retaliation by the company in terms

10  of being asked to perform tasks of general maintenance and

11  to work with unsafe machinery, which they know to be

12  dangerous and even deadly."  I take it those words were

13  written by Attorney Connelly.

14      A.    Um-hum.

15      Q.    That's a yes?

16      A.    Yes.

17      Q.    Is this information that Mr. Goodwine had

18  provided, or did you actually observe any harassment or

19  retaliation?

20      A.    Oh, I've listened to comments that was made, not

21  directly to Cari but about Cari.  And --

22      Q.    Let me stop you there for a second, though.  So as

23  far as anything said to or done to Cari, you didn't observe

24  anything that appeared to be harassment or retaliation,

25  correct?

1      A.   I didn't hear these people say it to Cari other

2  than what Bill Donnell had said.

3      Q.   Right.

4      A.   But I heard people talk about what was said to

5  Cari.

6      Q.   Okay.  And I'll get to that.  But I'm just trying

7  to break things down so I fully understand what you know.

8  And the first thing I'm asking about is what you personally

9  observed between any supervisors or other employees and Cari

10 directly.  And my question is, did you ever witness any

11 harassment by any supervisor or other employee or any

12 retaliation by any supervisor or other employee directed at

13 Cari personally?

14     A.   No.  Because of different shifts.  Once in a

15 while, I did work a shift on a weekend with him.  But

16 nothing was said at that time.  It was other people talking

17 what they had heard and what their comment or opinion was

18 about things.

19     Q.   So you just weren't really in a position to

20 observe anything.  You guys weren't working together.

21     A.   Right.

22     Q.   All right.

23     A.   I know they stuck him on same jobs every day.

24     Q.   What's a sand job?

25     A.   Pardon?

1      Q.   I thought you said sand.

2      A.   Same.

3      Q.   Same jobs.  I apologize.  I misheard you.

4      A.   You know, they would make him stand at the same

5   machine for like a week-and-a-half, two weeks.  I mean,

6   everybody else gets rotated.  Let him run different jobs.

7   You know, three days is long enough.

8      Q.   How do you know that?

9      A.   Huh?

10     Q.   How do you know that?

11     A.   He's told me.

12     Q.   Okay.

13     A.   And even David, I heard it from him.

14     Q.   David?

15     A.   Woodard.

16     Q.   So David Woodard and Cari Goodwine have told you

17   they've been scheduled at the same machine for longer

18   periods of time than other employees.

19     A.   That's what they said, yes.

20     Q.   All right.  But you weren't in a position to

21   observe that yourself.

22     A.   Like I said, if -- they start at 10 to 3:00.  I

23   come off the floor at five to 3:00.  So I can see where

24   they're at.  If they're walking -- you know, if they're at a

25   machine down the aisle, I'm walking.

1      Q.    Did you keep track?

2      A.    No.  And, like I said, at the end there he ended

3   up in the washer area.  And I'm assuming he just got tired

4   of doing what we just talked about.  Same job, listening to

5   the crap.  I'm --

6      Q.    You're inferring that, you're surmising?

7      A.    I'm assuming.

8      Q.    All right.  Attorney Connelly's words that you

9   signed off on indicate that Mr. Goodwine worked with unsafe

10  machinery that the company knew to be dangerous and even

11  deadly.  What piece of machinery is that?

12     A.    Punch presses.  I mean, the equipment is old.

13  I've watched two people get tangled up in them already.

14     Q.    Who is that?

15     A.    Tim Norton got his finger clipped from a hydraulic

16  piece that came back without -- I don't even know why he put

17  his finger -- his hand in there.

18     Q.    Okay.

19     A.    But the machine wasn't done in cycle.  And the

20  hydraulics pulled this metal plate down and took his finger.

21  And I can't recall this guy's name because he's not employed

22  at -- Beers.

23     Q.    Beers?

24     A.    Something Beers.  He got his hand just mangled in

25  there.

1      Q.    Do you know when Tim Norton got his finger

2   clipped?  Best recollection, even it's just a year.

3      A.    A year.

4      Q.    About a year ago?

5      A.    Probably less.

6      Q.    So sometime in 2004?

7      A.    Probably.

8      Q.    All right.  And how about Mr. Beers?

9      A.    I couldn't give you a date on that.  But it was

10  third shift, zinc side.

11     Q.    This is on the zinc side?

12     A.    Yes.

13     Q.    How about Norton, was he on the aluminum --

14     A.    Aluminum side.

15     Q.    And Mr. Norton, is he -- what's his race?

16     A.    Black.

17     Q.    He's a black man.  How about Mr. Beers?

18     A.    He's white.  We have a gentleman out there who has

19  had a couple seizures.  I didn't witness them.  Who

20  everybody had made comments, he's going to fall into a pot,

21  he's going to get caught in a machine.  I mean, he's not

22  there now.  I guess his sickness or illness, however you

23  want to put it, has taken him out.

24     Q.    Who was that?

25     A.    Dave Marlette.  White.

1    Q.   Any other instances you can think of where

2  employees have been required to work on unsafe machinery?

3    A.   Well, again, you know, it's -- if there's molten

4  metal, people get splashed with metal here and there.  I

5  mean, you know.

6    Q.   It's a dangerous job; is that right?

7    A.   Yeah.  We had a girl, that the machine closed, and

8  made a shot, and it spit out the parting line.  She got it

9  all over her leg.  She needs grafts.  They cut her pants off

10 right there at the machine to keep the jeans from melting --

11 or her work pants from being melted into the skin.

12   Q.   Now, I take it when you're working with molten

13 metal and in a shop environment, it's a -- it's a

14 dangerous --

15   A.   Sure it is.

16   Q.   All right.

17   A.   You know, you're working with heavy tonnage

18 equipment.  Even hanging a die on an overhead crane is --

19 you know, if a chain breaks, you better not be under it.  We

20 had a guy that came around a corner on a jitney, who had a

21 pole stuck in a container where you dump dross in, and he

22 came around and never saw the end of the pole, it was

23 hanging up into the aisle, and drove it into his leg.

24 Accidents happen out there.

25   Q.   And I know these aren't your words precisely, but

1    that's what you understood was meant by the words, work with

2    unsafe machinery, that it's known to be dangerous and even

3    deadly.

4        A.    Yes.

5        Q.    All right.  You're not thinking of anything else

6    within the scope of that statement.

7        A.    No.

8        Q.    All right.

9        A.    Just out on the floor.  Conditions.

10       Q.    And those are conditions that all employees out

11   there are exposed to, were they not?

12       A.    Well, I wouldn't say all.  Because, you know,

13   we're all assigned to different trim, and maintenance, and

14   shipping.  I mean, not all, but, yeah.

15       Q.    Most.

16       A.    Most.  You know --

17       Q.    Certainly, the machine operators.

18       A.    Yeah.  If a jitney driver from zinc -- from

19   shipping drove down an aisle and the machine spit, yeah, he

20   would get hit, could get hit.

21       Q.    But, certainly, when we're talking about all

22   machine operators, it's fair to say that all of those

23   operators were exposed to those same conditions.

24       A.    Yes.

25       Q.    You had mentioned something earlier I should

1    follow up on.  You had indicated that although you didn't

2    observe any harassment or retaliation of Mr. Goodwine, you

3    had heard about it from other employees; is that correct?

4        A.    Yes.

5        Q.    All right.  Tell me what you're referring to.

6        A.    I recall -- like I said, this is right after Gary

7    got terminated, or.

8        Q.    Do you remember when that was?

9        A.    No, I don't.

10       Q.    That's Gary Gebhardt.

11       A.    Yeah.  Oh, that black guy over there got Gary

12   fired.  Somebody else made a comment.  Cari didn't get Gary

13   fired, Gary got Gary fired with his mouth.  That's pretty

14   much it.  Everybody was pointing fingers, and.

15       Q.    Okay.  So you heard an employee comment that --

16   words to the effect, that that black guy over there got Gary

17   fired.

18       A.    Yeah.

19       Q.    Who is that a reference to?

20       A.    It's been a while.  I couldn't tell you.  But I

21   know it was a union worker.

22       Q.    Okay.  It wasn't a supervisor?

23       A.    No.

24       Q.    And do you know who the union worker was referring

25   to?  Was he referring to Cari Goodwine?

1        A.    Yes.

2        Q.    Another employee, I take it, said, hey, you know,

3   that guy didn't get Gary fired, Gary's mouth got Gary fired.

4        A.    Right.

5        Q.    Was that in direct response to this comment?

6        A.    No.

7        Q.    And do you know who made that comment?

8        A.    No, I don't.

9        Q.    Is there anything else?

10       A.    That's all.

11       Q.    That's it?

12       A.    Like I said, I was only involved with this Bill

13  Donnell stuff.

14       Q.    Okay.

15       A.    And just hearsay that I've heard from -- different

16  people made comments about what happened to Gary.  And then

17  this here I was told by Jeff to jot some stuff down.

18       Q.    I got you.  No, that's fine.  And, again, as I

19  told you at the outset, Mr. Henry, I just want to know what

20  information you have, whatever it is.  Let me confirm, then.

21  You didn't personally witness any harassment or retaliation

22  against Cari Goodwine; is that correct?

23       A.    No, I didn't.  Correct.

24       Q.    You heard some comments about Cari Goodwine.

25  Specifically, one union employee, a non-supervisor, had said

1    words to the effect that that black guy over there got Gary

2    Gebhardt fired.  And you understood the reference to black

3    guy was to Cari Goodwine.

4        A.    Right.

5        Q.    All right.  You heard another employee, whose name

6    you can't recall, state words to the effect that Cari

7    Goodwine did not get Gary Gebhardt fired, Gary Gebhardt's

8    mouth got him fired.

9        A.    Right.

10       Q.    All right.  Have we now talked about all of the

11   indications or statements that you heard relative to

12   potential discrimination or retaliation against Cari

13   Goodwine?

14       A.    Yes.

15       Q.    All right.  Are there any problems with any of the

16   other supervisors, with anyone at HR or management, that you

17   would like to tell me about that you're having personally?

18   Are you having any difficulties with any of those folks?

19       A.    No.  Just what I've got written down there.

20       Q.    Okay.

21       A.    I mean, some is damaging, some is just jotting it

22   down for what was said.  I mean, conder something up to get

23   you fired.

24       Q.    And we talked about that one.  Okay.  And you

25   understand that if you perceive you're having a problem,

1  that someone is not treating you fairly, that you can go to

2  your union.  You're a union --

3      A.  Yes.

4      Q.  -- employee.  You can go to your union

5  representative, or Ben Hancock, or Shelly Antolik, right?

6      A.  Yeah.  I went to the union steward, let him know

7  what was going on.  And he goes, what do you want to do

8  about it, do you want to go up front; no.

9      Q.  All right.  So you let him know, but then when he

10 asked you whether you wanted to take it up front -- I take

11 it to take it to management.

12     A.  Right.

13     Q.  All right.  You said no at this point.

14     A.  No.

15     Q.  So I take it you haven't gone to see Ben Hancock

16 or Shelly Antolik.

17     A.  Not at all.

18     Q.  Okay.  When is the last time you spoke with David

19 Woodard?

20     A.  Oh, it's been -- I haven't seen David in -- since

21 he quit, and I don't know even when that is.  And, again,

22 he's another one, I can't pull in his driveway, and I don't

23 know his phone number.

24     Q.  That's fair enough.

25     A.  I just work with these guys.

1      Q.    No, I understand.

2      A.    I don't bring a lot of my coworkers to my house

3  either.

4      Q.    And I think we're just about finished here.  Let

5  me just check my notes.  You didn't see any racial graffiti

6  in the plant during the time you've worked there?

7      A.    I really didn't.

8      Q.    You --

9      A.    If somebody else might have saw it and it was

10  erased the next day that you know about, I don't know about

11  that, but I didn't see any.

12     Q.    Okay.  Fair enough.  And other than the one

13  so-called joke that Gordy Phillips told you, you talked

14  about --

15     A.    Yeah.

16     Q.    You know what we're talking about?

17     A.    Right.

18     Q.    It was the one you wrote down.

19     A.    Yes.

20     Q.    Other than that, that's the only racial slur or

21  comment that you can recall?

22     A.    No, not the only.

23     Q.    Okay.  What other ones are there?

24     A.    Well, you know, the black jokes.  You know, just

25  daily thing out there.

1  Q. Who, though?

2  A. Anybody, really.  I mean, it's not directly only

3 black jokes either, it's -- they're dirty, and.

4  Q. But in terms of -- and I understand that it's a

5 shop, and I'm sure there are jokes involving matters of a

6 sexual nature.

7  A. Sure.

8  Q. But can you recall anyone else making a joke of a

9 racial nature?

10  A. There's guys that say it.  But, again, I wouldn't

11 feel comfortable giving anybody's name.

12  Q. And why won't you feel comfortable doing that?

13  A. Because I can't remember if it was them that said

14 it or somebody else.  I can't commit myself to that.  Like

15 you said, I've got to be truthful, and that's the best I can

16 explain it.  I can't even tell you what the joke was.

17  Q. Okay.

18  A. You know, it's just something you laugh about for

19 five minutes, you forget about it the next day.

20  Q. Can you recall any employee ever making a racial

21 joke to or in the presence of an African American?

22  A. I wasn't there, but I recall people talking about

23 Dave Turner, saying to a hot metal foreman, is that black

24 guy going to deliver any metal to my machine today.  And I

25 guess he got six or eight days off for that.  That's the

1    only one that sticks with me.

2         Q.    Okay.

3         A.    Because he got time off for it.

4         Q.    You heard about that.  You didn't overhear the

5    comment, but someone told you --

6         A.    Never heard it.  I didn't witness nothing.

7         Q.    This Turner fellow got suspended for a period of

8    time?

9         A.    Right.

10        Q.    And I take it maybe you were talking about what

11   happened to Dave Turner, and someone said, you know, he made

12   a comment --

13        A.    Right.

14        Q.    -- to this effect.

15        A.    Oh, it was all over the floor, real fast.  Because

16   of all this going on with Cari and David.

17        Q.    But, again, just to confirm, you cannot recall a

18   specific joke or a particular individual making a specific

19   joke of a racial nature.

20        A.    No, sir, I can't.  That's the only one.  And what

21   Dave Turner had said is what I just told you.

22        Q.    Yeah.  And you didn't overhear Turner, you heard

23   about that.

24        A.    That's right.

25        Q.    And we've reviewed all the documents you have

1    that --

2        A.    That's it.

3              MR. LANZILLO:  All right.  Mr. Henry, that

4              completes your deposition.  I want to thank you

5              for coming in today.  You have the right to review

6              the transcript of your deposition before it is

7              finalized.  And that gives you an opportunity to

8              correct any mistakes or errors substantively or in

9              transcription.

10                  It's your option whether you want to exercise

11             that right and review it before the transcript is

12             finalized.  You'll get a copy in any case, or

13             whether you want to waive that right.  And I'm not

14             your attorney, so I can't advise you what

15             people -- people typically -- a lot of people

16             waive, but it's entirely up to you.

17             THE WITNESS:  I would like to read it and then

18             sign it later.

19             MR. LANZILLO:  Fair.

20             THE WITNESS:  I don't like this.  And I'm sorry I

21             signed something like this with somebody else's

22             name on it.  But, like I said, he was sitting in

23             his chair reading it, and I was sitting across his

24             desk.  This should have never happened, and I'm

25             going to question him about it.

1      MR. LANZILLO:  Okay.  And the "this" you're

2      referring to is Exhibit 1, the affidavit.

3      THE WITNESS:  With Mr. Hilbert's name on.  That's

4      not right.

5      MR. LANZILLO:  And you said you're going talk to

6      go talk to him about it, you're talking about Jeff

7      Connelly?

8      THE WITNESS:  Jeff Connelly.

9      MR. LANZILLO:  Fair enough.  Okay.  The witness

10      will read.  And we're done.

11

12      (Deposition concluded at 11:30 a.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25