1              IN THE UNITED STATES DISTRICT COURT
           FOR THE WESTERN DISTRICT OF PENNSYLVANIA
2

3   CARI GOODWINE,            :
                Plaintiff     :
4                             :
                v.            :    Case No. 04-142E
5                             :
    PHB DIE CASTING,          :
6               Defendant     :

7

8

9

10            Deposition of GEORGE ARRINGTON, taken before

11      and by Carol A. Holdnack, RPR, Notary Public

12      in and for the Commonwealth of Pennsylvania,

13      on Tuesday, May 3, 2005, commencing at 10:00 a.m.,

14      at the offices of Knox McLaughlin Gornall & Sennett,

15      P.C., 120 West Tenth Street, Erie, PA.

16

17  For the Defendant:

18      Richard A. Lanzillo, Esq.
        Knox McLaughlin Gornall & Sennett, P.C.
19      120 West Tenth Street
        Erie, PA 16501
20

21  For the Plaintiff:

22      Jeffrey A. Connelly, Esq.
        824 Hilborn Avenue, Suite 1
23      Erie, PA 16505

24

25            Reported by Carol A. Holdnack, RPR
              Ferguson & Holdnack Reporting, Inc.

1                          I N D E X

2

3   GEORGE ARRINGTON

4        Direct Examination by Mr. Lanzillo . .  3

5

6

7

8   EXHIBITS:

9        Arrington Deposition Exhibit 1 . . . .  6

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          G E O R G E   A R R I N G T O N, first having

2          been duly sworn, testified as follows:

3

4                           DIRECT EXAMINATION

5    BY MR. LANZILLO:

6

7          Q.    Mr. Arrington, my name is Rich Lanzillo.  I

8    introduced myself to you a few moments ago.

9          A.    Right.

10         Q.    I represent PHB Die Casting in a lawsuit filed on

11   behalf of a gentleman named Cari Goodwine.

12         A.    Okay.

13         Q.    And I have asked you to appear here today pursuant

14   to subpoena so that I can ask you some questions.  And the

15   reason I'm doing that is your name has been listed as a

16   potential witness --

17         A.    Okay.

18         Q.    -- relative to that case.  And that's why we're

19   here.  Both my questions and your responses will be taken

20   down by Carol, our court reporter, and ultimately put

21   together in a booklet type of form.  And I can explain to

22   you at the end of the process what happens after the

23   transcript for this proceeding is completed.

24              The Plaintiff in this case is represented by

25   Attorney Jeff Connelly.  Mr. Connelly's office just

1    contacted me by telephone to advise that he is running late

2    and that we should just proceed, and he will join us at his

3    earliest opportunity.

4         A.   Okay.

5         Q.   The only instruction I have for you relative to

6    the deposition is to please let me know if at any time you

7    don't hear me clearly when I ask you a question, or if the

8    question doesn't make sense, sometimes I ask bad questions,

9    if you let me know that, I can either repeat or rephrase the

10   question to make sure you and I are on the same page.

11        A.   Okay.

12        Q.   Okay.  Would you state your full name.

13        A.   George E. Arrington, Junior.

14        Q.   And where do you live, Mr. Arrington?

15        A.   2704 Jackson.

16        Q.   That's Erie?

17        A.   Erie, PA.

18        Q.   And what's your Zip Code?

19        A.   16504.

20        Q.   And where are you currently employed?

21        A.   I'm -- run my own business at the current time.

22        Q.   Okay.  And what's the name of your business?

23        A.   A & W Garage.

24        Q.   Is that an automotive garage?

25        A.   Automotive.

1      Q.    How long have you been self-employed?

2      A.    Well, since I've been laid off at PHB Die Casting.

3      Q.    Okay.  And you worked at PHB Die Casting up

4   until -- actively worked, what, 2001?

5      A.    Right.  Correct.

6      Q.    And then you were laid off at that time?

7      A.    Correct.  And then soon after that, I was sent a

8   letter just stating that I was no longer needed.

9      Q.    Okay.  Do you recall when you started at PHB?

10     A.    Yes.

11     Q.    When was that?

12     A.    Back in -- it's been a while now.  I can't give an

13  exact date, but it was back in '88.  I don't recall the

14  exact date.

15     Q.    Okay. And what position or positions did you hold

16  while you were employed at PHB?

17     A.    One was die cast machine operator, DCPL, and also

18  a tool crib manager.

19     Q.    The DCPL position, was that a union job?

20     A.    Yes.

21     Q.    Okay.  And what about the tool crib manager, was

22  that salary?

23     A.    That's salary.

24     Q.    Do you recall when you went to a salary position?

25     A.    Date-wise, I can't give you -- recall the dates

1    exactly at this time.  But I can say maybe two years after

2    my employment.

3        Q.   Okay.  So you were only a DCPL until about 1990 or

4    so?

5        A.   Somewhere around in that.

6        Q.   All right.  And then you went over to a salary

7    position in the tool crib; is that correct?

8        A.   Correct.  I went from a light-duty position to

9    management.

10       Q.   Okay.  Tell me about that.  What, did you have an

11   injury?

12       A.   Yes.

13       Q.   Okay.  And was that a work-related injury or

14   something else?

15       A.   Work-related.

16       Q.   Okay.  And so you went on light duty.  And was

17   that light duty in the tool crib?

18       A.   It led up to that.

19       Q.   I see.  You mentioned a letter advising you of the

20   termination of your employment.

21            (Arrington Deposition Exhibit 1 marked for

22             identification.)

23       Q.   Mr. Arrington, for the record, I've handed you a

24   document we've marked as Exhibit 1 to your deposition.  This

25   is a letter, I believe, from Benjamin Hancock to you dated

1    March 3, 2003.

2        A.    Correct.

3        Q.    Is that the letter to which you were referring in

4    your earlier testimony?

5        A.    Yes.

6        Q.    Okay.  As I understand it, what had happened, you

7    were laid off in 2001, and at some point there was a change

8    in company policy as far as anyone on layoff for more than

9    six months, their employment was terminated -- at least

10   anyone in the salary position.

11       A.    I wasn't aware of that beforehand.  But this is

12   what the letter had stated.

13       Q.    Okay.  That's what they advised you, Mr. Hancock

14   advised in the letter?

15       A.    (No response.)

16       Q.    Do you recall your last day of active employment

17   at PHB?  I know it was 2001.  Do you recall the -- actually,

18   it looks from my records as if your last day actively

19   working at PHB was June 8, 2001.

20       A.    The date, I can't, right at this moment, pinpoint.

21   But I can say it was in June, right there, it was probably

22   close to the end of the work period.

23       Q.    Okay.

24       A.    Which would have been like a Friday.

25       Q.    Okay.  And it was 2001?

1      A.    Yes.

2      Q.    Okay.  As I indicated in our discussion

3  immediately preceding your deposition, I scheduled your

4  deposition because you had been listed just generally as

5  someone who may have information relevant to claims or

6  defenses in this lawsuit listed in discovery responses

7  served upon me by the Plaintiff.  There wasn't a lot of

8  detail as far as what you might know about, so I'm just

9  going to ask you about a number of areas that may bear on

10  the case.  And we'll just go through them categorically and

11  see if there's anything --

12      A.    Okay.

13      Q.    -- we need to follow up on.  During the course of

14  your employment at PHB, did you observe any racial or racist

15  graffiti?

16      A.    Yes.

17      Q.    Okay.  Could you tell me --

18      A.    In the restrooms.

19      Q.    When did you see that?

20      A.    In the restrooms, right there, periodically we

21  would see racial slurs, the Ku Klux Klan, things such as

22  that.  And niggers, the word spelled out on the bathroom

23  walls.

24      Q.    And when you say periodically, when specifically

25  did you see that?

1      A.    There, again, right there, date-wise, right there,

2  it's been so long I just can't -- I don't want to hold

3  myself to saying it was this date or that date.  But there

4  were certain dates.

5      Q.    And --

6      A.    I could say this point; that it happened more than

7  once.

8      Q.    Okay.  And can you remember using the date of --

9  well, let me back up here.  You weren't there after June of

10  2001, so, obviously, you didn't see it after that date.

11      A.    No, couldn't have.

12      Q.    So using your last day of employment, can you give

13  me any type of a time frame as far as when you last saw any

14  type of graffiti.

15      A.    Something like, that it's hard to say, right

16  there, the date because it's been so long ago.  Had we had

17  this sooner, this discussion sooner, it probably would have

18  been fresh in my mind.  But something like that, I've kind

19  of written off at this point.

20      Q.    So you really don't recall?

21      A.    Not the date-wise, no.

22      Q.    Do you recall whether there was anything written

23  on -- in the bathroom walls in 2001?

24      A.    I've seen them over the years.

25      Q.    Okay.  On how many occasions over the years did

1    you see that?

2        A.    I'll say several.

3        Q.    And by several, you mean more than once?

4        A.    More than once.

5        Q.    Can you be any more specific than that?

6        A.    Well, I can't be more specific as far as how many

7    times because I didn't count myself, right there, because it

8    was alarming to me to see something like that.

9        Q.    And are you aware of anyone else who observed that

10   graffiti?

11       A.    I'm sure that any employee, right there, that

12   visited the restrooms, right there, had seen them.  And it

13   was brought to the attention, right there -- to the best of

14   my knowledge, it was brought to the -- from what I've heard,

15   through the shop, right there, it was brought to the

16   management.

17       Q.    When you say from what you've heard, what are you

18   referring to?

19       A.    Other people in the shop.  Other gentlemen.

20       Q.    Did you report anything?

21       A.    Myself?  No, because it was already reported at

22   that time.

23       Q.    It was your understanding that someone else had

24   reported it, therefore, you didn't report it to anyone.

25       A.    Right.

1      Q.    And I know there are multiple bathrooms at that

2   facility.  Where did you observe the graffiti?

3      A.    This was in the main area right below the crib.

4   Tool crib is on the second floor which I worked, and

5   bathroom was underneath it.

6      Q.    Okay.  And some -- you know, and when I talk to

7   people about the bathrooms at PHB as a point of reference,

8   they often tell me -- they often identify the bathroom

9   according to how many urinals it has or how many toilets it

10  has.  Do you remember how many urinals or toilets there were

11  in that bathroom?

12     A.    Right now, I can't.  It's been so long since I've

13  been in there, if I was there.  I know somewhat of the

14  layout of the place, right there.  I can kind of picture

15  that.

16     Q.    Is this the bathroom closest to the tool crib?

17     A.    The tool crib is right on top of it, the second --

18  story tool crib in which I worked.  There's two sections.

19  There's a front half and there's a second half.  The second

20  half is right below, right -- the bathroom is right below

21  that.

22     Q.    All right.

23     A.    And right adjacent to that used to be, from my

24  recollection -- things have changed, from what I've been

25  told.  Is that the tool room was right across from that

1    bathroom entrance.  And that's where most of the die cast

2    personnel washed up in the two basins along with usage of

3    the bathroom.

4         Q.   Is that bathroom on the same floor as the tool

5    crib?

6         A.   The first-floor tool crib, yes.  I have -- I'm in

7    the upstairs, right there, I have a stairwell leading to the

8    second.

9         Q.   So the bathroom you're referring to was located,

10   at least when you were employed, across from the first floor

11   tool crib?

12        A.   Correct.

13        Q.   All right.  And where specifically within the

14   bathroom did you observe graffiti?

15        A.   On the walls and on the stalls, in the bathroom

16   stalls.

17        Q.   Bathroom stalls.  And when you say the walls, what

18   area do you mean?

19        A.   Right next beside you, there's -- you couldn't

20   help but to see it.

21        Q.   You're talking about next to the urinal?

22        A.   No, no.  We noticed it -- I noticed a lot of this

23   right in there inside the bathroom stalls.  They did a lot

24   of painting over it, right there, afterwards, after they

25   were notified.

1      Q.    So --

2      A.    Graffiti just like in your average bathroom.

3      Q.    Yes.

4      A.    You got graffiti going on.  Somebody decides to

5  write something about somebody or write something that they

6  had time to write about and it's in there.

7      Q.    Yes.  I think a couple witnesses mentioned that it

8  was not uncommon for people to write things about

9  supervisors, for example, or maybe have some off-color jokes

10  written on the wall.  And then someone would come in and

11  either try to erase it or clean it or paint over it.

12      A.    They would spray paint, right there, and spray

13  over them.

14      Q.    Okay.

15      A.    And once in a while they would come upstairs to

16  the tool crib and paint the bathrooms, with the paint that I

17  supplied.

18      Q.    Okay.  And that if someone reported the graffiti,

19  it would then be painted over?

20      A.    Best of my knowledge.

21      Q.    Okay.  How much graffiti in general -- I mean, put

22  aside the separating it into categories whether it was

23  racist or about supervisors or whatever.  How much graffiti

24  would there be in those bathrooms, generally?

25      A.    A lot.

1       Q.    A lot.

2       A.    All different types, right there.  You know, you

3   name it.

4       Q.    Yeah.

5       A.    Comments about other workers or whomever it was.

6       Q.    Okay.  And do you remember anything specific about

7   the content of the graffiti?  You told me a few words that

8   you recall.  But give me your best recollection as far as

9   what it said.

10      A.    One was KKK.  Which I used to hear that -- hear

11  rumors of that surfacing throughout the shop, that they were

12  having KKK rallies somewhere out in the counties.  And the

13  guys that would ask me in a smart remark if I was attending

14  one of them.

15      Q.    Okay.  You say you heard rumors of KKK rallies out

16  in the county.  Who told you -- who told you that?

17      A.    Guys in maintenance.

18      Q.    Anyone in particular?

19      A.    I heard it from various, various ones.  Guys

20  mention that.

21      Q.    I mean, were they -- well, tell me who you're

22  thinking of, who you're referring to.

23      A.    I've heard it from Clyde Porter.

24      Q.    Clyde Porter?

25      A.    Bill Diehl.  Chuck Merritt.  Scott Reichert.

1      Q.    And how would that come up, the topic of the idea
2    that there might be some sort of a KKK rally in the county?
3      A.    It was just general conversation.  They would just
4    come out, hey, George, there's a KKK rally going on out
5    there in by Clyde's place out there, are you attending.
6      Q.    Who said that to you specifically?
7      A.    I heard that from Bill Diehl and I've heard it
8    from Chuck Merritt.  Scott Reichard -- not Scott Reichert,
9    I'm sorry.  Scott -- this was not Scott Reichert.  Scott --
10   what's his last name.  Used to be in charge of maintenance.
11   Thin fellow.  Geez, I can't think of his name at the moment.
12   He took over in maintenance.
13          I got his name somewhere lodged in and I just
14   can't recall it right at this time.  It's not Scott
15   Reichert, though.  I can picture his face and his whole body
16   structure, but I just can't recall his last name at this
17   moment.
18     Q.    He worked in maintenance, his name was Scott?
19     A.    Yes.
20     Q.    Was he a supervisor?
21     A.    Supervisor.  He was in charge of maintenance soon
22   after Butch Smith left.  Even heard remarks made by Butch
23   Smith as well.
24     Q.    What did Butch say?
25     A.    Well, he would ask questions; hey, George, you

1    going out there to that rally, in a joking-about way.

2         Q.    When did George say that to you?

3         A.    Pardon me?

4         Q.    I'm sorry, when did Butch say that to you?

5         A.    There, again, right there, time-wise, it's been so

6    long that I tried to block a lot of this out of my head.

7         Q.    Can you give me a year, Mr. Arrington?

8         A.    It happened so often, every time they've had a

9    rally out that way, I've always been noted -- notified,

10   right there, of their presence.

11        Q.    Okay.  Well, you say it happened so often.

12        A.    Whenever there -- whenever there was any rally of

13   that sort going on anywhere, out there, in Girard or

14   somewhere in the neighboring counties, I was always notified

15   of it.

16        Q.    Okay.  I'm not aware of there ever being a KKK

17   rally in Girard.

18        A.    No, I said in their counties, out there, the

19   counties, right there.  Something like East Springfield,

20   somewhere in that neighborhood.

21        Q.    That still doesn't answer my question, though.

22   What is your best recollection as to when Butch Smith made

23   the comment to you to the effect, hey, George, are you going

24   to that rally?

25        A.    At this point, my mind is a blank.  I really can't

1    tell you the date.

2         Q.   Did you report those comments to anyone?

3         A.   Pardon me?

4         Q.   Did you report the comments by Butch Smith, Clyde

5    Porter or Bill Diehl to anyone at the company?

6         A.   I've said something once or twice, right there, to

7    my boss.

8         Q.   Who was that?

9         A.   Mike Pretz.

10        Q.   Spretz?

11        A.   Pretz.

12        Q.   P-R-E-T-Z?

13        A.   Yes.

14        Q.   What was his position?

15        A.   He was above me in the management pool.  He was my

16   immediate supervisor.

17        Q.   Do you know if he's still there?  I haven't heard

18   that name before.

19        A.   Presently, I heard he is retired or he's not

20   there, from the best of my knowledge.

21        Q.   And what did you tell Mike Pretz?

22        A.   Well, I mentioned to him certain things that was

23   said.  And how I didn't like it.

24        Q.   What did you say?

25        A.   Right now, exactly word for word, I can't really

1    tell you, right there, because there's -- at the heat of the

2    moment, you never know what you said.

3        Q.    Give me your best recollection.

4        A.    I can't really make that far, right there, as to

5    what I said word for word, but I know it was pertaining to

6    comments.

7        Q.    Do you recall anything as far as what you said,

8    even if it's not -- doesn't have to be word for word.

9        A.    Well, I remember once I was -- I went to him,

10   right there, in reference about a -- being called a nigger.

11       Q.    Okay.  Who called you a nigger?

12       A.    By Bill Diehl.

13       Q.    When did Bill Diehl call you a nigger?

14       A.    It was -- as far as the date, I can't say the

15   dates.  But I can recollect, right there, it was an incident

16   involving a matter, right there, in the tool crib somewhere.

17   He was displeased with and he made a comment of, you

18   niggers.  And he soon apologized afterwards, after I told

19   Bill, told Bill about how I felt about it.

20       Q.    Do you remember the year, Mr. Arrington, that --

21       A.    It was before I left.  Put it somewhere in vague

22   terms.

23       Q.    Okay.  Do you know if it was --

24       A.    As far as, like I say, right there, I'd say six

25   months to say a year, whatever.  We've had so many incidents

1    to reference them.  I had notes at one time when a lot of

2    this stuff had taken place, but my notes aren't with me.  To

3    make the claims of the dates.

4        Q.   Do you still have those notes?

5        A.   I have some notes, but I don't have a date on

6    them.  I have notes, right there, with me right now that I

7    had typed some things out, right there, but some of this

8    stuff that was left there because I thought it was

9    short-term layoff.  They told me, right there, when things

10   pick up, they would be back, they would call me back.  But

11   needless to say, it never picked up.

12       Q.   Well, let me go back to this incident that you

13   described with Bill Diehl.  How long did Bill Diehl work at

14   the facility?  Was he there the whole time that you were or

15   did he come on later?

16       A.   He's been there the whole time before and after.

17       Q.   All right.  And this incident that you described

18   in the tool crib where he used the word nigger, was that

19   earlier in your employment, midway through your employment,

20   toward the end of your employment?

21       A.   I would say closer towards the end.

22       Q.   Okay.  Do you think it was within a year of the

23   date you left, two years, three years?

24       A.   It could be any one of the three.  And like I say,

25   I had my notes, right there, I had specifics written down

1    inside of a note and a journal.  And I lost all that when I

2    left.

3        Q.    Okay.  And tell me as much as you can about the

4    conversation which Mr. Diehl used the word nigger.

5        A.    Well, he was displeased with something.  And like

6    I said, all the things I had in the journal word for word

7    was said because it was fresh in my mind.

8        Q.    I understand.

9        A.    And right now, you know, the -- just like anything

10   else, sometimes I have a tendency not to want to block out

11   some of the things, right there, at this point in time

12   because it's bad experiences.

13       Q.    And all I can ask you to do is give me your very

14   best recollection.  So I think you've told me that this was

15   something that took place while you were in the tool crib?

16       A.    Yes.

17       Q.    Okay.  Was anyone else present besides Mr. Diehl?

18       A.    No.  There was only myself and him.

19       Q.    All right.  And you've indicated that you thought

20   that he was displeased about something.  Do you remember

21   what he was displeased about?

22       A.    Could have been having a bad day.  I think it

23   might have been brought on by a bad day or whatever.

24   Something of that magnitude.

25       Q.    And, again, what is the very -- your very best

1    recollection as far as what he said?

2         A.    Oh, boy, that's really going back now.

3         Q.    You just stated that it's really going back now, I

4    know that makes it --

5         A.    Well, you're talking about 2003, here it is 2005.

6    That's kind of -- we talk about ancient stuff, right there,

7    to me.  And layman's terms, I'm trying to make forward

8    progress in my life instead of looking backwards.

9         Q.    Sure.  I understand.  Can you remember anything?

10        A.    Right now, I just -- my mind is drawing a blank,

11   right there.  It's not to say that I won't remember later.

12   But right at this present time, I just can't recite.

13        Q.    Have you done your very, very best to try to

14   recall what he said?

15        A.    Yes.

16        Q.    And you just --

17        A.    Just right now, you know, certain dates or

18   whatever, is just not fresh in my mind.  You know, this

19   thing has been pushed backwards in my mind as of something I

20   wanted to forget, not something I wanted to remember.

21        Q.    And, again, we've moved on from the date issue.

22   I'm just trying now to --

23        A.    And then the -- even so with the words, right

24   there, trying not to let them stick in my head.  And not to

25   be angered by them or be somewhat -- what is the word I want

1    to say.  I just want to let that, you know, old dog, let it
2    lay.
3        Q.   Okay.  And understand that I regret having to wake
4    that old dog.  But because your name has been listed as a
5    witness, I have to ask you about this.  And --
6        A.   Well, see --
7        Q.   Let me finish, please.  And you don't have to
8    explain.
9        A.   Okay.
10       Q.   I just need to know that you have told me
11   everything you remember about the incident with Bill Diehl
12   to the very best of your recollection.
13       A.   At this point in time.  There may be membrances
14   [sic], membrances of exact match later on, like as I sit
15   down or, you know, rejog my memory and say, okay, this is
16   what happened.  Not someone telling me.  Not someone talking
17   to me.  But just I could be sitting there later on tonight
18   and it will come to me, this questions.
19       Q.   What might jog your memory?
20       A.   I could be sitting here, right there, thinking
21   about it.  And then later on in the day, right there, after
22   everything is done, and transpired, I'll say, if I
23   concentrate, I can remember word for word what was said.
24       Q.   Can you do me a favor and concentrate as hard as
25   you can right now and try to remember.

1        A.    I doubt if I could do it right now, like I say,

2    just the facts of --

3        Q.    Do you want to take a break and think about it for

4    a minute?

5        A.    That's not going to do it, right there, because

6    right now, see, I got things that I'm concentrating on at

7    work.  I got things that I need to do after I get out of

8    here, and my mind is not solely on this.  To be truthful.

9    And that's the best of my recollection.  My mind is thinking

10   of what I need to do for my business after this point, right

11   there, and I need to do this to be able to survive.

12        So my mind -- things that I'm doing, once this

13   interview is over, I got to go back to the real world and

14   realize what I got to do to feed my family.  And this, right

15   there, matters is really a -- really draining for me, right

16   there, to sit here and have to go back to something so

17   negative and so emotional, that's hurtful, right there, that

18   these things are still happening in this day and time.

19        Q.    My only --

20        A.    You know.

21        Q.    My only concern, Mr. Arrington --

22        A.    I know -- I understand what your concern.  But my

23   concern, right there, is that this is something, right

24   there, is hurtful, right there.

25        Q.    Well, and, again, all I want is --

1      A.   And these experiences, right there, just don't

2   bring the best of me, right there, at this point to listen

3   to and elaborate.

4      Q.   Something else that I neglected to mention at the

5   beginning.  You and I have to try to refrain from speaking

6   at the same time.  It makes it hard for Carol to take down

7   what we say.  But let me tell you this.  I need to have your

8   very best recollection of matters relating to the questions

9   that I ask you.

10          I regret that they may be painful or uncomfortable

11   for you to recall.  But in this process, I need to know that

12   information.  And, in particular, I need to know that now so

13   that I don't have to hear something for the first time later

14   on.  So if there is something you recall, it is important

15   that you're forthcoming with it right now.

16      A.   Yes.  If I could recall it at this present time, I

17   would do it.  There would be nothing, right there, for -- if

18   I could do it, I would do it, because I'm not trying to

19   be -- refrain from that, right there, to tell you later to

20   the best of my knowledge.

21      Q.   Okay.  Do you have any reason to believe that you

22   would recall more at a later date than you would recall now?

23      A.   That's just the way that things, right there,

24   appear, right there, with me sometimes.  I got so much

25   that's going on that I just don't have -- I got so much

1   going on, right there.  My wife has had cancer and my kid's

2   going through all kinds of trauma in school.  And just

3   everyday pressures that you got to deal with.  And sometimes

4   certain things categorize, right there, you have to take and

5   still manage to stay above.

6        Q.   Let me just --

7        A.   So I understand what you're saying, but I'm just

8   saying right now I'm just giving you an answer to why I

9   can't focus on what you're asking me.

10       Q.   Let me conclude my questions regarding this

11  incident involving Bill Diehl with this final one.  Am I

12  correct that you have told me everything that you can

13  recall, sitting here today after we've discussed it at

14  length, about the incident with Bill Diehl?

15       A.   Well, there's other incidents that he -- we've

16  had, right there, where he made statements as to the fact of

17  you guys eating watermelons, right there, do you guys still

18  eat watermelons, and chitlins, and.

19       Q.   Okay.  Let me go back to my question, though.  And

20  I'm talking about the incident in the tool crib that you

21  told me about where Mr. Diehl used the word nigger.  And my

22  question is --

23       A.   There's been cases where Mr. Diehl have made

24  comments about niggers, and then said that he didn't mean

25  me, meaning niggers, right there, in general.

1      Q.    But let me focus again -- please, let me finish my
2    question.
3      A.    Okay.  Sorry.
4      Q.    With respect to the incident in the tool crib that
5    you described to me where only you and Mr. Diehl were
6    present, have you told me everything that you can remember
7    regarding that incident?
8      A.    Yes.
9      Q.    All right.  Okay.  Let's move on, then.  Were
10   there any other incidents involving Mr. Diehl where he made
11   statements in your presence, either to you or while you were
12   standing in the area, that you considered to be racist or
13   racial in nature?
14     A.    Well, you know, watermelon seeds you guys -- you
15   guys, that's common of you guys.
16     Q.    I take that as a yes.
17     A.    Yes.
18     Q.    Can you remember when he made these other
19   statements or --
20     A.    These things happened throughout my employment
21   with PHB.  And sometimes it was not by me maybe taking it as
22   serious by others.
23     Q.    Okay.
24     A.    Because there's been others, right there, who made
25   remarks to me as to how they were offended by these

1    comments.

2        Q.    What I'm going to focus on at the moment,

3    Mr. Arrington, is what was said, your best recollection as

4    to what was said, when it was said, by whom it was said, and

5    in whose presence it was said.  Try to keep those facts --

6    factual inquiries in mind.  That's the information I'm

7    interested in at the moment.

8        A.    Well --

9        Q.    So, let me -- please, don't resist my question,

10   try to do your best in answering it.  All right.  Right now

11   we're talking about who said it, and we're talking about

12   Bill Diehl.  Now, I want to ask you your best recollection

13   of what else he said that you interpreted.

14       A.    You're crisscrossing the message you're sending

15   me.  You're saying who said, and then you're saying what

16   Bill said.  Now, which is it you want?

17       Q.    All right.  We're focusing on Bill.  If there's

18   other people, we'll get to them.  I'm going to go through

19   every person who you recall or believe made a racist comment

20   in your presence or to you.

21       A.    Okay.

22       Q.    And I'm going to ask you the same series of

23   questions.

24       A.    Okay.

25       Q.    Who, what was said, when, where, who was present.

1    All right.  And now we're focusing on Bill Diehl.  You told

2    me about the comments in the tool crib.  We're done with

3    that.  Now --

4        A.    Okay.

5        Q.    Now I want to go on.  What other comments did Bill

6    Diehl make to you that sounded to you to be racial or racist

7    in nature?  And I think you said something about watermelon.

8        A.    Yes.

9        Q.    All right.  What did he say?

10        A.    Well, you guys, you know how you guys like

11    watermelon.  That's been something that has been said over

12    and over and over and over and over.  So as far as dates

13    that it was said, it's just been many.  If you want to put

14    down as how many, say many over the course of my employment.

15        Q.    Okay.  And that's Bill Diehl?

16        A.    Yes.

17        Q.    All right.  Can you tell me how many times he said

18    that to you?

19        A.    I would say many.  More than ten.  Not less than

20    ten.  As opposed to how many times, just given a roundabout,

21    I know it's more than ten.

22        Q.    And can you remember when he said that to you?

23        A.    As I stated before, in the course of my

24    employment, many times.

25        Q.    And where did he make that statement, where were

1    you when he made that statement?

2        A.    Throughout the shop.

3        Q.    Anyplace that you can remember in particular?

4        A.    I've had it noted in the crib, I've had it noted

5    in the lunchroom, maintenance area.

6        Q.    Who overheard the statement?

7        A.    Well, there's been other individuals that came to

8    me and proclaimed that they've heard remarks of such and

9    they didn't care for it.

10        Q.    That's not my question, though.

11        A.    You said who?

12        Q.    Yeah.  I'm talking about the statements --

13        A.    Okay.  You said -- you're saying who, right?

14        Q.    I'll restate the question for you to make sure I'm

15    clear.  On the incidents where Mr. Diehl made the comment to

16    you about, quote, you guys liking watermelon, comments made

17    directly to you or in your presence, who else was there to

18    overhear the statement?

19        A.    Vernon Duck and Tim -- Tim Norton.

20        Q.    And do you recall on how many occasion Mr. Duck or

21    Mr. Norton overheard the statements?

22        A.    You would have to ask them to be exact.

23        Q.    So the answer is, you don't recall?

24        A.    You would have to ask them, as I state.

25        Q.    Well, how many times do you recall them being

1    present when that statement was made?

2        A.    See, the thing about it, right there, I'm not -- I

3    don't say how many times we met or how many times we recall

4    being there.  You know, it's not like a math problem where

5    you take two subjects and you add two subjects.  So as to

6    say how many times, you know, you're not going to be able to

7    find me, right there, stating like writing this down, this

8    was the date, this was a date.  I didn't do this every time.

9    Because like --

10       Q.    And I'm not faulting you for that.  I'm just

11   asking you a question.  Do you remember how many times

12   Mr. Duck and Mr. Norton were present for that comment?

13       A.    As to what they've heard --

14       Q.    No, present with you.

15       A.    What I'm saying as what they heard, even if you're

16   in the same room don't mean that you have to be paying

17   attention to the conversation.  As to what they heard, all

18   of the times or how many times, I can't tell you.  That

19   would be something you'll have to take up with Mr. Duck and

20   Mr. Norton.

21       Q.    All I'm asking you, Mr. Arrington, is how many

22   times can you recall Mr. Duck and Mr. Norton being in the

23   same area with you when Mr. Diehl made the watermelon

24   comment.

25       A.    Right now, like I said, I don't know how many

1    times.  That's my answer.

2        Q.  Okay.  What did you do after the -- after Diehl

3    made the watermelon comment to you?  Did you do anything in

4    response to that comment?  Did you tell him you didn't

5    appreciate the comment, did you report it to anyone?

6        A.  No, I didn't, at the time, not myself, I didn't.

7    As to what anyone else have done, I don't know.

8        Q.  Okay.  You didn't report the comment to anyone?

9        A.  No.

10       Q.  What about Diehl's comment about -- comment in the

11   tool crib where he used the word nigger, did you report that

12   to anyone?

13       A.  I had mentioned that before, I told you, Mike

14   Pretz.

15       Q.  Okay.  Anyone else?

16       A.  That's -- I went to my supervisor.

17       Q.  That's right, you told me, and you couldn't recall

18   what you -- what you said to him.  Although, I thought you

19   told me that you reported Butch Smith's comment to Mike

20   Pretz.

21       A.  No, I told you I reported --

22       Q.  Okay.  Any other comments by Bill Diehl that were

23   racial or racist in nature?

24       A.  Let me think.  Bill Diehl and I, right there,

25   were -- he was a funny person.  And I'm trying to think

1  of -- when I say funny, sometimes laughter meaning character

2  in the shop and also, right there, at times he had mood

3  swings depending on what situations he was going through.

4      Q.   Okay.  How did you get along with him?

5      A.   I would say I had an average relationship with

6  him.

7      Q.   Did you ever tell him, hey, Bill, words to the

8  effect, hey, Bill, you know, it's not funny?

9      A.   Well, after that incident when he spoken, I

10  was -- the type of guys I worked with -- let me give you --

11  I'm going to stray a little bit from your question here.

12  But I'm going to give you a little input, right there, how

13  Bill and I, right there, were.

14      Q.   Okay.

15      A.   Bill was a guy that I got along with.  I

16  understood him, because he's an older gentleman and I

17  respected everybody.  I worked in the salary department, he

18  worked there.  Sometimes I knew the pressure could be

19  overwhelming.

20      One thing about Bill that he could say things,

21  right there, that would rub someone the wrong way.  He was

22  noted for saying that.  I may not have taken offense that

23  others may have taken offense to some things that were said

24  or some things may have not had as much meaning to me as it

25  had to others.

1    Q.    Okay.

2    A.    I've been a versatile type of person, more or

3    less, to the point where I adapt to what everyone throughout

4    some of the comments that was said.  I never took it to the

5    levels that I could have taken it to.  Because I had to work

6    there.  And I felt that if I did challenge this, that it may

7    be a problem for me.

8         So being in the management pool where I needed the

9    job and to support my children and my family, I didn't run

10   to the highers-to-be with all the problems that came about.

11   More or less tried to work it out by like gentlemen, right

12   there, that come to a person if they offended me and say

13   something to them at that magnitude.  And say that you

14   offended me.  And, hopefully, that we can resolve it as men

15   instead of taking it to a higher level.

16        I wasn't looking to see to get this guy fired from

17   his position, because I know that would be the ultimate.

18   And I just wanted to give him an opportunity, right there,

19   to say if he meant it, or if he was just remorseful at it.

20   Not looking for someone to ask my forgiveness, but just to

21   be a man about it and say, hey, look you made a mistake, you

22   shouldn't do this.  Because it's not right.

23   Q.    Did you have that type of conversation with Diehl?

24   A.    Yes, I've had that conversation with Diehl.

25   Q.    And did he apologize or express remorse?

1    A.   He -- him and I had came to some kind of

2    resolution after we had -- I had spoke with Mike, because at

3    the heat of the moment I think that I was more upset because

4    it was presented to me and in the way it presented to me.

5    And when I went to Mike, the best of my knowledge, right

6    there, that him and I, right there, afterwards we talked

7    about it.  I didn't want to go up to the -- to see this man

8    lose his job as a result of it.  I knew he hurt me.  But I'm

9    just not that type of person to look to go after an

10    individual, right there, and take and hurt him.

11    Q.   Okay.  Did he -- did he apologize?

12    A.   He apologized to me.  I mean, him and I have had

13    an, I say, an ongoing relationship, not to the point where

14    we were enemies, we were just respectable.  And that is how

15    it drums up our relationship.  It's not to the point where

16    we -- we would talk about things such as events we went on,

17    vacations, or his growing up and his upkeeping or something

18    like that.  And he would just share those moments with me,

19    if he went on a trip or whatever, just casual conversation.

20    Because those are things that we did.

21        But he had his moments where he was -- I knew he

22    would fly off into left field.  And so that is how one of

23    these moments did came about, and that's how we end up

24    discussing it today.  It's not that I see him as an

25    individual, that I would want to do something to him.

 1    That's why I've never brought this matter forth to this

 2    point.  You asked me, and you asked me be to truthful about

 3    it, and that's what I'm being.

 4        Q.   And that's all I can ask of you, and that's fine.

 5        A.   I'm not here to crush somebody.  I'm just here to

 6    tell the facts, right there, what I know.  As far as dates

 7    and stuff, I wasn't trying to hurt anyone, so I didn't log

 8    things down as a point to say; this guy did this, this guy

 9    did that.  And if I seen him on the streets, I would speak

10    to him.

11        Q.   I think I understand.  I mean, you knew you could

12    take this up to human resources and have something done

13    about it, but you chose to work it out with Bill directly?

14        A.   Because my ability at PHB was to work with the

15    individuals there.  Because there was a conflict between

16    union and management.  And I ran a tool crib.  And there was

17    always conflict.

18        Q.   You're on the management side?

19        A.   I try to keep equal tier.  Because I know what

20    these guys are going through.  Because they're trying to get

21    machines up and they're being hammered about machinery,

22    right there, being down.  I know management is complaining

23    about the money, right there, that is going there.  So I'm

24    kind of the middle guy.

25            I get -- you know.  So, basically, right there,

1    what I'm trying -- I've tried to do when I was at my

2    employment at PHB was to stay neutral.  And try to continue

3    to -- because I knew if I didn't stay neutral, that my

4    position, right there, could be eliminated.  Because they

5    look at me, these guys would in a union shop, could really

6    eat you alive.

7        Q.    So because of that, when an issue, a conflict

8    arose like the one that you described here with Bill Diehl,

9    you would try to work it out with the employee?

10       A.    I've done, right there, with all the guys, not

11   just Bill.  If there was any kind of an argument, if things

12   where points that someone would come up and say that we were

13   out of stock and getting their butt kicked about it, and I

14   would say, hey, let's find out why.  If there's a resolution

15   to this, we can make it an easy solution.  How about this;

16   am I stocking too less, am I stocking too much of one item,

17   what do we need to do.  Do we have to have a meeting of the

18   minds to say what you need so that I can present this to

19   management and say this is what the guy's running into.

20             And, more or less, right there, I have to save

21   face with these guys because I'm a salary employee.  These

22   guys work with me on a daily basis.  I have to work with

23   them.  They're union.  Sometimes union shops, right there,

24   have a totally different atmosphere than just being in the

25   everyday world where they're protected some areas, right

1   there.  Where, you know, a guy shouldn't be protected.

2          And the salary sometimes, right there, could be

3   harder, right there, not knowing the problems, not being

4   aware of them.  And they only look at dollars and cents.

5   And me, right there, as an individual, I was trying to be

6   the best, right there, manager I could, right there, and

7   solve it and trying to help both sides.

8          Q.   Let me follow up on this situation with Bill

9   Diehl.

10         A.   Go ahead.

11         Q.   And by the way, I'm sure you understand that when

12  I use these words, which we all find offensive, that I'm

13  doing it only because it's part of the inquiry I have to

14  make in this lawsuit.  When Bill Diehl used the word nigger,

15  was it -- did he call you that name or did he use it in a

16  different context?

17         A.   It was one that says, you know, you're acting like

18  something, you know.  Like I said something of a magnitude

19  where he may have said it, right there, because of something

20  that I was doing there at the shop or just he was displeased

21  with.  As to say exactly what it was at this moment, I just

22  can't really tell you.

23         You know, I know it was something I had to have a

24  disagreement with him.  Because Bill is the type of person

25  that's headstrong.  If he -- if he disagrees with something,

1    and he's just bullheaded.  I mean, even management and

2    everyone else probably knows of this, right there, and

3    they've dealt with him.

4        Q.    Okay.  On this -- on the occasions, though, when

5    you would -- when Bill Diehl would say something that you

6    interpreted as racist, I get the sense that on at least one

7    occasion it was in anger, the tool crib incident.

8        A.    Some of it is.  And like in joking --

9        Q.    Right.

10       A.    -- and the way he felt, that he can just joke

11   about certain things.  The word nigger never surfaced at

12   that point in time.  To say in a joking about the, right

13   there, subject.  It was, you guys are, or something like

14   that, right there.  I've heard a lot of that, right there,

15   through the course of the shop where there was you guys

16   other than that, right there, are -- there were things of

17   that magnitude where they didn't identify us by names.

18       Q.    Okay.

19       A.    And they all knew our names, right there.  So if

20   there was -- and a certain individual you were speaking

21   about you could have appeared to him as Tim, George, Ron or

22   whomever.  The same as if I was speaking about one of the

23   guys; Bill, himself, or Gene, or Tom, or whomever I may be

24   speaking of, I would say, hey, you know, Tom over here, my

25   deposition too.  Might say you guys.  Because I'm asking

1    what did he mean when you guys are making that kind of

2    statement.

3        Q.    Did they answer you when you asked that question?

4        A.    Well, some will say, I'm sorry, I didn't mean any

5    harm, right there.  But I would say, you know, when you say

6    you guys, what are you meaning.  They would say, no, I

7    didn't mean any harm.  Some would say that.  You know, it

8    was just the shop, right there.  There was an old layman

9    term where you have older gentlemen from a different era.

10   And they -- the way they spoke, you know, that some of it,

11   right there, was still like a pre '60s and so forth era,

12   whatever they felt like, boy or whatever they called the

13   gentlemen back then of different color, like it still

14   existed throughout the shop.

15       Q.    Did anyone ever call you boy?

16       A.    They may have said some of those comments, right

17   there, and/or in a joking manner or something like that.

18   But it was, you know, these comments, right there, surfaced

19   throughout the shop.

20       Q.    But you can't recall any incidents where anyone

21   in particular --

22       A.    Most of the time I always dismissed it.  I was

23   more of a guy that tried to reason with everybody and have a

24   good time.  We would laugh and we would joke about it,

25   whatever.  So some things that you could say to me if we

1    were friends, you may not be able to say to someone else.

2        Q.    Okay.

3        A.    And I'm sure you have people that you can make

4    comments about, right there, even saying anything that may

5    come to mind.

6        Q.    Absolutely.

7        A.    That you can't make to the general public.

8        Q.    Right.  There are comments people would make to me

9    about ethnic background, that I know coming from them,

10   they're joking around.

11       A.    They're joking around about.  And that's the type

12   of demeanor that I would say that I kept with most of the

13   shop people.

14       Q.    Okay.  Anything else from Bill Diehl that you can

15   recall as far as comments that you interpreted as racial or

16   racist?

17       A.    I spent a -- I didn't spend a lot of time on the

18   floor.  I spent -- you know, my general area was throughout

19   the shop, but I didn't spend a lot of time on the floor

20   around Bill Diehl.  No more than passing in the crib or

21   passing in maintenance or something like that.  So

22   individuals that you probably could speak with is people

23   that is out on the floor that have like a Vernon Duck or a

24   Tim Norton.  Those guys could possibly give you more insight

25   because they have more -- he's working on machines that

1    they're working on.  Bill just -- and I just be passing and
2    parts exchange, or.
3        Q.    Right.  You were --
4        A.    We weren't side-by-side workers, right there, if
5    you want to call it that.
6        Q.    You would have happenstance encounters with him
7    but you weren't assigned to the same work area.
8        A.    No.  Where these guys may have had more of
9    a -- they're in the die casting maybe working on a machine,
10   they may be assisting him, or they may be talking or
11   whatever, you know, when maintenance is out there working.
12   They may have more of a conference, right there, and they
13   may see each other in passing.
14       Q.    Okay.  So you did not work on the shop floor where
15   the die cast --
16       A.    No.
17       Q.    -- machines were?
18       A.    No.
19       Q.    Okay.
20       A.    No, my sole attention was in the tool crib.
21   Sometimes going out just looking through.  I might walk by
22   in passing, but.
23       Q.    Let me go back to these statements about KKK
24   rallies.  Do you know, the Bill Diehl and the others who
25   made those comments, were they joking?

1      A.    There was some -- you know, at some point some

2  guys, right there, you kind of feel a little uneasy when

3  they say things.  And some guys, you know, may be just

4  joshing with you.  It's kind of like what I was telling you,

5  some guys you don't know when because you feel like a knife

6  is being stabbed in your back.  And maybe this guy, right

7  there, might say something.

8      Q.    Do you know whether on the instances when the

9  individuals you mentioned before, Bill Diehl, Clyde Porter

10 and --

11     A.    Maybe Clyde Porter might have been more of a guy

12 that was -- if he said something like that, it might have

13 been in a joshing, funny state, right there, in front of the

14 guys, but I don't think it was something that he would.

15     Q.    You didn't get the sense that Bill Diehl or Clyde

16 Porter or Scott Reichert were members of the --

17     A.    No, not Scott Reichert.  You have to --

18     Q.    Take him out.

19     A.    Right.  It's not Scott Reichert.  Two Scotts that

20 worked in maintenance.  One, Scott Reichert, and him and I

21 got along pretty good in maintenance.  And the other, I

22 never had a problem with him.  The other Scott, I'm trying

23 to think, is real frail.  And him and I used to joke around

24 a lot.  But he would say something.  And his was -- his, by

25 the way, would be mentioned more or less in a joking type

1    state.

2         Q.    Okay.

3         A.    It was something that one guy would say, hey, you

4    know, Clyde said that these guys is having a KKK rally out

5    there, or whatever, or stuff, or whatever.  And the sheets

6    or something like that, you know, and just joking.  And I

7    could handle it, but maybe others might have found

8    offensive.  And those comments being said.

9         Q.    You knew those guys well enough to understand that

10   they weren't serious about that, they were joking around?

11        A.    Well, my relationship with them, where others

12   might find offensive, right there.  It's just like today

13   they got slang that they call one another, right there,

14   which I would never call another person.

15        Q.    Porter and Diehl, were they both maintenance guys?

16        A.    Yes.

17        Q.    Okay.  So they weren't die cast operators either.

18   They worked with you?

19        A.    Right.  They worked throughout the shop.

20        Q.    Throughout the shop.  I apologize, you did tell me

21   that.

22        A.    Maintenance doesn't have a sole direction as to

23   where they work at in a shop.  They could be at a machine,

24   they could be in a front office, they could be up on the

25   scaffold, they could be anywhere in the plant.  Outside.

1  Wherever they're needed, they could be, right depending on

2  their job title or their experience.  Bill Diehl was an

3  electrician.  So he would be needed wherever there was a

4  problem.

5      Q.   Were they salaried or union?

6      A.   It was hard to say, right there.  They had a funny

7  salary thing, right there, where some of them were salary

8  but -- some of them were salary because they were -- I don't

9  know how they call them group leaders out there, if they

10  were salary.  Everybody kept their pay kind of a secret.  No

11  one liked to discuss, right there, what.

12      Q.   Okay.  And you had mentioned Butch Smith had made

13  a similar comment, you know, hey, George, you going to that

14  rally.

15      A.   It was in a joking fashion, like, with him and I.

16      Q.   Okay.  You knew him well enough that you could --

17      A.   Yeah.  Butch has been a -- and I, right there,

18  have a decent relationship.

19      Q.   Okay.  Were you friends with Butch?

20      A.   Yeah, I knew Butch, right there.

21      Q.   And how about Bill, did you consider him to be a

22  friend?

23      A.   I say he was a -- him and I were marginal, right

24  there.  We could talk and talk about things and so forth.

25  It's not --

1    Q.    He's an older guy?

2    A.    Huh?

3    Q.    Is he an older guy?

4    A.    Yes, he was much older than I were.  You know, and

5    lot of the older guys I got along with, right there, pretty

6    well.

7    Q.    How about Clyde Porter?

8    A.    Clyde Porter was -- he's a grouch.  He was just

9    one of those type of guys that I don't think he got along

10   with many, right there.  And it was his way, the

11   good-old-boy way, nobody's way but his.

12   Q.    All right.  So we've talked about Bill, we've

13   talked about Clyde, we've talked about Butch Smith.  Anyone

14   else make comments that might have had a racial overtone to

15   them that you can remember?

16   A.    There was quite a bit of people, right there, that

17   made little remarks of whatever and stuff.

18   Q.    Can you remember anyone in particular?

19   A.    Whether remarks -- some of them would say, where

20   is your brothers at.  Where the brother goes and what's

21   happening in the hood.  It was various guys would say things

22   like that.  Some of them to me, right there, was just joking

23   and some guys were -- I don't know what they meant.  If they

24   were meaning in a sly way that they were insinuating your

25   brothers, like your brothers.  Or when we took a vacation

1    they would ask questions as to, where your bros at, they

2    didn't show up today.

3        Q.    Who asked you that question?

4        A.    I would get that throughout the shop.  It was not

5    just one individual.  A lot of the individuals would ask

6    that question, where your bros at, right there.  And they

7    didn't make it in today, or.

8        Q.    Anything that bothered you enough that you

9    reported it to HR?

10       A.    Like I said, right there, to me, right there, a

11   lot of that stuff, right there, was just petty shop talk,

12   right there, going around, right there.  As long as no one

13   came out and physically called me something like a nigger,

14   right there, something like that, I didn't find it offense,

15   to go run up to HR, right there, to complain about it.

16       Q.    Right.

17       A.    And even then, right there, it all depends on the

18   situation.  I was more to more of a nice guy, right there,

19   than a guy that would go up and complain about something.  I

20   hadn't -- I'm going to detour from your subject what you're

21   saying just to give you a demeanor about my aptitude.

22             I was told by right by my supervisor, direct

23   supervisor, on top of by Dan Langer, that you're a big guy,

24   right there, but you don't quick to anger.  And I had an

25   incident once with one of the senior buyers where he would

1    call me up.  And we were in -- and he was in a disagreement

2    with me.  And he was yelling in my ear, right there, and he

3    was just getting really vocal.

4            And I said, and I spoke to him in a tone, in a

5    calm tone.  I said, John, I says, please do not talk to me

6    like what you're yelling in my ear, if you can't talk to me,

7    then this conversation is over.  And he told our boss, which

8    was a big boss, right there, that Dan -- that this had

9    happened.  And Dan said, well, George, why did you hang up

10   on John.  I said, John was screaming in my ear.  And there

11   was nothing at that point in time that I could have done to

12   justify the situation other than hang up, I says, because if

13   I had said something inappropriate, I may have not been here

14   right now.  Because one thing would have led to another.  He

15   said, well, good thinking, good analogy.

16       Q.   I think I understand.  There was nothing said to

17   you in your presence that you thought justified going to

18   human resources.  You were able to handle it on your own.

19       A.   Right.

20       Q.   Okay.  I mean, you knew that you could go to human

21   resources.

22       A.   I, basically, right there, didn't go.  Because

23   like I said, just because of the fact that I thought about

24   it.  And I was just more or less rather than to go this way,

25   like some individuals might, I may look at it and say this

1    guy deserves a second chance.  If it continues to happen

2    from that point on and he said this, right there, after it,

3    then I know he's going to say it, and I'm just going to back

4    off from that point.

5         Q.    I mean, if someone crossed the line --

6         A.    They, to me, right there, they -- some people

7    could have found it offensive the first time.  I may look at

8    a situation and say maybe this guy was angry, maybe this guy

9    could sit down and talk about it, and understand it.  And he

10   can't say this to me.  As an individual.  And if it

11   continued after that, then I felt that I done everything in

12   my power to diffuse the situation.  If it didn't diffuse at

13   that point, then I would take it up to management and have

14   them rectify it.

15        Q.    Understood.

16        A.    I'm a man within reason.

17        Q.    Anyone else that you can recall specifically that

18   made comments of a racial nature?

19        A.    I'm not going to stipulate on what I heard because

20   that's hearsay.

21        Q.    Right.

22        A.    I'm just going on what I know.  There were things

23   said to me by other individuals, other employees that worked

24   there.  There was -- and I didn't want to say what was

25   factual and what was said.

1       Q.    I understand.  I know that other people may have

2    told you some things.

3       A.    Right.  So I can't go and comment on what they

4    told.  Because, like I said, I wasn't in the shop to

5    actually experience that problem.  Where there might have

6    been other individuals that worked in the shop.

7       Q.    Okay.  That's fair enough.

8       A.    And there was comments.  You know, I just feel

9    that there was -- that being away from the county and then

10   they're out in the county and some of them, right there,

11   told me that they didn't see that many blacks.  And only

12   thing they seen, right there, on TV as to what was going on,

13   and that's how they experienced us to be bad.

14          And those comments were made, right there, by some

15   of the individuals.  Because they said they never had that

16   many black families out there, so it was new grounds, right

17   there, for them, right there, to experience, right there.

18   And all they had experience of black folks, they say, were

19   things that they seen on TV, which were bad.

20      Q.    Were you ever party to any grievances out at PHB?

21   You probably wouldn't have been because you weren't part of

22   the union.

23      A.    No.

24      Q.    Okay.

25      A.    Although, right there, I had a unique experience

1    of when I got injured.  I felt it was a little -- some

2    things didn't go well.

3        Q.    Okay.

4        A.    And that might have been the fact, right there.  I

5    don't know.  It just seemed like it I was getting a raw

6    deal, right there, it seemed.

7        Q.    Was that a Workers' Comp. claim?

8        A.    Yes.

9        Q.    Okay.

10       A.    Well, it was -- it was a unique situation.

11   Because when I was injured, I explained to them, right

12   there, that I reported it.  I did everything, right there,

13   that I had to do.  And as a result, right there, I was --

14   when I went on -- when I went on work light duty, what they

15   call light duty, I worked there for a short time.  And then

16   I was told there was no more work available.  And under

17   seniority, which I was in the union at the time, you go by

18   date of hire.

19       Q.    Right.

20       A.    And there was individual which I still was doing

21   the same type of work that I felt had had less time than I

22   did, right there, where I felt offended by that, right

23   there.  And I spoke to my union person.

24       Q.    Who was that?

25       A.    At the time it might have been Jay, Jay Smith.

1      Q.    When did you -- when were you injured?

2      A.    I was injured -- oh, man, that's really going

3   back.  I would say somewhere in '89, '90, somewhere in --

4   that's the best I can recollect.

5      Q.    And do you know how long you were on light duty

6   after that?

7      A.    I was on light duty, right there, basically

8   because they couldn't determine what was wrong with my

9   hands.

10     Q.    Okay.  So --

11     A.    As far as the time -- as far as the time factor, I

12  still have never gotten an operation because they couldn't

13  never figure out what was wrong with me.

14     Q.    Okay.  So were you on light duty for the rest of

15  your employment from 1990 on, or was it different?

16     A.    No.  What they did, right there, is afterwards

17  when I was on light duty and -- let me back up, right there.

18     Q.    Sure.

19     A.    So we don't get past this point, this statement.

20  While I was on light duty, as I stated before, I went off --

21  I was off on Thanksgiving holiday.  A union told me, right

22  there, that I got -- I presented them, hey, what's going on.

23  They said well, I don't know what to tell you.  And the next

24  thing I know, I said well -- they says well -- I says, why

25  did they lay me off.  I said, you know.  Or did they --

1  what's the deal.

2          You know, I don't understand.  You know, you tell

3  me they're not -- so I wasn't receiving a check, right

4  there.  And it was during the holidays.  And I said, well,

5  hey, I got a family to feed, I need to know where is my

6  income coming, what's going on here because I got mortgage

7  payments and everything else, a family to feed, and

8  holidays, I just like to know.  I says, I'm not looking for

9  any money to take from anyone, but I know that I'm -- either

10  I'm unemployment, or what, which way do I go here, I'm not

11  receiving anything.  I don't know.

12          I wanted to come to work, but I'm not getting any

13  money, so where am I.  Well, they said in a matter, right

14  there, hey, why don't you try -- in a joking manner.  And it

15  kind of angered me, right there, with union because I didn't

16  feel --

17          Q.    Why don't you try what?

18          A.    Unemployment.

19          Q.    Oh, I see.

20          A.    Why don't you go sign up for Unemployment.

21          Q.    Okay.  That was the union's -- your union guy told

22  you that.

23          A.    Union guy.  Which I wasn't too happy with that

24  comment, right there, being said like that to me.  I felt

25  that they just kind of dropped the ball on me, right there.

1    So I lost a lot of faith in the union.  I never came from a

2    union shop before.  This is my first actual experience of

3    being under a union.  I've always worked in just a regular

4    shop and worked every day of my life.  And this was my first

5    day of experiencing anything with a union.  So I didn't even

6    know any claims or how to get -- you know, because that's

7    the first time I've ever been injured in my live.

8            And everything was new.  I was young, you know, in

9    my early 20s.  And I was like, hey, well, I got a family to

10   take care.  And I'm used to working 70 hours a week, 90

11   hours a week.  So I'm hurting.  And I'm -- in my previous

12   job, I had no problem working 70 to 90 hours a week.  And

13   I'm like, hey, I need something here to tide me over.

14   What's going on here. You guys tell me why I can't work,

15   tell me why I'm laid up or the doctor -- I even explained to

16   the doctor, I'm not looking to take time off, I just want to

17   know what's wrong with me so I can get back to work.

18       Q.   What was your injury?

19       A.   Well, they couldn't really tell me.  At once they

20   was trying to treat me for carpel tunnel.  Then they said it

21   was something in my wrist, and they wanted to do exploratory

22   surgery.  And I said, look, I'm not going to let you just

23   cut me and use me as a human Guinea pig just to be putting a

24   needle running up and down my arm.  I said, if you can tell

25   me what's wrong with me, rather for you to tell me that.

1    Q.    Was there a --

2    A.    And I went to a specialist.

3    Q.    Okay.  Was there a point in time, though, when you

4  had a specific injury, or did this happen --

5    A.    This was one of the spur-of-the-moment things.  It

6  happened -- I was working out in die cast toward the end of

7  my shift.  I was picking up zinc metal.  And the next thing

8  I know, I heard a pop in my wrist.  And I said, wow.  So I

9  took it easy.  There was almost, like, 15/20 minutes left to

10 my shift.  And I heard a pop.  I told one of the supervisors

11 that, hey, I heard a pop.  And I didn't think much of it.  I

12 thought it was just maybe I sprained it or something.  No

13 big deal.

14        So I went home.  And things, right there,

15 evaluated to a point where I -- it swelled up.  And so I

16 went to the emergency room that night, because I was working

17 second shift.  And after going to the emergency room, they

18 told me take a couple days off.  And I notified work that I

19 wouldn't be in work.

20   Q.    Okay.

21   A.    And I notified them I wouldn't be at work.  And

22 then when we get back to that point, right there, when they

23 laughed and joked about the Unemployment, I did go file for

24 Unemployment.  I says, what the hell, I got nothing to lose.

25 So I filed for Unemployment.  After filing for Unemployment,

1    I realized that the lady heard my case and she gave me

2    the -- they said they would send a decision back.  A

3    decision came back that PHB denied it.  And we had a hearing

4    up on it.  And this -- now, this is back in December, now

5    we're in December.  The months are accumulating.

6        Q.   Okay.  So this is back in '89, '90, in that time

7    frame?

8        A.   Yes.

9        Q.   All right.

10       A.   So now the months is just, you know, changing

11   over, right there.  We're into -- January the decision come

12   back, we had our hearing.  At our hearing, Ben shows up to

13   represent the hearing.  And the first thing that comes out

14   of his mouth, right there -- he had like a smirk on his

15   mouth.  And he says, we don't believe that you're -- that

16   you should be getting Unemployment, because you're injured

17   and you should be getting Workmen's Comp.  And his remark

18   came out of his mouth like a smile.  And something like a

19   little gesture like (indicating).  And I didn't find that

20   humorous at all.  I thought that was -- that that remark,

21   right there, was kind of off-keyed, coming from him.

22       Q.   Okay.  But you were on Workers' Comp.  You file

23   for Unemployment.

24       A.   Well, they said that I was laid off.  This is what

25   was so alarming to me.  They said I was laid off, right

1    there, because there was no work.

2        Q.   No light-duty work?

3        A.   Right.

4        Q.   All right.

5        A.   So they laid me off supposedly, right there.  This

6    is what they tell me.  Don't worry about coming to work, we

7    have no more work for you.  So I'm like, what.  I asked the

8    union, what the heck is going on, I don't know why I'm

9    seeing a lot -- if I got more time and if there's a guy,

10   right there, that went -- if we're under union policy, why

11   should I be laid off if there's another guy less than and

12   he's -- my injuries couldn't allow me to do anything in the

13   shop.  But I said, I'm still able to use my left hand or do

14   a little work, right there, with my right.  I says, these

15   guys are doing it, why can't I.

16       Q.   That's a conversation you had with your union

17   steward?

18       A.   Right.

19       Q.   All right.  And your union steward told you --

20   suggested, why don't you file for Unemployment Compensation?

21       A.   Right.

22       Q.   You did.  Were you ultimately awarded Unemployment

23   Compensation benefits?

24       A.   I was awarded Unemployment Compensation as well

25   as --

1        Q.    Workers' Comp.?

2        A.    Workers' Comp.  Because when they got to the

3    hearing, they realized that I still could work in the

4    workforce.  That I was still able to work in the workforce.

5    Regardless if PHB had any work for me based on my

6    experience.

7        Q.    Okay.

8        A.    So not long after I was awarded those claims, PHB

9    called me back.  And that's how I got in the tool crib.

10       Q.    Okay.

11       A.    And the tool crib, right there, whether they

12   created the position for me -- but there was other people up

13   there.  And vast majority of people working in the tool

14   crib, and I learned tool crib, right there, took it serious

15   enough because I took my job serious enough to want to be

16   there, not just go there to lay around.  And the man that

17   was running the tool crib at the time, right there, he kind

18   of brought me under his wing and he showed me, right there,

19   how certain things -- because I wanted to know.

20       Q.    And you worked in the tool crib, then, from the

21   early '90s up --

22       A.    That's when I -- when the position came available.

23   He went downstairs to fill a position and I took his

24   position on the upstairs.

25       Q.    Okay.  And you worked there until 2001?

1    A.    Correct.

2    Q.    Okay.  I got it.

3    A.    But even in the course of my employment, I could

4    never figure out that I know there's been a different way

5    that they treat other individuals in the shop as a whole.

6    Because when I was on -- when I was laid off at that time --

7    Q.    Back in the early '90s?

8    A.    Right.  When I was off, right there, they posted

9    what they said layoff, or however they want to term it.

10   They used to go around and do collections.  And I've noticed

11   through that shop that whenever there was a collection

12   for -- if just say white and black, the blacks were never

13   given the same equality.

14   Q.    Who are you talking about now?  You say they.

15   A.    Well, when they do a collection, just a whole.

16   Q.    Who is they?

17   A.    Well, the union.  Union in whole, right as a body.

18   But never do the same as they would do for as opposed to a

19   white worker working in there.  Like if they --

20   Q.    You mean like a voluntary contribution, someone

21   has been laid off.

22   A.    Right.  They would go out -- if a person is out,

23   what they would do is like a union type of a gesture, hey,

24   so-and-so is off, right there, for work.  How about us,

25   right there, getting a gathering, or selling this, or doing

1    this, right there, as opposing sending them something to

2    tide them over.  This is something they did, right there.

3    And we would all pitch in and give a buck or two or sign a

4    card and send that, right there, to the individual just

5    stating that we all feel some of this shared -- some of the

6    responsibilities, maybe a little bit of help to tide you

7    over.  But I didn't see that same type of, right there, of

8    aptitude, right there, with the blacks.  Being given the

9    same equality that they were doing.  I don't know why they

10   didn't do it, those individuals.  You'll have to ask that.

11       Q.   You perceived that the union's enthusiasm for

12   raising money for laid-off black workers was not as high as

13   it was for laid-off white workers; is that correct?

14       A.   Right.  So in the shop, right there, that let me

15   know that there's some type of -- an unproper imbalance,

16   right there, in decisions being made, right there, as to

17   people of color.

18       Q.   Okay.  Do you recall the identity of any

19   particular white workers who were laid off for whom money

20   was raised?

21       A.   Going back, right there, I could say some of these

22   guys, I remember.  I'm trying to think.  I know Curt Bickel

23   was an employee there.  And let me see who else was an

24   employee then.

25       Q.   Curt Bickel was an employee who was laid off --

1      A.    Right.

2      Q.    -- and some sort of collection was taken up?

3      A.    Right.

4      Q.    Anyone else?

5      A.    There's quite a few guys, right there.  I have a

6  sheet I have with all the individuals' names on it that was

7  off because I used to get a light-duty sheet sometimes and

8  review.  And that's how they would send a lot of us.  They

9  would get a light-duty sheet, tells you who is off on what

10 disability and whatever.  And circulate.  Curt Bickel, first

11 one that come to mind.

12     Q.    Anyone else you can think of?

13     A.    It's hard, right there.  I'm not trying to be --

14     Q.    That's all right.  I know you're going back a

15 number of years.

16     A.    Yeah.  And these guys, right there, I could be

17 sitting here right now and I can't remember their name but

18 remember their face.  And I'm just bad with names.  And I

19 could see a person later on, right there, and say tell my

20 wife, you know, so-and-so.  And then she says no, I don't

21 know so-and-so.

22     Q.    Not every white guy who was laid off had a

23 collection taken up for him, did they?

24     A.    I say a vast majority of them did.  A vast

25 majority of them, right there.  Because it used to be things

 1   posted on the bulletin boards.  Individuals would have

 2   raffles.  And even if there was deaths that was in the

 3   family, that was also considered or whether a person was off

 4   due to an injury.

 5       Q.   Okay.  All right.  But so as far as the union's

 6   enthusiasm for helping out people who were laid off, you

 7   thought it was greater for the white guy than the black guy.

 8       A.   Right.

 9       Q.   To put it in very simple terms.

10       A.   Right.

11       Q.   All right.

12       A.   Because I know there was one incident I could

13   speak of that I know of, right there.  Vernon Duck was off,

14   and he never received any compensation, right there, for it.

15       Q.   From the union?

16       A.   From the union.  Myself, I never received any

17   compensation like that.  From the union.  There would be

18   even points where these guys would give turkeys, take them

19   to these guys' houses or whatever and deliver them, during

20   the holiday season.  Or fruit baskets.

21            And one more thing.  There's a couple things that

22   I'd like to share, right there, with some of my

23   experiences --

24       Q.   Sure.  Go ahead.

25       A.   -- right there.  That I -- at this conference.

1    When I worked at PHB, my position in the tool crib was

2    maintain keeping the area clean.  And keeping the shelves

3    stocked.  And when one of those two, right there, if my area

4    wasn't clean, I'd get an unsatisfy report.  And my boss

5    would jump all over my tail about it.  And some of the

6    things that I would find would be really alarming to me

7    after I swept the floor and went through the aisles and

8    cleaned up things.  I noted that they would spit peanuts on

9    the floor in shells, right there, sunflower seeds.

10         And I mentioned my displeased feelings about it,

11   right there.  Because it was when they walked through and

12   they would due a report.  And I was only there for one

13   shift.  And maybe they may have came later on and seen this

14   on the floor and say, hey, it's unsat.  These one of the

15   claims that I would get.

16         And then sometimes they would say material wasn't

17   on the shelf when they knew that the second shift or shift

18   before, third shift, may have taken it out to solve a

19   problem.  And never documented it to say that it was used,

20   right there, for that purpose.  So whoever showed up on

21   first, that being myself or any of the workers, never had

22   notes to say that this material was used prior to it, to

23   give us a heads-up to order to whatever direction we need to

24   go.

25         Sometimes material was hidden in the maintenance

1    area, only to get my butt chewed out, right there, about not

2    having inventory.  And a guy comes up on an off shift,

3    because if he's working second and because they rotate from

4    time to time, and say, hey, I saved the day, I fixed it when

5    they were stockpiling material in maintenance or a crib in

6    their areas.  Things that they were taking out of the crib

7    without proper notification.

8            There was things, right there, that when I went to

9    for a doctor's excuse, and I had an ailment, I called off

10   and brought a doctor's excuse, right there, from the

11   doctors.  When it was told to me that this doctor, right

12   there, is lying.  And I was -- I was told this by Ben

13   Hancock as well.

14       Q.   When -- well, let me back up.  The peanut shells

15   and the sunflower seeds, do you know who put those on the

16   floor?

17       A.   No.  Because I had mentioned it to my supervisor

18   as well as maintenance supervisor that this was happening.

19       Q.   Okay.

20       A.   And it was done on off -- not on my shift.

21       Q.   Okay.  Let me ask you.  This comment you say that

22   Ben made to you about your doctor lying, when did that

23   happen?

24       A.   Well, they called me and complained about to me

25   about attendance.

1    Q.    Okay.  When did they call you?

2    A.    Oh, I can't remember the date, like I said, right

3    now.  I can't, you know, jog the dates.  But these are

4    things that I know that they said.

5    Q.    Okay.  So they called you up and said, you know,

6    you're missing a lot of work?

7    A.    No, we need to talk.

8    Q.    Okay.

9    A.    They brought me in and they reprimanded me about

10   doctor's excuse.  We think that you're missing a lot of

11   work.  You have doctor's excuses, but we think your doctor

12   is lying.  And that was said to me personally.  And I was

13   like, how can my doctor be lying.  I got an excuse.  I was

14   off, right there, I says it's not uncommon for me.  I says,

15   you know.

16   Q.    Was this the wrist, whole wrist thing that we're

17   talking about, does this have anything to do with the wrist

18   situation?

19   A.    No.  This was just everyday employment.

20   Q.    Okay.

21   A.    If I came up with a cold -- because most of the

22   individuals that came to work with, they're coughing, they

23   turn the doorknobs.  Or I work with a lot of things that --

24   handle a lot of things that these guys handled throughout

25   the shop.

1       Q.    Which doctor are we talking about here regarding

2  the conversation?

3       A.    This is my family practitioner.

4       Q.    Who's that?

5       A.    It was Dr. Obenreder.  He's retired now.

6       Q.    Okay.  And do you know when this conversation took

7  place?

8       A.    It was during -- I can't -- like I said, I had my

9  journal with the dates.  And all that information that was

10 there is lost, right there, at the shop, right there,

11 because I didn't think that they were going to keep me out

12 of the tool crib being that I was only person running the

13 tool crib upstairs.

14           And when they told me that they didn't need my

15 services, soon after that I found out that they brought a

16 young lady that was in maintenance, and they brought her up

17 to fill my position.  Which they said there was no longer a

18 position for me.  Her name was Betty Coleman.  From my

19 understanding from other individuals in the shop.

20      Q.    Let me ask you, though.  When did Ben Hancock tell

21 you about -- make his comment about your doctor's excuse?

22      A.    I would say before -- it was somewhat before --

23 before they let me go.  Somewhere in that year.

24      Q.    Okay.  So you think 2000/2001?

25      A.    There was even an incident, right there, in that

1    same parallel.  I was injured in 2000.  As opposed to an

2    auto accident.  And Mr. Hancock came up to the tool crib

3    after I had asked him for help.  I said Ben, I says, I was

4    involved in an automotive accident November of 2000.  And I

5    needed your assistance, right there, because there's a lot

6    of product that I have, and my doctor advised me no

7    repetitive bending or lifting anything over 10 pounds.

8            Ben came upstairs.  He says, show me what you need

9    to have, right there, as though he was concerned.  Once we

10   got up there, I says, I can -- if you get this product up

11   here, Ben, I said, I need someone to help me, right there,

12   get this product.  I can't lift and stuff because it was on

13   a skid.

14       Q.   Okay.

15       A.   And I said some of the lighter items, I said, I

16   have no problem with picking up and doing.  But these heavy

17   items, I says, I just can't do it.  It's like motors,

18   80 pounds.  And Mr. Hancock came in and grabbed some items.

19   And he acted as though he was a human scale, and he started

20   doing like this (indicating).  He said, well, this don't

21   feel that heavy.

22       Q.   Okay.

23       A.   And I looked at him and I says, Ben, I said, I

24   didn't ask you to -- like I didn't need your services, I'm

25   just asking for you to -- you know, they have done it

1  throughout the shop, if you -- they always said, if you

2  needed help, don't be afraid to ask.  And I felt that I

3  was -- basically, at that point I knew that I wasn't in the

4  best of situations, right there, through Ben's eyes, right

5  there.  Because when he started looking at me and evaluating

6  what I'm lifting, there's no reason for him to do that.

7  Because he's never had to do that for me through the course

8  of my employment, right there, with PHB.

9         For him to come there and do something of that

10  magnitude kind of displeased me, right there, with him.  And

11  I'm wondering what would make him come up and grab an item

12  and say, this don't look like it's heavy enough, as though I

13  was a liar.

14     Q.   What you're demonstrating doesn't show up on the

15  transcripts.  Just for the record, the witness was picking

16  up a coffee cup to demonstrate that Mr. Hancock would pick

17  up an item and say -- kind of lift it up and down and say,

18  this doesn't seem that heavy to me.

19     A.   Correct.

20     Q.   All right.

21     A.   And that's not what I was asking him.

22     Q.   Okay.

23     A.   The only thing I was asking him, if I had a --

24  something like a motor sitting over here in on a skid, those

25  items can't be -- can't lay there because they need to be

1    put on the shelf.

2        Q.   You were injured in a motor vehicle accident in

3    November of 2000; is that right?

4        A.   Yes.

5        Q.   All right.  That was outside of the scope of your

6    employment?

7        A.   That was after work.  I was leaving home, going

8    home from work.

9        Q.   Was there a lawsuit or anything that arose out of

10   that accident?

11       A.   Yes, so I can't talk about that too much.

12       Q.   Okay.  Is it still pending?

13       A.   Yes.

14       Q.   Who represents you in that case?

15       A.   Right now, I'm -- attorney out there on West 26th

16   Street.

17       Q.   Okay.  Is that a lawsuit filed here in State

18   Court, Court of Common Pleas of Erie County?

19       A.   Yes.

20       Q.   Have you met Jeff, Mr. Connelly, prior to today?

21       A.   Yes.

22       Q.   Okay.  When is the last time you met with Attorney

23   Connelly?

24       A.   Probably about a month ago, two months.

25       Q.   Okay.  And what was the purpose of that meeting?

1      A.    Well, I was -- I had a fire at my house.  And

2  Mr. Connelly was handling the proceeding we were at -- we

3  had some bad advice, right there, from some people that

4  wasn't reputable doing the work for us.

5      Q.    Okay.  So you consulted Attorney Connelly as

6  counsel.

7      A.    Correct.

8      Q.    Is Attorney Connelly representing you at this

9  time?

10      A.    No.

11      Q.    All right.  Have you met with Attorney Connelly

12  concerning the subject matter of this case?  When I say this

13  case, I mean Cari Goodwine's lawsuit.

14      A.    We had talked, that's about it.  What, we were

15  just talking.  He asked me about the PHB.  And I said

16  certain things that happened there.

17      Q.    When is the last time that you saw Cari Goodwine

18  or David Woodard?

19      A.    I don't see those guys on a constant basis.  Last

20  time I saw them is when I worked at PHB.  We don't pass each

21  other's paths, right there, like that.

22      Q.    So the last time you saw either one of those guys

23  would have been back in June of 2001?

24      A.    They worked second shift.  So I may have not even

25  seen them that day.

1      Q.    I got you.

2      A.    When 3:00 comes, it's like a rat race.  Everybody

3  is out of that place.  And you don't want to be standing

4  near the door.

5      Q.    I got you.

6            MR. LANZILLO:  Okay.  I think that's all I have.

7            Thank you, Mr. Arrington.  I don't know if

8            Attorney Connelly has any questions or not.

9            MR. CONNELLY:  No, I don't.

10           MR. LANZILLO:  You have the right to review your

11           transcript before Carol finalizes it.  This is

12           your right.  You may either exercise that right

13           and have Carol send you a copy of the transcript.

14           You would then read over it.  If there are any

15           errors in transcription or otherwise, you could

16           correct them.  It would have to be done within 30

17           days, I believe.

18              Or you can do what a lot of witnesses do, and

19           that's just waive that right and let Carol

20           finalize the transcript.  But that's entirely up

21           to you.  However you want to proceed, but you need

22           to tell Carol now what you want to do.

23           THE WITNESS:  Yes, I would like to exercise that

24           right.

25

1          (Deposition concluded at 11:32 p.m.)
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25