1                    THE UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF PENNSYLVANIA
2

3  CARI GOODWINE,            :
        Plaintiff            :
4                            :
            v.               : Case No. 04-142E
5                            :
   PHB DIE CASTING,          :
6        Defendant           :

7

8

9          Deposition of WILLIAM HILBERT, taken before

10    and by Sonya Hoffman, Notary Public in and for the

11    Commonwealth of Pennsylvania on Wednesday, April

12    13, 2005, commencing at 10:09 a.m., at the offices of

13    Knox McLaughlin Gornall & Sennett, P.C., 120 West

14    Tenth Street, Erie, PA 16501.

15

16

17  For the Plaintiff:

18      Jeff A. Connelly, Esquire
        Connelly Law Office
19      824 Hilborn Avenue, Suite 1
        Erie, PA 16505
20

21  For the Defendant:

22      Richard A. Lanzillo, Esquire
        Knox McLaughlin Gornall & Sennett, P.C.
23      120 West Tenth Street
        Erie, PA 16501
24

25              Reported by Sonya Hoffman
             Ferguson & Holdnack Reporting, Inc.

1                              I N D E X

2

3

4    WILLIAM HILBERT

5         Direct Examination by Mr. Connelly . . . . . . . 3

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          W I L L I A M   H I L B E R T, first having

2          been duly sworn, testified as follows:

3

4                         DIRECT EXAMINATION

5     BY MR. CONNELLY:

6

7          Q.    Mr. Hilbert, my name is Jeff Connelly, and we're

8     here to take some depositions regarding the Cari Goodwine

9     lawsuit.  Have you had your deposition taken before in other

10    cases?

11         A.    Regarding this?

12         Q.    No, other cases.  Are you familiar with the

13    procedure?

14         A.    Yes, vaguely.

15         Q.    Basically, just a few things:  One, if there's

16    anything that I ask you and you're not sure of, rather than

17    maybe the whole process becoming confused with what I'm

18    asking and what you're saying, ask me to make it more clear

19    or ask Rich.  And if there's anything that you have any

20    questions about concerning what my meaning is, make it clear

21    to me.

22              And if there's any yes or no answer, a shake of

23    the head, she can't take down.  And I do that all the time,

24    so I'll probably do it more than you do.

25              I have to ask you, are you under the influence of

1  any medication or drugs or anything that would hamper your

2  memory?

3       A.   Just old age.

4       Q.   We're all getting there.  And other than that, do

5  you have any questions of me right now?

6       A.   No.  I've got one problem, can I get out by

7  noontime?

8       Q.   Yes.  I'm going to be very brief with you, okay?

9       A.   Okay.

10       Q.   One thing I want to you ask about, I received

11  Answers to Interrogatories that I gave to your attorney, are

12  you familiar with those answers?  Did you review them?

13            MR. LANZILLO:  I don't think he knows what you're

14            talking about, and the answer is, no, he did not.

15            That was coordinated by the HR director.  In fact,

16            I'm surprised if Mr. Hilbert has ever even seen

17            those before.

18       Q.   Then these are signed by -- so you're not

19  familiar -- you don't know whether these answers are --

20  personally, you don't know whether these answers are

21  accurate or not.

22       A.   True, yes.

23       Q.   And these were signed by Ben Hancock.  He's a

24  personnel director?

25       A.   Yes.

```
 1        Q.    Does he have any ownership in PHB?

 2        A.    Yes, he does.  He's a -- we have an ESOP -- our

 3   company is an ESOP, so he has a few shares.

 4        Q.    Let me ask you this:  Is he an officer in the

 5   corporation at all?

 6        A.    No.

 7        Q.    Would you then explain to me exactly why he was

 8   the one that verified the answers to these questions when

 9   he's not a party to this lawsuit?

10             MR. LANZILLO:  Well, let me just interject with an

11             objection and notation, to the extent that you

12             know.  And in fairness to the witness, I selected

13             Ben Hancock because he was the man in the best

14             position to coordinate the gathering of

15             information and the person with the most direct

16             knowledge as opposed to Mr. Hilbert.

17             MR. CONNELLY:  But then can we agree then that his

18             answers represent accurately the corporation's

19             position?

20             MR. LANZILLO:  To that extent, Mr. Hancock has

21             verified the information.  To the best of his

22             knowledge, information, and belief those are the

23             responses served on behalf of PHB.

24             MR. CONNELLY:  Well, okay.  He was -- that's fine.

25   BY MR. CONNELLY:
```

1     Q.    Let me just ask you a few questions, then, Mr.

2     Hilbert:   In your personal knowledge of Mr. Goodwine, did

3     you ever have an opportunity to meet with him?

4     A.    Yes.

5     Q.    Do you remember how often?

6     A.    Two or three times.

7     Q.    Do you recall what the subject of the meetings

8     were?

9     A.    Once I was talking to his little -- his children

10    that he had in the plant when I was giving him a turkey.

11    Q.    Okay.

12    A.    And in reference to him, he was on light duty --

13    or no, he was on S & A at the time and I asked him how he

14    was doing, et cetera, and the kids came in and that was it.

15    Quick, brief.  One time when it was involving this

16    situation -- maybe two times when it was involving this

17    situation, but I -- that would be it.

18    Q.    When you say "this situation", to what are you

19    referring specifically?

20    A.    Why I'm here today.

21    Q.    Do you mean complaints about discrimination?

22    A.    Complaints about this.

23    Q.    Things in the lawsuit?

24    A.    Yes.

25    Q.    Do you recall what the result of those meetings

1    were with Cari?

2          A.    Results as far as?

3          Q.    Was there any decision that anything would be

4    done?  Did the two of you come to any agreement as to what

5    PHB might do or what Cari might do or anything like that?

6    Was there any -- in this meeting with you concerning a

7    complaint or concerns about discrimination, what would have

8    transpired after that?  In other words, did PHB take any

9    steps to alleviate his concerns or anything like that or did

10   you?

11              MR. LANZILLO:  Objection to form.  Go ahead.

12         A.    Yes, I did.  I talked to the other individuals

13   that he was referring to were harassing him and discussed

14   it.

15         Q.    Do you recall who those individuals were?

16         A.    I think one -- yeah, one of them was, of course,

17   the Bill Darnell situation, the maintenance fellow.  And who

18   else, who else, who else, I believe Gebhardt, as I recall.

19         Q.    And what was the subject matter of the

20   conversations or what did you advise them?  Mr. Darnell,

21   what did you advise him?

22         A.    I wanted to make sure what Cari had intimated that

23   he said, and I asked him if that was right and if it was.

24   That was about that.  That brought up for the situation,

25   then, Mr. Darnell to go to Cari and offer his apology if he

1  was indeed not communicating properly, and I think that

2  happened.  As I recall, Mr. Hancock said they did shake

3  hands and it seemed to work rather well.

4       Q.   Do you recall what the specific complaints were

5  about Mr. Darnell?

6       A.   That he had said something about -- we were

7  putting in a new crane and we had dug a hole in the ground

8  and he had said something.  And I don't know what he said.

9       Q.   Okay.

10      A.   But it was taken as -- in reference to --

11      Q.   I'm familiar with that.

12      A.   Yes, that's the only thing.

13      Q.   And how about Mr. Hancock; do you remember?  Did

14  Mr. Hancock say anything or do you recall --

15      A.   He seemed to think that it went well.

16      Q.   What was it that Cari was concerned about with

17  Mr. Hancock?

18      A.   No, it wasn't Mr. Hancock.

19      Q.   Was there someone else?

20      A.   Mr. Gebhardt.

21      Q.   Mr. Gebhardt, I'm sorry.  Did you speak with Mr.

22  Gebhardt?

23      A.   I spoke with him after the situation and

24  reprimanded him for whatever that was all about and warned

25  him that that's not the way our company should run and was

```
 1   very disappointed.
 2        Q.    Okay.  In the Interrogatories --
 3              MR. CONNELLY:  And do you have a copy of them
 4              there?
 5              MR. LANZILLO:  I don't, Jeff.  I can have someone
 6              bring them up.
 7              MR. CONNELLY:  I don't have an extra copy, but
 8              let's see if I can make it clear.
 9              MR. LANZILLO:  Okay.
10        Q.    There are a list of approximately 15 -- or 19
11   people that were interviewed, it says, "Interviewed
12   regarding our discussions concerning complaints served by
13   Mr. Goodwine."  Are you familiar with those, or would this
14   be something that I would have to ask Mr. --
15              MR. LANZILLO:  I can tell you this, Mr. Hilbert
16              was not consulted.
17              MR. CONNELLY:  So we're not going to be getting a
18              whole lot from these regarding personal knowledge?
19              MR. LANZILLO:  No.
20              MR. CONNELLY:  We're going to have to set him up,
21              Hancock.
22              MR. LANZILLO:  Okay.  We can talk about scheduling
23              afterwards.
24              MR. CONNELLY:  Okay.  We'll do that afterward.
25        Q.    Besides Mr. Gebhardt and Mr. Darnell, did you
```

1    speak to anyone else regarding Cari at all that you can

2    remember?

3        A.   No.

4        Q.   Do you have an antidiscrimination policy at PHB?

5        A.   Yes.

6        Q.   And is that posted?

7        A.   Yes.

8        Q.   What does it -- what is it?  What is your

9    antidiscrimination policy?

10       A.   I would be kidding if I thought I could tell you

11   exactly what it is, but it says that we do not permit any

12   harassment or -- what's the word I want, discrimination of

13   any sort.

14            It would also say that religious, sexual, all the

15   normal things that would be in a harassment policy, it's

16   there.  It's part of our handbook that's given out when you

17   come in as an employee.  It's posted.

18       Q.   I believe a while ago there was a lawsuit filed by

19   a Fred Jackson.  Do you remember Mr. Jackson?

20       A.   Oh, yes.

21       Q.   Are you familiar with what the outcome was of

22   that?

23       A.   Yes.

24       Q.   Was there an order issued by -- or a compromise

25   between yourself -- your company and Mr. Jackson?

1     A.   After a very lengthy --

2     Q.   Yeah, I know how long they can be.

3     A.   Yes, there was.

4     Q.   And what was that?

5     A.   We agreed to pay what the judge told us we should

6     agree to pay.

7     Q.   How much?

8     A.   $10,000, which ended up being about $6,000 after

9     taxes.

10    Q.   What about, was there anything else in the order

11    as to the regards of PHB doing anything and posting any kind

12    of policy or anything like that?

13    A.   There was, and I can't tell you exactly what it

14    was right now.  And we also had in the agreement that a --

15    some kind of a clause that the lawyers put in to tell you

16    that we didn't really agree, but we agree.  We agree to

17    agree, whatever you guys call that.

18         MR. CONNELLY:  We'll ask him to clarify.

19         MR. LANZILLO:  In the clause there's no admission

20         of liability.  It's a compromised disputed claim.

21         MR. CONNELLY:  You said I could look at that file,

22         correct?

23         MR. LANZILLO:  Yes.  Let me know and you can come

24         over whenever it's convenient.

25         MR. CONNELLY:  I'm happy about that.

1    Q.    When Mr. Gebhardt was -- well, let me ask you this

2    first:  In the Interrogatories, it says that PHB has

3    conducted training sessions, participated in training

4    sessions for employees where they received education.  And

5    this is the training schedule that I was just given; would

6    that be it?

7    A.    Uh-huh.

8         MR. LANZILLO:  Jeff, just to be fair to you, I've

9         given you documents that I believe were produced

10        as part of the EEOC file, as well as the initial

11        disclosure.  Those relate to a particular training

12        session.  And in the documents produced in

13        response for your request for production of

14        documents, we provided you a training log for all

15        the employees as well as other training schedules.

16   Q.    Approximately, how many classes did each employee

17   have to go to; if you know?

18        MR. LANZILLO:  If you remember.

19   A.    That, you better ask Ben Hancock.

20   Q.    Do you know who conducted those trainings?

21   A.    I introduced it, I recall, whenever we had a

22   training session, and Mr. Zamboldi.

23        MR. LANZILLO:  Yes.

24   Q.    Okay.  Gary Gebhardt was ordered to take a

25   diversity training class.

1      A.    Yes.

2      Q.    Was that done through you or was that done through

3   some other -- or was that as a directive that came from you?

4      A.    It came from PHB.

5      Q.    And it was scheduled for February 15th and he

6   didn't -- they cancelled that class; is that correct?

7      A.    Yes.

8      Q.    Was there any attempt to set up another class or

9   find another class for him to attend?

10     A.    I would think so, but I don't know that.

11     Q.    Okay.  How is the -- basically, the work

12  hierarchy, like supervisors, line foremen, managers, how

13  does it work at PHB?  You have the workers, and then who

14  is -- can you give me who is above whom all the way to you.

15     A.    Well, you got the worker, you got the foreman --

16  shift foreman.  And then whatever particular department

17  you're in, you have the department manager who the foreman

18  would report to.  And then the department manager reports to

19  the operations officer who reports to me.

20     Q.    Okay.

21     A.    It's not real complicated where we are.

22     Q.    Referring back to Jackson, how long ago did that

23  start; do you recall, approximately?

24           MR. LANZILLO:  The proceedings, do you mean, Jeff?

25           MR. CONNELLY:  Yeah, the lawsuit.

1      A.   This would be a guess --

2      Q.   Yes.

3      A.   -- it started four years ago.

4      Q.   Okay.  When did it end?

5      A.   Approximately, a year and a half or so later.

6      Q.   Do you have what they call a bad-boy list?

7      A.   Yes.

8      Q.   How did that get that name?

9      A.   I think it was set -- I can't tell you that, I

10   don't know, but I got a hunch it was the union who decided

11   to call it that, the union president.

12     Q.   It's just a slang name that they have for it?

13     A.   Yes.

14     Q.   That's what I thought.

15          MR. LANZILLO:  That's a dysphemism.

16          MR. CONNELLY:  He's waited all day -- probably all

17          year to say that.

18          MR. LANZILLO:  I've never gotten to use that word.

19          It's taking a relatively innocuous or innocent

20          thing and attaching a stigmatizing language to it.

21          It's the opposite of a euphemism.

22     Q.   On the bad-boy list, from what I understand, it's

23   that if there's basically a large amount of absences that

24   are unexplained or unexcused, they're put on that list.  And

25   then the second year, it's basically if they're absent more

1  than three times, even with a doctor's excuse, they stay on

2  that list.  "That if the employee's on corrective policy for

3  a second or subsequent year, a doctor's slip will not excuse

4  an absence but may be used to treat multiple days of absence

5  as a single occurrence."

6        Was that negotiated between the company and the

7  union?

8     A.   I can't say that you're right in what you just

9  said, I would have to review it.

10     Q.   I was quoting from the information I was given.

11     A.   But it's in our handbook for the union and it

12  would have to be negotiated.  And I believe it was

13  negotiated in our last contract, but, again, that's all I

14  know at this point.

15     Q.   Do you have any personal knowledge of -- I know

16  Cari missed a lot of days and was placed on that list.  Do

17  you have any personal knowledge as to why he missed -- had

18  as many absences as he did?

19     A.   I know he missed an awful lot of days, an awful

20  lot of days.  I believe part of it was probably S & A would

21  be one of the reasons.  Other than that, no, I don't.  He

22  did have a -- I think he took some voluntarily layoffs when

23  business got slow.

24     Q.   When you say --

25     A.   But that wouldn't be --

1      Q.    When you say "S & A", what do you mean?

2      A.    Sickness & Accident.  But that would be -- again,

3   something would be in his personnel records that we have.

4      Q.    Do you recall having any conversations with anyone

5   regarding his absences, anyone in PHB, yourself?

6            MR. LANZILLO:  At any particular time, Jeff?

7      Q.    It would be at the time or after.

8      A.    At the time of these accusations?

9      Q.    No.  While he was -- let's put it this way:  He

10  was missing a lot of work, was it ever brought to your

11  attention that Cari, specifically Cari, was?  Or is that

12  something that's just handled by the managing staff?

13     A.    It was -- it's usually just the human resource's

14  opportunity.  Reports are given and they're general reports.

15     Q.    Okay.  Do you have any personal knowledge of

16  Cari's work history besides that he -- what you were told,

17  that he missed days and the facts of this lawsuit and those

18  couple of meetings that you had with him?  Were there any

19  other instances that you can recall where you discussed Cari

20  with anyone?

21     A.    No.

22     Q.    How many, if you know, black individuals are in

23  management at PHB?

24     A.    In management?

25     Q.    Yes.

1    A.    There used to be a couple of foremen --

2  supervisors, I guess.  But they declined to continue to be

3  foremen and went back to regular hourly employees.  And

4  black people in management, I don't think we do have any,

5  unless I'm mistaken, but I don't think so.

6    Q.    And how does an individual get promoted at PHB,

7  like move up, from worker to a foreman or to a supervisor?

8  What has to be done?

9    A.    Performance.

10    Q.    And who decides how they're promoted or who

11  decides when they're promoted?

12    A.    Well, if we're going to have a position open, we

13  would post it.  That would be one way they would find out

14  about it.  And then they would apply for it.  And then their

15  education, their backgrounds, their work habits, their

16  attendance, all those things that would be normally reviewed

17  would be how you would do it and you'd pick the best of

18  the --

19    Q.    Who would make the decision?  Would it be a group

20  or would it be one individual?

21    A.    I depends upon the position you're looking to.

22    Q.    All right.

23    A.    Like, give me an idea of what position you're

24  talking about.

25    Q.    Let me ask you this:  Would it be the more

1    important the position, the more individuals from PHB would

2    be involved in the hiring?

3        A.    Say that again.

4        Q.    The more important the position, the more --

5        A.    Yes.   There's also a group of four or five that

6    will interview the particular person and then they give

7    their opinions, et cetera.   And if it's an important

8    position, I have the final say.

9        Q.    Of those individuals that interviewed, do you know

10   who they would be?   Or what positions they would have, if

11   not specifically their names?

12       A.    They go to foreman, it could be a foreman.

13            MR. LANZILLO:   I'm going to object to form, it's a

14            little vague.

15            MR. CONNELLY:   It is a little vague.

16       Q.    Well, you said that there was a -- generally

17   there's an interview process and four or five people are

18   involved.   How do you select or who selects those four or

19   five people to do the interview?

20       A.    Well, usually the people that they'd be working

21   for and with.   There aren't that many opportunities if

22   you're thinking -- are you referring to coming into the

23   front office and being an account manager or a --

24       Q.    No.   I'm referring to workers and how they would

25   move up in the corporation.   How the workers would move up

1    in the -- the physical workers.

2        A.    In the shop?

3        Q.    The laborers, yes, in the shop.

4        A.    When we would have that opportunity, we would

5    depend upon the division manager -- or the department

6    manager, absolutely.

7        Q.    He would make the recommendation?

8        A.    He would recommend it.

9        Q.    Would that be posted though?

10        A.    Sure.

11        Q.    And then would they go to him and say they were

12    interested and then he would basically make a decision as to

13    who he thought was qualified?

14        A.    There's a system that we go through.

15        Q.    Would that be the system or what is it?

16        A.    If you're going to depose Ben, you want to ask Ben

17    that.

18        Q.    Okay.

19        A.    I've got about 700 people and it's hard for me to

20    do all these things.

21        Q.    No problem.

22        A.    There was a time when I knew it.

23        Q.    Sometimes it's better not to know everything -- or

24    not to have to.  And it's your contention and your belief, I

25    would -- if my understanding is correct, that you do not

1   believe that there was any racial discrimination at PHB?

2        A.   I don't think so.

3        Q.   Okay.  And do you -- if there is, if it's brought

4   to your attention, what would your steps be?

5             MR. LANZILLO:  I'll object to form, it's a very

6             broad --

7        Q.   If you got a specific complaint of discrimination,

8   how would you respond to that?

9             MR. LANZILLO:  Same objection.  Go ahead, do the

10            best you can.

11       A.   How would I respond?  You know, even though we are

12   a good-sized company with a lot of people, I do know most of

13   the people somehow.  I don't know all their names but I've

14   been in all the departments as a leader at one time or

15   another in my long history in manufacturing.  I celebrated

16   50 years yesterday, how's that?

17       Q.   Congratulations.

18       A.   I started when I was 10.  But, anyway -- now, I've

19   got to get back to the question.  Ask me the question again.

20       Q.   How would a complaint be --

21       A.   First it wold go to Mr. Hancock, who would then do

22   his investigation of the situation.  And then he would go to

23   his managers of the particular departments, whatever.  And

24   it would eventually come to me when they have what they're

25   going to do about it.

1          When it would get to me, if I knew the individual,

2    I would interview them and ask them what's going on and get

3    his side of the story.  And that's about how I would do it.

4          Q.   In your knowledge, if there are -- if there is a

5    complaint made to human resources or to a supervisor, is it

6    investigated?

7          A.   It certainly is.

8          Q.   Is that your policy?

9          A.   Absolutely.

10          MR. CONNELLY:  I'm done.  See.  What I do want to

11          tell you is you have the right, before I get that,

12          to read it to make sure it's correct, if you want

13          to.

14          MR. LANZILLO:  I'll take care of that, Mr. Hilbert

15          will read.

16

17          (Deposition concluded at 10:39 a.m.)

18

19

20

21

22

23

24

25