1           COMMONWEALTH OF PENNSYLVANIA
         DEPARTMENT OF LABOR AND INDUSTRY
2          BUREAU OF WORKERS' COMPENSATION

3                    - - - -

4  DAYVED WOODWARD,                    )
                                       )
5                        Claimant,     )
                                       )
6               -vs-                   )   SS No. 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
                                       )
7  PHB DIE CASTING,                    )
                                       )
8                        Employer.     )

9

10

11
                         - - - -
12
           DEPOSITION OF:  PATRICK CAMP
13
                         - - - -
14

15                                      CERTIFIED TRANSCRIPT

16

17
              DATE:      February 22, 2005
18                       Tuesday, 2:00 p.m.

19

20            LOCATION:  7900 West Ridge Road
                         Fairview, PA
21

22
              TAKEN BY:  Employer
23

24
           REPORTED BY:  Cynthia A. Eirich
25                       Notary Public
                         AKF Reference No. CE85881

1           DEPOSITION OF PATRICK CAMP,
 a witness, called by the Employer for examination, in
2 accordance with the Rules of Civil Procedure, taken
 by and before Cynthia A. Eirich, a Court Reporter and
3 Notary Public in and for the Commonwealth of
 Pennsylvania, at the offices of PHB Die Casting 7900
4 West Ridge Road, Fairview, Pennsylvania, on Tuesday,
 February 22, 2005, commencing at 2:11 p.m.

5

6                   - - - -

7

 APPEARANCES:
8
        FOR THE CLAIMANT:
9 WAYNE JOHNSON, Esq.
 345 West 6th Street
10 Erie, PA   16507
 (814) 454-6345
11

12

13        FOR THE EMPLOYER:
 Melissa Peterson, Esq.
14 O'BRIEN RULIS BOCHICCHIO SOSSO
 DDI Plaza One, Suite 300
15 1225 Washington Pike
 Bridgeville, PA   15017
16 (412) 914-1058

17

18

19

20

21

22

23

24

25

1                    * I N D E X *

2   Direct Examination by Ms. Peterson - - - - - - -   4
    Cross-Examination by Mr. Johnson - - - - - - - -  14
3   Redirect Examination by Ms. Peterson - - - - - -  34
    Recross-Examination by Mr. Johnson - - - - - - -  37
4
    Certificate of Court Reporter  - - - - - - - - -  40
5

6

7

8

9                * INDEX OF EXHIBITS *

10
            (No Deposition Exhibits were marked.)
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          PATRICK CAMP,

2                   having been duly sworn,

3           was examined and testified as follows:

4                          - - - -

5                    DIRECT EXAMINATION

6                          - - - -

7  BY MS. PETERSON:

8  Q.    Could you please state your name for the

9         record?

10 A.    Patrick Camp.

11 Q.    Are you currently employed by PHB Die Casting?

12 A.    Yes.

13 Q.    And what is your current position?

14 A.    I'm a line foreman.

15 Q.    And how long have you been employed by PHB

16        total?

17 A.    Almost nine years.

18 Q.    How long have you been a line foreman?

19 A.    August of 2004.

20 Q.    Is when you started?

21 A.    That's when I started.

22 Q.    Was there a period of time when you were the

23        union steward for PHB?

24 A.    Let me correct that, I think it's August 2003.

25 Q.    That you became a line foreman?



```
 1  A.    Yes, August of 2003.

 2  Q.    Was there a time when you were a union steward?

 3  A.    Yes.

 4  Q.    And do you recall the approximate years that

 5        you were a union steward at PHB?

 6  A.    From probably December of '99 to December of

 7        2002 I do believe.

 8  Q.    So approximately three years?

 9  A.    Yes.

10  Q.    Now, when you were a union steward do you

11        recall a Mr. Dayved Woodward, who is the

12        claimant in this case --

13  A.    Yes.

14  Q.    -- also employed at PHB?

15  A.    Yes.

16  Q.    Let me finish my question.  I know you might

17        anticipate my questions but the court reporter

18        can only take one of us down at one time.

19                 So you knew Mr. Woodward?

20  A.    Yes.

21  Q.    And how did you know him?

22  A.    He was a DCBO.

23  Q.    Did you work in the same area as Dayved?

24  A.    Yes.

25  Q.    What was your position at the time that Dayved
```

1        was working there?

2  A.    I was a setup man.

3  Q.    Would you have to setup Mr. Woodward's machines

4        on occasion?

5  A.    Occasionally.

6  Q.    In your capacity as a union steward, during the

7        three years that you were, did Mr. Woodward

8        approach you with complaints about his fellow

9        supervisors and/or coworkers?

10 A.    Yes.

11 Q.    What types of complaints did he voice to you?

12 A.    Getting put on not favorable jobs, unfavorable

13        jobs, overtime list being wrong, stuff in that

14        nature.

15 Q.    Do you recall approximately how often did he

16        come to you with complaints?

17 A.    On an average probably once a week.

18 Q.    With respect to his complaints what did you

19        personally do about them?

20 A.    I followed up on them.

21 Q.    How so?

22 A.    Went to the people that were involved,

23        supervisor, shop supervisors, ask to see the

24        records of the overtime lists.  Just ask them

25        why things were done the way they were done as

1    to who ran the job and why did he get the

2    certain jobs.

3  Q.    Did you ever tell Dayved that you wouldn't do

4    anything about any of his complaints?

5  A.    No.

6  Q.    Now, did Dayved ever make specific allegations

7    of racism or racist remarks being said against

8    him or him being treated unfairly because of

9    his race to you personally?

10  A.    Anything that he came about somebody else

11    saying something, is that what you are asking?

12  Q.    Yes.

13  A.    Not come right out and tell me, no.

14  Q.    You heard through the grapevine of these

15    allegations that he has?

16  A.    He'd always point to his hand.

17  Q.    Dayved would point to his hand?

18  A.    The reason why, it was like the color of his

19    skin.

20  Q.    Now, with respect to some of his complaints --

21    and you said one of the nature of the

22    complaints was the job assignments that he had

23    been receiving from his supervisors -- what

24    specifically did you do to address his

25    complaint about his job assignments?

1  A.    We had a meeting with Ron Sayers.

2  Q.    That was his supervisor?

3  A.    Yeah.  And he printed up a computer printout of

4        the machines that he had ran.

5  Q.    That Dayved had run?

6  A.    Yeah, that Dayved had run in the last three

7        weeks.  And he asked Dayved to pick another

8        DCBO from his shift to compare to.  And Dayved

9        didn't want to do that so I just picked a name.

10       I threw a name out and he printed that up.  And

11       Ron compared them and showed them to me, and I

12       didn't see any difference.

13 Q.    Was the other person that was chosen with

14       respect to their job assignments, were they in

15       a comparable position to Dayved's?

16 A.    Yes.

17 Q.    They ran the same types of machines?

18 A.    Yes.

19 Q.    Did Mr. Woodward ever complain about having to

20       write a letter for his file after he had

21       damaged some taps on one of his machines?

22 A.    Yeah, he came to me about it and asked me if he

23       should write it.  I told him he had to.

24 Q.    Why did you tell him he had to?

25 A.    Because if he didn't it would be

```
 1        insubordination.
 2   Q.   Was this a procedure done by the company?
 3   A.   Yes.
 4   Q.   Did you personally ever ask people to write
 5        letters?
 6   A.   Yes, all the time.
 7   Q.   And if another person other than Mr. Woodward
 8        had done similar damage, would they likewise
 9        have been asked to write a letter?
10   A.   Not on the first time, but the second time if
11        it happened.  And I believe that happened with
12        Dayved.  As I recall he broke a set of taps and
13        then he broke four more and then he had -- told
14        him he wanted him to write a letter up.  Rex
15        Ryan wanted him to write a letter.
16   Q.   Do you know if the letter was ever written by
17        Dayved?
18   A.   I believe it was.
19   Q.   Now, do you recall a meeting or any complaints
20        by Mr. Woodward that someone had yelled suey
21        when he got up to go to the bathroom?  Do you
22        know anything about that?
23   A.   I remember it vaguely, but I didn't really
24        consider it anything towards him.  There's an
25        individual out there that will just yell woo
```

```
 1        wee.
 2 Q.     You said out there, where is there?
 3 A.     In the die casting department.
 4 Q.     In the same department that Dayved worked in?
 5 A.     Yeah.  And he does it all the time.  It's not
 6        directed to anybody.  He just wipes the sweat
 7        off his brow and yells woo wee.
 8 Q.     Do you know if this person is African American
 9        or white?
10 A.     Yeah, he's African American.
11 Q.     Do you recall any discussions or meeting about
12        Mr. Woodward's complaints about being left off
13        a Rexroth team?
14 A.     He came to me about that, and I followed up on
15        it.  And they take a certain amount of people
16        on a team, and if they have that quota of
17        people, six or seven then they don't want any
18        more on the team.  They want a set amount of
19        people.
20 Q.     And did you discuss this with Mr. Woodward?
21 A.     Yeah.
22 Q.     Going back to his other complaints that he had,
23        and you said you followed up on and talked to
24        the people involved, you sometimes had
25        meetings, did you ever go back to Dayved and
```

1       tell him what action or inaction would be taken

2       in response to his complaints?

3  A.   Yeah, everyone I followed back up on and told

4       him I may have to wait and talk to Butch Smith

5       in the morning, or I may have to talk Ron or

6       Rex the following day.  If they were on a off

7       shift, where we work second, and I wouldn't be

8       able to talk to him until first shift at 2:00

9       o'clock.

10 Q.   And this is with respect to all of the

11      complaints that he --

12 A.   Pretty much.  As far as to my knowledge I did

13      the best that I was capable of doing.

14 Q.   Now, because you had worked in the same

15      department as Mr. Woodward did you observe him

16      as he worked?

17 A.   Yeah.

18 Q.   And what was your impression as to his overall

19      work performance, attitude towards work?

20 A.   He did -- he didn't do any more than he had to

21      do.

22 Q.   What do you mean by that?

23 A.   There's guys out there that go above and beyond

24      what they have to do and lend a hand, and he

25      was, I don't know, wasn't a type of person that

1    really wanted to get his elbows dirty and get

2    right down it.  And he'd rather watch somebody

3    else do it for him or -- like being a setup guy

4    there's things that are nice to have the DCBO

5    help with.

6              And he would sometimes instead of

7    help you with it he would go off and go to the

8    bathroom, talk to his buddies, whatever.

9  Q.   As a setup person that was working at the same

10       time as Mr. Woodward, did you ever give him any

11       problems in your capacity as a setup guy, as

12       you described it, because of his race or for

13       any other reason?

14 A.   No.

15 Q.   Did you ever refuse to setup a machine for

16       Dayved?

17 A.   No.

18 Q.   Now, did any of Dayved's coworkers ever

19       complain to you about his work and work habits?

20 A.   Yeah.  They sometimes would come to me and ask

21       why was he always the last one in the

22       department or why does he take two 20-minute

23       breaks during the day or just that they kind of

24       thought that he got the better jobs really, why

25       does he always get to run that or --

1  Q.    Now, based on your knowledge and experience

2        working in that department, did you ever see

3        any individuals, coworkers or supervisors

4        picking on Dayved or giving him a hard time?

5  A.    No.

6  Q.    Did Cari Goodwine ever say anything to you

7        about Mr. Woodward or his attitude, work

8        performance, anything of that nature?

9  A.    He just told me watch my back with him.  He

10       told me to be careful, watch my step.  He was

11       out to --

12 Q.    That Dayved was out --

13 A.    That Dayved was out to get the easy money.

14       That Cari had known him since they were little

15       kids and --

16              MR. JOHNSON:  I'm going to object to

17       what Cari Goodwine told him.

18              MS. PETERSON:  I anticipate that he

19       is going to be testifying and can present

20       rebuttal testimony.  But your objection is

21       noted.

22 BY MS. PETERSON:

23 Q.    You may continue if there is anything else.

24 A.    That's it.

25 Q.    Since Mr. Woodward left his employment at PHB

```
 1        have you had any contact with him --
 2  A.    No.
 3  Q.    -- at all?
 4  A.    No.
 5  Q.    That's all I have.  Thank you, Mr. Camp.
 6                       - - - -
 7                   CROSS-EXAMINATION
 8                       - - - -
 9  BY MR. JOHNSON:
10  Q.    You were a union steward from December of '99
11        to December of 2002; is that right?
12  A.    I think so.
13  Q.    Were you still a union steward when
14        Mr. Woodward left his employment?
15  A.    When did he leave?
16              MS. PETERSON:  I think there are,
17        there were separate times where he left his
18        employment so you might want to be more
19        specific.
20  BY MR. JOHNSON:
21  Q.    He was off for a about a year with a shoulder
22        injury in 1993.  Were you still a union steward
23        at that time?
24  A.    '93?
25              MS. PETERSON:  2003.
```

1  BY MR. JOHNSON:

2  Q.    Yeah, I'm sorry, 2003.

3  A.    2003 in October I don't believe I was.

4  Q.    That's when he went off of work in October of

5        2003.

6  A.    Because I started the foreman's job August of

7        2003.  And I had been off I think I said 2002.

8              MS. PETERSON:  Yeah.  I think, just

9        to clarify for the record, I believe he went

10       off for the last time in October 2003 and then

11       had initially gone off for the shoulder in the

12       Fall of 2002 and returned for one week in 2003

13       and then went back off.

14             MR. JOHNSON:  Okay.

15             MS. PETERSON:  If that's correct.  I

16       think that is.

17             MR. JOHNSON:  Okay.

18             MS. PETERSON:  I don't want to

19       confuse the judge at all.

20             MR. JOHNSON:  Right.

21 BY MR. JOHNSON:

22 Q.    Let me ask you this way.  Were you the union

23       steward for the majority of time that

24       Mr. Woodward was employed by PHB?

25 A.    Yes, I believe.

1  Q.    Have you ever written any grievances for the
2        union?
3  A.    No.
4  Q.    Never?
5  A.    With the grievance, the way the grievance works
6        here if he would ask me for a grievance paper
7        -- I'm not sure if he did or not, but I've done
8        it before where I went and got the grievance
9        paper.  It's a piece of paper.  I'd give it to
10       them, they fill it out.
11 Q.    Are there any formal steps when you grieve
12       something?
13 A.    Person that writes the grievance -- the real
14       only formal step that I know of, there used to
15       be a box at the union office that when you got
16       done filling it out you'd put it in the box.
17       After that I don't know where it goes from --
18 Q.    What union were you with?
19 A.    I was with the Steel Workers 711.  It has
20       changed now, and I couldn't tell you what it's
21       changed to now.
22 Q.    And you are no longer in the union because you
23       are a foreman, correct?
24 A.    Correct.
25 Q.    Do you know if in the labor contract there's a

```
 1        set procedure you would do the grievances

 2        through or how you would do that?

 3  A.    I think there is, but I can't -- I really

 4        didn't do a lot of grievances the whole time I

 5        was there.

 6  Q.    Did you do any?

 7  A.    Personally, no.

 8  Q.    Are you aware of people filing actual

 9        grievances?

10  A.    From what they say to if they've really done it

11        I don't know.

12  Q.    So you don't know.  And you don't recall if

13        Mr. Woodward had ever requested that a

14        grievance be filed?

15  A.    No.

16  Q.    What could Mr. Woodward have done if he was not

17        happy with the result you would get for his

18        various complaints?

19  A.    He could go talk to Greg Biebel, the union

20        president at the time, or a, I want to say

21        councilman, but it's not that.  I can't

22        remember the name.  There's like six other

23        individuals that they could go to that are on

24        the board, the grievance committee, I guess.

25        Grievance committee, that's what it is.  He
```

```
 1        could have gone to either one of those.
 2  Q.    Are you aware that Mr. Woodward has made
 3        complaints that he was discriminated against
 4        because of his race?
 5  A.    I do now.  Not at the time.
 6  Q.    It's your testimony that while you were the
 7        union steward you were not aware that
 8        Mr. Woodward was making complaints that he was
 9        being discriminated against?
10  A.    That's what he called it when he said he was
11        being discriminated against because of the jobs
12        he was getting.
13  Q.    You testified he would come and make complaints
14        to you approximately on a weekly basis.  So it
15        would happen quite often?
16  A.    Yeah.
17  Q.    Did he ever make any complaints other than
18        unfavorable jobs?
19  A.    Overtime.
20  Q.    Did he ever complain to you about racial slurs?
21  A.    No.
22  Q.    Are you aware of any racial slurs taking place
23        in the workplace?
24  A.    Towards him?
25  Q.    Yes.
```

1  A.    No.

2  Q.    How about towards anyone?

3  A.    No.

4  Q.    But there were racial slurs?

5  A.    I imagine.  Nobody ever came to me about them.

6  Q.    I originally asked you if you knew of any

7        racial slurs being said in the workplace to

8        which you asked me towards him?

9  A.    Right.

10  Q.   Which would lead me to believe that -- and I

11       don't want to put testimony into your mouth --

12       but would lead me to believe that you have

13       heard it but it was not directed directly to

14       Mr. Woodward?

15  A.   Correct.

16  Q.   So there were racial slurs being said in the

17       workplace?

18  A.   White guys too.

19  Q.   I didn't hear you.

20  A.   For white guys too.  I shouldn't say they are

21       racial slurs.  They are just, I don't know,

22       just the way people talk.

23  Q.   How many black employees were working at the

24       same time Mr. Woodward was employed?

25  A.   I honestly couldn't tell you.

1  Q.    Did you work a set shift?

2  A.    I worked a set shift.  I can tell you how many

3        on the shift.

4  Q.    Was that the same shift that Mr. Woodward

5        worked?

6  A.    Yes

7  Q.    How many were on your shift?

8  A.    Three.

9  Q.    And that would be Mr. Woodward, Cari Goodwine

10       and Jamal Shields?

11 A.    Correct.

12 Q.    Are you aware of any complaints by Cari

13       Goodwine in regards to discrimination based on

14       his race?

15 A.    No.

16 Q.    He never complained to you?

17 A.    No.

18 Q.    What about Mr. Shields?

19 A.    No.

20 Q.    Is Mr. Shields still employed by PHB, if you

21       are aware?

22 A.    Yes.

23 Q.    Are you aware that Cari Goodwine has filed a

24       complaint against PHB based on discrimination?

25 A.    No.

1  Q.    Mr. Woodward never complained to you about

2        hearing the word nigger being used in the

3        workplace?

4  A.    No.

5  Q.    Did anyone talk to you about nigger being used

6        in the workplace?

7  A.    Like who?  No, not that I know of.  No one ever

8        talked to me about it.

9  Q.    Who would you report to -- and this is a two

10        part question -- first as in terms of your

11        duties as a union steward, who would you report

12        to?  Would that be Mr. Biebel?

13  A.    Yeah.

14  Q.    Did you ever have any discussions with

15        Mr. Biebel in regards to complaints of racial

16        slurs being used in the workplace?

17  A.    No.

18  Q.    So until I asked you about this today you

19        really have no knowledge or were not aware of

20        Mr. Woodward's complaints as to racial slurs?

21  A.    As to racial slurs, no.

22  Q.    You are not aware of anyone complaining about

23        racial slurs?

24  A.    No.

25  Q.    What about graffiti in the form of a burning

1      cross or a KKK?

2  A.   I never saw anything.  Nobody ever came to me

3       about it.

4  Q.   Is it fair to summarize that your testimony

5       today would be that nobody came to you at all

6       in regards to any claim of racial

7       discrimination?

8  A.   Um-hum.

9  Q.   And that is a yes for the court reporter to

10      take down?

11 A.   Yes.

12 Q.   As a union steward were you aware of any policy

13      at PHB in regards to discrimination?

14 A.   No.

15 Q.   Is there a policy now in effect in terms of

16      discrimination that you are aware of?

17 A.   There may have been one when I was a union

18      steward, but I did not know of it.

19 Q.   Is there one now?

20 A.   I believe so.  I don't know.

21 Q.   You don't know?

22 A.   No.

23 Q.   And you are a foreman at PHB currently?

24 A.   Um-hum.

25 Q.   Is it fair to say that if there was a

1       companywide policy on discrimination you would

2       be aware of it as you have a supervisory job?

3  A.    Yes.  We had a meeting on it, I don't know, six

4       months ago on discrimination.  And yes, I do

5       believe there is a policy on it now.  But I

6       don't know if there was one then.

7  Q.    You have no independent knowledge of there

8       being one prior to this meeting you had

9       approximately six months ago?

10  A.    No.

11  Q.    But there's no formal document or standard

12       procedure that is followed when there is a

13       claim of discrimination for a racial slur?

14  A.    For union or company?

15  Q.    For the company.

16  A.    Company, there is now.

17  Q.    There is now.  And that is what the meeting was

18       for?

19  A.    Yes.

20  Q.    What about with the union, would you be aware

21       if there's anything?

22  A.    Just I'm sure whatever company policy is.

23  Q.    So your testimony is that all the complaints

24       that Mr. Woodward made to you over this period

25       of time where you were the union steward were

1          based on unfavorable jobs or overtime lists?

2  A.      (Witness nodding.)

3  Q.      He made no -- are you shaking your head yes

4          again?

5  A.      No, I'm listening.

6  Q.      And that there were no complaints that he was

7          being treated differently based on race?

8                 MS. PETERSON:  I just want to

9          clarify.  I think I did discuss some other

10         complaints during direct examination, that is

11         like the Rexroth team and that Mr. Camp did

12         acknowledge having information.

13                THE WITNESS:  There was --

14  BY MR. JOHNSON:

15  Q.     I guess what I'm getting at, Mr. Camp, is that

16         from your testimony it seems that you are

17         saying Mr. Woodward complained about not

18         getting the jobs he wanted and not getting the

19         overtime he wanted, and I think the Rexroth

20         would fall into not getting a job that he

21         wanted.

22                But you also testified that this was

23         almost on a weekly basis.  So from 1999 to

24         2002, that's three years he was making weekly

25         complaints?

 1  A.    Which would always follow up as the reason he
 2        thought it was the color of his skin.  And I
 3        said that before.
 4  Q.    But you do not have any knowledge of him making
 5        complaints as to a racial slur being made?
 6  A.    No, I do not.
 7  Q.    And nothing about graffiti?
 8  A.    He never came to me about graffiti or writing
 9        on the wall.  If he would have I would have
10        went and he should have showed me it.
11  Q.    Butch Smith, what is his position?
12  A.    Now?
13  Q.    Yeah.
14  A.    I believe he's plant engineer.
15  Q.    What was he in say 2002?
16  A.    He was the shop supervisor for aluminum and
17        zinc.
18  Q.    Is that somebody you would interact with as
19        part of your job duties as the union steward?
20  A.    Yes.
21  Q.    Did you have any conversations with Mr. Smith
22        in regards to the complaints that Mr. Woodward
23        had made?
24  A.    Yeah.
25  Q.    And what were those in regards to?

1  A.    Following up on Rexroth or jobs, overtime,

2        anything like that.

3  Q.    But nothing in terms of racial slurs?

4  A.    No.

5  Q.    And nothing in terms of graffiti on the

6        bathroom walls?

7  A.    No.

8  Q.    Are you aware of the incident where

9        Mr. Woodward complained about someone saying

10       the word suey?

11 A.    I was aware of it.

12 Q.    Did he make a complaint to you about that?

13 A.    A written complaint, no, he just came to me and

14       said somebody said suey.

15 Q.    Did he ask that anything be done in regards to

16       do that?

17 A.    No.

18 Q.    Was anything done in regards to that?

19 A.    No.

20 Q.    Do you know who made that remark?

21 A.    No, I do not.

22 Q.    I think on your direct examination you said it

23       was somebody who was African American?

24 A.    Yeah, but I don't know if he made that remark

25       at the time.  And it wasn't suey either, it was

1      woo wee.

2  Q.  Okay.  But then there's -- I'm asking you about

3      a specific incident where Mr. Woodward alleged

4      that someone used the word suey towards him?

5  A.  No.

6  Q.  You are not aware of that?

7  A.  No.

8  Q.  And when you talked on direct examination about

9      the African American who says woo wee because

10     it's hot, you are not talking about the suey

11     incident that you know nothing about?

12 A.  I just assumed that's what it was.

13 Q.  Well, I think your testimony was at the time

14     you were the union steward and the time that

15     Mr. Woodward was working there were three

16     blacks working on the second shift?

17 A.  Right.

18 Q.  That would be Jamal Shields and Cari Goodwine

19     and Mr. Woodward?

20 A.  Yeah.

21 Q.  Are you saying that it was either Jamal Shields

22     or Cari Goodwine who said this?

23 A.  No.  What would happen was there would -- if

24     setup gets behind they call third shift in, all

25     right.  So they start at 7:00 o'clock.  And Roy

```
 1        Hinton is a setup guy.
 2   Q.   Did Mr. Woodward tell you who he believed had
 3        used that word?
 4   A.   No, all I recall is he said he heard somebody
 5        say suey or woo wee or whatever.
 6   Q.   What about an incident in regards to chitlins,
 7        are you at all familiar with that?
 8   A.   No, I'm not.
 9   Q.   Were there other union stewards that
10        Mr. Woodward could make complaints to during
11        the time he was working at PHB?
12   A.   No.  If it was before the time I was union
13        steward, but there's only one per shift in die
14        casting.
15   Q.   Would you be made aware if Mr. Woodward had
16        made complaints about racial discrimination to
17        anyone but yourself?
18   A.   No, not that I know of.
19   Q.   And again, I'm not trying to put words in your
20        mouth, but would it be fair to say that it's
21        your position that Mr. Woodward would not be
22        telling the truth if he states that he had many
23        complaints about various words being said and
24        that sort of thing?
25   A.   Could you say that again?
```

```
 1  Q.   Yeah.  I apologize, it's an unwieldly question.
 2       Mr. Woodward's testimony is basically that he
 3       made many complaints and that nothing was ever
 4       done of that from his complaints.  And your
 5       testimony is basically that he never made any
 6       complaints that you are aware of except in
 7       regards to job assignments and overtime?
 8  A.   Right.
 9  Q.   I guess my question to you is --
10  A.   He never came to me on a racial as to --
11  Q.   He never came to you as anything racial?
12  A.   Right.
13  Q.   And you are not aware of him going to anyone
14       else because of something regarding race?
15  A.   Correct.
16  Q.   If he did make complaints to someone else
17       regarding race, is that something that would
18       come back to you?
19  A.   No.  Like who?  I --
20  Q.   If he made complaints to --
21  A.   Nobody ever came back to me on that.
22  Q.   So Lawrence Smith or Butch Smith never came to
23       you and talked to you about any complaints
24       Mr. Woodward would have made in regards to
25       race?
```



1  A.    No.

2  Q.    What about Rex Ryan?

3  A.    No.

4  Q.    What about Ron Sayers?

5  A.    No.

6  Q.    And just for purposes of the record, Rex Ryan

7        and Ron Sayers are line supervisors?

8  A.    Shift supervisors.

9  Q.    Is that the same position you have?

10 A.    No, I have line supervisor.

11 Q.    You are a line supervisor?

12 A.    Right.

13 Q.    What is the difference between the line

14        supervisor and a shift supervisor?

15 A.    A shift supervisor is in charge of everybody in

16        aluminum die cast, and line foremen are line

17        supervisors in charge of 13 machines.

18 Q.    Do you know who Shelley Antolik is?

19 A.    Yeah.

20 Q.    She is in human resources?

21 A.    Correct.

22 Q.    Did she ever come talk to you about any

23        complaints Mr. Woodward had made?

24 A.    No.

25 Q.    Are you aware of any racial slurs made by Tom

```
 1        Thompson?
 2 A.    No.
 3 Q.    What about Gary Gephart?
 4 A.    I don't know anything about that.
 5                   - - - -
 6      (There was a brief pause in the proceedings.)
 7                   - - - -
 8 BY MR. JOHNSON:
 9 Q.    Was Mr. Woodward satisfied with the outcome on
10       each complaint that he made to you?
11 A.    No, I don't believe so.
12 Q.    But it was never taken any further than you
13       talking just to Mr. Woodward?
14 A.    I did what I could and came back with an
15       answer.  And sometimes it wasn't the answer he
16       liked so I tried to -- that's it.
17 Q.    Did you ever inform him that he had a right to
18       file a grievance?
19 A.    Yeah, he knew that.
20 Q.    As a union steward could you have filed a
21       grievance on behalf of Mr. Woodward?
22 A.    I think it's the individual who is filing the
23       grievance has to file a grievance.
24 Q.    It's fair to say that not many, if any,
25       grievances were filed that you were aware of?
```

```
 1  A.    Correct.

 2  Q.    How many, none?

 3  A.    Offhand I can't tell you of any of them.

 4  Q.    So it's very possible that no grievances were

 5        filed during the period that you were a union

 6        steward that you are aware of?

 7  A.    Anybody can go get a grievance paper.

 8  Q.    Well, if there were grievances filed for

 9        employees on second shift where you were the

10        union steward?

11  A.    Would I have known them?

12  Q.    Yes.

13  A.    No.

14  Q.    Where would the grievances go to then?

15  A.    Grievance committee.

16  Q.    Who would make up the grievance committee?

17  A.    Members of the union.

18  Q.    You weren't on the grievance committee?

19  A.    I was not, no.

20  Q.    You wouldn't receive copies of any grievances

21        that were filed by employees on your shift?

22  A.    No.

23  Q.    Just to summarize, you are not aware of anyone

24        using the word nigger?

25  A.    No.
```

1  Q.    And you are not aware of --

2              MS. PETERSON:  Is that a no?

3              THE WITNESS:  No.

4  BY MR. JOHNSON:

5  Q.    Yes, that is a no, right?

6  A.    Yes.

7  Q.    And you are not aware that there was a

8        complaint that there was racial graffiti in one

9        of the stalls in the bathroom?

10 A.    No, I was not aware of that.

11 Q.    And is sit fair to say you weren't aware of any

12       racial complaints Mr. Woodward made at all?

13 A.    No.

14 Q.    As a union steward if an individual employee

15       came to you with a claim of racial

16       discrimination what would you have done?

17 A.    I probably would have talked to Greg Biebel.

18 Q.    Who was the union president at the time?

19 A.    Right.

20 Q.    Is Mr. Biebel still the union president?

21 A.    I don't know if he is or not.

22 Q.    Is he still employed by PHB?

23 A.    Yes.

24 Q.    Is it fair to say that your opinion was that

25       there were no racial problems at PHB?

 1 A.    That is correct.

 2 Q.    That's all the questions I have.  Thank you.

 3                      - - - -

 4               REDIRECT EXAMINATION

 5                      - - - -

 6 BY MS. PETERSON:

 7 Q.    Just a few follow-up.  Mr. Camp, as a union

 8       steward what did your duties involve?  What did

 9       you do as a union steward?

10 A.    I'd make sure that things were being done fair.

11 Q.    And what would that -- how would you do that?

12 A.    Like job channeling or things like that.

13 Q.    So if somebody would complain to you about

14       something not being fair you would do something

15       about it, whatever needed to be done?

16 A.    Correct.

17 Q.    Were you directly involved in the grievance

18       process --

19 A.    No.

20 Q.    -- as a union steward?  Okay.

21               That was something that would be

22       taken to the grievance committee?

23 A.    Yes.

24 Q.    But if somebody asked you for a grievance

25       paper, as you described it, you would have

1        those papers available to that person?

2  A.    Yes.  I could go get them for them or tell them

3        where they could go get them.

4  Q.    Did you ever while working at PHB hear anyone

5        refer to another person by their race, be it

6        black, white or otherwise?

7  A.    No.

8  Q.    Have you ever heard anyone refer to

9        Mr. Woodward by his race?

10 A.    No.

11 Q.    Either directly to him or to somebody else?

12 A.    No.

13 Q.    Have you ever seen or observed Ron Sayers

14        treating Mr. Woodward unfairly, giving him a

15        hard time, making whatever types of remarks

16        towards him, did you ever witness anything like

17        that?

18 A.    No.

19 Q.    And Ron Sayers, that was one of his

20        supervisors?

21 A.    Correct.

22 Q.    Did you ever hear Ron Sayers making any types

23        of comments to any other African American

24        employees at PHB?

25 A.    No.

```
 1  Q.    Have you ever seen Mr. Sayers treat any African
 2        American employee at PHB, in your opinion,
 3        unfairly, giving them a hard time, anything of
 4        that sort?
 5  A.    No.
 6  Q.    Have you fielded any complaints of Ron Sayers
 7        regarding treatment that he may have done to
 8        employees?
 9  A.    No.
10  Q.    Did Mr. Woodward ever complain to you directly
11        about Ron Sayers?
12  A.    Yes.
13  Q.    What types of complaints, other than the job
14        assignments, did he complain about Mr. Sayers?
15  A.    No.
16  Q.    Did he ever complain about anything that
17        Mr. Sayers did to him while he was on light
18        duty for his shoulder, excuse me, for a lower
19        extremity injury -- I don't know if it was the
20        knee or ankle or anything -- do you recall
21        anything like that?
22  A.    He had come to me and said something about Ron
23        was following him around with a stool.
24  Q.    And what did you do in response?
25  A.    I just went and talked to Ron and asked him if
```

1          he was following him around with a stool.  And
2          he had told me, no, I took a stool over for him
3          to sit on, that if he needed to take a break he
4          could take a break.
5   Q.    And your opinion based on what Mr. Woodward had
6          said and Mr. Sayers said to you, do you feel
7          that Mr. Woodward was treated inappropriately
8          by Mr. Sayers?
9   A.    No.
10  Q.    Did you tell Mr. Woodward this, did you
11         follow-up with him afterwards?
12  A.    Yeah.
13  Q.    That's all.  Thank you, Mr. Camp.
14                      - - - -
15                 RECROSS-EXAMINATION
16                      - - - -
17  BY MR. JOHNSON:
18  Q.    Do you know a Freddy Jackson?
19  A.    I know the name.  I do not know him.
20  Q.    What do you know of the name?
21  A.    Just that he worked here.
22  Q.    Is that all you know that he was an employee at
23         some point in the past?
24  A.    Yeah.
25  Q.    Did you ever meet him or he -- go ahead and

1       answer that.

2  A.   No, I never met him.

3  Q.   He wasn't an employee at the same time you

4       were, or at least you did not work with him?

5  A.   I never worked with him.  And I don't know even

6       know if I was employed when he was.

7  Q.   Are you aware that he filed a discrimination

8       suit against PHB?

9  A.   Yes, I read it about it in the paper.

10 Q.   When did you read about that in the paper?

11 A.   I don't know.  I guess whenever it was settled.

12 Q.   Was that while Mr. Woodward was employed by

13       PHB?

14 A.   I couldn't tell you that.  I don't know.

15 Q.   Could it have been before, could it have been

16       after?  You don't have any --

17 A.   I don't know.

18 Q.   Do you have any independent knowledge by way of

19       your job as a union steward or as an employee

20       about Freddy Jackson?

21 A.   No.

22                 MR. JOHNSON:   That's all the

23       questions I have.

24                 MS. PETERSON:   I have nothing

25       further.   Mr. Camp, after today the court

1    reporter here is going to type up everything

2    that we said and put it into a transcript form.

3    You have the opportunity to review that

4    transcript for any mistakes, typographical

5    errors, things of that nature and then sign it.

6              Or you can waive signature, in which

7    case the court reporter will just type up the

8    transcript and forward it to us and you won't

9    have to deal with it anymore.  Which would you

10   prefer?

11             THE WITNESS:  That's fine.

12             MS. PETERSON:  Waive your signature,

13   okay.  That's all.

14                  - - - -

15   (The proceedings were concluded at 3:17 p.m.)

16                  - - - -

17

18

19

20

21

22

23

24

25

1  COMMONWEALTH OF PENNSYLVANIA )        CERTIFICATE

2  COUNTY OF ERIE                )        SS:

3       I, Cynthia A. Eirich, a Court Reporter and

4  Notary Public in and for the Commonwealth of

5  Pennsylvania, do hereby certify that the witness,

6  PATRICK CAMP, was by me first duly sworn to testify

7  to the truth, the whole truth, and nothing but the

8  truth; that the foregoing deposition was taken at the

9  time and place stated herein; and that the said

10 deposition was recorded stenographically by me and

11 then reduced to printing under my direction, and

12 constitutes a true record of the testimony given by

13 said witness.

14      I further certify that the inspection, reading

15 and signing of said deposition were waived by counsel

16 for the respective parties and by the witness.

17      I further certify that I am not a relative or

18 employee of any of the parties, or a relative or

19 employee of either counsel, and that I am in no way

20 interested directly or indirectly in this action.

21      IN WITNESS WHEREOF, I have hereunto set my hand

22 and affixed my seal of office this 7th day of March,

23 2005.

24

25
     Notarial Seal
     Cynthia A. Eirich, Notary Public
     City of Erie, Erie County
     My Commission Expires June 13, 2005
     Member, Pennsylvania Association of Notaries

                                    Cynthia A. Eirich

Pittsburgh, PA        Greensburg, PA        Erie, PA
412-261-2323          724-853-7700          814-453-5700

AKF

CE85881.TXT                                    Page 1

| | | | |
|---|---|---|---|
| ' | 3 | afterwards 37:11 | average 6:17 |
| '93 14:24 | 300 2:14.5 | ago 23:4,9 | aware 17:8; 18:2,7,22; |
| '99 5:6; 14:10 | 34 3:3 | ahead 37:25 | 20:12,21,23; |
| | 345 2:9.5 | AKF 1:25.5 | 21:19,22; |
| * | 37 3:3.5 | allegations 7:6,15 | 22:12,16; |
| * 3:1,9 | 3:17 39:15 | alleged 27:3 | 23:2,20; |
| | 4 | almost 4:17; 24:23 | 26:8,11; 27:6; 28:15; |
| – | 4 3:2 | aluminum 25:16; 30:16 | 29:6,13; |
| – 1:3,11.5, 13.5; 2:6; | 40 3:4.5 | American 10:8,10; | 30:25; 31:25; 32:6, |
| 4:4,6; 14:6, 8; 31:5,7; | 412 2:16 | 26:23; 27:9; | 23; 33:1,7, |
| 34:3,5; | 454–6345 2:10.5 | 35:23; 36:2 | 10,11; 38:7 |
| 37:14,16; 39:14,16 | 6 | amount 10:15, 18 | B |
| -vs- 1:6 | 6th 2:9.5 | and/or 6:9 | back 10:22, 25; 11:3; |
| 1 | 7 | ankle 36:20 | 13:9; 15:13; |
| 1225 2:15 | 711 16:19 | another 8:7; 9:7; 35:5 | 29:18,21; 31:14 |
| 13 30:17 | 7900 1:20; 2:3.5 | answer 31:15; 38:1 | based 13:1; 20:13,24; |
| 14 3:2.5 | 7:00 27:25 | anticipate 5:17; 13:18 | 24:1,7; 37:5 |
| 15017 2:15.5 | 7th 40:22 | Antolik 30:18 | basically 29:2,5 |
| 161–56–2381 1:6 | 8 | anybody 10:6; 32:7 | basis 18:14; 24:23 |
| 16507 2:10 | 814 2:10.5 | apologize 29:1 | bathroom 9:21; 12:8; |
| 1993 14:22 | 9 | APPEARANCES 2:7.5 | 26:6; 33:9 |
| 1999 24:23 | 914–1058 2:16 | approach 6:8 | became 4:25 |
| 2 | A | approximate 5:4 | behalf 31:21 |
| 20-minute 12:22 | able 11:8 | approximately 5:8; 6:15; | behind 27:24 |
| 2002 5:7; 14:11; 15:7, | above 11:23 | 18:14; 23:9 | believe 5:7; 9:11,18; |
| 12; 24:24; 25:15 | accordance 2:2 | area 5:23 | 15:3,9,25; |
| 2003 4:24; 5:1; 14:25; | acknowledge 24:12 | around 36:23; 37:1 | 19:10,12; 22:20; 23:5; |
| 15:2,3,5,7, 10,12 | action 11:1; 40:20 | assignments 7:22,25; | 25:14; 31:11 |
| 2004 4:19 | actual 17:8 | 8:14; 29:7; 36:14 | believed 28:2 |
| 2005 1:17.5; 2:4.5; 40:23 | address 7:24 | assumed 27:12 | best 11:13 better 12:24 |
| | | attitude 11:19; 13:7 | between 30:13 beyond 11:23 Biebel 17:19; 21:12,15; 33:17,20 |



CE85881.TXT                                                    Page 2

2:14
box 16:15,16
break 37:3,4
breaks 12:23
Bridgeville
  2:15.5
brief 31:6
broke 9:12,13
brow 10:7
buddies 12:8
BUREAU 1:2
burning 21:25
Butch 11:4;
  25:11; 29:22
-------------
       C
-------------
call 27:24
called 2:1.5;
  18:10
came 7:10;
  8:22; 10:14;
  19:5; 22:2,
  5; 25:8;
  26:13;
  29:10,11,21,
  22; 31:14;
  33:15
CAMP 1:12.5;
  2:1; 4:1,10;
  14:5; 24:11,
  15; 34:7;
  37:13;
  38:25; 40:6
capable 11:13
capacity 6:6;
  12:11
careful 13:10
Cari 13:6,14,
  17; 20:9,12,
  23; 27:18,22
case 5:12;
  39:7
cast 30:16
casting 1:7;
  2:3.5; 4:11;
  10:3; 28:14
CE85881
  1:25.5

14,17
changed
  16:20,21
channeling
  34:12
charge 30:15,
  17
chitlins 28:6
chosen 8:13
Civil 2:2
claim 22:6;
  23:13; 33:15
claimant 1:5;
  2:8.5; 5:12
clarify 15:9;
  24:9
color 7:18;
  25:2
come 6:16;
  7:13; 12:20;
  18:13;
  29:18;
  30:22; 36:22
commencing
  2:4.5
comments
  35:23
committee
  17:24,25;
  32:15,16,18;
  34:22
COMMONWEALTH
  1:1; 2:3;
  40:1,4
company 9:2;
  23:14,15,16,
  22
companywide
  23:1
comparable
  8:15
compare 8:8
compared 8:11
COMPENSATION
  1:2
complain
  8:19; 12:19;
  18:20;
  34:13;

21:22
complaint
  7:25; 20:24;
  26:12,13;
  31:10; 33:8
complaints
  6:8,11,16,
  18; 7:4,20,
  22; 9:19;
  10:12,22;
  11:2,11;
  17:18; 18:3,
  8,13,17;
  20:12;
  21:15,20;
  23:23; 24:6,
  10,25; 25:5,
  22; 28:10,
  16,23; 29:3,
  4,6,16,20,
  23; 30:23;
  33:12; 36:6,
  13
computer 8:3
concluded
  39:15
confuse 15:19
consider 9:24
constitutes
  40:12
contact 14:1
continue
  13:23
contract
  16:25
conversations
  25:21
copies 32:20
correct 4:24;
  15:15;
  16:23,24;
  19:15;
  20:11;
  29:15;
  30:21; 32:1,
  34:1,16;
  35:21
couldn't
  16:20;

6:9; 12:18;
  13:3
cross 22:1
Cross-Examin-
  ation 3:2.5;
  14:7
current 4:13
currently
  4:11; 22:23
Cynthia
  1:24.5;
  2:2.5; 40:3
-------------
       D
-------------
damage 9:8
damaged 8:21
DATE 1:17.5
day 11:6;
  12:23; 40:2
DAYVED 1:4;
  5:11,23,25;
  7:3,6,17;
  8:5,6,7,8;
  9:12,17;
  10:4,25;
  12:16; 13:4,
  12,13
Dayved's
  8:15; 12:18
DCBO 5:22;
  8:8; 12:4
DDI 2:14.5
deal 39:9
December 5:6;
  14:10,11
department
  1:1.5; 10:3,
  4; 11:15;
  12:22; 13:2
deposition
  1:12.5; 2:1;
  3:10.5;
  40:8,10,15
described
  12:12; 34:2
die 1:7;
  2:3.5; 4:11;
  10:3; 28:13;



CE85881.TXT

direct 3:2;
  4:5; 24:10;
  26:22; 27:8
directed
  10:6; 19:13
direction
  40:11
directly
  19:13;
  34:17;
  35:11;
  36:10; 40:20
dirty 12:1
discriminated
  18:3,9,11
discriminati-
  on 20:13,24;
  22:7,13,16;
  23:1,4,13;
  28:16;
  33:16; 38:7
discuss
  10:20; 24:9
discussions
  10:11; 21:14
document
  23:11
doing 11:13
done 6:25;
  9:2,8; 16:7,
  16; 17:10,
  16; 26:15,
  18; 29:4;
  33:16;
  34:10,15;
  36:7
down 5:18;
  12:2; 22:10
duly 4:2;
  40:6
during 6:6;
  12:23;
  24:10;
  28:10; 32:5
duties 21:11;
  25:19; 34:8
duty 36:18
-------------
        E

1:24.5;
  2:2.5; 40:3
either 18:1;
  26:25;
  27:21;
  35:11; 40:19
elbows 12:1
employed
  4:11,15;
  5:14; 15:24;
  19:24;
  20:20;
  33:22; 38:6,
  12
employee
  33:14; 36:2;
  37:22; 38:3,
  19; 40:18,19
employees
  19:23; 32:9,
  21; 35:24;
  36:8
Employer
  1:22.5;
  2:1.5,13
Employer. 1:8
employment
  13:25;
  14:14,18
engineer
  25:14
Erie 2:10;
  40:2
errors 39:5
Esq 2:9,13.5
even 38:5
everybody
  30:15
everyone 11:3
everything
  39:1
examination
  2:1.5; 3:2,
  3; 4:5;
  24:10;
  26:22; 27:8;
  34:4
examined 4:3
except 29:6

extremity
  36:19
-------------
        F
-------------
fair 22:4,25;
  28:20;
  31:24;
  33:11,24;
  34:10,14
Fairview
  1:20.5; 2:4
fall 15:12;
  24:20
familiar 28:7
far 11:12
favorable
  6:12
February
  1:17.5;
  2:4.5
feel 37:6
fellow 6:8
few 34:7
fielded 36:6
file 8:20;
  31:18,23
filed 17:14;
  20:23;
  31:20,25;
  32:5,8,21;
  38:7
filing 17:8;
  31:22
fill 16:10
filling 16:16
fine 39:11
finish 5:16
first 9:10;
  11:8; 21:10;
  40:6
follow 25:1
follow-up
  34:7; 37:11
followed
  6:20; 10:14,
  23; 11:3;
  23:12
following

foreman 4:14,
  18,25;
  16:23; 22:2
foreman's
  15:6
foremen 30:1
form 21:25;
  39:2
formal 16:11,
  14; 23:11
forward 39:8
four 9:13
Freddy 37:18;
  38:20
further
  31:12;
  38:25;
  40:14,17
-------------
        G
-------------
Gary 31:3
Gephart 31:3
gets 27:24
getting 6:12;
  18:12;
  24:15,18,20
give 12:10;
  16:9
given 40:12
giving 13:4;
  35:14; 36:3
Goodwine
  13:6,17;
  20:9,13,23;
  27:18,22
got 9:21;
  12:24; 16:8,
  15
graffiti
  21:25; 25:7,
  8; 26:5;
  33:8
grapevine
  7:14
Greg 17:19;
  33:17
grievance
  16:5,6,8,13;



CE85881.TXT                                                    Page 4

grievances
  16:1; 17:1,
  4,9; 31:25;
  32:4,8,14,20
grieve 16:11
guess 17:24;
  24:15; 29:9;
  38:11
guy 12:3,11;
  28:1
guys 11:23;
  19:18,20
------------
      H
------------
habits 12:19
hand 7:16,17;
  11:24; 40:21
happen 18:15;
  27:23
happened 9:11
happy 17:17
hard 13:4;
  35:15; 36:3
head 24:3
hear 19:19;
  35:4,22
heard 7:14;
  19:13; 28:4;
  35:8
hearing 21:2
help 12:5,7
hereby 40:5
herein 40:9
hereunto
  40:21
Hinton 28:1
honestly
  19:25
hot 27:10
human 30:20
------------
      I
------------
imagine 19:5
impression
  11:18
inaction 11:1
inappropriat-

  23:7; 38:18
INDEX 3:9
indirectly
  40:20
individual
  9:25; 31:22;
  33:14
individuals
  13:3; 17:23
INDUSTRY
  1:1.5
inform 31:17
information
  24:12
initially
  15:11
injury 14:22;
  36:19
inspection
  40:14
instead 12:6
insubordinat-
  ion 9:1
interact
  25:18
interested
  40:20
involve 34:8
involved
  6:22; 10:24;
  34:17
------------
      J
------------
Jackson
  37:18; 38:20
Jamal 20:10;
  27:18,21
job 7:1,22,
  25; 8:14;
  15:6; 23:2;
  24:20;
  25:19; 29:7;
  34:12;
  36:13; 38:19
jobs 6:12,13;
  7:2; 12:24;
  18:11,18;
  24:1,18;

  17,20,21;
  24:14; 31:8;
  33:4; 37:17;
  38:22
judge 15:19
------------
      K
------------
kids 13:15
kind 12:23
KKK 22:1
knee 36:20
knowledge
  11:12; 13:1;
  21:19; 23:7;
  25:4; 38:18
known 13:14;
  32:11
------------
      L
------------
labor 1:1.5;
  16:25
last 8:6;
  12:21; 15:10
Lawrence
  29:22
lead 19:10,12
least 38:4
leave 14:15
left 10:12;
  13:25;
  14:14,17
lend 11:24
letter 8:20;
  9:9,14,15,16
letters 9:5
light 36:17
likewise 9:8
line 4:14,18,
  25; 30:7,10,
  11,13,16
list 6:13
listening
  24:5
lists 6:24;
  24:1
little 13:14
LOCATION 1:20

------------
      M
------------
machine 12:1[
machines 6:3;
  8:4,17,21;
  30:17
made 18:2;
  23:24; 24:3;
  25:5,23;
  26:20,24;
  28:15,16;
  29:3,5,20,
  24; 30:23,
  25; 31:10;
  33:12
majority
  15:23
man 6:2
many 19:23;
  20:2,7;
  28:22; 29:3;
  31:24; 32:2
March 40:22
marked 3:10.[
mean 11:22
meet 37:25
meeting 8:1;
  9:19; 10:11;
  23:3,8,17
meetings
  10:25
Melissa
  2:13.5
Members 32:1[
met 38:2
might 5:16;
  14:18
mistakes 39:[
money 13:13
months 23:4,[
morning 11:5
mouth 19:11;
  28:20
Ms. 3:2,3;
  4:7; 13:18,
  22; 14:16,
  25; 15:8,15,
  18; 24:8;



CE85881.TXT                                                Page 5

-------------
        N
-------------
name 4:8;
  8:9,10;
  17:22;
  37:19,20
nature 6:14;
  7:21; 13:8;
  39:5
needed 34:15;
  37:3
never 16:4;
  20:16; 21:1;
  22:2; 25:8;
  29:5,10,11,
  22; 31:12;
  38:2,5
nice 12:4
nigger 21:2,
  5; 32:24
nine 4:17
No. 1:6,25.5
nobody 19:5;
  22:2,5;
  29:21
nodding 24:2
none 32:2
Notary 1:25;
  2:3; 40:4
noted 13:21
nothing 25:7;
  26:3,5;
  27:11; 29:3;
  38:24; 40:7
-------------
        O
-------------
O'BRIEN 2:14
o'clock 11:9;
  27:25
object 13:16
objection
  13:20
observe 11:15
observed
  35:13
occasion 6:4
Occasionally

40:22
offices 2:3.5
often 6:15;
  18:15
okay 15:14,
  17; 27:2;
  34:20; 39:13
once 6:17
one 2:14.5;
  5:18; 7:21;
  8:21; 12:21;
  15:12; 18:1;
  21:7; 22:17,
  19; 23:6,8;
  28:13; 33:8;
  35:19
only 5:18;
  16:14; 28:13
opinion
  33:24; 36:2;
  37:5
opportunity
  39:3
originally
  19:6
other 8:13;
  9:7; 10:22;
  12:13;
  17:22;
  18:17; 24:9;
  28:9; 35:23;
  36:13
otherwise
  35:6
out 7:13;
  8:10; 9:25;
  10:2; 11:23;
  13:11,12,13;
  16:10,16
outcome 31:9
over 23:24;
  37:2
overall 11:18
overtime
  6:13,24;
  18:19; 24:1,
  19; 26:1;
  29:7
-------------

2:10,15.5
paper 16:6,9;
  32:7; 34:25;
  38:9,10
papers 35:1
part 21:10;
  25:19
parties
  40:16,18
past 37:23
PATRICK
  1:12.5; 2:1;
  4:1,10; 40:6
pause 31:6
PENNSYLVANIA
  1:1; 2:3.5,
  4; 40:1,5
people 6:22;
  9:4; 10:15,
  17,19,24;
  17:8; 19:22
per 28:13
performance
  11:19; 13:8
period 4:22;
  23:24; 32:5
person 8:13;
  9:7; 10:8;
  11:25; 12:9;
  16:13; 35:1,
  5
personally
  6:19; 7:9;
  9:4; 17:7
Peterson
  2:13.5; 3:2,
  3; 4:7;
  13:18,22;
  14:16,25;
  15:8,15,18;
  24:8; 33:2;
  34:6; 38:24;
  39:12
PHB 1:7;
  2:3.5; 4:11,
  15,23; 5:5,
  14; 13:25;
  15:24;
  20:20,24;

13
pick 8:7
picked 8:9
picking 13:4
piece 16:9
Pike 2:15
place 18:22;
  40:9
plant 25:14
Plaza 2:14.5
please 4:8
point 7:16,
  17; 37:23
policy 22:12,
  15; 23:1,5,
  22
position
  4:13; 5:25;
  8:15; 25:11;
  28:21; 30:9
possible 32:4
prefer 39:10
present 13:19
president
  17:20;
  33:18,20
Pretty 11:12
printed 8:3,
  10
printing
  40:11
printout 8:3
prior 23:8
probably 5:6;
  6:17; 33:17
problems
  12:11; 33:25
procedure
  2:2; 9:2;
  17:1; 23:12
proceedings
  31:6; 39:15
process 34:18
Public 1:25;
  2:3; 40:4
purposes 30:6
put 6:12;
  16:16;
  19:11;



CE85881.TXT

5:16; 21:10;
29:1,9
questions
5:17; 34:2;
38:23
quite 18:15
quota 10:16
--------------
R
--------------
race 7:9;
12:12; 18:4;
20:14; 24:7;
29:14,17,25;
35:5,9
racial 18:20,
22; 19:4,7,
16,21;
21:15,20,21,
23; 22:6;
23:13; 25:5;
26:3; 28:16;
29:10,11;
30:25; 33:8,
12,15,25
racism 7:7
racist 7:7
ran 7:1; 8:4,
17
rather 12:2
read 38:9,10
reading 40:14
real 16:13
really 9:23;
12:1,24;
17:3,10;
21:19
reason 7:18;
12:13; 25:1
rebuttal
13:20
recall 5:4,
11; 6:15;
9:12,19;
10:11;
17:12; 28:4;
36:20
receive 32:20
receiving

40:10
records 6:24
Recross-Exam-
ination
3:3.5; 37:15
Redirect 3:3;
34:4
reduced 40:11
refer 35:5,8
Reference
1:25.5
refuse 12:15
regarding
29:14,17;
36:7
regards
20:13;
21:15; 22:6,
13; 25:22,
25; 26:15,
18; 28:6;
29:7,24
relative
40:17,18
remark 26:20,
24
remarks 7:7;
35:15
remember
9:23; 17:22
report 21:9,
11
REPORTED
1:24.5
reporter
2:2.5;
3:4.5; 5:17;
22:9; 39:1,
7; 40:3
requested
17:13
resources
30:20
respect 6:18;
7:20; 8:14;
11:10
respective
40:16
response

Rex 9:14;
11:6; 30:2,6
Rexroth
10:13;
24:11,19;
26:1
Ridge 1:20;
2:4
Road 1:20;
2:4
Ron 8:1,11;
11:5; 30:4,
7; 35:13,19,
22; 36:6,11,
22,25
Roy 27:25
Rules 2:2
RULIS 2:14
run 8:5,6;
12:25
Ryan 9:15;
30:2,6
--------------
S
--------------
same 5:23;
8:17; 10:4;
11:14; 12:9;
19:24; 20:4;
30:9; 38:3
satisfied
31:9
saw 22:2
Sayers 8:1;
30:4,7;
35:13,19,22;
36:1,6,11,
14,17; 37:6,
8
saying 7:11;
24:17; 26:9;
27:21
says 27:9
seal 40:22
second 9:10;
11:7; 27:16;
32:9
see 6:23;
8:12; 13:2

set 9:12;
10:18; 17:1;
20:1,2;
40:21
settled 38:1?
setup 6:2,3;
12:3,9,11,
15; 27:24;
28:1
seven 10:17
shaking 24:3
Shelley 30:1?
Shields
20:10,18,20;
27:18,21
shift 8:8;
11:7,8;
20:1,2,3,4,
7; 27:16,24;
28:13; 30:8,
14,15; 32:9,
21
shop 6:23;
25:16
shoulder
14:21;
15:11; 36:1?
shouldn't
19:20
showed 8:11;
25:10
sign 39:5
signature
39:6,12
signing 40:1?
similar 9:8
since 13:14,
25
sit 33:11;
37:3
six 10:17;
17:22; 23:3,
9
skin 7:19;
25:2
slur 23:13;
25:5
slurs 18:20,
22; 19:4,7,

CE85881.TXT

25:11,21;
29:22
somebody
7:10; 12:2;
25:18;
26:14,23;
28:4; 34:13,
24; 35:11
someone 9:20;
26:9; 27:4;
29:16
something
7:11; 16:12;
29:14,17;
34:14,21;
36:22
sometimes
10:24; 12:6,
20; 31:15
sorry 15:2
sort 28:24;
36:4
SOSSO 2:14
specific 7:6;
14:19; 27:3
specifically
7:24
SS 1:6; 40:2
stalls 33:9
standard
23:11
start 27:25
started 4:20,
21; 15:6
state 4:8
stated 40:9
states 28:22
Steel 16:19
stenographic-
ally 40:10
step 13:10;
16:14
steps 16:11
steward 4:23;
5:2,5,10;
6:6; 14:10,
13,22;
15:23; 18:7;
21:11;

31:20; 32:6,
10; 33:14;
34:8,9,20;
38:19
stewards 28:9
still 14:13,
22; 20:20;
33:20,22
stool 36:23;
37:1,2
Street 2:9.5
stuff 6:13
suey 9:20;
26:10,14,25;
27:4,10;
28:5
suit 38:8
Suite 2:14.5
summarize
22:4; 32:23
supervisor
6:23; 8:2;
25:16;
30:10,11,14,
15
supervisors
6:9,23;
7:23; 13:3;
30:7,8,17;
35:20
supervisory
23:2
sweat 10:6
sworn 4:2;
40:6
--------------
T
--------------
talked 10:23;
21:8; 27:8;
29:23;
33:17; 36:25
taps 8:21;
9:12
team 10:13,
16,18; 24:11
terms 21:10;
22:15; 26:3,
5

13:19
testimony
13:20; 18:6;
19:11; 22:4;
23:23;
24:16;
27:13; 29:2,
5; 40:12
there's 9:24;
11:23; 12:4;
16:25;
17:22;
23:11,21;
27:2; 28:13
they've 17:10
thing 28:24
things 6:25;
12:4; 34:10,
12; 39:5
third 27:24
Thompson 31:1
three 5:8;
6:7; 8:6;
20:8; 24:24;
27:15
threw 8:10
today 21:18;
22:5; 38:25
Tom 30:25
took 37:2
total 4:16
towards 9:24;
11:19;
18:24; 19:2,
8; 27:4;
35:16
transcript
39:2,4,8
treat 36:1
treated 7:8;
24:7; 37:7
treating
35:14
treatment
36:7
tried 31:16
true 40:12
truth 28:22;
40:7,8

type 11:25;
39:1,7
types 6:11;
8:17; 35:15,
22; 36:13
typographical
39:4
--------------
U
--------------
Um-hum 22:8,
24
under 40:11
unfairly 7:8;
35:14; 36:3
unfavorable
6:12; 18:18;
24:1
union 4:23;
5:2,5,10;
6:6; 14:10,
13,22;
15:22; 16:2,
15,18,22;
17:19; 18:7;
21:11;
22:12,17;
23:14,20,25;
25:19;
27:14; 28:9,
12; 31:20;
32:5,10,17;
33:14,18,20;
34:7,9,20;
38:19
until 11:8;
21:18
unwieldly
29:1
up 6:20; 8:3,
10; 9:14,21;
10:14,23;
11:3; 25:1;
26:1; 32:16;
39:1,7
using 32:24
--------------
V
--------------

CE85881.TXT                                                    Page 8

```
-------------- |  5:11,19;        |  23; 9:4,9,
      W        |  6:7; 8:19;      |   14,15
-------------- |  9:7,20;         | writes 16:13
wait 11:4      |  10:20;          | writing 25:8
waive 39:6,12  |  11:15;          | written 9:16;
waived 40:15   |  12:10; 13:7,    |  16:1; 26:13
wall 25:9      |  25; 14:14;      | --------------
walls 26:6     |  15:24;          |       Y
wanted 9:14,   |  17:13,16;       | --------------
 15; 12:1;     |  18:2,8;         | year 14:21
 24:18,19,21   |  19:14,24;       | years 4:17;
Washington     |  20:4,9;         |  5:4,8; 6:7;
 2:15          |  21:1; 23:24;    |  24:24
watch 12:2;    |  24:17;          | yell 9:25
 13:9,10       |  25:22; 26:9;    | yelled 9:20
way 6:25;      |  27:3,15,19;     | yells 10:7
 15:22; 16:5;  |  28:2,10,15,     | yourself
 19:22;        |  21; 29:24;      |  28:17
 38:18; 40:19  |  30:23; 31:9,    | --------------
WAYNE 2:9      |  13,21;          |       Z
wee 10:1,7;    |  33:12; 35:9,    | --------------
 27:1,9; 28:5  |  14; 36:10;      | zinc 25:17
week 6:17;     |  37:5,7,10;
 15:12         |  38:12
weekly 18:14;  | Woodward's
 24:23,24      |  6:3; 10:12;
weeks 8:7      |  21:20; 29:2
West 1:20;     | word 21:2;
 2:4,9.5       |  26:10; 27:4;
whatever       |  28:3; 32:24
 12:8; 23:22;  | words 28:19,
 28:5; 34:15;  |  23
 35:15         | work 5:23;
whenever       |  11:7,19;
 38:11         |  12:19; 13:7;
WHEREOF 40:21  |  15:4; 20:1;
white 10:9;    |  38:4
 19:18,20;     | worked 10:4;
 35:6          |  11:14,16;
whole 17:4;    |  20:2,5;
 40:7          |  37:21; 38:5
will 9:25;     | Workers 16:19
 39:7          | WORKERS' 1:2
wipes 10:6     | working 6:1;
witness        |  12:9; 13:2;
 2:1.5; 24:2,  |  19:23;
 13; 33:3;     |  27:15,16;
 35:16;        |  28:11; 35:4
 39:11; 40:5,  | workplace
```