## COMMONWEALTH OF PENNSYLVANIA
## DEPARTMENT OF LABOR AND INDUSTRY
## WORKERS' COMPENSATION OFFICE OF ADJUDICATION

**DAYVED WOODARD**                          **CLAIM PETITION**
2115  West 32nd Street
Erie, PA  16508                             **CLAIM NO. 2607372**


vs


**PHB**
7900 West Ridge Road
Fairview, PA  16415


and


**ROYAL & SUN ALLIANCE**
P.O. Box 4701
Syracuse, NY  13221


**BEFORE:**    **JUDGE CARMEN LUGO**
              3400 Lovell Place
              Erie, PA  16503

**DATE AND PLACE OF HEARING:**
              JANUARY 27, 2005
              3400 Lovell Place
              Erie, PA  16503

**APPEARANCES:**

**WAYNE G. JOHNSON, JR., ESQUIRE**          345 West Sixth Street
(Counsel for the Claimant)                  Erie, PA  16507

**MELISSA PETERSEN, ESQUIRE**              DDI Plaza One, Suite 300
(Counsel for the Defendant)                 1225 Washington Pike
                                            Bridgeville, PA  15017

**COURT REPORTER:**
LYNN R. MURRAY
3400 Lovell Place
Erie, PA  16503

# INDEX

**Witnesses:**             **PAGES**
CHRISTOPHER MCCULLUM    D-4
C-21-
RD-27
RC-32
RONALD SAYERS    D-36
C-93
RD-111
RC-113
REX RYAN    D-150
C-163
RD-171
RC-185
LOREN SMITH    D-186
C-201
RD-213
RC-218
RODNEY BERRY    D-229
C-238

# EXHIBITS

**EXHIBITS:**             **PAGES**

**Judge's:**
NONE
**Claimant's:**
NONE
**Employer's:**
NONE

1    **P R O C E E D I N G S**

2        THE JUDGE: This is the time set

3    for a third hearing in the case of

4    Dayved Woodard versus PHB. The

5    claimant is present and is

6    represented by Attorney Wayne

7    Johnson, Jr.  Here on behalf of the

8    employer and its carrier is

9    Attorney Melissa Petersen.

10        Pending before me is a claim

11    petition regarding an alleged date

12    of injury of January 1, 1999.

13        Attorney Johnson, you indicated

14    that you would have several

15    witnesses today?

16        MR. JOHNSON:  That's correct,

17    your Honor.

18        THE JUDGE: Who do you wish to

19    call first?

20        MR. JOHNSON:  I would call

21    Chris McCullum, who's outside.  May

1    I grab him?

2    THE JUDGE: You may. Raise your

3    right hand.  Please have a seat.

4    Keep your voice up so the court

5    reporter can hear you.  Please

6    answer all questions verbally.

7    THE WITNESS: Okay.

8    THE JUDGE: Attorney Johnson,

9    you may proceed.

10    MR. JOHNSON: Thank you, your

11    Honor.

12    * * *

13    **CHRISTOPHER MCCULLUM,**

14    called as a witness on behalf of the

15    Claimant, and having been previously

16    duly sworn, was examined and testified

17    as follows:

18    **DIRECT EXAMINATION**

19    BY MR. JOHNSON:

20    Q    Mr. Johnson, could you please state your

21    full name for the record and spell your

```
 1              last name.

 2      A       Christopher J. McCullum, M-c-C-u-l-l-u-m.

 3      Q       What is your address, sir?

 4      A       3402 Regis Drive.

 5      Q       Now, Mr. McCullum, have you ever met the

 6              claimant, Dayved Woodard, before this?

 7      A       No, just before.

 8      Q       You don't remember him from when you

 9              worked at PHB?

10      A       No, no, I don't.

11      Q       When did you work at PHB?

12      A       I started in June of 2000 and worked all

13              the way until September of 2000.

14      Q       How did you come to be aware of any

15              lawsuits or litigation between Mr.

16              Woodard and PHB?

17      A       I was reading it in the Daily Times, the

18              newspaper, read the ad.

19      Q       When you say ad, was there an ad or was

20              it an article?

21      A       It was an article and called the editor
```

1          and got some information on the lawyers

2          that were handling it because it was like

3          going through the same thing I was going

4          through.

5     Q    So what did you do?  Did you contact the

6          lawyer?

7     A    Yes, I did. We talked several times,

8          several times. We actually even met

9          several times.

10    Q    Do you recall who that attorney was?

11    A    Jeff Connelly, I believe.

12    Q    Why did you contact Attorney Connelly?

13         What was your motivations or reasons?

14    A    Well, like I said many times, if you took

15         Dayved's name out and put my name on it,

16         it would be the same thing and it was

17         just a big deal, you know, I'm shocked.

18         As a matter of fact, I was at work at the

19         time I was reading it and I'm like, wow,

20         you know, I had to call somebody, you

21         know, and tell somebody that already

1          knew, I had told somebody this before and

2          it's like, wow, you should call the

3          lawyer and maybe you can be a help, you

4          know.

5    Q    All right. So you did not know Mr.

6          Woodard?

7    A    No, no.

8    Q    Well, let me ask you this, you said you

9          could have put your name in for his in

10         the article that you read in the *Erie*

11         *Daily Times*.

12   A    Um-hmm.

13   Q    Could you go through any instances you

14         personally had with PHB for the Judge.

15   A    You got time?  I could start from day

16         one.  I remember getting hired, talking

17         to the manager, he was like we are going

18         to hire you as a "B" operator.  I said

19         okay.  And he said I want you to meet the

20         third shift foreman, I said okay.  I

21         already had the job. The foreman took me

1    around and he kept questioning me, do you

2    really want this job, you know, are you

3    really going to come, you know, like, I'm

4    like, yeah, I need a job, I need to make

5    money, are you really, you know, he was

6    almost gave me a whole new interview,

7    like you're not supposed to have this

8    job, you know.  Well, I'm like I already

9    got the job.  Well, I really want to

10   start you off as a "C" operator.  I don't

11   know why they want to start you off as a

12   "B".

13   Q    Could you tell the Judge what the

14        difference is between a "B" and a "C"

15        operator?

16   A    There was -- it's more technical things,

17        you can read blueprints, you can do your

18        own set-up work and things like that.  A

19        regular "C" operator is just an operator

20        and also the pay rates --

21                 THE JUDGE: You guys need to

1      keep your voices down.  If you're

2      going to talk, you need to leave

3      the room.  Do you understand?

4      Thank you.

5        THE WITNESS: And also the pay

6      is lower.  "B" I think it was like

7      50 cents extra or something like

8      that.

9 BY MR. JOHNSON:

10 Q  Do you recall who that supervisor was?

11 A  No, I can't.

12 Q  What other incidents did you have?

13 A  Well, the biggest one was, you have a 90-

14      day probation and they're supposed to let

15      you know if you're doing good or doing

16      bad before that 90 days.  According to

17      the foreman, I was just so terrible, I

18      was just horrible.  Now, the 90 days, it

19      had been over 90 days, you know, and he

20      said you're horrible, horrible, horrible,

21      I don't think you should work here no

more and all this other stuff because you

had an incident. Well, the incident

happened where a machine they had me run

that was supposed to be had a shutdown,

it should have had a shutdown tag on it,

but it didn't, the machine was throwing

parts out.  You stick parts into the

chuck and when the machine starts up, it

shot the parts out.  Now, it had already

been down, but they put me on the machine

and when it crashed, they blamed it on

me, oh, you tore up the machine. The

third shift foreman just went off, oh,

this ain't going to look good on your

record, this is just so terrible. But I

talked to the operator that normally runs

it on first shift and she said that

machine has been down for days, Chris.

Then I asked the second shift foreman.

He said, yes, it's been down, you know,

and I did write a note to your third

1      shift foreman and, you know, the foreman

2      never came up to me and said, Chris, I'm

3      sorry, I apologize, the machine was

4      broken down, never said nothing. This

5      machine could have killed me, I mean the

6      parts in there weigh at least about a

7      pound and they were spitting out.  He

8      knew it, but, you know, that was just

9      another incident.  Any machine I was

10     running, he would do that.  He would put

11     me on machines that were broke down and

12     then when it breaks down, he'll say, hey,

13     you know, you broke the machine, but the

14     machine was already having problems.  It

15     wasn't my fault.

16   Q   Did you ever personally hear any racial

17       slurs?

18   A   Not to my face, not to my face.  Only

19       thing I heard --

20             MS. PETERSEN:  I'm going to

21                object if he's going to have

1       hearsay.

2            THE WITNESS: The only thing --

3            THE JUDGE: Wait, wait. When

4       there's an objection, you need to

5       stop talking so I can address the

6       objection.

7            THE WITNESS: Okay.

8            THE JUDGE: And the questioning

9       asked you, I want you to repeat the

10      question, are you specifically

11      asking for firsthand knowledge of

12      racial slurs, that means someone

13      said something to you, not that you

14      heard that somebody said something.

15           THE WITNESS: A guy approached

16      me and he said --

17           THE JUDGE: Who's the guy?

18           THE WITNESS: I can't think of

19      his name.

20           THE JUDGE: Was he a co-employee

21      or management?

1          THE WITNESS: He was coworker.

2          THE JUDGE: Thank you.

3          THE WITNESS: He came up to me

4    and he said --

5          MS. PETERSEN:  I'm still going

6    to object then.

7          THE JUDGE: Sustained, hearsay.

8    You can't tell us what somebody

9    else said.

10         THE WITNESS: No, I'm about to

11   finish it.

12         THE JUDGE: Yes, but if you said

13   a guy came up to me and said that

14   would be hearsay.  You can't tell

15   me what he said to you.

16         THE WITNESS: I can't tell you

17   what he said to me?

18         THE JUDGE: No, not unless you

19   know his name.

20         THE WITNESS: I don't know.

21   BY MR. JOHNSON:

1    Q        Were there any other incidents that you

2             felt were discriminatory against

3             yourself?

4    A        Yes.  Wow, I mean you could be having a

5             conversation with an individual and

6             they'll say things like, Chris --

7                      MS. PETERSEN:  I'm going to

8                 object.  This is hearsay as well.

9                      THE JUDGE: Sustained.  You

10                can't tell us what other people

11                said unless you can identify who

12                they are because the other side

13                wouldn't have an opportunity to

14                cross-examine or call that

15                individual as a witness to verify

16                your testimony.

17                     THE WITNESS: Well, it's just

18                really hard --

19                     THE JUDGE: I understand, but

20                those are the rules.

21                     THE WITNESS: It's so long ago.

THE JUDGE: I don't blame you.
Those are the rules and I have to
sustain the objection so you can't
say anything.

THE WITNESS: There were stares,
you could be doing your job, and
people that didn't even have no
business in your area, was hawking
over you, you know, just like I'm
doing with you right now, making
you feel very uncomfortable because
it's like, well, you know, what did
I do wrong.  Am I doing something
wrong?  No, it's nothing.  I just
want to stare at you.  Now, these
are not set-up guys or anything
like that, just regular coworkers.

BY MR. JOHNSON:

Q      Are these your coworkers?

A      These are just regular coworkers.

Q      Did you ever make any complaints to any

1          supervisors?

2     A    Oh, yes, several times.

3     Q    Do you recall what supervisors you made

4          the complaints to?

5     A    No, just the hiring manager and the tool

6          shop, that's all.

7     Q    Do you recall what the specific

8          complaints were that you made to them?

9     A    Mostly was I'm asking for help, I'm not

10         getting it, you know, they're trying to

11         blame that I'm tearing up the machines

12         when the machines are already tore up.

13         Some of the set-up guys refused to do

14         anything for me, you know, even though

15         I'm asking for help, they didn't want to

16         give me no information, no nothing.

17    Q    What is a set-up guy?

18    A    A set-up guy is basically just a guy who

19         comes in and sets up the machine.  If

20         it's a problem that you can't handle,

21         they come in and fix it for you.  If it

1        goes past your job call, they come in and

2        do like maintenance work, things like

3        that.

4    Q    Set-up would be, could you describe to me

5        what set-up means?  Are you setting up

6        the machine to run it?

7    A    To run it, for example, like you have a

8        machine that's down, it's not working no

9        more, it's not my qualifications to fix

10       this.  I got to get somebody else on a

11       higher level than me to come in.  It's

12       almost like a supervisor comes in and he

13       repairs it.  When he would repair it, I

14       mean, you know, a couple times it would

15       break down again, you know.

16   Q    Any other complaints you made to your

17       supervisors?

18   A    The only complaint was basically the one

19       about when it was time for them to do my

20       review and different incidents that came

21       up, I mean it was like several incidents

1   as far as the machine not working right

2   and blaming it on me, the different

3   stares, the insults, things like that

4   coming from foreman and the set-up guy

5   and different coworkers.

6 Q  When you made these complaints to your

7   supervisors, was anything done to address

8   your concerns?

9 A  Well, they were apologetic, they

10   apologized, the manager, I remember he

11   was saying, he was very --

12     MS. PETERSEN:  I'm going to

13    object unless he identifies who

14    this is.

15     THE JUDGE: Do you remember the

16    names of anybody?

17     THE WITNESS: No, I don't.  I

18    put those people in the back of my

19    mind.

20     THE JUDGE: Objection sustained.

21     MR. JOHNSON: Thank you.

1    BY MR. JOHNSON:

2    Q       Your testimony is you worked at PHB from

3            approximately June through September of

4            2000?

5    A       Right.

6    Q       What was your reason for leaving?

7    A       The hassle, I mean I felt uncomfortable,

8            I mean, you know, you felt like, you

9            know, something bad is going to happen to

10           you and these people don't care.  I felt

11           unsafe, I started looking for another

12           job, and I got out of there.

13   Q       When you say you felt unsafe or

14           uncomfortable, what was your basis for

15           feeling that way?

16   A       Well, I mean, you know, talking to the

17           foreman and asking for help and not

18           getting it, complaining about different

19           things that were going on, the stares,

20           the comments, you know, I'm here to do a

21           job. The only thing I care about is I can

1          do this job, make my money, and go home.

2          I don't need the outside things.  I don't

3          care what color your son-in-law is.  So

4          what, we're the same color.  I don't care

5          about that. I'm just here to do a job.

6          The stares, I mean from people that

7          didn't have any business in my area, from

8          coworkers, you know, not getting

9          information that I needed to do my job

10         the right way.

11   Q     Were there any other black employees

12         working at the same time you were?

13   A     Not on third shift, no.

14   Q     So you were the only black employee?

15   A     Black machine operator at the time, yes.

16   Q     And do you feel that you were treated

17         differently than your coworkers?

18   A     Oh, yes, I do.

19   Q     What were the reasons for that?

20   A     Well, like I said, anytime you needed

21         help, there was no help.  You felt like

1    you were by yourself, like, okay, we're

2    not going to give him no help, we're

3    going to watch him fail so we have a

4    reason to get rid of him, that's how I

5    felt and that's how it was.  You felt

6    like you were lost and by yourself there.

7         MR. JOHNSON: That's all the

8         questions I have.

9         THE JUDGE: Cross-examination.

10         * * *

11    **CROSS-EXAMINATION**

12    BY MS. PETERSEN:

13    Q    Mr. McCullum, what division did you work

14         at at PHB?

15    A    The tool division.

16    Q    Where is that in relation to the die cast

17         division?

18    A    I believe that's like almost, I want to

19         say blocks, but it looks like fields

20         between areas.

21    Q    So it's an entirely separate area?

1    A       Yes.

2    Q       And during the time you worked at PHB,

3            you never had occasion to go to the die

4            cast division?

5    A       No.

6    Q       So you didn't ever meet with Mr. Woodard

7            before today?

8    A       No, no.

9    Q       And you never saw him working?

10   A       No, no, no.

11   Q       You never saw any of his supervisors or

12           coworkers --

13   A       No, no.

14   Q       -- talking with him or anything like

15           that?

16   A       Hmm-um.

17                   MS. PETERSEN:  Judge, I'm just

18               going to object to Mr. McCullum's

19               testimony in his entirety.  I don't

20               think it has any relevance on what

21               Mr. Woodard has testified to.  I

1          don't think it has any basis for

2          abnormal working conditions that's

3          specific to Mr. Woodard.

4               THE JUDGE: At this time, I'm

5          going to overrule your objection.

6               MS. PETERSEN:  Okay.

7               THE JUDGE: I'll let you brief

8          it.

9     BY MS. PETERSEN:

10    Q     Now, you said you don't remember any of

11          your supervisors or coworkers that had

12          made these comments to you?

13    A     No.

14    Q     You were there for approximately three

15          months?

16    A     Yes, a little bit more, a couple days

17          more.

18    Q     Were you a member of the union when you

19          were there?

20    A     No.

21    Q     So you didn't make any complaints to the

1          union?

2    A     Hmm-um.

3    Q     Was that because you were within your

4          trial period?

5    A     Yes.

6    Q     You left before the end of the trial

7          period?

8    A     Right, right, um-hmm.

9    Q     What happens during the trial period?

10    A     Well --

11    Q     For you.

12    A     -- for me, it's like they test you to

13          make sure you can do the job, you know,

14          and from what the manager -- according to

15          the manager, less than 30 days, if you're

16          doing terrible in 30 days, you're out.

17          This went on, you know, I was there for

18          the whole 90.

19    Q     So that 90 days is the trial period?

20    A     Yes.

21    Q     During this period, you can be terminated

1           for whatever reason?

2    A      Right.

3    Q      And after that is when you go through the

4           union and have a grievance process and

5           everything?

6    A      Right.

7    Q      And did you just work third shift at the

8           time you were there?

9    A      Third shift.

10   Q      What hours of the day was that?

11   A      From 11:00 to 7:00.

12   Q      11:00 p.m. to 7:00 a.m.?

13   A      Yes.

14   Q      And how many days a week?

15   A      Five, Monday through Friday.

16   Q      So you're full-time?

17   A      Well, starts Monday night.

18   Q      Sunday night to Thursday night?

19   A      Yes.

20   Q      You don't remember your set-up guys or

21           anything like that?

1   A        No, hmm-um.

2   Q        Do the people in the division that you

3            worked, the tool division, I guess?

4   A        Right.

5   Q        Are they union members or is this a non-

6            union area?

7   A        I wouldn't even remember.

8   Q        Did anybody ever make physical threats

9            against you?

10  A        No.

11  Q        Did you ever see any racist remarks in

12           the restrooms there when you were there?

13  A        No.

14                   MS. PETERSEN: All right, that's

15                all I have. Thank you, Mr.

16                McCullum.

17                   THE JUDGE: Follow-up?

18                   MR. JOHNSON:  Just a few

19                questions, your Honor.

20                         * * *

21                **REDIRECT EXAMINATION**

1    BY MR. JOHNSON:

2    Q      Mr. McCullum, you were in the tool

3           division?

4    A      Right, right, right.

5    Q      And if you know, is the tool division and

6           the die cast division both divisions of

7           the same company?

8    A      Yes.

9    Q      And are they located in the same general

10          area?  Let me ask you, there's separate

11          buildings?

12   A      Yes.

13   Q      Are they located on the same street?

14   A      Yes.

15   Q      The same property?

16   A      Yes.

17   Q      Now, you talked about probationary

18          periods?

19   A      Um-hmm.

20   Q      And I think you testified that there was

21          a 90-day period?

1    A    Right, right, right.

2    Q    Now, you were also talking about a 30-day

3         period, but I don't think you finished

4         what you were saying.

5    A    Well, the manager, the big thing after

6         was after the 90-day probation, the

7         foreman, he ran down a list of things, he

8         said I was making the other employees

9         uncomfortable, I was doing this, I wasn't

10        doing the job right, wasn't making rate,

11        I was just horrible, and the manager

12        looked at him, well, if you're having all

13        these problems with Chris, why didn't you

14        let him know and he said, the foreman

15        said --

16             MS. PETERSEN:  I'm going to

17                object to what the foreman said.

18             THE JUDGE: I'm going to allow

19                it. Go ahead.

20             THE WITNESS: The foreman said

21                he should have known he was going

1    to get fired after the 90 days and

2    I'm like, wait a minute, I thought

3    I was doing good because nobody

4    never complained about me and the

5    manager, his response was, the 30

6    days, if you wasn't productive,

7    wasn't doing what you were supposed

8    to in 30 days, he should have fired

9    you right then.  He should have

10   told you something. Waiting for

11   this 90-day period and that you

12   were a bad employee, you should

13   have --

14   BY MR. JOHNSON:

15   Q    Just so I'm clear, you worked from June

16        to September of 2000?

17   A    Um-hmm.

18   Q    Was it more than 90 days or less than 90

19        days?

20   A    It was a little bit more than 90 days

21        when I left, but --

1    Q    Had you completed your probationary

2          period?

3    A    Yes.

4    Q    Had they told you that you had completed

5          your probationary period?

6    A    Yes, and the thing about it, if I hadn't

7          had that meeting with them about the

8          treatment that I was getting, they

9          probably would have fired me if I hadn't

10         spoke up.

11    Q    Did you have a meeting at the end of your

12         probationary period?

13    A    Yes, as a matter of fact, this was the

14         day after that it happened because the

15         manager, the foreman, he would bring you

16         in and tell you the different things, you

17         know, give you a list of the problems he

18         has with you and after he gave me this

19         list and told me what he thought, I was,

20         like, no, hmm-um, that ain't how it went

21         down.  I don't appreciate this.  I'm

1          going to the manager and that's when we

2          had the big meeting and in the meeting,

3          it was a set-up guy, the foreman, and

4          also the hiring manager, and myself.

5     Q    But that was at the end or the completion

6          of your 90-day probationary period?

7     A    Right.

8     Q    And you were not terminated?

9     A    No, no, because after the manager heard

10         the different things, he was more upset

11         with the foreman and he apologized to me.

12         He says, is there any problems, Chris?

13         Do you want something done?  I just

14         wanted a job, you know, and I wanted to

15         be treated equal.

16    Q    And shortly after, you left your

17         employment with PHB?

18    A    Um-hmm.

19    Q    Is that correct?

20    A    Yes.  Probably two, three weeks after, I

21         ended up getting hired from another job.

1  Q      You weren't fired, you quit your job?

2  A      I quit.

3                  MR. JOHNSON: That's all the

4              questions I have, your Honor.

5                       * * *

6                  RECROSS-EXAMINATION

7  BY MS. PETERSEN:

8  Q      Mr. McCullum, just to clarify, the people

9          that worked in the tool division are

10          entirely different people than work in

11          the die cast division; correct?

12  A      Yes.

13  Q      People don't intermingle?

14  A      Merge, no.

15  Q      So you would have completely different

16          supervisors, coworkers, set-up guys, than

17          people in the die cast division?

18  A      Correct.

19                  MS. PETERSEN:  That's all I

20              have.

21                  THE JUDGE: Thank you, Mr.

1      McCullum.  You may step down.

2      You're free to leave.

3          THE WITNESS: All right.

4          THE JUDGE: Next witness,

5      Attorney Johnson?

6          MR. JOHNSON:  Your Honor, that

7      is the only witness I have.  I had

8      subpoenaed Kerry Goodwine, who was

9      going to be my other witness.  I

10     received a phone call two days ago

11     from Attorney Jeff Connelly, who

12     represents Mr. Goodwine in a

13     discrimination suit.  Mr. Goodwine

14     hired in the last month or so by GE

15     and is in his probationary period

16     where he can't miss a day of work

17     for 90 days and he is not going to

18     be here.  I was wondering if I

19     would be able to take his

20     deposition to submit?

21         THE JUDGE: Any objection?

1          MS. PETERSEN:  No, that's fine.

2          THE JUDGE: Then you may proceed

3     by deposition.

4          MR. JOHNSON:  Thank you, your

5     Honor.

6          THE JUDGE: Is that going to be

7     your only other witness?

8          MR. JOHNSON:  That's my only

9     other witness.

10         THE JUDGE: All right.  Ms.

11    Petersen, you identified several

12    witnesses.  I assume they're here

13    today?

14         MS. PETERSEN:  Yes, your Honor.

15         THE JUDGE: Call your first

16    witness.

17         MS. PETERSEN:  I would call Mr.

18    Ronald Sayers.

19         THE JUDGE: Are all these

20    individuals going to be testifying?

21         MS. PETERSEN:  Yes.

1       THE JUDGE: I would ask that

2       they be sequestered.

3           MS. PETERSEN:  Okay.

4           THE JUDGE: Anyone who is going

5       to testify needs to go out in the

6       lobby and we'll call you as you're

7       needed.  The two others in the

8       back, are they not testifying?

9           MS. PETERSEN: They are not

10      testifying.

11          THE JUDGE: Thank you.  Raise

12      your right hand.  Please have a

13      seat and keep your voice up so the

14      court reporter can hear you.

15          THE WITNESS: Okay.

16          THE JUDGE: Attorney Petersen.

17              * * *

18      **RONALD SAYERS,**

19      called as a witness on behalf of the

20      Employer, and having been previously

1     duly sworn, was examined and testified

2        as follows:

3       **DIRECT EXAMINATION**

4  BY MS. PETERSEN:

5  Q  Please state your full name for the

6     record.

7  A  Ronald Reed Sayers.

8  Q  By whom are you employed currently?

9  A  PHB Die Cast.

10  Q  What is your title there?

11  A  I am shift supervisor.

12  Q  How long have you been shift supervisor

13     there?

14  A  I've been shift supervisor since 1997.

15  Q  And how long have you been employed by

16     PHB, total?

17  A  I'm in my twenty-eighth year at PHB.

18  Q  And are you familiar with the claimant in

19     this case, Mr. Dayved Woodard?

20  A  Yes, I am.

21  Q  How are you familiar with him?

1    A    Just through working with him.

2    Q    Were you once his supervisor?

3    A    Yes, ma'am.

4    Q    Were you a direct supervisor to him,

5         meaning he reported directly to you?

6    A    Yes, to my foreman and myself, yes.

7    Q    Who was your foreman?

8    A    I had four different foremen underneath

9         me.

10   Q    Okay, we can get to that later.  Now, Mr.

11        Woodard had, I believe, worked for PHB

12        from 1998 to 2003; is that your

13        understanding?

14   A    Yes.

15   Q    And did he work a particular shift do you

16        recall?

17   A    Mostly second shift.

18   Q    What hours was that?

19   A    In his classification, it would be 2:40

20        to 10:40.

21   Q    2:40 p.m. to 10:40 p.m.?

1    A        Yes.

2    Q        And did you work on the same shift as Mr.

3             Woodard?

4    A        Every other week, I rotate.

5    Q        Okay.  How did you rotate your shift?

6    A        I swing shift.  One work I work first

7             shift and one week, I work second shift.

8    Q        And as the shift supervisor, what were

9             your duties?

10   A        My duties is to overlook the whole

11            department, assign people to machines,

12            make sure people are there, any important

13            jobs with the machinery as far as getting

14            them out on time, I'm in charge of

15            anything that goes on in the whole

16            department.

17   Q        What department is that?

18   A        Aluminum die cast.

19   Q        How many people work in the department

20            during one shift?

21   A        During one shift.

1    Q    A range.

2    A    Probably between 40 and 50, all depending

3         on how busy we are at the time.

4    Q    And you supervise all those people?

5    A    Yes, ma'am.

6    Q    What type of work is done in that

7         department?

8    A    It's like foundry.  It's molten metal,

9         making aluminum die cast parts.

10   Q    You make aluminum parts?

11   A    Yes.

12   Q    What types of machines are in that

13        department?

14   A    Mostly die cast machines, then there is

15        some secondary machines in there, punch

16        presses. Once in a while, there will be a

17        drill press or something for secondary

18        work.

19   Q    Okay. So there's 40 to 50 people working

20        there at one time.  Does everybody have

21        their own machine or how does that work?

1    A       No, they get moved around from machine to

2            machine.  There's different

3            classifications.  You're DCPOs run the

4            machines, I have operators that run hand

5            machines.  The DCPOs, they start the

6            machines up and everything and then

7            they're responsible for everything in

8            that work cell.  Then I also have a metal

9            man and the foreman and everything that

10           I'm in charge of.

11   Q       How many different machines in the same

12           department, in your department?

13   A       Die cast machines at that time, we had

14           about 30 machines.

15   Q       And do all the people in the department

16           work all the machines at any given time

17           or are certain people assigned to certain

18           machines?

19   A       They can run any given machine on any

20           given day.

21   Q       Okay.  Now, can you explain the procedure

1          of how people are assigned to certain

2          jobs, certain machines?

3     A    Well, as far as the procedure, they're

4          just assigned a machine.

5     Q    When a job comes in, you get an order or

6          if you can start from the beginning?

7     A    Well, when a brand new order, it will be

8          assigned --

9                    THE JUDGE: This is not a

10                   regular work injury. Why are we

11                   going through the job duties?

12                   MS. PETERSEN:  Because I think

13                   he did complain about his job

14                   assignments.

15                   THE JUDGE: Well, job

16                   assignments is one thing.

17                   MS. PETERSEN:  I wanted to go

18                   through the procedure of how people

19                   are assigned to their specific jobs

20                   because I think he had testified

21                   that he was assigned to all the

1           difficult jobs or a lot of

2           difficult jobs.

3               THE JUDGE: All right, I'll

4           allow it.

5   BY MS. PETERSEN:

6   Q       You can continue.

7   A       A job will come down, it will be lined

8           up, put in a machine, then when that

9           machine is ready to start up, anybody

10          that's available at that time will be

11          assigned that machine.  A lot of times,

12          if your machine finishes or whatever,

13          because they go by priorities, we have

14          the fourth job and it goes right down the

15          list, and if your job finishes or is up

16          on the priority list, when that machine

17          starts up, then you'll be moved to that

18          machine.

19  Q       Okay. So if you are working on a certain

20          machine and it was lower on the priority

21          list and then what if somebody calls off

1        that has a higher job on the priority

2        list, then what happens?

3    A    What happens then is if somebody calls

4        off and they're on a more important job,

5        then we'll look at the list and go to the

6        least priority machine and move that

7        individual to fill the higher priority

8        machine.

9    Q    Does it matter who the individual is?

10   A    Absolutely not.

11   Q    It's the priority, you said?

12   A    Priority machine, right.

13   Q    Now, are you given deadlines to complete

14       the jobs then?

15   A    Well, there's a deadline when we start

16       running the job, then however long it

17       takes to finish that job unless something

18       else more important comes up and we have

19       to take it out.

20   Q    Okay.  Now, you said you were responsible

21       for assigning jobs to employees and

1    machines to employees?

2    A    Yes.

3    Q    Were you the only one that was

4         responsible for assigning jobs or anybody

5         else?

6    A    No, there's shift supervisors on the

7         other shift.  Like I rotate, I have a

8         partner that's on the opposite shift of

9         me, he's on second and vice versa.  He

10        assigns jobs, also. Then we have three

11        dispatchers that are taken care of

12        anything that has to do with people in

13        that department as far as moving them

14        around or when people call off, they get

15        a hold of one of us and we'll switch

16        people around and at times, they'll move

17        people around a little bit, too.

18   Q    How are the assignment decisions made?

19        Is it random or is there a certain --

20   A    No, mostly it is random, because like I

21        said, it goes by the priority sheet or if

1          when one job finishes, they'll just

2          automatically take that individual and

3          put him on the next machine that's open.

4     Q    Were the assignments documented?

5     A    No.

6     Q    Now, if an employee is assigned to a

7          certain job on a machine, does the

8          employee work at that certain job until

9          it's completed?

10    A    No, not necessarily.  Sometimes that

11         machine could break down, then it will go

12         to get assigned another job and sometimes

13         they're on that job for a couple days or

14         they could be moved around.

15    Q    Okay.  Now, for the time you work at the

16         shop, were you physically in your

17         department among the people that work

18         there with the machines and everything?

19    A    Yes.

20    Q    Okay. And did you observe the people as

21         they worked there?

1    A    Sure.

2    Q    Now, with respect to Mr. Woodard, were

3         you observing his work as well?

4    A    Oh, sure.

5    Q    Now, when Mr. Woodard first started

6         working at PHB back in 1998, did he work

7         under a certain trial period?

8    A    Yes, everybody that starts, they go

9         through the regular union procedures,

10        it's either 60 or 90 days.

11   Q    Okay. What's the purpose of the trial

12        period?

13   A    Well, to get them broke in, taught, and

14        everything, to make sure everything goes

15        okay as far as making sure they come to

16        work every day and do good work.

17   Q    Now, do you observe employees during

18        their trial period?

19   A    Sure.

20   Q    So do you have any input as to whether an

21        employee stays on as an employee or

1     whether they're hired or fired?

2  A   Well, usually when the individual gets

3     hired and that, they go through a break-

4     in period, a training period, that's what

5     that whole 90 days is. Then they get

6     evaluated on an evaluation sheet, the

7     foreman they have at the time, because

8     there's three or four foremen out there,

9     and they get evaluated by them.

10  Q   Now, in general, what do you expect of

11     the employees that work in your

12     department?

13  A   Just to show up to work on time, to

14     follow the methods and do the proper work

15     that the job needs to be done, staying at

16     the machine and just do a good, fair

17     day's work.

18  Q   Did you have the same expectations for

19     Mr. Woodard when he worked there?

20  A   Sure.

21  Q   Were your expectations for Mr. Woodard

1   different than any of your other

2   employees?

3 A No.

4 Q Now, initially after Mr. Woodard started

5   working at PHB, do you remember whether

6   he was meeting your expectations

7   initially?

8 A Dayved was a fair individual, he did

9   pretty -- fair work. There's times where

10   we had to talk to him when he wasn't

11   staying at his machine or doing a few

12   things he wasn't supposed to be doing.

13 Q Did his work performance ever change

14   during the time he worked there or did he

15   continue to meet these expectations?

16 A Yes, he did fair work.

17 Q Now, you said he would leave his machine

18   or were there problems with this work

19   performance at all?

20 A Yes, there's times when he would leave

21   his machine and go talk to other people,

1    leave his machines running or do various

2    other things.

3  Q  What's wrong with that?

4  A  Well, the machines is not -- the machines

5    they run, they're automatic machines and

6    everything. There may be a machine that's

7    still running, there's something that

8    could go wrong or there's some safety

9    problems to other individuals around the

10    area.

11  Q  Do you know how long he would leave his

12    machine?

13  A  Not exactly, no.

14  Q  Was it for a minute, two minutes, or --

15  A  It could be any of that.

16  Q  And you don't think that was appropriate?

17  A  No, I mean they're allowed to go down get

18    a drink, stuff like that, but basically

19    if you leave for a while, it's going to

20    be a problem.

21  Q  What's a while?

1    A    Well, I don't have any time limit on it.

2    Q    15 minutes, is that too long?

3    A    Oh, 15 minutes, is, without getting

4         relief, because we have relief people

5         that when they do have to go to the

6         bathroom or something like that, then we

7         ask for that and we'll get a relief, set

8         up relief person comes over and runs the

9         machine for them while they go for a

10        bathroom break or whatever they have to

11        do.

12   Q    Now, if an employee wants to go on a

13        break, do they go get the relief person?

14   A    They tell the foreman or else call

15        myself.

16   Q    Okay. And the foreman or yourself would

17        assign the relief person to that machine?

18   A    Yes.

19   Q    So that would happen when a person would

20        go to lunch as well; right?

21   A    At lunchtime, if we didn't keep that

1    machine running, we would tell him to

2    shut it off at a certain period of time,

3    they would shut their machine down, go to

4    lunch, and when they come back, they

5    would start back up.

6  Q  Okay.  Other than Mr. Woodard leaving his

7    machine for probably longer than you'd

8    like him to, did he have any other

9    problems with his work performance or

10    attitude or anything like that?

11  A  No.

12  Q  Okay.  Now, these issues you had with his

13    leaving the machine, did you tell him

14    about it?

15  A  Yes.

16  Q  And how did he react?

17  A  He seemed fine at the time. There was a

18    couple different times where I just told

19    him, hey, this is the kind of stuff you

20    can't do.  It's going to cause you

21    problems.  You have to stay at the

```
1              machine, keep the machine running.

2    Q         Would you have to do this many times or

3              how often would you have to remind him?

4    A         Just a couple times I talked to him one-

5              on-one about it.

6    Q         Two times?

7    A         Two times I remember, yes.

8    Q         What happened during these one-on-one

9              talks you had with him?  You said you had

10             two times where you --

11   A         Right, well, one time at the beginning of

12             the shift, periodically during the shift,

13             I'll go around and check the castings,

14             look at them, see if there's anything

15             wrong with them or whatever, and the one

16             time I walked by and there wasn't an

17             operator, so I looked at the casting and

18             there still wasn't an operator there, so

19             I checked my sheet that came with me of

20             the assignments, who's running that

21             machine and Dayved was on this machine
```

1          and it was a thousand ton one at the time

2          and I started looking around for him, I

3          started walking down to use the one phone

4          and Dayved come around the corner then

5          and I asked him where he was and he said

6          he was over talking to Jamal Shields.

7     Q    Okay. And then what did you say to him?

8     A    Well, that's one of the occasions that I

9          told him, well, okay, we can't be doing

10         this, we got to stay at the machine

11         because Jamal was over on the side of the

12         department running another machine, which

13         is quite a ways away and you can't leave

14         that machine running, I don't know how

15         long he was gone, but I was there for a

16         couple, three minutes anyhow, and he was

17         gone, you know, quite a while, I don't

18         know how long he was gone, but I said

19         this is the kind of thing that can cause

20         trouble, you know, safety problems or

21         whatever if something goes wrong with

1          that machine.

2    Q    Did you have any other people in your

3          department that had these types of

4          problems or issues of leaving their

5          machine longer than you'd like them to?

6    A    Yes, I've had problems with other people,

7          too.

8    Q    And would you do the same thing to them?

9    A    Oh, absolutely.

10    Q    You approach and remind them not to or

11          what would you --

12    A    Yes, I would approach them, talk to them

13          about staying at the machines and not

14          leaving for a long period of time.

15    Q    Now, Mr. Sayers, did you have any

16          personal problems with Mr. Woodard?

17    A    No.

18    Q    Did you have any problem with him being

19          African-American or black?

20    A    Absolutely not.

21    Q    In general, do you have any problems with

1    people who are black or members of a

2    minority?

3  A  No, ma'am.

4  Q  Now, during the time that Mr. Woodard

5    worked at PHB and under your supervision,

6    did you ever deliberately try to give him

7    a hard time or make his employment

8    difficult at PHB?

9  A  No.

10  Q  Did you ever single him out or target him

11    or harass him, make life difficult for

12    him when he worked there?

13  A  No.  All I really care about out of any

14    individual there is what kind of work

15    they do at the machine, just to do the

16    eight hours worth of work that they are

17    hired to do.

18  Q  So the contacts you've made to Mr.

19    Woodard that you described were because

20    you wanted him to have a better

21    performance?

1     A     Correct, you know, staying at the

2           machine, keeping your machine running,

3           because there's different things can

4           happen just not safety problems, but

5           sometimes if you're not watching what you

6           were doing, you're going to have damages

7           to the machine, breakage or whatever and

8           making scrap parts.

9     Q     Did you ever make any derogatory or

10         racist comments to or about Mr. Woodard?

11    A     No, ma'am.

12    Q     Did you ever hear any of Mr. Woodard's

13         other supervisors or coworkers make any

14         racist or derogatory comments to or about

15         him?

16    A     No, ma'am.

17    Q     Did Mr. Woodard ever complain to you

18         directly about being treated unfairly by

19         his supervisors or coworkers?

20    A     Just about me treating him unfairly.

21    Q     He told you?

1    A      Well, the told the union --

2    Q      Telling you directly?

3    A      No.

4    Q      Did he ever complain to you about any

5           coworkers or supervisors making racist or

6           derogatory comments?

7    A      No.

8    Q      Now, do you personally think there was a

9           problem in the shop with racism?

10    A      No.

11              MR. JOHNSON:  Objection,

12             speculation.

13              THE JUDGE: Sustained.

14              MS. PETERSEN:  From his own

15             experience.

16              THE JUDGE: Sustained.

17    BY MS. PETERSEN:

18    Q      Now, at a prior hearing, Mr. Woodward

19           testified that during his trial period,

20           he was asked by one of his supervisors,

21           Rex Ryan, to work overtime over a

1          weekend, I believe, and then when he

2          showed up, you were the supervisor at the

3          time and you told him to go home. Do you

4          recall something like that?

5     A    No, ma'am, I don't.  Normal procedure if

6          we do do that, if somebody isn't on the

7          schedule, in case there might be a

8          mistake, we usually just find something

9          for that individual to do.

10    Q    Okay.  So if he had showed up, you're

11         saying you wouldn't have sent him home?

12    A    No.

13    Q    Is it possible you could have sent him

14         home?

15    A    I don't recall.

16    Q    Now, during this trial period, did you

17         have any personal problems with Mr.

18         Woodard?

19    A    Personal problems, no.

20    Q    If he had been sent home by yourself

21         during his trial period, did you try to

1            make life difficult for him after that

2            time?

3    A      No.

4    Q      Now, Mr. Woodard also testified that you

5            were constantly putting him on more

6            difficult jobs.  Is that true?

7    A      No.

8    Q      How so?

9    A      At that time period, we were moving

10          people around on a regular basis to try

11          to keep -- because we had some jobs that

12          were a little harder, so we were moving

13          people around.  Rex Ryan, myself, which

14          Rex is my partner on the other shift that

15          we swing with, we came up with a program

16          where every Wednesday, we would move

17          people around, you know, so that way they

18          would only have to -- they weren't

19          running the same job for more than three

20          days.  If we put them on a job on a

21          Wednesday, they would run that job, if it

1          was running, Wednesday, Thursday, Friday,

2          and then they'd have the weekend off

3          unless they worked, of course, then

4          they'd have to run the same job Monday

5          and Tuesday and then that Wednesday,

6          they'd get moved to something else.

7    Q    So a person wouldn't be assigned to the

8          same job for three weeks?

9    A    No.

10   Q    At a time?

11   A    Shouldn't be, no.

12   Q    Shouldn't.  Is it possible?

13   A    When we came up with this program, then

14         no, they wouldn't be running the same job

15         for that long.

16   Q    Okay.  You said there may be harder jobs

17         or jobs that are perceived as more

18         difficult or harder than other jobs?

19   A    Some are, yes.

20   Q    What types of jobs would they be?

21   A    Well, they could be various different

```
 1              kind of jobs, could be a little heavier

 2              job or could be a quicker running job.

 3              One person might complain about one job

 4              that another person likes.

 5    Q         Well, did you ever set out to

 6              specifically assign the heavier or more

 7              difficult jobs to Mr. Woodard?

 8    A         No.

 9    Q         Now, you indicated there are some jobs

10              that people like and other people

11              wouldn't like?

12    A         Yes.

13    Q         Now, in Mr. Woodard's case, are you aware

14              of jobs he liked to do, but others didn't

15              like to do?

16    A         One job that he did like to run was the

17              -- the customer was called Rex Roth and

18              he seemed to like to run that job, yes.

19    Q         Now, conversely, were there jobs that he

20              didn't like to do, but others didn't mind

21              doing?
```

```
1    A    Not right off the top of my head.

2    Q    Okay.  Now, did Mr. Woodard ever make

3         complaints to you directly about his job

4         assignments?

5    A    Just through the union.

6    Q    He didn't approach you directly?

7    A    Well, when he went through the union and

8         we had a meeting one time and tried to

9         discuss all this, yes.

10   Q    We'll get to that.  Well, actually why

11        don't we discuss that now.  You said that

12        he had approached -- he went through the

13        union about your job assignments?

14   A    Yes.

15   Q    Can you tell me what happened there?

16   A    Well, he went to -- well, actually he

17        went to my one boss and complained about

18        me, which I was kind of surprised.  I

19        heard that he had a problem with a

20        supervisor, but I didn't think it was me.

21        The next day after, my boss at the time,
```

1    which was Butch Smith, told me that the

2    problem was with me and he wanted to know

3    what was going on.  I was kind of

4    surprised because I always thought I

5    treated Dayved okay and everything, but

6    so I went to -- I asked Butch Smith if I

7    could have a meeting with Dayved and

8    everything and I said I'll get the union

9    involved and everything. So at that time,

10    I talked to the union president, which

11    was Greg Biebel (phonetic) and the union

12    steward on that shift, which was Pat

13    Camp, and we had a meeting, had it in my

14    office, the three union individuals and

15    myself and we talked about that.

16    Q    How were his complaints addressed?  He

17    said he wasn't happy with his job

18    assignment.

19    A    His job assignments, he said he didn't

20    have a problem running anything out in

21    the shop, but he felt that I was treating

1      him unfairly and was assigning harder

2      jobs just to him.

3   Q  Okay, and how was that complaint

4      addressed then?

5   A  Well, I didn't think that I did, but I

6      said, well, maybe I'm, you know, let me

7      look it up, so I printed out what he had

8      run for about five or six prior, you

9      know, I could bring that up on the

10     computer and I printed it right out and

11     we looked at that and the union steward

12     and the president and everything, I said

13     it seems to be a pretty good mixture of

14     machines and jobs that he ran and

15     everything.

16  Q  Did you ever compare his work with

17     anybody else's?

18  A  Yes, that's what he was saying that some

19     other people always got easier jobs all

20     the time, so I had asked him, well, tell

21     me who, I'll print them up and we'll

1        compare them and he said, no, he didn't

2        want to do that, he didn't want to bring

3        anybody else's name into it and stuff and

4        I said, well, that's your only way I can

5        see if I make a mistake or maybe there is

6        something wrong here, we just need to

7        take a look at it and he still declined,

8        he didn't want to bring anybody else in

9        on that, so I looked at the union steward

10       and I said, well, Pat, give me a name,

11       anybody and he gave me a name, I don't

12       remember who it was at the time, so I

13       printed that up, looked that up, printed

14       it out and they were pretty close

15       assortment of jobs that both of them ran.

16   Q   Close assortment, you mean hard jobs,

17       easy jobs?

18   A   Right, the variety was pretty similar.

19   Q   Do you remember if the other person was

20       white?

21   A   Yes, probably.

1 Q  Now, was there an occasion when you had

2    walked by Mr. Woodward and Jamal Shields

3    at the computer and you said to Mr.

4    Shields, I'll take care of you?  What

5    happened?

6 A  Yes, I did say that.  I don't remember

7    where it was at, if it was at the

8    computer or whatever, but I don't think

9    Dayved was there very long at the time.

10    I was just getting to know him and talk

11    to him a little bit, same thing with

12    Jamal, I talked to him quite a bit. You

13    know, there's lighter times of the day

14    where you like to keep it lighter, get to

15    know your individuals a little bit and

16    have a little bit and have a little fun

17    or kid around a little bit and they were

18    talking about the jobs that they were on

19    and Dayved said he was on a harder job

20    and Jamal said he was on a little lighter

21    job and I just -- that's what I said,

1    yes, I take care of you, Jamal, you know,

2    I was funning around.  I didn't know it

3    was a serious matter at the time.

4  Q  You didn't mean to be malicious or --

5  A  Oh, no, no, and this was before I found

6    out that there was a problem between --

7    that Dayved had a problem or thought I

8    had a problem with him.

9  Q  So you said it just the way you said it

10    today, sort of light-hearted?

11  A  Yes, that's exactly what it was, you

12    know, you keep things on a lighter side

13    if you can.  You want to get to know your

14    individuals and their personalities and

15    everything.

16  Q  Did you ever hear Mr. Shields say, wow,

17    Dayved, they're really hitting you hard

18    after this conversation?

19  A  I don't recall that, no.

20  Q  Now, speaking of Mr. Shields, do you know

21    where in the shop he worked?

1    A    Yes, he works, he has the same job Dayved

2         does.  He does DCPO, die cast machine

3         operator.

4    Q    Was he in the same department as Dayved?

5    A    Yes.

6    Q    Do you know whether or yourself or any of

7         the supervisors told Mr. Woodard not to

8         talk to Jamal Shields?

9    A    Personally, no, just hearsay.

10   Q    Okay.  Now, going to some specific

11        incidents then Mr. Woodard had testified

12        about, was there an occasion when you saw

13        him standing outside the lunchroom and

14        you told him to warm your lunch or

15        something to that affect?

16   A    I did not tell him to warm my lunch, no.

17   Q    What happened?

18   A    What had happened at that time is there

19        was, I don't know, half a dozen people

20        standing outside the lunchroom, it was

21        fairly early, you know, we don't like

1       people to go to lunch too early because

2       they have to shut the machines down if

3       they're not getting relieved, so we don't

4       want them there before a few minutes

5       before lunchtime and I walked by the

6       lunchroom and it was probably somewhere,

7       five, ten minutes before lunchtime.  Like

8       I said, there was a half a dozen people

9       standing there and I noticed there's

10      three or four microwaves already heating

11      up lunches and that and I said, hey,

12      guys, why don't you, you know, sometimes

13      you -- I'm a little sarcastic in trying

14      to get guys to think about what they're

15      doing.

16   Q  What do you mean, what were they doing,

17      going to lunch too early?

18   A  Oh, yeah, they were way too early. Their

19      lunches were already in the microwaves

20      heating up and I said, hey, why don't you

21      just warm up my lunch, too, you know,

1     being a little sarcastic.

2  Q  Again, this is light-hearted or fun, just

3     --

4  A  Just to get a point across, yes.

5  Q  Did you direct our comment to Mr. Woodard

6     specifically?

7  A  Not specifically, no.  How could you do

8     that when there's other guys standing in

9     there and there's two or three microwaves

10    going?

11  Q  Okay.  Now, he also testified that there

12     was an incident where he was on light

13     duty in process control, he was picking

14     up parts, and I guess you had asked where

15     he was and then you subsequently

16     following him around with a stool. Do you

17     remember something like that?

18  A  Yes, I remember something like that, but,

19     no, I did not follow him around with a

20     stool.

21  Q  What happened?

1    A        He was on light duty for either, I can't

2             remember if it was either a knee or ankle

3             injury.  He was doing -- helping out

4             process control.  Process control takes

5             care of all the procedures on how the

6             parts run and do x-rays and various jobs.

7             So what Dayved was assigned, he would go

8             around twice a day, once at the beginning

9             of the day and once after lunch, with a

10            cart and they have an assigned sheet on

11            certain jobs that are x-ray jobs, that

12            process actually x-rays these jobs to see

13            how solid they are.  So he'll go around

14            and pick up these castings and put them

15            on the cart and bring them into process

16            control, probably average right around

17            ten or 12 machines that you have to do

18            that for and he'll put them in the x-ray

19            room, and then they'll do the x-rays on

20            it after that.  Then there's the Rex Roth

21            jobs, when they're running, they have to

be cut up or sectioned on a jigsaw so

they're also -- he would also do that or

whoever we have would do that.  So that

usually took an hour, maybe two hours at

most to do that and then after that,

Dayved was always disappeared, you know,

he wasn't around. So the one day, I paged

him a couple times and there wasn't any

answer and once he did come around, I

asked him where he was.  He said he was

in the bathroom doing some other stuff.

That was after lunch that day.  So I

said, well, tomorrow, when you come in

and do this, when you're done doing the

process end of it, I want you to give me

a call so we can find you something else

to do. Then the next day, I checked with

the nurse to see exactly what his

restrictions were on what he can do and

what he can't do, so I could find

something to assign him.  At that time,

1  all these restrictions he had, he was

2  supposed to be able to sit down when he

3  needed to to take relief off his knee or

4  ankle. So the next day or that same day

5  when he called me, said he was all done,

6  I said, okay, I took him out by six

7  hundred three, which is a machine right

8  next to where he was working the process,

9  took him out in between right there and

10  said, okay, get your broom, we can just

11  sweep this up.  He said, well, I can't

12  stand that long, I can't do this because

13  I have to stand, I'm supposed to be able

14  to sit and that and that's when I pointed

15  to a stool because most of the machines

16  have a stool.  I said, well, right

17  there's a stool, when you need to sit

18  down, sit down and take a break.  When

19  you get this area done, just move on to

20  the next machine.

21  Q  You didn't follow him around with the

1          stool?

2    A     No, ma'am.

3    Q     From place to place?

4    A     No.

5    Q     Were you with him the whole time as he

6          worked and followed him?

7    A     No, I got a very big department to run.

8          Like I said, there's almost 50 people at

9          times and when I make my rounds, I check

10         up on him, see how he's doing.

11    Q    When you were checking up on him and were

12         you doing this to harass him or give him

13         a hard time?

14    A    No, that's my job.  I check on all the

15         guys as I walk around.  I always see what

16         they're doing.

17    Q    Did you have any type of confrontation

18         with Mr. Woodard as a result of this

19         incident or as a result of the stool and

20         telling him where to work, anything like

21         that, do you recall, a face-to-face

1          confrontation?

2     A    Yes, it was probably a couple -- a week

3          or so after that, we had a little

4          confrontation when I took him to an area

5          when he was done doing the process

6          control, I took him down to 1600 ton two,

7          because there's an area down there, that

8          machine was done running and there was a

9          bunch of stuff all over the floor, so I

10         took him down there to clean that area up

11         and we had a little confrontation there

12         where we had to -- well, the union

13         steward was right down from there, but --

14    Q    Who's the union steward?

15    A    Pat Camp.

16    Q    You said a confrontation.  Were voices

17         being raised?

18    A    Well, yes, they started getting raised,

19         because what I wanted to do, Dayved

20         didn't want to do a few things and the

21         union steward was right there and he had

1           told the union steward that if -- I

2           wasn't to talk to him anymore, that if I

3           had to tell him anything, I had the

4           steward and he'd tell him.  That's when I

5           raised my voice a little bit, I said, no,

6           I'm your immediate supervisor.  If I need

7           to talk to you, I'm going to talk to you.

8           I don't want to go through -- go find

9           somebody else to go through that --

10    Q    Back up.  Did the union steward tell him

11           or tell you not to talk to Dayved

12           directly, but to go through him first or

13           was it Dayved telling you?

14    A    Dayved was telling -- told me through the

15           steward.  He told Pat, he says, I don't

16           want him talking to me anymore.  If he

17           has anything to say to me, I want him to

18           tell you and then you can tell me.

19    Q    Okay.  What was discussed before then

20           that led to this heated argument?

21    A    Well, I took Dayved down there and I

1       showed him that I wanted this cleaned up

2       and everything and he said, okay, and I

3       started walking away and all of a sudden,

4       he started leaving the area again and I

5       said where are you going?  He said I got

6       to go get my backpack and my Gatorade and

7       all this other stuff, which is way up on

8       the other side of the shop.  I said,

9       well, what do you need that for?  He

10      said, well, I got to have my Gatorade and

11      everything down there. Well, we have

12      different area through the whole

13      department where we have Gatorade and

14      drinking fountains where you can just mix

15      your own right there, whatever you need.

16      And I told him, I said, well, right

17      there, there's Gatorade right there, I

18      says right there is a bathroom right next

19      to it. Why do you have to go get that

20      other stuff, that's a waste of time.

21      Besides, you're not supposed to be

1          walking around, just stay right down here

2          and, you know, because of his injury and

3          everything, he wasn't supposed to be

4          doing that much walking.  So I said right

5          there is everything you need and that's

6          when the union steward walked by and he

7          grabbed the union steward.

8    Q    Now, during this time, were you trying to

9          give Dayved a hard time just to be

10        stubborn?

11   A    No, not to be stubborn, I didn't mean to

12        give him a hard time at all. What I

13        wanted done was a little bit of work for

14        the time that he's there.

15   Q    Okay.  Now, he also testified that there

16        was an occasion where he cracked some

17        taps on one of the dies, I think, and he

18        was asked to write a letter to put in his

19        file. Do you know anything about writing

20        a letter for the file?

21   A    I wasn't involved in that, no.

1     Q        But is this like a procedure of the

2               company's or --

3     A        Yes, we do that if there's damage to a

4               trim die or whatever that we feel that

5               there was something that the individual

6               didn't do correctly or should have done

7               correctly, then we do do that.

8     Q        Do what, the letter?

9     A        Ask them to write a letter.

10    Q        What's the purpose of this?

11    A        The purpose of doing this, you know,

12              there's times where things do get broke,

13              you know, but it happens a couple times,

14              we'll ask an individual to write down

15              simply just what happened, you know,

16              they're not saying they did something

17              wrong or whatever.  We just want them to

18              write down what had happened and

19              everything and then that goes in their

20              files and it makes them think about it a

21              little more, you know, oh, wow, this is

1          going in my file, I got to watch what I'm

2          going a little closer and do a good job,

3          try to make sure this doesn't happen

4          again.

5    Q     Does this happen every time when there's

6          damage done or, you know, something

7          breaks down?

8    A     No, we don't have them write it all the

9          time.  No, there's times that if we feel

10         it's a mechanical breakdown, mechanical

11         problem, then, no, we don't have them

12         write anything.

13   Q     Okay.  Was Mr. Woodward the only person

14         that was asked to write a letter to put

15         in the file in this case or were other

16         people --

17   A     No, many people.

18   Q     Are supervisors required to write letters

19         for their file on occasion?

20   A     Supervisors themselves?

21   Q     Foremen?

1    A        No.

2    Q        Just the people working on the machines?

3    A        Yes.

4    Q        Now, I think he had also testified that

5             he wanted to be on the Rex Roth team and

6             there was a meeting about that. Do you

7             recall anything about that?

8    A        Yes, Dayved was upset because he wasn't

9             on that Rex Roth team.

10   Q        Can you describe what the Rex Roth team

11            is?

12   A        Sure.  Different companies that we make

13            things for that were one of our bigger

14            customers, if we have problems with their

15            jobs, there was teams that were organized

16            to do some problem-solving on these jobs

17            and they would, wherever these jobs,

18            these castings went through different

19            departments and that, we would select

20            people that worked on them in different

21            areas so he could do the problem-solving

1           on them, anything that was done with that

2           job.  And those people, this particular

3           job at the time, we were having a lot of

4           problems with a lot of rejects, a lot of

5           things being sent back from the

6           customers. So they had this team and then

7           we decided to keep the team members that

8           were running these jobs on those jobs to

9           run all the time.

10    Q     These members had been picked before Mr.

11          Woodard had demonstrated an interest in

12          this?

13    A     Yes.

14    Q     And were you responsible for assigning

15          people to this team or how were people

16          put on this team?

17    A     No, the people that were put on that

18          team, there were suggestions from -- all

19          the supervisors were asked their

20          suggestion on each shift who they would

21          like to see run that and we were putting

1         people on there that were taking the

2         extra step to make sure they did high

3         quality work and weren't missing

4         anything, didn't have any other work that

5         had to be reworked a lot. Those were the

6         individuals we were trying to put on

7         there because we were in trouble with

8         this customer at that time.

9    Q    Do you know why Mr. Woodard wasn't picked

10        for the team?

11   A    Dayved's work at the time wasn't at the

12        standards that we wanted to be put on

13        there.  I think we picked three people

14        per shift, if I recall, and Dayved was

15        not one of those three.

16   Q    Okay.  Did it have anything to do with

17        his race?

18   A    Oh, absolutely not. As a matter of fact,

19        Jamal Shields was on that team and Jamal

20        is an African-American.

21   Q    Now, you had mentioned a couple times

1          during your testimony that there were

2          some meetings held with Mr. Woodard and a

3          union representative and maybe members of

4          management or yourself. Do you recall

5          attending these types of meetings?

6     A    Yes, a couple.

7     Q    They're probably in response to

8          complaints that he had?

9     A    Yes.

10    Q    Okay.  Do you recall any specific

11         meetings?

12    A    Yes, I already talked about the one and I

13         thought that I satisfied -- as a matter

14         of fact --

15    Q    The one with the job assignments?

16    A    The job assignments and felt that I had a

17         problem with him.

18    Q    Okay. And any other meetings do you

19         recall?

20    A    There was one other short meeting with my

21         boss, Butch Smith, the same thing, he was

1    complaining that I was out to get him or

2    treating him unfairly.

3    Q    Were you out to get him?

4    A    No.

5    Q    Did you treat him differently than other

6    people?

7    A    No, I didn't treat him differently than

8    anybody else.  All I want people to do is

9    pretty much stay at their machines and do

10    a good day's work.

11    Q    Now, with respect to Mr. Woodard's

12    complaints, were his complaints addressed

13    during these meetings, like did an

14    investigation follow or, you know, what

15    happened during these meetings?

16    A    Well, there wasn't any investigation that

17    followed.

18    Q    Did they talk to the people involved?

19    A    Oh, sure.

20    Q    Okay. And you said a union representative

21    was there.  Do you know if any union

1          action had been taken by the union on

2          behalf of Mr. Woodard?

3     A    No, I don't believe so.

4     Q    During these meetings that you attended,

5          do you recall whether Mr. Woodard was

6          told by yourself or anybody else that

7          nothing would be done about his

8          complaints?

9     A    Not by myself, no.

10    Q    Did you hear anybody say something like

11         that, that nothing is going to be done or

12         something to that affect?

13    A    Not on the company's end of things, no.

14    Q    Now, when Mr. Woodard worked at PHB, did

15         any of his coworkers complain to you

16         about him?

17    A    About Dayved?

18    Q    Yes, about his work performance or

19         anything to that affect?

20    A    People that relieved his machines and

21         stuff like that were, during lunches,

1          take too long of lunches and Dayved

2          wouldn't be the only one. There's other

3          ones that do that, also, but if we didn't

4          talk one-on-one with the individual, most

5          of the times what I did when people

6          started complaining about people taking

7          too long of breaks, I would have the

8          union steward go and talk to everybody

9          and that way, it covers the whole group

10         and that and if we had any problems after

11         that, it prolonged, then I would go and

12         talk to the individual.

13    Q    Now, you said you'd have the union

14         steward talk to everybody.  Did that

15         include Mr. Woodard?

16    A    Yes.

17    Q    Did Kerry Goodwine -- or actually was

18         Kerry Goodwine an employee at PHB during

19         the time Mr. Woodard worked there?

20    A    Yes.

21    Q    Did he work in the same department as you

1        did?

2    A    Yes.

3    Q    Did he ever mention anything to you about

4        Mr. Woodard?

5    A    Yes, he did.

6    Q    What did he say?

7    A    That one time -

8            MR. JOHNSON:  Objection, this

9           is hearsay.

10           MS. PETERSEN:  This is going to

11          be, I expect this person to testify

12          to day.

13           THE JUDGE: You're going to call

14          this witness, so I'm going to allow

15          the testimony.  You may answer the

16          question.

17           THE WITNESS: That meeting that

18          I discussed about where I had the

19          union president there, the union

20          steward, and everything when we

21          talked and I compared people on job

1    assignments and everything, they

2    looked okay and that, Dayved had

3    said that in that meeting, he

4    brought up Kerry Goodwine's name

5    and Jamal's name, saying they also

6    had a problem and how I did things

7    as a supervisor assigning jobs and

8    everything and after that meeting

9    was over, the very next day, Kerry

10   had approached me and asked if he

11   could talk to me and I said sure,

12   so we went in my office. And he

13   told me that he understood that

14   Dayved brought his name into the

15   meeting yesterday and stuff and I

16   said, yeah, he did.  He said, well,

17   I want you to know right from him

18   that he had already talked to

19   Dayved and told Dayved to never

20   bring his name up in a conversation

21   again with problems.  He says if I

1          have a problem with you, I'll come

2          to you myself and talk to you.   He

3          said I want you to know, I don't

4          have a problem with you, I don't

5          have a problem with how -- you

6          treat me real good and everything.

7          He says I don't have a problem with

8          you. Then he also told me at that

9          time that I should watch things,

10         how they're done and everything,

11         because Dayved has a problem with

12         me and he likes to -- he's known

13         Dayved for a long time and he likes

14         to try to find ways to get things a

15         little easier.

16    BY MS. PETERSEN:

17    Q      Did you understand what he meant by that?

18    A      I guess what he was trying to tell me was

19           --

20                 MS. PETERSEN: We'll address

21           this with Kerry at his deposition.

1      MR. JOHNSON:  Well, if he's

2      guessing, it's speculation.

3      THE JUDGE: Sustained.

4 BY MS. PETERSEN:

5 Q  Let's move on.  Now, do you recall Mr.

6    Woodard being off work for approximately

7    a year due to a non-work related shoulder

8    injury?

9 A  Yes, he was probably off about a year.

10 Q  Did you ever see him come into the shop

11    during the period that he was not

12    working?

13 A  Yes.

14 Q  What occasions were these?

15 A  He came in every Wednesday for his -- I

16    mean I only seen him every other week

17    because I was only on second shift every

18    other week, but during that period of

19    time, he come in every week for his

20    paycheck.

21 Q  Every week that he was off work?

1    A    Yes.

2    Q    Now, was he required to come in to get

3         his check, do you know?

4    A    No, that could have been mailed to him.

5    Q    Did you ever talk to him during these

6         visits that he made to the shop?

7    A    Yes, one time I happened to go into

8         process control after lunch to get some

9         stuff and he was about to come in to get

10        his paycheck and he was in there talking

11        to individuals and I said hi to him and I

12        asked him, I said, hey, how you doing,

13        when are you going to be coming back to

14        work?  He says, yeah, right, like you

15        won't be back.  I said sure.  He acted

16        like why do you care, you know, I don't

17        like to see anybody off work.  I want to

18        see them come back to work.

19   Q    Did you ever notice him feeling

20        uncomfortable or unhappy about being

21        there and talking to you or being at the

1        shop, your impressions?

2   A    No, there's times where he didn't seem to

3        -- at that time, he seemed kind of

4        awkward, you know, like he didn't believe

5        I cared about it or anything.

6   Q    Now, during the time Mr. Woodard worked

7        there, did you try to single him out,

8        make him a target or harassment by

9        yourself or make life difficult for him

10       as his supervisor?

11  A    No.

12           MS. PETERSEN: That's all I

13        have. Thank you, Mr. Sayers.

14           THE JUDGE: You may cross-

15        examine.

16              * * *

17          **CROSS-EXAMINATION**

18  BY MR. JOHNSON:

19  Q    Let me just start with something you

20        testified to to begin with in regards to

21        Kerry Goodwine, your testimony is that

1           Mr. Goodwine came and saw you and said he

2           had no problems with you?

3    A      Um-hmm.

4    Q      And he had no problems with the company?

5    A      Right, he didn't have any problem.

6    Q      Are you aware that he filed a claim of

7           discrimination?

8    A      With the company?

9    Q      Yes.

10   A      Well, he filed discrimination at one time

11          with one of my foremen, which we had

12          taken care of that.

13   Q      You're not aware that he filed a

14          complaint with the EEOC?

15   A      His name was on the thing when we went

16          through the EEOC, yes.

17   Q      Are you aware that the EEOC did an

18          investigation based on his complaints?

19   A      Again, his name was with Dayved's, but

20          that was, I believed to be Dayved's

21          report.

```
1    Q    So you have no independent knowledge that

2         Mr. Goodwine is currently litigating a

3         Federal lawsuit against PHB for

4         discrimination?

5    A    I don't know this.  I know Dayved is.

6    Q    Are you aware of any other lawsuits

7         against PHB based on discrimination

8         except Mr. Woodard's?

9    A    Right now, just Mr. Woodard's, yes.

10   Q    In the past, were there other lawsuits

11        based on discrimination against PHB?

12   A    Mr. Jackson had one, Freddy Jackson.

13   Q    Do you know roughly around what time

14        period that was?

15   A    No, I don't.

16   Q    Is that the only other lawsuit that

17        you're aware of?

18   A    Yes.

19   Q    Do you know what the result of that

20        lawsuit was?

21   A    Not completely, no.  It didn't involve
```

1          me.

2     Q    But, if you know, was it based on racial

3          discrimination?

4     A    I really don't know.

5     Q    Was Mr. Jackson black?

6     A    Yes.

7     Q    Did you ever receive any orders from --

8          well, let me ask you this, who is your

9          supervisor or boss?  Who do you report

10         to?

11    A    At that time, it was Butch Smith.

12    Q    And what is his position?

13    A    He was manager of aluminum die cast.

14    Q    Did you ever receive any instructions

15         from Mr. Smith or anyone else as to how

16         you were going to treat or have any

17         policies in regards to discrimination?

18    A    We don't put up a discrimination right

19         from the get-go.  I don't exactly know

20         what you mean.

21    Q    Well, do you agree with me that Mr.

1      Woodard at some point made some

2      allegations that he was being treated

3      unfairly based on his race?

4   A    Yes.

5   Q    What was done when those complaints were

6      made, if anything?

7   A    Well, with Dayved, we had a meeting, we

8      talked about the discrimination and

9      everything else and there wasn't any --

10     didn't see where anything was coming from

11     it.

12   Q    When you say we didn't see anything there

13     was anything coming from it, are you

14     talking about yourself?

15   A    Yes.

16   Q    Did Mr. Woodard agree with you?

17   A    Not entirely, no.

18   Q    What about these derogatory comments, do

19     you know anything about, any complaints

20     about derogatory comments?

21   A    No.  What do you mean derogatory?

1    Q    Well, let me ask you this, did Mr.

2         Woodard ever complain that racial slurs

3         were being said in the workplace?

4    A    To me, no.

5    Q    Did Butch Smith or any of the higher-ups

6         in the company talk to you about the fact

7         that someone had made complaints about

8         racial slurs being made?

9    A    There was one instance that I was not

10        involved with.  I believe it was Tommy

11        Thompson (phonetic) was talking to

12        another individual, but --

13   Q    Who's Tommy Thompson?

14   A    He was a foreman at the time in aluminum

15        die cast.

16   Q    What do you know about that incident?

17   A    I don't know a whole lot. All I know is

18        hearsay.

19   Q    So your understanding is that Mr.

20        Thompson used a racial slur?

21   A    Just talking to another individual,

1         nothing too --

2    Q    It wasn't directed to Mr. Woodard?

3    A    No.

4    Q    But it was said as far as you know?

5    A    As far as I know, yes.

6    Q    Was anything done in regards to a racial

7         slur made by Mr. Thompson, whether it was

8         to Mr. Woodard or a coworker?

9    A    I know he was called up front and talked

10       to.  I don't know what kind of

11       disciplinary actions or anything.

12   Q    Is there a written policy on racial slurs

13       being made by either employees and/or

14       foremen?

15   A    Written policy, I don't believe so.  It's

16       not tolerated, but I don't think there's

17       anything written.

18   Q    Do you know if any disciplinary action

19       was taken against Mr. Thompson?

20   A    I do not know that, no.

21   Q    Now, I'd like to talk about assignments

1           on jobs.

2   A     Okay.

3   Q     I think originally your testimony that

4           assignments are random?

5   A     For the most part, yes.

6   Q     Okay.  And could you again explain how

7           you decide what person is going to be on

8           what machine?

9   A     They're just placed basically, we have a

10          board up there at each machine has a list

11          and then every individual has a nametag

12          and those nametags are just put at

13          machines and as their machine finishes or

14          breaks down or whatever, then their name

15          is taken off and put to an open machine

16          and then they have a separate sheet where

17          the jobs are assigned priorities on how

18          important they are, how quick they have

19          to get them delivered.  So then, of

20          course, you go by priorities.

21   Q     Now, at some point, did that policy of

1          how you made assignments change?

2     A    I don't know exactly what the timeframe

3          was, but we went to changing people

4          around every Wednesday.

5     Q    And I think your testimony was the policy

6          changed where you would move around every

7          Wednesday to rotate people off of harder

8          jobs?

9     A    We were attempting to get rotation, yes,

10         get frequent -- different frequency on

11         try to change them from a bigger machine

12         to a smaller machine.

13    Q    Were you still going down the list at

14         that point or not?

15    A    What do you mean going down the list?

16    Q    Well, originally you said you would go

17         down a list to assign people to these

18         jobs?

19    A    The board, yes -- oh, the list is a

20         priority list, that's what you're talking

21         about.

1    Q       Were you still going down the board after

2            you instituted this policy where you

3            would switch every Wednesday?

4    A       Well, that's where you get some of the

5            natural changes.  We were changing people

6            around every Wednesday, but if people

7            called off, then you would have to go by

8            the priority list. So that person may go

9            back to a bigger machine. That part of

10           it, you know, that's just natural flow.

11           If somebody called off, all of a sudden,

12           okay, now you got to go to the lowest

13           priority machine, shut that one down, and

14           put that guy over to that machine to fill

15           the shot.

16   Q       Do you know when PHB instituted this

17           policy?

18   A       I don't know the date or anything, but we

19           had some complaints on some people that

20           were saying they were getting some bigger

21           jobs and that, so that's why we came up

1          with that to try to eliminate that, to

2          try a little more flow on it.

3     Q    I know you don't know an exact date, but

4          could you tell me a year?

5     A    No, I don't know what year it was.  It

6          was shortly after we had that meeting

7          with Dayved and there was some other

8          people in the department, also, that were

9          complaining about the same thing, so

10         that's when Rex and myself sat down and

11         we came up with this moving them around

12         on Wednesdays to try to get a little more

13         flow, to try to help the problem, if

14         there was a problem with people being on

15         the same machine too long.

16    Q    Do you know if there were any union

17         grievances filed by Mr. Woodard?

18    A    No, I do not.

19    Q    If there were, would you be a part of the

20         grievance procedure?

21    A    Only if they were to come and get

1          information from me, yes.

2     Q    So you're not aware of any grievances

3          filed by Mr. Woodard in any respect?

4     A    No.  The only time we were to get

5          involved in that is if the grievance was

6          filed, then they would go through the

7          grievance thing through personnel and

8          everything and then get us involved if it

9          ever got that far, but I was never

10         brought in on anything like that.

11    Q    It never got that far with Mr. Woodard?

12    A    No, not to my knowledge.

13    Q    Mr. Sayers, you testified as to Mr.

14         Woodard not being at his machine?

15    A    Correct, at times.

16    Q    And I think you testified that only

17         happened twice; is that correct?

18    A    No, that didn't only happen twice.  I

19         said there was two instances that I

20         stopped Dayved and talked to him and

21         explained to him that this creates some

1    problems.  You know, the other time that

2    I didn't talk about, I walked by his

3    machine to look at castings again and he

4    wasn't there, so I walked by -- this was

5    603, so I walked over to use the phone in

6    the process to page him and when I picked

7    up the phone, he's talking on the phone

8    and here, there's another phone in the x-

9    ray room and Dayved was talking on it.

10   So I hung it up and I waited for him to

11   come out and when he was done talking on

12   the phone, he's in this room where you

13   can't see him talking on the phone and

14   his machine is out there running all by

15   itself.  So when he came out, I just

16   simply talked to him, Dayved, this is the

17   kind of stuff that creates problems.  You

18   can't do this, please, you know, please

19   don't do this stuff.

20   Q    Did anything that day?  I mean you said

21   not being at the machine could create

1          problems. Was there a malfunction or a

2          problem with the machine on that date?

3     A    Nothing happened at that time, no, but

4          that doesn't mean that it couldn't.

5     Q    And I believe you have no knowledge as to

6          how long he was away from the machine?

7     A    No.

8     Q    So it could have been just a few seconds?

9     A    It was more than a few seconds because

10         when I walked by the machine, I looked at

11         the part, he was no longer there.  I

12         walked up and down the aisle and then I

13         walked up to use the phone in process and

14         then I waited for him to stop when he was

15         done with his conversation, so it was

16         more than just a few seconds. You're

17         talking at least minutes.

18    Q    I'd like to talk about the period of time

19         that Mr. Woodard was on light duty and

20         the incident you had testified to in

21         regards to a stool.

1    A        Okay.

2    Q        What were Mr. Woodard's restrictions at

3             the time, if you know?

4    A        His restrictions at the time that he

5             could only do so much walking, you know,

6             according to when he felt uncomfortable

7             with how much standing or walking, he was

8             to sit down.

9    Q        Okay.  Now, you think you testified to,

10            he had a job that would only take a

11            couple hours of his shift?

12   A        Um-hmm.

13   Q        Then you were trying to find work for him

14            to do?

15   A        To fill the rest of the time, correct.

16   Q        And you testified as to taking him down

17            to different areas of the plant?

18   A        Um-hmm.

19   Q        And that was to clean up?

20   A        Yes, simple sweeping.

21   Q        All right. Did you ever just tell Mr.

1          Woodard to report to or to go an area of

2          the shop and clean up?

3     A    Sure, different machines.

4     Q    But you testified that you would take him

5          from place to place?

6     A    I took him to 603 the very first time to

7          tell him what to do and everything and

8          then after that, I took him down, yes, I

9          took him down to 1600 ton two to show him

10         exactly what area we needed cleaned up.

11    Q    And what does the clean-up entail?  Is

12         that just --

13    A    Simple sweeping.

14    Q    And you had to physically show him?

15    A    Sure.

16    Q    And each time you took him to a different

17         area, you would actually go with him and

18         show him what to sweep?

19    A    No, just those two times, the very first

20         time, then after that, I told him just to

21         go right down the line from machine to

1        machine, and then the second time.

2    Q    I've never been in your plant, sir, but

3        there's been some references to Gatorade.

4        Mr. Woodard would have Gatorade or there

5        would be Gatorade available for the

6        employees.  I assume it's a relatively

7        hot place in there?

8    A    It can be during the summertime, yes.

9    Q    So would it be unusual for Mr. Woodard to

10        have his own Gatorade that he would have

11        during his shift?

12    A    Yes, Dayved had a backpack he usually

13        carried with him from whenever he went on

14        a machine, yes.

15    Q    That was not just when he was on light

16        duty, but for the whole time he was

17        employed at PHB?

18    A    Um-hmm.

19                THE JUDGE: You need to say yes

20            or no to the question.

21                THE WITNESS: Yes.  Sorry.

1                    THE JUDGE: That's all right.

2      BY MR. JOHNSON:

3      Q      So it wasn't unusual for Mr. Woodard to

4             say I need to get my backpack and

5             Gatorade?

6      A      He usually had that at his machine, yes.

7      Q      Do you know of any other complaints Mr.

8             Woodard made in regards to discrimination

9             other than what we talked about already?

10     A      Not personally, no.

11     Q      Are you aware of an incident where it was

12            alleged that there was some graffiti in

13            the bathroom?

14     A      I seen and heard of it, no, just through

15            these proceedings is all I heard of it.

16     Q      So you knew nothing about it?

17     A      No.

18     Q      Until this workers' compensation matter

19            started?

20     A      Right, that and the thing that I went

21            through with the EEOC.

1    Q    So you became aware of the graffiti when

2         the EEOC did their investigation?

3    A    Yes, they asked me questions, correct.

4    Q    And your testimony would have been that

5         you didn't know anything about it?

6    A    Correct.

7    Q    Was there ever a memo circulated among

8         the foremen or a meeting held to discuss

9         allegations of discrimination occurring

10        at PHB at any time?

11   A    No, I don't believe so.

12             MR. JOHNSON: That's all the

13        questions I have.

14             THE JUDGE: Any redirect?

15                  * * *

16                  **REDIRECT EXAMINATION**

17   BY MS. PETERSEN:

18   Q    Mr. Sayers, did you ever see graffiti or

19        writings in any of the bathrooms at PHB

20        that you entered that were racist in

21        nature?

1    A    Racist, no.  There is stuff on the walls

2         all the time, but our janitor gets it

3         painted over usually as quick as he sees

4         stuff, he usually paints over.

5    Q    What kind of stuff is on the walls over

6         there?

7    A    It's just, I get things written about me,

8         people, you know, somebody don't like

9         somebody else, they write something on

10        there, it's like a bunch of little kids.

11   Q    Was there anything written about Mr.

12        Woodard in particular?

13   A    No, I don't really pay any attention to

14        what's written on there.  You see what's

15        there, but you get it painted over.

16   Q    Oh, just for the court reporter, how do

17        you spell your last name?

18   A    S-a-y-e-r-s.

19             MS. PETERSEN:  That's all I

20          have. Thank you.

21             THE JUDGE: Anything else,

1           Attorney Johnson?

2                   MR. JOHNSON:  Just a few

3           questions, your Honor.

4                       *  *  *

5                   RECROSS-EXAMINATION

6    BY MR. JOHNSON:

7    Q       Are you aware that the EEOC made a

8           determination that there was, in fact --

9                   MS. PETERSEN:  I'm going to

10          object.  I don't see the relevancy

11          to the instant proceedings.

12                  THE JUDGE: That there was a

13          finding by the EEOC that there was

14          discrimination at PHB?

15                  MS. PETERSEN:  I don't think

16          it's relevant to whether there is

17          abnormal working conditions for Mr.

18          Woodard, in particular.

19                  THE JUDGE: The basis of the

20          abnormal working conditions in the

21          case is the allegation of racial

1          discrimination.  Objection

2          overruled.

3               MR. JOHNSON: Thank you, your

4          Honor.

5     BY MR. JOHNSON:

6     Q     Are you aware of the determination made

7          by the EEOC?

8     A     No, I don't know what the final outcome

9          was, no.

10    Q     You're not aware that they found that

11         there was graffiti in the bathroom of a

12         burning cross?

13    A     No.  I've heard and read that, but I, you

14         know, know nothing else about it.

15               MR. JOHNSON: That's all the

16          questions I have.

17               MS. PETERSEN:  Nothing further.

18               THE JUDGE: I have a couple

19          questions for you.  You indicated

20          that part of your job in managing

21          the whole department or supervising

1    the whole department is assigning

2    operators to machines; is that

3    correct?

4         THE WITNESS: Yes, ma'am.

5         THE JUDGE: So you would be the

6    person ultimately responsible for

7    assigning Mr. Woodard to whatever

8    machine he was assigned to; is that

9    correct?

10        THE CLAIMANT: I'm one of three

11   or four people, yes, but on that

12   shift, my dispatcher will put

13   people on there and then if -- I'll

14   move them around after that if they

15   need to be moved around as far as

16   priorities.

17        THE JUDGE: The assignment of

18   jobs, is that done on a weekly --

19   the assignment to machines, is that

20   done on a daily basis or is that

21   done on a weekly basis?

1          THE WITNESS: It could be daily,

2     all depending on what jobs finish,

3     what people call off, you have to

4     fill the gaps and everything.

5          THE JUDGE: You also testified

6     in describing some of the work

7     there, that an individual could be

8     assigned to one particular job for

9     three or four days in a row; is

10     that correct?

11          THE WITNESS: Yes, ma'am.

12          THE JUDGE: That would be the

13     same machine producing the same

14     part; is that correct?

15          THE WITNESS: Yes.

16          THE JUDGE: If it is a Wednesday

17     and that person is not done with a

18     particular job that they have been

19     working, would they still be pulled

20     and reassigned or do they have to

21     finish the job that they started?

1      THE WITNESS: What we were doing

2   at that time on Wednesday, they

3   would run it Wednesday, Thursday,

4   and Friday, and then it didn't

5   matter what they did on the

6   weekend, if that job was still

7   running or that machine, it didn't

8   even require the same job, they

9   would be on that machine, sometimes

10   that job might finish, the next day

11   it would be a different job that's

12   in there, but they're on that same

13   machine for three days at the end

14   of the week and then the two days

15   at the beginning of the next week

16   until they got moved on Wednesday

17   again.

18      THE JUDGE: Are there particular

19   operators that are assigned to, I'm

20   just going to use as an example,

21   let's say you have five presses or

1                five die cast machines. Would I

2                always get assigned, if I was a die

3                cast operator, to machine one?

4                    THE WITNESS: No.

5                    THE JUDGE: Is that where the

6                rotation comes in?

7                    THE WITNESS: Right.

8                    THE JUDGE: Does rotation have

9                to do with the machine or does it

10               have to do with the difficulty of

11               the particular job being done?

12                 THE WITNESS: Usually the

13               machine. We have machines, as far

14               as just giving an example, we did

15               have machines as small as a 250-ton

16               machine and then they go all the

17               way as big as a 2,000-ton machine

18               and, of course, you're bigger

19               machine is going to produce a

20               little bigger part.

21                 THE JUDGE: Does that make that

1    particular machine more difficult

2    to operate?

3        THE WITNESS: Not necessarily.

4        THE JUDGE: You also described

5    the speed or the cycle of the

6    product being produced could also

7    be a factor whether or not it's a

8    difficult job?

9        THE WITNESS: Right.  Your

10   smaller machines will go at a more

11   frequent pace.

12       THE JUDGE: Is it your testimony

13   that in all the years that you've

14   been employed at PHB Die Casting,

15   you have never heard racial slurs

16   on the job site?

17       THE WITNESS: I've heard them,

18   of course, and like I said, they're

19   not tolerated.  If I hear somebody

20   say something, I tell them, hey,

21   guys, watch what you're saying,

1    watch what you're doing.

2        THE JUDGE: Have you ever had to

3    take any disciplinary action

4    against co-employees or foremen for

5    this type of behavior?

6        THE WITNESS: Well, just

7    recently, just recently we have

8    just done that last week and in the

9    past, we have talked to other

10    people, too, yes.

11        THE JUDGE: Have you taken any

12    formal disciplinary action where

13    someone is written up or suspended

14    for three days or anything for that

15    type of behavior?

16        THE WITNESS: Yes.

17        THE JUDGE: During the time that

18    Mr. Woodard was employed there, did

19    you ever have to take action

20    against a co-employee or a

21    supervisor for that type of

1            behavior?

2                THE WITNESS: I don't believe

3            so.

4                THE JUDGE: You yourself did not

5            see the graffiti that was alleged

6            to be in the bathroom that

7            consisted of a burning cross?

8                THE WITNESS: No, ma'am.

9                THE JUDGE: How long was Mr.

10           Woodard on light duty for the

11           restrictions on his leg or ankle?

12              THE WITNESS: I'm not really

13           sure.

14              THE JUDGE: Was it more than a

15           couple days?

16              THE WITNESS: Yes.

17              THE JUDGE: Was it several

18           weeks?

19              THE WITNESS: Yes.

20              THE JUDGE: And during that

21           time, did you, on a daily basis,

1    take him to his job assignments?

2           THE WITNESS: No.

3           THE JUDGE: The description that

4    you took him to one machine area

5    and you took him to another machine

6    area, did that all happen on one

7    day?

8           THE WITNESS: No.  I'm not even

9    sure if it was the same week.

10          THE JUDGE: Generally speaking,

11   when he was on light duty, he was

12   assigned to the quality inspection

13   job?

14          THE WITNESS: Process control,

15   yes.

16          THE JUDGE: And the process

17   control job, you understood only

18   took several hours to perform; is

19   that correct?

20          THE WITNESS: Yes.

21          THE JUDGE: Thereafter you

1    assigned Mr. Woodard to do some

2    janitorial clean-up; is that

3    correct?

4            THE WITNESS: Basically, yes.

5            THE JUDGE: And did he know

6    where he was supposed to go every

7    day to do the janitorial clean-up?

8            THE WITNESS: No, I showed him

9    that first time, the first machine

10   to go to, and then after that, I

11   said just work down the row, you

12   know, go from machine to machine

13   where it needs to be swept up.

14           THE JUDGE: Did you have the

15   occasion to walk with him from

16   machine station to machine station

17   or cell with the stool and carry

18   the stool for him?

19           THE WITNESS: No, ma'am, no.

20   There's usually a stool at every

21   machine.

1          THE JUDGE:  So there wasn't a

2     stool that was to be taken from job

3     area to job area?

4          THE WITNESS: No.

5          THE JUDGE: Do you remember how

6     many meetings you may have attended

7     with the claimant, Mr. Woodard, and

8     union personnel regarding his

9     complaints of discrimination?

10          THE WITNESS: I remember two.

11          THE JUDGE: Did one involve the

12     assignment of jobs and he felt he

13     was being treated differently in

14     being given hard jobs because of

15     his race?

16          THE WITNESS: That was in both

17     meetings, yes.

18          THE JUDGE: What was the second

19     meeting that you recall?  What

20     actual discrimination was involved?

21          THE WITNESS: It was just going

1    on the same thing with that he felt

2    that I was treating him unfairly

3    and the job assignment wasn't

4    getting any better.  It also had to

5    do with the Rex Roth, him wanting

6    to be on the Rex Roth team and

7    running the Rex Roth job more.

8        THE JUDGE: And during that

9    meeting, did he indicate that he

10   felt he wasn't selected for this

11   team for racial reasons?

12       THE WITNESS: I don't think so.

13       THE JUDGE: How many shifts does

14   the aluminum die cast department

15   have?

16       THE WITNESS: Three.

17       THE JUDGE: On the three shifts

18   during the time that Mr. Woodard

19   was employed, how many of the

20   employees were black?

21       THE WITNESS: The time that he

1          was employed all three shifts --

2              THE JUDGE: You can give me a

3          fluctuation or fluctuating between.

4              THE WITNESS: -- probably half a

5          dozen.

6              THE JUDGE: By half a dozen, you

7          mean about six?

8              THE WITNESS: About six, yes,

9          right around there, I think.

10           THE JUDGE: On every shift, are

11         there 50 employees approximately?

12           THE WITNESS: It varies.  When

13        we're slow, sometimes we slow down

14        to about 30 or so, and then when we

15        were real busy, it could be up to

16        50.  It really fluctuates on what

17        kind of work we have and stuff.

18           THE JUDGE: If you had a

19        complement of 30 to 50 employees on

20        a shift, how many of those

21        employees would be black?

1          THE WITNESS: Right now probably

2    just two, two per shift.

3          THE JUDGE: Presently are there

4    blacks employed at PHB?

5          THE WITNESS: Yes.

6          THE JUDGE: Could you tell me

7    what's the longest period of

8    employment a black employee has

9    held at PHB?

10         THE WITNESS: Oh, boy, I don't

11   -- there's several right now that

12   are in the teens, I would believe.

13         THE JUDGE: After the meeting

14   that you had with the union

15   individuals that were present

16   regarding the assignment of jobs

17   and the issues as to whether or not

18   Mr. Woodard was assigned more

19   difficult jobs on a more regular

20   basis than other employees, was

21   there a finding made that his

1     accusations were valid?

2          THE WITNESS: Well, the union

3     steward or the -- as a matter of

4     fact, the union president told me,

5     he thought we were doing everything

6     we could.  He felt that he didn't

7     find that I was doing anything

8     wrong.  He told me at the time that

9     I handled that meeting real well

10    and presented everything, seemed to

11    be fair.

12         THE JUDGE: And the union did

13    not file any other grievance

14    following that meeting?

15         THE WITNESS: No, it was dropped

16    right there.

17         THE JUDGE: Was there a report

18    generated as a result of that

19    meeting?

20         THE WITNESS: No.

21         THE JUDGE: Was there any

1    disciplinary action taken against

2    anyone because of that meeting?

3         THE WITNESS: No.

4         THE JUDGE: As a supervisor,

5    were you involved in the

6    evaluations that were performed for

7    Mr. Woodard?

8         THE WITNESS: I would look them

9    over after they were done and read

10   over.  I don't remember Dayved's

11   primarily, but that's usually what

12   happens.  If I might do them

13   myself, all depending on what the

14   classification is, but if it's

15   Dayved's work classification, I

16   like the foreman that is looking

17   over the individual or the machine

18   that individual runs, whoever is

19   performing and is over that, that's

20   who I want doing the evaluation

21   because they have more hands-on

1    experience with what the person

2    did.

3         THE JUDGE: Do you have any

4    recollection at this time as to the

5    type of evaluations Mr. Woodard

6    had, whether they were excellent,

7    satisfactory, below average-type of

8    evaluations?

9         THE WITNESS: No, I don't.

10        THE JUDGE: To your knowledge,

11   was Mr. Woodard ever disciplined

12   because of a poor evaluation?

13        THE WITNESS: No.

14        THE JUDGE: You described Mr.

15   Woodard as performing fair work; is

16   that correct?

17        THE WITNESS: Yes.

18        THE JUDGE: But the work was

19   sufficient to keep him as an

20   employee; is that correct?

21        THE WITNESS: Yes.

1        THE JUDGE: Did you ever write

2    the claimant up or take any

3    disciplinary actions against Mr.

4    Woodard for him leaving his

5    machine?

6        THE WITNESS: No.  I was trying

7    to just get to him so he would know

8    that that's going to create

9    problems, it's a safety problem

10   most of all that he needs to stay

11   at his machine.

12       THE JUDGE: Were any of the

13   meetings that you had with Mr.

14   Woodard and the union and other

15   management people, did they

16   specifically involve allegations of

17   racial discrimination?

18       THE WITNESS: Could you say that

19   again?

20       THE JUDGE: Any of the meetings

21   that you had with Mr. Woodard and

1   the union, did they involve

2   specific allegations or racial

3   discrimination?

4       THE WITNESS: It would be

5   brought up, you know, that I had a

6   problem, like, at the meetings and

7   that, he thought I was racial and

8   that, which I told him, no, I'm

9   not, you know, I don't have a

10  problem with African-Americans.  I

11  even told him in that one meeting,

12  I said, as a matter of fact, my

13  best friend in school was an

14  African-American and he told me

15  that didn't make any difference.

16      THE JUDGE: Have any other

17  employees during the time that you

18  have been employed at PHB brought

19  discrimination charges against you?

20      THE WITNESS: Against me, no.

21      THE JUDGE: And you, yourself,

1    have never been disciplined by your

2    manager or the owner for alleged

3    racial discrimination against

4    employees?

5         THE WITNESS: No way.

6         THE JUDGE: Have you been

7    involved in the EEOC findings of

8    fact or hearings in Mr. Woodard's

9    case?

10        THE WITNESS: Had I been

11   involved in that hearing, yes.

12        THE JUDGE: All right.  Have you

13   been involved in any other hearings

14   with the EEOC with other employees

15   who have brought racial

16   discrimination charges against PHB?

17        THE WITNESS: No.

18        THE JUDGE: Do you supervise

19   Gary Gebhardt?

20        THE WITNESS: I did, yes.

21        THE JUDGE: Is Mr. Gebhardt

1      still an employee of PHB?

2           THE WITNESS: No, ma'am.

3           THE JUDGE: Was he fired or did

4      he voluntarily quit?

5           THE WITNESS: He was fired.

6           THE JUDGE: Could you tell me

7      why he was fired?

8           THE WITNESS: There was a --

9      through the EEOC when they did

10     their evaluations and everything,

11     Gary Gebhardt was interviewed.  His

12     interview came through that he had

13     racial discrimination problems and

14     that he had a problem with African-

15     Americans, so that's why he was

16     terminated.

17          THE JUDGE: And how long had Mr.

18     Gebhardt been employed by PHB?

19          THE WITNESS: I would believe he

20     was there for about 33 years.

21          THE JUDGE: An employee of that

1      length, were you aware of the fact

2      that he was causing these types of

3      problems in the workplace?

4           THE WITNESS: I had -- there was

5      times where I was Gary's immediate

6      supervisor.  Gary, at times, would

7      call different people names, not

8      just African-Americans, you know,

9      he would be a little rough at times

10     and I would sit down and I had

11     talks with him and everything and

12     at one time, when we got a little

13     slower, he was laid off because of

14     this and this being his people

15     skills and that's why he was laid

16     off and when he came back, we had a

17     talk with him and he got much, much

18     better, you know, he turned right

19     around on that. But then there was

20     one little problem after that where

21     he had supposedly told somebody

1    else that they had to make them

2    work a little harder and he

3    couldn't answer what he meant by

4    "them" and that's what got him into

5    that EEOC hearing and they asked

6    him, I don't know exactly what they

7    asked him, but he didn't come

8    across very well at all through

9    this interview with the EEOC and

10   that's when our company decided

11   that he had a problem that we did

12   not want in our company any longer

13   and they terminated him.

14        THE JUDGE: At 33 years of

15   employment, he would have been

16   eligible for his pension, et

17   cetera, Mr. Gebhardt?  Was he at

18   that appropriate age and years of

19   service?

20        THE WITNESS: We don't have a

21   pension.

1    THE JUDGE: So any employees

2    that work for 33 years and retire,

3    they don't get any benefits?

4    THE WITNESS: No, we don't have

5    a pension as far as the company

6    people and that.

7    THE JUDGE: Is there some type

8    of 401(k) type of plan that would

9    be --

10    THE WITNESS: Whatever he has,

11    they have an ESOP.  I don't know if

12    he still got that or not.

13    THE JUDGE: Was he in

14    management, Mr. Gebhardt?  Was he

15    considered management?

16    THE WITNESS: Yes, ma'am, he was

17    a foreman, a line supervisor.

18    THE JUDGE: He would not have

19    been a union member?

20    THE WITNESS: No, he was not.

21    THE JUDGE: Did you supervise an

1    individual by the name of Tom

2    Thompson?

3          THE WITNESS: For a short period

4    of time, yes, I did.

5          THE JUDGE: What position did

6    Mr. Thompson hold?

7          THE WITNESS: Same position,

8    line supervisor, line foreman.

9          THE JUDGE: Is Mr. Thompson

10    still an employee of PHB?

11          THE WITNESS: Yes, he is.

12          THE JUDGE: Have you ever had to

13    discipline Mr. Thompson for

14    situations involving where he may

15    have racially discriminated against

16    co-employees?

17          THE WITNESS: Have I?  No.

18          THE JUDGE: Have you ever

19    received any complaints that Mr.

20    Thompson was racially

21    discriminating against the

1     employees?

2         THE WITNESS: I haven't, no.  He

3     went through that one little -- he

4     had some kind of an instance, but I

5     was not involved in that.

6         THE JUDGE: And that was an

7     instance where he was speaking and

8     someone may have used inappropriate

9     language?

10        THE WITNESS: Yes.

11        THE JUDGE: Now, if you

12    supervised him, why were you not

13    involved in that incident?

14        THE WITNESS: I only supervised

15    him for a short period of time.  I

16    don't believe he was on my shift

17    when that happened because he moved

18    shifts a couple times.

19        THE JUDGE: Is there an employee

20    by the name of Nick Hazenbek

21    (phonetic).

1          THE WITNESS: Hazenbek.

2          THE JUDGE: Is he a supervisor

3     or is he --

4          THE WITNESS: No, he is a union

5     individual.  His classification is

6     called metal man.

7          THE JUDGE: Have you ever had --

8     do you supervise him?

9          THE WITNESS: I did at times,

10    yes.

11         THE JUDGE: During the time that

12    you supervised him, did you ever

13    have to discipline him for

14    allegations of racial

15    discrimination?

16         THE WITNESS: no.

17         THE JUDGE: Did you ever receive

18    any complaints that he had been

19    racially discriminating against

20    employees?

21         THE WITNESS: No.

1          THE JUDGE: Do you supervise

2     Mike Langer?

3          THE WITNESS: I did, yes.

4          THE JUDGE: Is he still an

5     employee of PHB?

6          THE WITNESS: No, ma'am.

7          THE JUDGE: Did he voluntarily

8     quit or was he fired?

9          THE WITNESS: I believe he

10    voluntarily quit?

11         THE JUDGE: Did you have any --

12    did you supervise him?  I'm sorry,

13    did I ask you that?

14         THE WITNESS: Yes.

15         THE JUDGE: Did you have any

16    problems with his job performance,

17    Mr. Langer's job performance?

18         THE WITNESS: Yes.

19         THE JUDGE: Do you recall an

20    incident and you may not have been

21    involved in it, but you may have

1    heard of it, where Mr. Langer was

2    operating a machine, he left for

3    the restroom, and as a result,

4    something happened with the machine

5    and parts were spewed all over the

6    floor and someone had to clean up

7    the mess and Mr. Langer was not

8    made to do it, some other

9    individual was made to do it; are

10    you familiar with that?

11        THE WITNESS: No, I'm not.

12        THE JUDGE: Do you know who

13    Shelly Antolik (phonetic) is?

14        THE WITNESS: Yes.

15        THE JUDGE: And what position

16    does she hold?

17        THE WITNESS: She's in human

18    resources.

19        THE JUDGE: At any time did you

20    feel threatened by Mr. Woodard

21    while he was employed there?

1          THE WITNESS: No.

2          THE JUDGE: Is Mr. Camp still

3     employed at PHB, Pat Camp?

4          THE WITNESS: Yes.

5          THE JUDGE: Is he still a union

6     member?

7          THE WITNESS: No.

8          THE JUDGE: At the time that Mr.

9     Woodard was employed there, was Mr.

10    Camp a union steward?

11         THE WITNESS: He was a union

12    steward, yes.

13         THE JUDGE: Do you recall a

14    meeting regarding an allegation

15    that somebody was making farm

16    noises or pig-call noises?

17         THE WITNESS: No.

18         THE JUDGE: How many meetings do

19    you believe that you had that

20    involved Mr. Woodard and the union,

21    a rough estimate?

1          THE WITNESS: Three.

2          THE JUDGE: You don't remember

3     more than three meetings during the

4     time during that time --

5          THE WITNESS: That I was

6     involved in, no.

7          THE JUDGE: The incident that

8     you described where Mr. Woodard

9     indicated that he didn't want you

10    to speak to him directly, but

11    rather through the union steward,

12    what happened as a result of that?

13    Did the union steward back him up?

14    Did the union do anything about

15    that?

16          THE WITNESS: I don't know what

17    he did with that.  At that time, I

18    told Dayved that I was his direct

19    supervisor and that if I needed to

20    talk to him, I would.  At that

21    time, I excused myself from the

1       area.

2               THE JUDGE: If Mr. Woodard

3       testified that while he was on

4       light duty, you were following him

5       around with a stool, would that

6       basically be inaccurate?

7               THE WITNESS: Yes, ma'am, that

8       is inaccurate.

9               THE JUDGE: Are you familiar

10      with an individual by the name of

11      William Diehl (phonetic), who may

12      have been an electrician hired by

13      PHB?

14              THE WITNESS: Yes.

15              THE JUDGE: He would not have

16      been a PHB employee?

17              THE WITNESS: He is a PHB

18      employee.

19              THE JUDGE: Oh, I'm sorry.  You

20      have your own electricians?

21              THE WITNESS: Yes, he works in

1    the maintenance department.  He is

2    one of the electricians.

3        THE JUDGE: You would not

4    supervise Mr. Diehl?

5        THE WITNESS: No.

6        THE JUDGE: As a supervisor in

7    the aluminum die cast, did you ever

8    receive any complaints about Mr.

9    Diehl's behavior while he was in

10    your department?

11        THE WITNESS: No, ma'am.

12        THE JUDGE: Now, you indicated

13    that discrimination is not

14    tolerated, but there's no specific

15    written policy within the employee

16    handbook addressing discrimination

17    to your knowledge?

18        THE WITNESS: Not to my

19    knowledge, not that I recall.

20        THE JUDGE: Does PHB have

21    annual, biannual meetings where

1    they discuss such things as racial

2    discrimination or sex

3    discrimination or gender

4    discrimination or age

5    discrimination, that those things

6    are not really tolerated and the

7    employees are trained or --

8    THE WITNESS: No.

9    THE JUDGE: Are you aware of any

10   allegations that Mr. Gebhardt would

11   purposely speed up the cycles of

12   machines just to bother the

13   operators?

14   THE WITNESS: No.

15   THE JUDGE: How long was -- and

16   I assume Kerry Goodwine is a

17   gentleman?

18   THE WITNESS: Yes.

19   THE JUDGE: How long was Mr.

20   Goodwine employed by PHB?

21   THE WITNESS: I'm really not

1    sure. He had to have been there

2    probably somewhere around five

3    years. I'm not really sure.

4       THE JUDGE: And you supervised

5    Mr. Goodwine?

6       THE WITNESS: Yes.

7       THE JUDGE: Did Mr. Goodwine

8    ever bring complaints to you

9    regarding racial discrimination?

10       THE WITNESS: Yes, the one that

11    happened with Mr. Gebhardt, came to

12    me and I had a meeting with that to

13    try to get to the bottom of that,

14    yes.

15       THE JUDGE: Did that involve a

16    union meeting as well?

17       THE WITNESS: I had the union

18    steward there involved, yes.

19       THE JUDGE: Thank you, Mr.

20    Sayers, those are all the questions

21    I have.

1          Attorney Petersen, any follow-

2     up?

3          MS. PETERSEN:  No, I have

4     nothing further.

5          THE JUDGE: Attorney Johnson?

6          MR. JOHNSON:  Nothing further,

7     your Honor.

8          THE JUDGE: You may step down.

9     Let's take a ten-minute break here

10     to allow restroom use and then you

11     can call your next witness.

12     (Whereupon, a brief recess was taken.)

13          THE JUDGE: Please raise your

14     right hand.  Please have a seat.

15     You may proceed with this witness.

16                * * *

17          **REX RYAN,**

18     called as a witness on behalf of the

19     Employer, and having been previously

20     duly sworn, was examined and testified

21          as follows:

1                        **DIRECT EXAMINATION**

2      BY MS. PETERSEN:

3      Q      Please state your name.

4      A      Rex Ryan, R-y-a-n.

5      Q      Are you employed by PHB?

6      A      Yes, I am.

7      Q      What's your title there?

8      A      General foreman.

9      Q      Are you familiar with the claimant in

10            this case, Mr. Dayved Woodard?

11     A      Yes.

12     Q      How are you familiar with him?

13     A      He was one of my operators.

14     Q      Okay. When he worked there, were you also

15            a general foreman at the time or did you

16            have a different position?

17     A      I was a general foreman.

18     Q      Okay. What was your position in relation

19            to Mr. Woodard?  Were you his direct

20            supervisor?

21     A      I was his direct supervisor.

1    Q    Okay.  And he worked from February '98

2         until 2003 -- or, yes, 2003; correct?

3    A    As far as I know, yes.

4    Q    Now, were you one of his supervisors

5         during this time?

6    A    Yes.

7    Q    Okay.  Now, Ron Sayers just testified in

8         this matter.  What's your relation to

9         him?  Are you the same --

10   A    I'm the same thing he was, but I was one

11        shift and he was on the other.

12   Q    Did you rotate shifts with him?

13   A    Yes.

14   Q    You worked in the same department?

15   A    Yes.

16   Q    And he indicated that he was involved in

17        assigning jobs to the employees in that

18        department. Did you do that as well?

19   A    Yes, I did.

20   Q    And did you personally observe the people

21        in your department as they worked?

1    A    Yes.

2    Q    Including Mr. Woodard?

3    A    Yes, I did.

4    Q    Now, did you have the same expectations

5         from Mr. Woodard's work as you did for

6         the other employees?

7    A    Yes, I did.

8    Q    There wasn't anything different?

9    A    Hmm-um.

10   Q    No?

11   A    No.

12   Q    Okay, you need to say yes or no.

13   A    Sorry.

14   Q    In your opinion, how was Mr. Woodard's

15        work performance?

16   A    He didn't act very aggressive, just very

17        slow, didn't act -- the type of job that

18        he had, the machine, you have to keep up

19        with the machine and Dayved had problems

20        doing that.  He just -- didn't act to me

21        like he wanted to do it, that was my

1   impression.

2 Q What was his attitude towards work, your

3   impression?

4 A Well, he never got mad.  You always had

5   to keep telling him to keep the machines

6   running.

7 Q Okay.

8 A Complained a lot, things like that.

9 Q Now, Mr. Sayers testified that he would

10   occasionally see Mr. Woodard absent from

11   his machine.  Did that happen with you as

12   well?

13 A If he asked for a break and sometimes he

14   would walk off and be over here doing

15   this or that when the machine was running

16   by itself and we didn't like that.

17 Q Was there a problem with the machine

18   running by itself?

19 A If it broke down or things like that or

20   they had an oil leak or some kind of

21   mechanical problem, there could be other

1           problems.

2       Q   And did you say anything to Mr. Woodard

3           about --

4       A   Yes, I told him to go back to his

5           machine.

6       Q   Did you have to do this repeatedly or

7           just one time?

8       A   Off and on.

9       Q   Now, when Mr. Woodard worked at PHB, did

10          any of his coworkers complain to you

11          about him and his work performance?

12      A   No.

13      Q   Now, did you ever work at PHB at the same

14          time as Ron Sayers?

15      A   Yes.

16      Q   Did you ever observe Mr. Sayers picking

17          on or harassing Mr. Woodard?

18      A   When Mr. Sayers was working, I was at

19          home.

20      Q   Okay. So you didn't see him working?

21      A   No.

Q    Did you ever observe Mr. Sayers using
     racial slurs or derogatory remarks?

A    No.

Q    Towards Mr. Woodard?

A    No.

Q    Did you ever observe any supervisor or
     coworker using racial slurs, making
     derogatory remarks about Mr. Woodard or
     to Mr. Woodard?

A    No.

Q    Did you ever notice any of the
     supervisors or employees picking on or
     harassing Mr. Woodard?

A    No.

Q    Did Mr. Woodard ever complain to you
     directly about being treated unfairly at
     PHB?

A    No.

Q    Now, Mr. Woodard had previously testified
     about an incident involving an individual
     named Mike Langer and I think he relieved

1           him from his machine and when Mr. Woodard

2           came back, there were parts all over the

3           floor.  Do you recall such an incident?

4      A    Yes.

5      Q    Can you tell me what happened?

6      A    It was at dinnertime. Dayved went to

7           lunch and I had Mike Langer relieve his

8           machine.  We was keeping it running on a

9           continuous basis and Dayved called me

10          over and said look at the mess and I

11          walked over and there was castings laying

12          all over and I told Dayved, I said -- he

13          did complain to me about what happened

14          and I told him to clean up the mess,

15          start it back up, and I'll go talk to

16          Mike Langer.

17     Q    And what did you say to Mike Langer?

18     A    I asked him what happened.  He said, oh,

19          I was just having problems and this and

20          that and I told him just don't do it

21          again. That was basically the extent of

1           it.

2     Q     Did you hear Mike Langer or Dayved

3           arguing or talking?

4     A     No.

5     Q     Did you walk away from Dayved laughing?

6     A     No.

7     Q     Did you ever see Mike doing this thing to

8           other machines, leaving the parts on the

9           floor?

10    A     Yes, he was known for that.

11    Q     So this wasn't just to Mr. Woodard?

12    A     No.

13    Q     Did you ever hear Mr. Langer make any

14          racist remarks to Mr. Woodard?

15    A     No, I didn't.

16                 THE JUDGE: I'm sorry, what was

17              the question?

18                 MS. PETERSEN: Did you hear Mr.

19              Langer making any racist remarks

20              towards Mr. Woodard?

21                 THE JUDGE:  And your answer

1                    was?

2                         THE WITNESS:  No.

3                         THE JUDGE:   Thank you.

4    BY MS. PETERSEN:

5    Q       Now, do you recall an incident in which

6            you had told Mr. Woodard to write a

7            letter to be placed in his file because

8            he had cracked some taps on a die?

9    A       Yes, he didn't locate the casting right.

10           The first time he did it, I just chewed

11           him out, I guess, or whatever you want to

12           call it and the second time, he did it,

13           which was about ten or 15 minutes later,

14           I told him you have to write me up a

15           letter in your own words what happened

16           and basically that's what it was.

17   Q       And then the letter would go in his file?

18   A       Went up to personnel.

19   Q       Now, is this a policy of the company?

20   A       Yes.

21   Q       This isn't something that you made up

1            with Mr. Woodard?

2    A      No.

3    Q      Did you ask other people to do similar

4            types of letters?

5    A      Um-hmm.

6    Q      Yes?

7                 THE JUDGE: You need to say yes

8            or no.

9                 THE WITNESS: Yes.  Sorry about

10           that.

11                THE JUDGE: You need to let her

12           finish her question before you

13           start answering.

14               THE WITNESS: Okay.

15   BY MS. PETERSEN:

16    Q      Did you tell him to write the letter

17            because of his race?

18    A      No.

19    Q      Now, Mr. Woodard had also testified that

20            he was constantly given more difficult

21            jobs to do than other employees in his

1          area.  Now, as a supervisor and I think

2          you said you were responsible for

3          assigning jobs to him, is this accurate?

4     A    No, we assign the jobs as they came

5          along.

6     Q    Were you involved in a meeting regarding

7          Mr. Woodard's complaints about his job

8          assignments?

9     A    No.

10    Q    Do you recall anything like that?

11    A    No.

12    Q    Did he ever come to you directly with any

13         types of complaints, be it his job

14         assignments or problems with other

15         coworkers or supervisors?

16    A    Well, he'd ask me off and on why do I

17         have to run this or why do I have to run

18         that, that's just the way his job was.  I

19         mean it changed from day to day.  He

20         might be on this machine one day, this

21         machine the next day.  I remember one

1    time he did ask me why do I have to run

2    this machine?  Why don't you let the new

3    people run it?  I told him we did the

4    same thing with you, we started all the

5    new people out on the least difficult

6    machines and as you progress, the longer

7    you're there, the more you run the

8    machines, we advance you up to the bigger

9    ones so you can run anything in the

10   place.

11  Q    So did you specifically set up to give

12       him more difficult jobs or machines to

13       do?

14  A    No.

15  Q    Do you recall attending any meetings with

16       Mr. Woodard and members of management and

17       union representatives regarding his

18       complaints?

19  A    No.

20  Q    Now, during the time Mr. Woodard worked

21       at PHB, did any of his coworkers complain

1          to you about him?

2     A    We talked amongst ourselves that he was

3          always leaving machines and things like

4          that.   We would give him a ten-minute

5          break and he might not come back for half

6          an hour and we'd have to go look for him,

7          things like that.

8     Q    Do you recall Mr. Woodard being off work

9          for a shoulder injury for about a year?

10    A    Yes.

11    Q    Did you ever see him stop into the shop

12         during this time?

13    A    Yes, he came in and got his check.

14    Q    Did you ever talk to him during this

15         time?

16    A    No.

17    Q    But you did see him?

18    A    Yes.

19    Q    Did he seem not happy to be at the shop

20         to you or uncomfortable?

21    A    Basically he just walked by me and never

1        said anything.

2    Q     Okay.  Now, in the bathrooms at PHB, did

3          you ever see pictures of a cross burning

4          or KKK on the bathroom?

5    A     No.

6    Q     Did you ever see any racist or racial

7          slurs written in the bathrooms?

8    A     No.

9              MS. PETERSEN:  I think that's

10             all I have.  Thank you, Mr. Ryan

11             THE JUDGE: Cross.

12             MR. JOHNSON: Thank you, your

13             Honor.

14                  *  *  *

15             **CROSS-EXAMINATION**

16   BY MR. JOHNSON:

17   Q     Your testimony is you did not see a

18         burning cross or KKK written in the

19         bathroom; correct?

20   A     Yes.

21   Q     Are you aware -- did you ever hear

1            anything about that written in the

2            bathroom?

3     A      The first time I found out about it is

4            when this all came about.

5     Q      Okay.  Nobody ever made any complaints to

6            you?

7     A      No.

8     Q      There was never a memo or anything from

9            management about --

10    A      Well, we had them periodically through

11           the years I've been there.

12    Q      But there was nothing specific in regards

13           to this allegation that there was a

14           burning cross and a KKK written in the

15           bathroom?

16    A      Not that I can remember.

17    Q      And the first time you heard about this

18           is when you got involved in this?

19    A      Yes.

20    Q      Is that something you should have been

21           made aware of?

1    A    I would think so, yes, but I might have

2         been.

3    Q    Fair enough.  Mike Langer, you talked

4         about an incident with Mr. Woodard and

5         Mr. Langer and I think you said Mr.

6         Langer had a propensity to leave parts

7         all over the place?

8    A    Yes.

9    Q    You went and talked to Mr. Langer because

10        there was a mess in front of Mr.

11        Woodard's machine?

12   A    Yes, I did.

13   Q    Did Mr. Langer have to help clean up the

14        mess that he made?

15   A    No, he didn't.

16   Q    Did Mr. Langer receive any sort of

17        discipline for the mess that he made?

18   A    I basically just asked him why he did it

19        and he would just shake his shoulders,

20        this type of thing, and I told him do not

21        do it again.

1    Q      Just kind of like a who cares-type of

2           thing?

3    A      Basically on his part, yes.

4    Q      That was the end of the incident as far

5           as you were concerned?

6    A      Right, but he had done it not only to

7           Dayved, but other times during his course

8           of employment.

9    Q      Your testimony is that Mr. Woodard made

10          no complaints to you?

11    A      Not that I can remember, no.

12    Q      He made absolutely no complaints about

13          how he felt he was treated differently?

14    A      No.

15    Q      Did you ever tell him to go file a report

16          if he thought he was discriminated

17          against?

18    A      No.

19    Q      You participated in no meetings in

20          regards to Mr. Woodard's complaints?

21    A      None that I can remember.

1      Q      And your testimony is you're not even

2             aware of him having any complaints?

3      A      No.

4      Q      Are you aware of any racial --

5             allegations of racial slurs in the

6             workplace?

7      A      I imagine there probably is, but nothing

8             against Dayved.

9      Q      Are you aware of an incident with a Mr.

10            Thompson?  Let me ask you this, do you

11            know who Mr. Thompson is?

12     A      No.

13     Q      Is there a foreman named Tom Thompson at

14            PHB?

15     A      Yes.

16     Q      Are you aware of a time when Mr. Thompson

17            would have said something that was racial

18            in nature?

19     A      No.

20     Q      So obviously there was no investigation

21            or anything done if you're not --

1    A    Not on my part, no.

2    Q    Would you be Mr. Thompson's supervisor?

3    A    No.

4    Q    Is he above or below you?

5    A    Below.

6    Q    Who would be Mr. Thompson's supervisor?

7    A    It would Mark Nye (phonetic) on the zinc

8        department.

9    Q    And you can't testify in any way really

10        to the relationship between Mr. Woodard

11        and Ron Sayers because you basically

12        worked opposite shifts?

13    A    Yes.

14    Q    When you're there, he's not and when Mr.

15        Sayers is at work, you're not?

16    A    Right, yes.

17    Q    Is it fair to summarize your testimony

18        that you had no knowledge of Mr.

19        Woodard's complaints of discrimination

20        while he was working at PHB?

21    A    Yes.

1    Q    Are you aware of anyone else making

2         complaints of racial discrimination at

3         PHB?

4    A    I heard about the Kerry Goodwine thing.

5    Q    Who did you hear that from?

6    A    Just like a rumor mill-type thing.

7    Q    Were you part or did you participate in

8         any way in regards to the EEOC

9         investigation of Mr. Woodard's

10        complaints?

11   A    Yes.

12   Q    What about Mr. Goodwine's complaints?

13   A    I never had any problems with Kerry.   In

14        fact, the day that he left, he come up to

15        me and shook my hand.

16   Q    My question is did you participate in the

17        EEOC investigation in regards to Mr.

18        Goodwine's complaints?

19   A    No.

20   Q    Are you aware of anyone else filing a

21        discrimination suit except for Mr.

1         Goodwine and Mr. Woodard?

2    A    Just Mr. Goodwine.

3    Q    Were you ever made aware of a

4         discrimination suit filed by a Mr.

5         Jackson?

6    A    Yes.

7    Q    Do you know anything about that suit?

8    A    Just what I heard.  He worked in a

9         different department than I did.

10   Q    What you heard, was it the same basic

11        allegations that Mr. Woodard has made?

12   A    Geez, it's been so long.

13   Q    Fair enough.  After the suit was filed by

14        Mr. Jackson or the complaints to the EEOC

15        made by Mr. Woodard, did PHB do anything?

16        Were there meetings with you or the other

17        supervisors in regards to allegations of

18        discrimination or how you should conduct

19        yourself or how employees should be made

20        to act?

21   A    Not that I can remember.

1          MR. JOHNSON:  Okay, I don't

2     have any further questions.

3          MS. PETERSEN:  I just had one

4     other question.

5                  * * *

6          **REDIRECT EXAMINATION**

7     BY MS. PETERSEN:

8     Q     Mr. Ryan, do you recall an incident where

9           Mr. Woodard, I guess, got up to go to the

10          bathroom and someone in the department

11          yelled, soo-ee (phonetic)?  Do you recall

12          anything like that?

13    A     No.

14    Q     So you didn't receive any complaints

15          about that?

16    A     No.

17              MS. PETERSEN: That's all I

18          have.

19              THE JUDGE: How long have you

20          been employed at PHB?

21              THE WITNESS: 39 years.

1    THE JUDGE: How long have you

2    been a foreman?

3        THE WITNESS: 27.

4        THE JUDGE: 37 years?

5        THE WITNESS: 27 years.

6        THE JUDGE: 27 years.  Are you

7    familiar with an individual by the

8    name of Gary Gebhardt?

9        THE WITNESS: Yes.

10        THE JUDGE: Did you supervise

11    Mr. Gebhardt?

12        THE WITNESS: At one time, I

13    did, yes.

14        THE JUDGE: Mr. Gebhardt is no

15    longer employed by PHB; is that

16    correct?

17        THE WITNESS: Yes.

18        THE JUDGE: Do you understand

19    whether or not he voluntarily quit

20    or was he terminated?

21        THE WITNESS: My understanding

1    was he was terminated.

2         THE JUDGE: Do you understand

3    why he was terminated?

4         THE WITNESS: Because he made a

5    racial remark.

6         THE JUDGE: While you were

7    employed there, did you ever note

8    Mr. Gebhardt to make racial

9    comments?

10        THE WITNESS: No.

11        THE JUDGE: You testified that

12   to your knowledge no one ever made

13   racial slurs in the workplace; is

14   that correct?

15        THE WITNESS: Yes.

16        THE JUDGE: You're going to tell

17   me that during the 39 years that

18   you were employed at PHB, you never

19   heard of any racial comments being

20   made?

21        THE WITNESS: I would imagine

1  probably has been off and on, but I

2  don't pay any attention to it

3  because that stuff happens all the

4  time in every place you work.

5      THE JUDGE: What policy does PHB

6  have with regard to racial

7  discrimination and racial slurs

8  being used in the workplace?

9      THE WITNESS: It's not supposed

10  to happen.

11     THE JUDGE: Did you ever have to

12  discipline anyone, co-employee or

13  subordinate for racial

14  discrimination or using racial

15  slurs in the workplace?

16     THE WITNESS: No.

17     THE JUDGE: Does Mr. Sayers have

18  an equal position to yours or does

19  he supervise you?

20     THE WITNESS: No, he's the same

21  as I am.

1          THE JUDGE: Mr. Sayers testified

2     that you guys alternate shifts?

3          THE WITNESS: Yes.

4          THE JUDGE: So generally you

5     would equally supervise Mr. Woodard

6     as much as Mr. Sayers would; is

7     that correct?

8          THE WITNESS: Yes, every other

9     week.

10         THE JUDGE: And Mr. Woodard

11    never came to you with any

12    complaints with regard to his job

13    assignments or his feelings that he

14    was being discriminated against?

15         THE WITNESS: Not being

16    discriminated, but he complained

17    all the time about what machines he

18    had to run, why he had to run them

19    and things like that.

20         THE JUDGE: Can you tell me was

21    Mr. Langer formally disciplined for

1    the incident involving the machine

2    that he relieved Mr. Woodard from?

3         THE WITNESS: What I did was I

4    went and talked to him and asked

5    him why he done it and he just

6    shrugged his shoulders like that,

7    like I don't care.  I couldn't

8    discipline.

9         THE JUDGE: Why couldn't you

10   discipline?

11        THE WITNESS: Well, basically

12   all I told him was just don't do it

13   again.

14        THE JUDGE: All right.  Is that

15   something that you tolerate,

16   individuals letting machines spew

17   parts all over the place?

18        THE WITNESS: No, that's why I

19   told him just don't do it again.

20        THE JUDGE: Well, why did you

21   tolerate in on this specific

occasion?

THE WITNESS: Because it happened without my knowledge. I did go and tell him about it.

THE JUDGE: Now, you said Mike was known for this. So it appears that he has a history for doing this. Listen to my question, was he at any time disciplined for that type of action?

THE WITNESS: No.

THE JUDGE: Can you tell me why Mr. Langer was allowed to behave like that and was not disciplined?

THE WITNESS: It depends on what you mean by disciplined.

THE JUDGE: I mean oral warning, I mean written warning, I mean a letter in the file that explains his behavior.

THE WITNESS: An oral warning,

1   yes.

2       THE JUDGE: Was that the extent

3   of the discipline that Mr. Langer

4   received?

5       THE WITNESS: Yes, from me, yes.

6       THE JUDGE: And how many

7   occasions on your shift, did Mr.

8   Langer behave in this fashion?

9       THE WITNESS: That's the only

10  one I can think of.

11      THE JUDGE: Is Mr. Langer still

12  employed there?

13      THE WITNESS: No.

14      THE JUDGE: Did he voluntarily

15  quit or was he fired?

16      THE WITNESS: He voluntarily

17  quit.

18      THE JUDGE: Can you tell me why

19  Mr. Langer was not made to clean up

20  the mess that he made?

21      THE WITNESS: Because he was at

1    dinner at the time. Dayved told me

2    when I came back from dinner.

3        THE JUDGE: Is that type of

4    behavior tolerated from other

5    employees?

6        THE WITNESS: No.

7        THE JUDGE: How long had Mr.

8    Langer been employed at PHB?

9        THE WITNESS: I'm -- probably

10   five to ten years.

11       THE JUDGE: During the time that

12   you would have supervised Mr.

13   Woodard, there were never any

14   meetings with the union called

15   because of complaints that Mr.

16   Woodard may have had during the

17   shift that you were supervising?

18       THE WITNESS: Not that I was

19   involved in.

20       THE JUDGE: In your capacity as

21   a foreman, are you involved in

1   meetings that involve grievances or

2   complaints by employees with the

3   union?

4       THE WITNESS: If I'm involved,

5   yes.

6       THE JUDGE: By being involved,

7   you mean if it's something that

8   involves a situation that you were

9   part of, is that what you mean?

10      THE WITNESS: Yes.

11      THE JUDGE: You would not be

12  called in as a general supervisor

13  or manager or anything like that to

14  participate in the meeting?

15      THE WITNESS: No.

16      THE JUDGE: Is Mr. Butch Smith,

17  he would be above you; is that

18  correct?

19      THE WITNESS: Yes, he was my

20  boss.

21      THE JUDGE: Did Mr. Smith ever

1      call you in for a meeting or have

2      discussions with you of any

3      complaints that Mr. Woodard had?

4           THE WITNESS: No.

5           THE JUDGE: Do you ever recall

6      having a meeting in 2000 involving

7      yourself, the claimant, and Rick

8      Bartosick (phonetic)?

9           THE WITNESS: No, I don't.

10          THE JUDGE: Involving an

11     incident where the claimant, Mr.

12     Woodard, may have lost his temper

13     with Mr. Sayers?

14          THE WITNESS: Not that I can

15     remember, no.

16          THE JUDGE:  Have you, yourself,

17     ever been disciplined for

18     allegations of racial

19     discrimination?

20          THE WITNESS: No.

21          THE JUDGE: Have there ever been

1       any charges brought against you?

2                   THE WITNESS: No.

3                   THE JUDGE: Alleging that you

4       racially discriminated against

5       employees?

6                   THE WITNESS: No.

7                   THE JUDGE: Did you consider Mr.

8       Gebhardt to have a problem that he

9       on occasion would make racial

10      comments while at work?

11                  THE WITNESS: No.

12                  THE JUDGE: Were you surprised

13      that they decided to fire him after

14      33 years of employment?

15                  THE WITNESS: No, I wasn't

16      surprised.

17                  THE JUDGE: Why weren't you

18      surprised?

19                  THE WITNESS: Because he said or

20      what he did, what it involved,

21      probably should have been.

1   THE JUDGE: Do you know if that

2   was the only incident or something

3   similar to that occurring with Mr.

4   Gebhardt?

5   THE WITNESS: Yes.

6   THE JUDGE: To your knowledge,

7   that was the only incident?

8   THE WITNESS: Yes.

9   THE JUDGE: You don't remember

10   there being a prior history of him

11   having similar problems?

12   THE WITNESS:  Not to my

13   knowledge.

14   THE JUDGE: And you would have

15   worked with him during the 39 years

16   that you were employed?

17   THE WITNESS: Yes.

18   THE JUDGE: And 27 of those

19   years, you were a supervisor;

20   right?

21   THE WITNESS: Yes.

184

1              THE JUDGE:   Those are all the

2         questions I have.   Ms. Petersen,

3         any follow-up?

4              MS. PETERSEN:   Just one

5         question actually.

6    BY MS. PETERSEN:

7    Q    As to Mike Langer, during the time he was

8         there, the five or ten years, did he have

9         this problem with letting the parts fall

10        on the floor the entire time?

11   A    Off and on.  He was a disciplinary

12        problem-type person.

13   Q    Was he talked to during this time by

14        yourself?

15   A    By myself, yes.

16   Q    How about other supervisors?  Did they

17        talk to him?

18   A    As far as I know, yes.

19             MS. PETERSEN:   Okay, that's all

20        I have.

21             MR. JOHNSON:   Just a few, your

185

1          Honor.

2               * * *

3          RECROSS-EXAMINATION

4     BY MR. JOHNSON:

5     Q      And this involves Mr. Langer again.  You

6            testified that there were parts all over

7            the floor?

8     A      A few laying on the floor.

9     Q      What kind of parts were those?

10    A      The casting that the machine was running

11           at the time.

12    Q      And you did not make Mr. Langer put any

13           sort of note into his file?

14    A      No. Basically all I did was I asked him

15           why he did that.

16    Q      Did you ever ask Mr. Woodard to put any

17           notes in his file?

18    A      Yes, with the incident with the

19           mislocated casting.

20    Q      Where he what?

21    A      He had to slip a casting into a fixture

1 and drill four holes and he misplaced

2 them twice.

3 Q Is that the only time you've had him put

4 anything in his file?

5 A That I can remember, yes.

6    MR. JOHNSON: That's all I have.

7    THE JUDGE: You may step down.

8 Next witness.

9    MS. PETERSEN:  I'll go get him.

10    THE JUDGE: Raise your right

11 hand.  Please have a seat.  you may

12 proceed with this witness.

13    * * *

14    **LOREN SMITH,**

15 called as a witness on behalf of the

16 Employer, and having been previously

17 duly sworn, was examined and testified

18 as follows:

19    **DIRECT EXAMINATION**

20 BY MS. PETERSEN:

21 Q Would you please state your name.

1    A       Loren Smith.

2    Q       And do you also go by Butch?

3    A       Butch.

4    Q       Are you employed by PHB?

5    A       Yes, I am.

6    Q       What's your title there?

7    A       Currently plant engineer.

8                    THE JUDGE: Sir, how do you

9              spell your first name?

10                   THE WITNESS: L-o-r-e-n.

11                   THE JUDGE: Thank you.

12   BY MS. PETERSEN:

13   Q       And how long have you held that title?

14   A       Plant engineer?

15   Q       Um-hmm.

16   A       Currently I've held that for about a year

17           and before, I had it for about 17 years,

18           18 years, somewhere in there.  I've been

19           there a total of 20 years.

20   Q       So what were you before you were plant

21           engineer?

188

1    A    I was manager of die cast.

2    Q    How long were you manager of that die

3         cast?

4    A    From 2000 to the end of 2003, beginning

5         of 2004.

6    Q    So how were you in relation to Ron Sayers

7         and Rex Ryan?

8    A    I was their direct supervisor.

9    Q    When you were manager of die cast?

10   A    Yes.

11   Q    You're no longer their supervisor?

12   A    That's correct.

13   Q    Okay.  Now, are you familiar with the

14        claimant in this case, Mr. Dayved

15        Woodard?

16   A    Yes.

17   Q    How are you familiar with him?

18   A    Well, Dave worked out in the department

19        as DCPO production operator.

20   Q    And you were one of his supervisors for

21        that department?

1    A        That's correct.

2    Q        Did you ever have any direct contact with

3             Mr. Woodard as he worked there?

4    A        Not in the sense of like day-to-day

5             assigning work or checking on the work or

6             anything of that kind of thing.  As I

7             traveled through the department and my

8             work, I would see Dave and say hi or

9             how's the job going, things like that.

10   Q        So you knew him to talk to him?

11   A        Yes.

12   Q        You saw him working?

13   A        Yes.

14   Q        How often were you in his department when

15            he was there?

16   A        I was in the department all the time, but

17            at the time, I believe Dave was on second

18            shift and was not out there a lot.

19   Q        Okay. What was your impression of how he

20            worked, his work performance?

21   A        As far as his work performance was

1    concerned, I don't recall any complaints

2    or any incidents where there was a

3    problem as far as his work performance,

4    the quality of his parts or anything like

5    that.

6    Q    How about his attitude?

7    A    There were other issues that came up that

8    Rex or Ron brought to me, yes.

9    Q    Now, during your personal observation of

10    Mr. Woodard and any conversations that he

11    may have had with coworkers, supervisors,

12    did you ever hear or see any of the

13    supervisors or coworkers making

14    derogatory or racial comments towards

15    him?

16    A    No, I did not.

17    Q    Did you ever observe any of his

18    supervisors singling him out, harassing

19    him, or making life difficult for him as

20    he worked there?

21    A    No, I did not.

Q      Now, Mr. Woodard testified there were
       several meetings that he placed you at
       the meetings with union representatives
       and some of his supervisors regarding
       complaints that he had of his treatment
       by a supervisor.  Do you recall these
       meetings?

A      Yes, I do.

Q      What meetings do you recall?

A      I recall a couple where Dayved had some
       complaints, some issues, and we met in my
       office. There was Ron Sayers was there,
       Dayved, and Pat Camp and myself and I
       asked Dayved at the time to state his
       concerns and issues and so we can discuss
       them, get them out in the open. At the
       time, and I'm not sure of the date or the
       exact time, I believe it was in 2001, I'm
       not sure, I did document them, but
       Dayved's concern at that time was that
       Ron had been picking on him or singling

1          him out, as you said earlier, and

2          specifically giving him more difficult

3          jobs and not keeping Dayved in the

4          rotation of the jobs. That was one

5          specific claim that was made.  And I

6          believe quench job was mentioned, also,

7          if I'm not mistaken.

8     Q    What is that again?

9     A    A quench job.  It's a job where the

10         casting comes out of the machine and it's

11         very hot and have to quench it in a water

12         solution, cool it down to cool the

13         casting down and sometimes if the weather

14         is cold or after a lengthy period of time

15         working in the quench, it's not the most

16         desirable job to have, and guys don't

17         like that, so you kind of rotate the guys

18         around so everybody has a chance to work

19         those kind of jobs.

20    Q    What was done at the meeting in response

21         to these complaints that he had?

193

| | | |
|---|---|---|
| 1 | A | After the meeting, first of all, I sat |
| 2 | | down with Ron one-on-one and we discussed |
| 3 | | it and I talked to Ron, got his side of |
| 4 | | that. Then I went over to the |
| 5 | | dispatcher's office, I went through the |
| 6 | | jobs that Dayved had been assigned to and |
| 7 | | I had gone back through the computer |
| 8 | | records to look and see if we saw that |
| 9 | | Dayved had been assigned to a |
| 10 | | particularly bad job, a heavy job, or not |
| 11 | | been in the rotation like everybody else. |
| 12 | Q | And what did you conclude after looking |
| 13 | | at -- |
| 14 | A | Well, I went back about three-and-a-half, |
| 15 | | four weeks through the computer records |
| 16 | | and found that I couldn't differentiate |
| 17 | | any difference between Dayved's work |
| 18 | | record, you know, the jobs he had been |
| 19 | | assigned to or anybody else. I picked |
| 20 | | several names at random just to look and |
| 21 | | I couldn't see anything that stood right |

out.

Q    Were these white employees that you
      picked at random?

A    Yes, they were.

Q    Okay.

A    Sometimes just because you get assigned
      to a job, sometimes what happens is that
      job may break down and you'll get pulled
      off that job and put on the next
      available job.  It may be a good job, it
      may not be, it just depends on how things
      go.  So you may see a lot of changes in
      jobs from day-to-day, but you may end up
      working on jobs where a machine will
      break down and the next thing you know,
      you get put on this job. So there's a lot
      of change that happens.

Q    So what happened after the meeting?  How
      were these complaints addressed?

A    At that particular time, I dismissed the
      claim.

1    Q    Why?

2    A    Well, I didn't feel there was any

3         substance to it to be honest with you.  I

4         checked the records.  The computer showed

5         me that his work performance or the jobs

6         he had been given weren't any different

7         than anybody else.

8    Q    Did you discuss this with the union

9         representative that was there at the

10        meeting?

11   A    I didn't go back to Pat and discuss this.

12        I did not go back to Dayved and I wish I

13        had gone back and told Dayved that I did

14        check into it and found -- I didn't see

15        any substance to it.

16   Q    Were there any other meetings that you

17        recall attending?

18   A    Yes. There was another one after that, I

19        don't know, three, six months later, I'm

20        not sure of the exact date.  And it was

21        again about the harassment or, if you

1         will, that Ron was picking on Dayved.

2         Dayved had asked at one time to be

3         included on the Rex Roth team and at that

4         time, he had addressed me about it and I

5         had talked to Ron about that, about

6         putting him on that team. And at that

7         time, the team had already been formed

8         and it was also right in the time period

9         when the team concept in there was kind

10        of fading away, the teams weren't meeting

11        as often. And, in fact, I'm not even sure

12        the Rex Roth team met after that or not

13        to be quite honest with you.  So that was

14        another issue that had been addressed.

15  Q     Do you recall any other meetings that you

16        attended in response to Mr. Woodard's

17        complaints?

18  A     No, those were the only three that I

19        recall.

20  Q     Do you recall attending any meetings in

21        which racial discrimination was brought

1         up by Mr. Woodard or anybody else in the

2         meeting?

3   A     No.

4   Q     Now, did Mr. Woodard come to you

5         indicating that there was a picture of a

6         burning cross with KKK in the bathroom?

7   A     I don't recall Dayved coming directly to

8         me, but I do remember the incident, yes.

9   Q     Did you personally do anything when you

10        heard this?

11  A     Yes, I did.  I immediately went to the

12        restroom that was in question, the men's

13        room there, and I looked in that restroom

14        and I did not see anything on the walls.

15        I then went, I did go to a second men's

16        room, the larger shower room/restroom,

17        and looked in there.  Now, there was

18        derogatory stuff written on the wall, but

19        there was nothing racist or directed

20        toward Dayved individually, okay.

21  Q     What type of derogatory things were on

1         the wall?

2    A    Well, there's stuff written about other

3         workers, you know, the guys will write

4         something on there maybe about a football

5         teams sometimes, that kind of stuff.

6    Q    Nothing about Dayved?

7    A    Nothing about Dayved.  I also asked Rod

8         Berry about that. Rod Berry is our

9         janitor and asked him, because Rod is

10        very good about covering that stuff over

11        as soon as he sees it and I asked him if

12        he had seen anything --

13                  MR. JOHNSON:  I'm just going to

14             make an objection if he's going to

15             say what Rod Berry said.

16                  MS. PETERSEN: Rod is going to

17             be testifying as well.

18                  THE JUDGE: I'll allow it then.

19   BY MS. PETERSEN:

20   Q    You may continue.

21   A    I asked Rod about that and Rod had not

1    seen anything in that particular restroom

2    and so I thought, well, maybe I missed

3    it, somebody already painted over it.

4    Rod had had a habit through the years

5    when I was the plant engineer prior to

6    becoming a departmental manager there,

7    Rod had had a habit of taking myself into

8    the restroom and showing me these kind of

9    writings if they were really serious or

10    if they're extremely derogatory.  He

11    would take me in and show me.

12    Q    What kind of writings are you referencing

13    that would be really derogatory?

14    A    Oh, something with a lot of foul language

15    directed at a supervisor, things like

16    that.

17    Q    Okay. Did you ever receive any complaints

18    from Mr. Woodard directly regarding Mr.

19    Sayers treating him unfairly or picking

20    on him?

21    A    Well, yes, those led up to those

1              meetings.

2    Q        Okay, so he complained to you directly?

3    A        I believe he said something to me out on

4             the floor one day, I was passing by him

5             and I think we talked about it.

6    Q        Then you had the meeting?

7    A        But then we had the meeting.

8    Q        Did any other coworkers in Ron Sayers'

9             department have complaints to you about

10            Mr. Sayers?

11   A        There was one other employee in

12            particular that had a clash with Ron

13            where it was like a personality conflict,

14            if you will.

15   Q        What were that person's complaints?

16   A        He felt that just Ron picked on him.

17   Q        In what way?

18   A        I don't know, maybe just constantly

19            harassing him. This other employee was a

20            first shift employee and he never

21            complained to me about the jobs that he

1          was given, it was that kind of -- he just

2          felt Ron kind of looked after him too

3          much and was hounding him.

4     Q    Was that person black?

5     A    No.

6     Q    White?

7     A    Yes.

8     Q    Any other complaints about Ron that you

9          received?

10    A    No, those are the only two.

11    Q    Any complaints about Rex Ryan?

12    A    No.

13                    MS. PETERSEN:  Okay, that's all

14              I have. Thank you.

15                    THE JUDGE: You may cross.

16                    MR. JOHNSON: Thank you, your

17              Honor.

18                         *  *  *

19                    **CROSS-EXAMINATION**

20    BY MR. JOHNSON:

21    Q    Is it fair to say that all the meetings

1    you had with regard to Mr. Woodard were

2    based on his complaints of his job

3    assignments?

4  A    Job assignment or inclusion with the Rex

5    Roth team, yes. He did mention that

6    particularly.

7  Q    Were there any meetings as to Mr.

8    Woodard's complaints about racial slurs?

9  A    In one of those meetings, that did come

10    up, yes.  He mentioned the "N' word that

11    had been mentioned out on the floor.

12  Q    What was the result of the meeting where

13    Mr. Woodard brought up the use of racial

14    slurs?

15  A    I went out and I talked to the various

16    supervisors in that area and no one could

17    back up Dayved's claim that they had

18    heard that word or heard any of that

19    stuff going on.  I was trying to

20    substantiate his claim.

21  Q    Your testimony is you were never able to

203

1              substantiate the claim?

2     A        That's right.

3     Q        Do you recall who it was alleged that

4              made the racial slurs?

5     A        It was never mentioned who made the slur

6              that I recall.

7     Q        Are you aware of any instances where

8              anybody was using racial slurs?

9     A        No, sir.

10    Q        Do you know who Tom Thompson is?

11    A        Sure, yes, I do.

12    Q        Who is he?

13    A        He's currently a supervisor or a line

14             foreman.

15    Q        All right.

16    A        At PHB.

17    Q        Would he be under you?

18    A        At that time?

19    Q        At that time.

20    A        Yes.

21    Q        Are you aware of any racial slurs made by

1         him?

2    A    No, sir, I'm not.

3    Q    If there were allegations of racial slurs

4         made by a foreman or line supervisor, who

5         would do the investigation into that?

6         Would that be your responsibility?

7    A    Well, if it was brought to my attention,

8         I would do an initial investigation, but

9         then I would immediately go to Mr.

10        Hancock with it.

11   Q    Who is Mr. Hancock?

12   A    Ben Hancock, he's in charge of personnel,

13        human resources.

14   Q    Is there a written procedure for an

15        employee to follow if they have

16        complaints about racial slurs or problems

17        with discrimination?

18   A    Well, at that time, I'm not aware of any

19        policy at that time.  We have a

20        harassment policy now at the shop.

21   Q    But there was nothing in place during the

1              time?

2    A        I wasn't aware of any, no.

3    Q        And you don't know anything about an

4              alleged racial slur by Mr. Thompson?

5    A        Tom Thompson, no, I do not.

6    Q        What about, do you know a Gary Gebhardt?

7    A        Yes.

8    Q        Who is he?

9    A        Gary Gebhardt was another line foreman,

10             supervisor, same level as Mr. Thompson.

11             He worked for me there.

12   Q        Are you aware of any allegations of

13             racial slurs made by him?

14   A        Yes.  It would have been after the fact

15             of Dayved being there.

16   Q        Okay.  How were you made aware of that?

17             Did somebody complain directly to you

18             about that?

19   A        No, quite honestly I heard it secondhand

20             that a slur or a comment was supposedly

21             made and then was involved in the

1          investigation as to what had actually

2          happened and all that.

3     Q    But at the time, your position was -- you

4          were the manager of the die cast

5          division?

6     A    Department, yes.

7     Q    So directly under you would be the

8          foreman or line supervisors?

9     A    No, there's one level in between Ron and

10         Rex were the shift supervisors and then

11         those line foremen would report to them.

12         Rex and Ron ran the actual shift on the

13         different shifts, first or second shift.

14    Q    So is it fair to say they would be --

15         when I say they, I mean Ron Sayers and

16         Rex Ryan, they would be one step above

17         Gebhardt and Thompson?

18    A    Yes, you're right.

19    Q    If there were complaints about Gebhardt

20         and Thompson, who would an employee take

21         that complaint to?

1   A     Well, it would be one of two people.

2         Some of the workers would go directly to

3         their union steward, or to their union

4         committeeman or they would go directly to

5         Ron or Rex, one or maybe both. They might

6         do it together.

7   Q     Now, you testified that you had a few

8         meetings in regards to Mr. Woodard's job

9         assignments, but then you decided to

10        dismiss the claim, I think that's what

11        you testified to?

12  A     Yes.

13  Q     Was this a formal dismissal?  Was there a

14        grievance filed?  I mean how did you come

15        up with the determination?

16  A     I'm not aware of any grievance that was

17        written at all.  You're talking about a

18        union grievance?

19  Q     Well, I'm asking there was a meeting.

20        Was it part of a union grievance?

21  A     No, it was not, it was an informal thing.

1    Q    Was a union member there?

2    A    Yes.

3    Q    Who was there for the union?

4    A    Well, Dayved was in the union and then

5         Pat Camp was his steward at the time.

6    Q    So it was brought by the union?

7    A    Well, I guess so, if that's -- there

8         wasn't any written grievance.

9    Q    Was there an agreement that this

10        complaint would be dismissed or did you

11        just -- I don't want to put words in your

12        mouth, but it sounded like you just

13        determined that there was nothing there?

14   A    I investigated, trying to find something

15        that would back up Dayved's claim that

16        there's something substantial here that

17        it happened and I couldn't find anything

18        that would substantiate what Dayved was

19        claiming.

20   Q    So you dismissed the complaints?

21   A    Yes, at that point, I felt there wasn't

1          anything to it.

2    Q     And you never told Mr. Woodard?

3    A     That's correct. I said if I had anything

4          to do over again, I would go back to

5          Dayved and tell him that.

6    Q     Did you tell the union or did it just

7          stop?

8    A     It just stopped at that point.

9    Q     Were you part of the EEOC investigation

10         in any way?

11                MS. PETERSEN: Which one?

12   BY MR. JOHNSON:

13   Q     Mr. Woodard's?

14   A     I'm not sure I understand what you're

15         asking me.

16   Q     Did anyone from the EEOC talk to you in

17         regards to Mr. Woodard's complaints?

18   A     I have to recall.  I've spoken to the

19         EEOC on a couple of occasions.  Probably

20         they did, yes, I think so.

21   Q     But you're not aware of all these

1              incidents that we've talked about except

2              for the issue of the assignments?

3     A      No, and the only other issue would be the

4              Gary Gebhardt issue that happened

5              afterward.

6     Q      In the chain of command, shouldn't you

7              have gotten wind or news about these

8              complaints, for example, of the racial

9              slur being made?

10    A      Well, that really depends.  If a racial

11            slur or whatever would have happened, if

12            someone had felt strongly enough about

13            that and brought it up through the chain

14            of command, yes, I would have heard about

15            it, but Rex and Ron deal with a lot, as

16            shift supervisors, they deal with a lot

17            of issues day-to-day on the floor amongst

18            all of the people working there and there

19            is a lot of things that happen on the

20            floor that they take care of and it's not

21            necessarily racial issues or any of that

```
 1              kind of thing, but all kinds of little

 2              issues that happen that Ron and Rex deal

 3              with and take care of that never got to

 4              the level of the manager.

 5     Q        Is it fair to say then that Mr. Woodard

 6              had complaints that he voiced to Ron

 7              Sayers or Rex Ryan, you would not be

 8              aware of them unless Mr. Sayers or Mr.

 9              Ryan brought it to your attention?

10     A        Or Dayved, right.  If those two would not

11              have come to me about it, I probably

12              wouldn't have heard about it.

13     Q        And your testimony is you didn't hear

14              about the racial slur?

15     A        I'm sorry?

16     Q        You didn't hear about the complaint about

17              racial slurs?

18     A        Um-hmm.

19     Q        You did not hear about that?

20     A        No, no.  If you're referring to anything

21              -- the only racial slur that I can
```

1   confirm that I heard was when Dayved

2   mentioned to me in our meeting about

3   someone using the "N" word.

4 Q So you're not aware or let me ask you

5   this, would you be aware of any

6   investigation that PHB would do on their

7   own in regards to allegations of racial

8   discrimination made by an employee?

9 A Well, if PHB had an investigation going,

10   I would only be aware of it if I had been

11   called into a meeting and told about it

12   or asked about it.

13 Q And that's true even though you were the

14   manager of the whole division?

15 A Of the department.

16 Q Of the department where this allegedly

17   took place?

18 A Well, yes.  If there was a racial or

19   something happen on the floor, racial

20   slur or whatever, if the supervisor

21   didn't bring it to me or if the

1          particular employee or union didn't bring

2          it to me, I may not be aware of it.

3                    MR. JOHNSON: That's all the

4          questions I have.

5                    MS. PETERSEN:  I just had a

6          couple questions.

7                         * * *

8                    **REDIRECT EXAMINATION**

9     BY MS. PETERSEN:

10    Q     Were you at a meeting with Pat Camp, the

11          union representative, and Mr. Woodard and

12          I don't who else might have been there,

13          about -- it was discussed that Mr.

14          Woodard had to write a letter because he

15          had cracked some taps; do you remember

16          something like that?

17    A     Yes.

18    Q     What do you recall?

19    A     I don't recall the job or the machine or

20          any of that, but --

21    Q     First of all, why was it brought up, do

1           you know that?

2     A     Yes.  When an employee works at a machine

3           at our plant and in my department, if

4           something happens where an accident

5           happens where they may damage some

6           tooling or equipment or cause the job to

7           break down for a long period of time, or

8           even a short period of time, but it may

9           be costly breakdown, if what the employee

10          had done to cause that, sometimes, I'll

11          give you an example, they locate a

12          casting incorrectly in the tooling and

13          they cycle the machine and it damages the

14          tooling, that can be very costly, time

15          and money.  So we want the employee to

16          understand what they did wrong and so as

17          a habit, we would ask them, I

18          particularly in my department, it had

19          been going on before me, but when I took

20          over, I carried it on, to ask the

21          employee to write a quick note.  I ask

1     them to write them on whatever they have,

2     napkins, piece of cardboard, tablet

3     paper, didn't matter, just write it down

4     on a piece of paper the machine you were

5     on, what happened, yes, you know, and

6     then sign it. That was my way of

7     cementing in their mind that they

8     understood what they did wrong and to try

9     to prevent it from happening again.

10   Q  This has happened every time something is

11     damaged?

12   A  I'm not going to say every single time,

13     but I'm going to say for the vast

14     majority of time, yes.

15   Q  What if the machine was only down for

16     like 15 minutes?

17   A  I typically did not ask the employees to

18     write a letter or document it, if it was

19     a minor breakdown, because those things

20     happen often. But the more serious ones I

21     did ask them to do that.

1    Q     Now, what was Mr. Woodard's complaint to

2          your understanding?

3    A     My understanding was he didn't feel he

4          should have to do that.

5    Q     Did he tell you why?

6    A     I don't recall why, but it was just his

7          feeling, maybe it wasn't -- because it

8          wasn't a real costly breakdown.  Taps

9          aren't real expensive in comparison to

10         big tooling dies and things.

11   Q     What was your response or what was

12         discussed?

13   A     If I recall correctly, we still asked

14         Dayved to write the letter regardless. We

15         wanted it documented so he understood

16         what he had done wrong.

17   Q     And he had testified that the machine was

18         only down for about 15 minutes. Was it

19         then unreasonable for him to have to

20         write the letters since you just

21         testified that sometimes you don't have

1          to write the letter?

2     A    Yes, I understand.  My opinion was I

3          didn't feel it was unreasonable.  All I

4          was asking for was just documentation of

5          what happened so they understood, Dayved

6          understood what he had done wrong, that's

7          all it was.

8     Q    Have people been asked to write letters

9          where the machine was down for less than

10         15 minutes?

11    A    I'd have to answer probably.

12    Q    And this is something that's asked of all

13         types of employees?

14    A    Yes, it wasn't just union employees, it

15         was salaried employees, also, I mean

16         supervision.  If we had an issue with a

17         supervisor who made a mistake, I've asked

18         them to write them up, too.

19    Q    And he did write the letter for his file?

20    A    I don't recall if Dayved wrote it or not,

21         I honestly don't.

1          MS. PETERSEN:  Okay, that's all

2       I have.  Thank you.

3          THE JUDGE: Anything else,

4       Attorney Johnson?

5              * * *

6          **RECROSS-EXAMINATION**

7   BY MR. JOHNSON:

8   Q      Would you have reviewed the letter that

9          Mr. Woodard would have written for the

10         file?

11  A      Oh, absolutely.  If he wrote it, I read

12         it.

13  Q      So if he made an allegation that he

14         thought he was being treated differently

15         based on his race, would you have done

16         any investigation into that?

17  A      Yes.

18             MR. JOHNSON:  Nothing further.

19             THE JUDGE: You testified you've

20             been employed there 20 years; is

21             that correct?

1           THE WITNESS: Approximately,

2     yes.

3           THE JUDGE: And during that 20

4     years, you would have supervised

5     Mr. Gebhardt on occasion?

6           THE WITNESS: That's correct.

7           THE JUDGE: And to your

8     knowledge, Mr. Gebhardt was

9     terminated?

10          THE WITNESS: Yes, he was.

11          THE JUDGE: Did you know how

12    long Mr. Gebhardt had been an

13    employee at PHB?

14          THE WITNESS: Oh, I'm not

15    exactly sure.  I think it's 28, 30

16    years, long time.

17          THE JUDGE: So he was employed

18    there longer than you had been?

19          THE WITNESS: Oh, absolutely,

20    yes.

21          THE JUDGE: And the incident

1    that caused him to be terminated

2    was an incident after Mr. Woodard

3    stopped working there?

4         THE WITNESS: Yes.

5         THE JUDGE: To your knowledge,

6    it was an isolated incident,

7    something like that had never

8    happened before involving Mr.

9    Gebhardt?

10         THE WITNESS: To my knowledge,

11    that's the only one that had

12    happened with Mr. Gebhardt, yes.

13         THE JUDGE: You don't know

14    whether Mr. Gebhardt had a history

15    of being discriminatory or making

16    racial comments?

17         THE WITNESS: I'm not aware of

18    that, no.

19         THE JUDGE: Are you aware of any

20    informal disciplinary actions taken

21    against Mr. Gebhardt in the past

1    regarding his behavior?

2         THE WITNESS: We had a layoff at

3    one time, salaried layoff, where

4    Mr. Gebhardt was laid off, but it

5    wasn't as far as his performance or

6    discriminatory policies or anything

7    like that.  He was laid off for a

8    period of time as lack of work.

9         THE JUDGE: Did you find Mr.

10   Gebhardt to be a person that was

11   racially discriminatory against

12   other people?

13        THE WITNESS: I have never heard

14   him say anything discriminatory.  I

15   was in the meeting with the EEOC

16   lady and talked to her, but I

17   wasn't in there when apparently

18   Gary made a remark that supposed he

19   was racist.

20        THE JUDGE: If there's no

21   history of Mr. Gebhardt acting in

1    that fashion, why did PHB fire Mr.

2    Gebhardt?

3        THE WITNESS: I can't answer

4    that.  I did not make the decision

5    to fire him.

6        THE JUDGE: Were you not part of

7    the decision-making process with

8    regard to Mr. Gebhardt being fired?

9        THE WITNESS: No, I was not.

10        THE JUDGE: Would you have been

11    the plant engineer at the time Mr.

12    Gebhardt was terminated?

13        THE WITNESS:  No.

14        THE JUDGE: You still would have

15    been the manager of the die cast

16    department?

17        THE WITNESS: That's correct.

18        THE JUDGE: You were not

19    involved in Mr. Gebhardt's

20    termination, even though he worked

21    in the die cast department?

1        THE WITNESS: I was called up to

2    Ben's office and told that Mr.

3    Gebhardt was going to be

4    terminated.

5        THE JUDGE: Can you tell me why

6    you chose not to report to Mr.

7    Woodard or to the union the results

8    of your investigation regarding job

9    assignments that Mr. Woodard

10   received, considering you had a

11   meeting with the union called in

12   and everything?

13       THE WITNESS: As I testified

14   earlier, that was poor judgment on

15   my part to not go back to Dayved

16   and tell him. That was a mistake on

17   my part.

18       THE JUDGE: Were there any

19   reports generated as a result of

20   that meeting?

21       THE WITNESS: I had a habit of

1    writing myself notes whenever I had

2    meetings and personnel-type

3    meetings like that, when I meet

4    with an employee, I go into the

5    computer, I type up a couple

6    sentences, I put the date, who was

7    there, and I document those.

8        THE JUDGE: And your testimony

9    is during the 20 years you've been

10   employed here, you never had an

11   occasion to overhear a racial slur?

12       THE WITNESS: No, I have not.

13       THE JUDGE: PHB, I understand to

14   be what I would consider like a

15   factory?

16       THE WITNESS: Um-hmm, factory,

17   um-hmm.

18       THE JUDGE: And employees that

19   usually work in factories tend to

20   be crude, would you not agree?

21       THE WITNESS: I would agree.

1        THE JUDGE: And during the 20

2    years, you never came across

3    anybody whether you heard them

4    specifically -- I guess my question

5    is not did you hear "X" say this,

6    but did you as you're walking

7    through hear people use

8    inappropriate language, perhaps

9    racial slurs?

10        THE WITNESS: No, you described

11    it very well.  In my walking

12    through the plant, I never heard

13    that, never heard someone say

14    something directly racial, but

15    secondhand and third-hand, yes.

16    You hear that all the time,

17    somebody said this, somebody said

18    that, not all the time, I shouldn't

19    say that, occasionally.

20        THE JUDGE: Was any

21    investigation done into those

1      secondhand comments that you may

2      have heard?

3           THE WITNESS: Not that I'm aware

4      of.

5           THE JUDGE: And to the best of

6      your knowledge, during the time

7      that you managed the die cast

8      department, including Mr. Woodard

9      or any other employee, nobody came

10     to you with complaints with regard

11     to racial discrimination?

12          THE WITNESS: No.

13          THE JUDGE: Thank you.  Any

14     follow-up, Attorney Petersen?

15          MS. PETERSEN:  Nothing.

16          THE JUDGE: Attorney Johnson.

17          MR. JOHNSON:  Just two or

18     three, your Honor.

19   BY MR. JOHNSON:

20   Q     Were you aware of any other lawsuits that

21         were filed against PHB based on

1          discrimination?

2    A      Well, I'm aware of a lawsuit about an

3          employee named Fred Jackson, but I don't

4          know if that was discrimination case or

5          not.

6                MR. JOHNSON:  Nothing further.

7                THE JUDGE: You may step down.

8          And your other witnesses that you

9          have out there --

10              MS. PETERSEN:  I have Pat Camp

11         and Rod Berry, they're still out

12         there.

13             THE JUDGE: And Rod Berry is

14         whom?

15            MS. PETERSEN:  He is the

16         janitor.

17            THE JUDGE:  And his testimony

18         would be brief, I assume?

19            MS. PETERSEN:  Five minutes.

20             THE JUDGE: All right, let's do

21         Mr. Berry.

1    MR. PETERSEN:  Okay.

2    THE JUDGE: And Mr. Camp's

3    testimony?

4    MS. PETERSEN:  He may be a

5    little bit more because he was the

6    union steward.  Can we take him by

7    depo?

8    THE JUDGE: Any objection to

9    doing it by deposition?

10    MR. JOHNSON:  No objection.  We

11    can do it when we do Mr.

12    Goodwine's.

13    THE JUDGE: That's fine.  Please

14    come forward.  Raise your right

15    hand.  Please have a seat in the

16    witness stand to my left.  Attorney

17    Petersen, you may proceed with his

18    testimony.

19    MS. PETERSEN: Thank you.

20                    *  *  *

1          **RODNEY BERRY,**

2          called as a witness on behalf of the

3          Employer, and having been previously

4          duly sworn, was examined and testified

5          as follows:

6          **DIRECT EXAMINATION**

7    BY MS. PETERSEN:

8    Q       Would you please state your name for the

9            record.

10   A       Rodney Berry.

11   Q       Is that B-e-r-r-y?

12   A       Right.

13   Q       And you're employed by PHB currently?

14   A       Yes.

15   Q       What is your job there?

16   A       Janitor.

17   Q       And how long have you been janitor at

18           PHB?

19   A       Almost 15 years.

20   Q       And is that also the length of time you

21           were employed by PHB?

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | Now, during your employment at PHB, did |
| 3 | | you ever have occasion to see a picture |
| 4 | | of a burning cross or a KKK in the |
| 5 | | restrooms at PHB? |
| 6 | A | Yes, I did, one time. |
| 7 | Q | Actually, let me back up.  You're |
| 8 | | responsible for cleaning the restrooms at |
| 9 | | PHB; correct? |
| 10 | A | Yes. |
| 11 | Q | How often do you do that? |
| 12 | A | Every day. |
| 13 | Q | And going back to my question, did you |
| 14 | | have occasion to see a picture of a |
| 15 | | burning cross with a KKK in the bathroom? |
| 16 | A | Yes. |
| 17 | Q | Do you remember when this occurred? |
| 18 | A | The best I can remember is when one of |
| 19 | | our bosses who retired, Mr. Jack |
| 20 | | Spaulding, because I used to go get him |
| 21 | | to look at the stuff if there was a |

1          problem. We had some incredible messes in

2          there and he used to come take pictures

3          or something, come take a picture of it

4          and --

5     Q    Can you give us a timeframe of the last

6          five years?

7     A    Late nineties, probably.

8     Q    Okay. And exactly what did you see?

9     A    There was a, I remember a cross about

10         this tall, about --

11                    THE JUDGE: What's the

12              dimensions?  Can you describe it

13              verbally?

14                    THE WITNESS: Probably about

15              maybe one-and-a-half feet high and

16              a little over a foot wide probably.

17    BY MS. PETERSEN:

18    Q    Do you know if it was in pen or marker,

19         can you recall?

20    A    Marker.

21    Q    And that was the cross?

1    A        It was a burning cross and I remember

2             seeing KKK on there.

3    Q        And do you recall how long it was there?

4    A        If I didn't get rid of it that day, it

5             was gone by the next day because I had to

6             wait until they took a picture or

7             whatever and then our restrooms are kind

8             of busy, so I'd wait until I got a chance

9             to go paint over that, there might be

10            somebody in there.  If I didn't get it

11            gone that day, it was gone the next day.

12            This is in our large --

13   Q        How did you remove it or what did you do?

14   A        Spray paint.

15   Q        What were you going to say?

16   A        This was in our large men's room, there's

17            like ten stalls in there.

18   Q        Was it in one of the stalls or was it --

19   A        One of the stalls on the wall.

20   Q        And you said it was there for only at the

21            most two days?

1    A      Yes, now, like I said, this is a long

2            time ago, it's possible when I saw it, I

3            have vacation time and sometimes I'm off

4            for a week, maybe two weeks.  It could

5            have been at a time when I had just come

6            back from vacation and that, I don't

7            remember.

8    Q      Okay.

9    A      I just basically went in there and saw it

10          the one day and I got it taken care of.

11   Q      What's the longest amount of time you

12          were away on vacation or had the time

13          off?

14   A      Two weeks is the longest.

15   Q      So two weeks would have been the longest

16          that the drawing would have been on the

17          wall?

18   A      Yes.

19   Q      Was it possible that it had been there

20          for months?

21   A      No, not possible.

1    Q       You spray-painted it over?

2    A       Yes.

3    Q       Did it return?  Did another drawing

4            return?

5    A       I've never seen it since.

6    Q       Was there any other type of racial

7            comments or slurs on the bathroom walls

8            that you noticed over the years?

9    A       No.  At the same time that was on there,

10           there was another stall two stalls down,

11           someone had black power written on there.

12   Q       Did that go?

13   A       I painted over that, too.  Most of the

14           stuff is like one person against another

15           person and I've had them to the point

16           where the last number of years, you

17           hardly ever see anything on the walls

18           anymore.  This morning I painted two

19           small things.  It's the first time I've

20           had to paint over in the last -- I don't

21           know.

1    Q    What were these small things about?

2    A    I don't read them.

3    Q    Was there any indication of a burning

4         cross and the KKK that you saw, was that

5         directed to Mr. Woodard?

6    A    No.

7    Q    Are you familiar with Mr. Woodard?

8    A    Yes, he's worked for me when I was on

9         light duty or something, he was helping

10        me out for a while.

11   Q    So you know him personally then?

12   A    Yes.

13   Q    You've had occasion to talk to him when

14        he worked there?

15   A    Right.

16   Q    Now, did people, did they ever approach

17        you if they saw something in the

18        bathrooms they didn't like?

19   A    Sometimes somebody would tell me there

20        was something written about somebody and

21        cover it up.

1    Q    And would you comply?

2    A    Right, yes.

3    Q    Did Mr. Woodard ever approach you to tell

4         you there was something in the bathroom

5         that he didn't like?

6    A    No.

7    Q    Do you recall who told you about the

8         cross in the bathroom, if anybody?

9    A    Nobody told me.

10   Q    You saw it for yourself?

11   A    Yes.

12   Q    Then what did you do after you saw that?

13        did you tell anybody else?

14   A    The way I remember, I went and told Jack

15        Spaulding, who was in charge of all the

16        die cast departments.  That's when I did

17        when I had a problem, then he would go

18        take a picture or when he got a chance to

19        do that and then he told me it was taken

20        care of and to go and cover it up.

21   Q    Did you ever see any writing or

1          derogatory comments or racist comments

2          about Mr. Woodard in the bathroom?

3    A     Generally, I don't take time to read the

4          stuff, you know, sometimes once in a

5          while maybe I will, but generally, I'll

6          paint it over.

7    Q     And you were the only janitor during the

8          15 years you were employed there?

9    A     No.

10   Q     Who else was janitor?

11   A     Ernie McIntyre (phonetic).

12   Q     When was he working there?

13   A     Probably the first three years I was

14         there, he was on first shift and I was on

15         second.

16   Q     So for the past 12 years, you have been

17         the only janitor at PHB?

18   A     Right.

19              MS. PETERSEN:  That's all I

20           have. Thank you.

21              THE JUDGE: Cross.

1                    MR. JOHNSON: Thank you.

2                          * * *

3                    **CROSS-EXAMINATION**

4     BY MR. JOHNSON:

5     Q        In regards to seeing graffiti in the

6              bathroom in terms of the KKK sign or a

7              burning cross, your testimony is that

8              only happened once?

9     A        That I --

10    Q        That you're aware of?

11    A        That I'm aware of.

12    Q        Could it have happened on more than one

13             occasion?

14    A        I never saw it.  If it did happen, then

15             somebody else would have had to have

16             covered it over.

17    Q        And when to the best of your

18             recollection, when did this occur?

19    A        Like I said, it was when Jack Spaulding

20             was still there, so he left sometime in

21             the late nineties, '97, '98, somewhere

1         around there.

2    Q     Did you ever receive a complaint from

3         Butch Smith stating that Mr. Woodard was

4         complaining about graffiti in the

5         bathrooms?

6    A     No.

7    Q     Did anyone ever tell you to go remove or

8         paint over any discriminatory graffiti in

9         the bathroom?

10    A     Just things about them personally, not --

11         just like somebody telling me something

12         wrote something about me and some girl.

13    Q     All right, so you're not aware -- let me

14         ask you this, did you ever hear a

15         complaint made by Dayved Woodard that

16         there was graffiti of a discriminatory

17         nature in the bathroom for a period of

18         weeks?

19    A     No.

20    Q     Are you hearing this for the first time

21         when I'm saying it to you?

A       I've been to a couple hearings at work
        where I was told there was supposed to
        have been a burning cross on the wall --
        not in the restroom that I saw it, but in
        another restroom over by our 1000-ton two
        machine, small, like a one-man restroom,
        I was told that was on the wall there and
        I never saw it there. That's generally a
        restroom where people write little things
        occasionally, they cover it up
        themselves. The only thing I ever saw
        really bad in there, one time there was a
        drawing of a person who was about this
        high --

                MR. PETERSEN: How high is that?

                THE WITNESS: Probably about six
                feet, about life-size, and I went
                and told Ben and he came down and
                looked at it and the restroom was
                painted after that.  Other than
                that, it's something like little

1          things about the foremen or

2          something like that, they all cover

3          it up themselves.

4    BY MR. JOHNSON:

5    Q     But you did hear about this?

6    A     Yes.

7    Q     Who told you about it?

8    A     I was told just in the hearings.

9    Q     What kind of hearings?

10   A     I don't actually know.  I was just

11         brought in, Ben was there, our lawyer.

12   Q     Who was your lawyer at that hearing?

13   A     Mr. Zamboni (phonetic).  And I talked to

14         him the one time, they brought me in and

15         asked me about it and then there was a

16         second time, there was a woman, she

17         represented somebody, I don't know, I

18         took her into the restroom and showed

19         her.

20   Q     What did you show her?

21   A     There was a couple little things written

1           on the wall.

2    Q     Was there a burning cross and KKK sign?

3    A     No.

4    Q     But that wasn't a restroom that you

5           regularly went into or cleaned; is that

6           fair?

7    A     Right.

8    Q     Okay. So there could have been a cross

9           and a KKK there for a few weeks without

10          you knowing about it?

11   A     I would have noticed something like that.

12              THE JUDGE: Let's back up.  Do

13          you clean that bathroom?

14              THE WITNESS: Yes.

15              THE JUDGE: And do you clean it

16          every day?

17              THE WITNESS: Yes.

18              THE JUDGE: Because one of the

19          questions he asked you, is that a

20          bathroom that you do not regularly

21          clean and you said yes.

1              THE WITNESS: I didn't hear him.

2              THE JUDGE: You didn't hear him.

3         So just to make sure we understand

4         your testimony, that is a restroom

5         that you regularly go into?

6              THE WITNESS: Yes, every day.

7              THE JUDGE: You may continue.

8    BY MR. JOHNSON:

9    Q    And you've never observed any graffiti in

10        this restroom that we're talking about?

11   A    No.

12   Q    And this is a one-stall restroom?

13   A    I never observed the burning cross or

14        KKK.

15   Q    And it is your testimony that you clean

16        that bathroom every day?

17   A    Yes.

18   Q    Do you agree that there were complaints

19        made by Mr. Woodard in regards to the

20        letters KKK and a burning cross?

21   A    From what I was told at these hearings,

1           that's it.

2      Q     And you never received any direction from

3           any of your supervisors telling you to

4           paint over any racially derogatory

5           pictures?

6      A     No.  If they had, no one was there, they

7           would have told me.

8                MR. JOHNSON: That's all the

9                questions I have.

10               MS. PETERSEN:  Nothing further.

11               THE JUDGE:  During the 15 years

12               that you have been employed there

13               as a janitor, have you had occasion

14               to overhear any racial slurs or

15               racial comments while on the work

16               floor doing your job?

17               THE WITNESS: If I've heard

18               anything, it's just in joking, when

19               they were with each other, people

20               of different races just -- but I

21               don't see it there.

1    THE JUDGE: So you have heard

2    racial slurs, but you thought it

3    was in a joking environment?

4    THE WITNESS: Yes, both ways.

5    THE JUDGE: You don't --

6    THE WITNESS: Just people,

7    they're friends, they get along.

8    THE JUDGE: In your opinion,

9    there's never any racial slurs made

10    in a malicious way?

11    THE WITNESS: I'm not saying

12    that it's not there, but it's not

13    that I've seen.  I'm by myself most

14    of the time.

15    THE JUDGE: Actually you're like

16    a fly on the wall, so you could

17    hear things that other people may

18    not hear so that's why I'm asking

19    you that.  Are there racial slurs

20    being tossed around back and forth

21    and maybe nonchalantly or maybe

1          maliciously?

2                 THE WITNESS: No.

3                 THE JUDGE: Thank you.  Any

4          follow-up, Attorney Petersen?

5                 MS. PETERSEN:  Nothing further.

6                 THE JUDGE: Attorney Johnson?

7                 MR. JOHNSON:  No, your Honor.

8                 THE JUDGE: Thank you, Mr.

9          Berry.  You may step down and

10         you're free to go.

11                All right, you can complete the

12         rest of the lay testimony in this

13         matter by deposition.  This record

14         will close out by mail.

15                Independent psychological

16         evaluation, has one been scheduled?

17                MS. PETERSEN:  No, your Honor.

18         I don't know if it was discussed at

19         one of the prior hearings.  Mr.

20         Gaughan had told me he had

21         requested that it be bifurcated.

1    Do you know anything about that at

2    all?

3        THE JUDGE: Bifurcate what?

4        MS. PETERSEN:  The abnormal

5    working conditions issue from the

6    medical issue.

7        THE JUDGE: I don't have any

8    notes that I was going to

9    bifurcate.  I don't want to

10   misspeak.  Maybe I did, but I

11   normally write that stuff down.

12       MS. PETERSEN:  I didn't see it

13   in the transcript.

14       THE JUDGE: Attorney Johnson has

15   been here for the last two hearings

16   --

17       MR. JOHNSON:  Unless it

18   occurred at the first hearing when

19   Mr. Connelly was still representing

20   Mr. Woodard, I didn't see anything

21   in the original transcript either.

1    THE JUDGE: You know what, I

2    don't know I would bifurcate that

3    issue because how can I bifurcate

4    -- I don't know.  I guess you're

5    asking me to factually bifurcate

6    whether those factual events truly

7    occurred and if they truly

8    occurred, do they rise to the level

9    of an abnormal working condition.

10    MS. PETERSEN:  Correct.

11    THE JUDGE: If I find that it is

12    an abnormal working condition --

13    MS. PETERSEN: Then we continue

14    with medical.

15    THE JUDGE: Why would you

16    continue with medical?

17    MS. PETERSEN:  If you said --

18    oh, you said if it is or is not?

19    THE JUDGE: If it isn't an

20    abnormal working condition and he

21    did experience what he did

experience, why would you -- then

you're going to say, well, that may

have happened, but he didn't have a

psychological episode as a result

of it? I mean so why would I

bifurcate I guess is the point.

You all can discuss it amongst

yourselves if you want. The only

reason to bifurcate would be to

save the money of not deposing

experts in this matter and going

down the road of presenting medical

evidence that he, in fact, has

whatever condition he has and I'm

not sure there's been a diagnosis

attached to his -- what he

described as rage.

         MS. PETERSEN:  I think that

might be a separate issue and

whether he was subjected to

abnormal working conditions, even

1    if he was, whether he suffered from

2    some type of mental illness, you

3    know, that's diagnosed by a

4    psychological or psychiatric

5    expert.

6         THE JUDGE: My gut reaction is

7    not to bifurcate.

8         MS. PETERSEN:  So we proceed

9    with our independent exam?

10        THE JUDGE: You know what,

11   review the transcript.  If I said I

12   would bifurcate and we've had this

13   discussion, I'll reconsider, but I

14   don't recall having a discussion to

15   bifurcate and usually I'm the one

16   that mentions bifurcations because

17   I like to bifurcate, I just can't

18   see doing it in this case because

19   there's a lot of abnormal working

20   conditions that involve perceptions

21   and those types of things that

1    really comes in through medical

2    evidence.

3        MS. PETERSEN:  So it's up to

4    you.

5        THE JUDGE: I would not

6    bifurcate. But my point is if I did

7    say I would bifurcate, I just don't

8    remember and let me know and I'll

9    reconsider.

10       MS. PETERSEN:  I didn't see it

11   discussed during the transcript,

12   but I wasn't sure if it was

13   discussed off the record or

14   anything like that.  But you're

15   saying you don't --

16       THE JUDGE: I don't feel

17   comfortable bifurcating.  You all

18   have to stipulate to the

19   bifurcation before I'd even

20   consider it.  I don't think you

21   guys have really talked about it,

so you probably need to talk about
it before you make that request to
me and that's a call on your part
and if you guys discuss it amongst
yourselves and you think
bifurcation is the approach you all
would like to follow, then you make
the request to me and then I'll
grant it or deny it.  That's the
action with regard to that.

    MS. PETERSEN: We will proceed
with depositions.

    THE JUDGE: Do depositions and
I'm going to assume we are not
bifurcating because I've not made a
decision to bifurcate, so you do
your depositions of the lay
witnesses, you move forward and you
have your independent medical or
independent psychological
examination of the claimant,

1       claimant deposes their expert, then

2       you depose your expert.  I'm

3       thinking we are now towards the end

4       of January.  I would think that the

5       two witnesses, Mr. Goodwine and Mr.

6       Camp, are lay witnesses and they

7       should be readily available, that

8       you should be able to complete lay

9       depositions during the month of

10      February, independent medical

11      examination has to be completed by

12      the end of March, claimant has to

13      depose their expert by the end of

14      April, employer deposes their

15      expert by the end of May, record

16      closes July 29th. By July 29th, I

17      need to receive deposition

18      transcripts, bill of costs on

19      behalf of the claimant, itemization

20      of legal services on behalf of the

21      claimant, and briefs from the

1    parties.

2         Anything else on behalf of the

3    claimant today?

4         MR. JOHNSON:  Nothing, your

5    Honor.

6         THE JUDGE: The employer?

7         MS. PETERSEN:  Nothing.

8         THE JUDGE: All right, counsel,

9    thank you.

10        MR. JOHNSON: Thank you, your

11   Honor.

12        MS. PETERSEN: Thank you, Judge.

13   (Whereupon, the hearing was concluded.)

14

15              * * * * * * *

16

17

18

19

20

21

**DAYVED WOODARD**

    **VS**

**PHB**

    **VS**

**ROYAL & SUN ALLIANCE**

# C E R T I F I C A T I O N

I, LYNN R. MURRAY, do hereby certify that to the best of my knowledge, the proceedings and evidence are contained fully and accurately in the record taken by me of the hearing in the above-entitled matter, and that this is a true and correct transcript of the same.

5-23-05
**DATE**

**LYNN R. MURRAY, COURT REPORTER**