```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE WESTERN DISTRICT OF PENNSYLVANIA
 2

 3  CARI GOODWINE,              :
                 Plaintiff     :
 4                             :
                 v.            :    Case No. 04-142E
 5                             :
    PHB DIE CASTING,            :
 6               Defendant     :

 7

 8

 9

10              Deposition of BENJAMIN HANCOCK, taken before

11      and by Carol A. Holdnack, RPR, Notary Public

12      in and for the Commonwealth of Pennsylvania,

13      on Tuesday, May 3, 2005, commencing at 1:35 p.m.,

14      at the offices of Knox McLaughlin Gornall & Sennett,

15      P.C., 120 West Tenth Street, Erie, PA.

16

17  For the Defendant:

18      Richard A. Lanzillo, Esq.
        Knox McLaughlin Gornall & Sennett, P.C.
19      120 West Tenth Street
        Erie, PA 16501
20

21  For the Plaintiff:

22      Jeffrey A. Connelly, Esq.
        824 Hilborn Avenue, Suite 1
23      Erie, PA 16505

24

25              Reported by Carol A. Holdnack, RPR
                Ferguson & Holdnack Reporting, Inc.
```

1                         I N D E X

2

3     BENJAMIN HANCOCK

4            Direct Examination by Mr. Connelly . .  3

5            Cross-Examination by Mr. Lanzillo  . . 31

6            Redirect Examination by Mr. Connelly . 32

7            Recross-Examination by Mr. Lanzillo  . 32

8            Further Redirect by Mr. Connelly . . . 33

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      B E N J A M I N   H A N C O C K, first having

2      been duly sworn, testified as follows:

3

4                      DIRECT EXAMINATION

5   BY MR. CONNELLY:

6

7      Q.   Mr. Hancock, my name is Jeff Connelly.  We met, as

8   we discussed, a while ago at David Woodard's first Workmen's

9   Comp., and just again a short while ago.  I'm going to --

10  have you ever had -- let me ask you this.  Have you had your

11  deposition taken before?

12     A.   Yes.

13     Q.   Okay.  So I'll be very brief.  And I do this --

14  I'll probably do this more than you will.  When the answer

15  is no or yes, please say that instead of hum-um or um-hum or

16  shake your head, because she can't get that.  I do it all

17  the time.  And if you do, I'll probably say yes, no.

18          And I want to ask you, are you under the -- are

19  you taking any medications that might interfere with your

20  memory today or anything like that?

21     A.   No.

22     Q.   Okay.  And to be honest, that's basically all I

23  need to tell you right now.

24     A.   All right.

25          MR. CONNELLY:  Well, I want to put on the record

```
 1              that, actually, earlier I did have a tie on.  I
 2              went home and changed.
 3              MR. LANZILLO:  I can vouch for that.
 4              MR. CONNELLY:  I am a real lawyer.
 5       Q.    With Mr. Goodwine, I'm sure you're familiar with
 6   everything that's been going on with Mr. Goodwine and
 7   Mr. Woodard, actually; is that correct?
 8       A.    Somewhat, yes.
 9       Q.    Okay.  We sent Interrogatories to PHB.  And we
10   were informed that -- I was informed at the last set of
11   depositions that you were basically the person that
12   answered -- provided answers for those Interrogatories; is
13   that correct?
14       A.    That is correct.
15       Q.    So you're familiar with them.
16       A.    Yes.
17       Q.    Okay.  So I'll probably go -- now, what I'll do
18   is, I'll go through it a little bit, some of these
19   questions, and maybe get little clearer answers for myself,
20   if you can.  If you don't -- if you don't know the answer or
21   if you're not sure about the question, let me know.  Because
22   I would rather you understood the question and answered it
23   succinctly than just took a stab at that may be what I'm
24   asking, or anything like that.  And it also makes it a lot
25   clearer.
```

1          So if there is anything, if there's anything

2     you're not clear on that I'm asking you, let me know, so

3     that we can both be on the same page.  And any time you want

4     to talk to Rich, feel free to, you know, go out of the room

5     and talk to him if you need to talk to him, speak to him, or

6     anything like that.  Okay?

7          A.   I understand.  I'll ask for clarifications if I'm

8     confused.

9               MR. CONNELLY:  Do you have a copy of the

10              Interrogatories?

11              MR. LANZILLO:  I don't have them here.

12         Q.   In the Interrogatories I asked if there were any

13    individuals questioned regarding Mr. Goodwine's complaints

14    or his allegations.  And you listed actually 19 different

15    names.  Two of those names are Cari Goodwine and David

16    Woodard.  But the other names that are listed, do you

17    know -- or can you tell me which one of these -- which ones

18    of these names of these individuals that you interviewed

19    personally or that you spoke to personally?

20         A.   I don't know whose names you have on the list.

21         Q.   Okay.

22              MR. LANZILLO:  Could he see the Interrogatory

23              answers.

24              MR. CONNELLY:  Yeah, sure.

25              MR. LANZILLO:  The response begins, "PHB

1          interviewed, questioned, counselled or otherwise

2          had discussions with the following employees

3          concerning matters relevant to the complaints or

4          allegations asserted by Mr. Goodwine."  And it

5          lists a series of names.

6     A.    Let's put it this way.  I was present when some of

7  these people were interviewed.  Some of the people, I don't

8  necessarily think they were interviewed; it was just casual

9  conversation.

10     Q.    And how did you get all of these names?  Some you

11  knew.

12     A.    I know all of those people.

13     Q.    I understand.  But were you present with all -- or

14  when all of these people were interviewed?

15     A.    No.

16     Q.    So did other people tell you that they had spoken

17  to them about this?

18     A.    Yes.

19     Q.    Now, what is Shelly Antolik, is that --

20     A.    Shelly Antolik.

21     Q.    What is her position?

22     A.    She is the employment and training supervisor.

23     Q.    When you say employment and training --

24     A.    She works in human resources.

25     Q.    And what are her duties, her job duties?

1    A.    She handles most of the hiring for the plant.  She

2    takes care of internal transfers of employees under the

3    labor agreement's bidding system.  She takes care of some

4    benefits.  She takes care of training for the corporation.

5    Scheduling and training for whatever, whatever the needs

6    are.

7        Q.    Okay.  Would she be directly under you?

8        A.    Yes.

9        Q.    And your position or your title is?

10       A.    Human resources manager.

11       Q.    Okay.  Ronald Sayers, what is his position?

12       A.    He's a die cast shift supervisor.

13       Q.    And what are his -- what are his main duties?

14       A.    He supervises approximately 50 people on a shift.

15   Produces die castings in the plant.

16       Q.    Was he Cari Goodwine's shift supervisor at any

17   time?

18       A.    Normally, every other week.

19       Q.    And Rex Ryan, who sounds like a movie star.  Rex

20   Ryan and Tom Mix.

21       A.    Rex Ryan was his supervisor every other week at

22   one time.

23       Q.    Is he still working or employed there?

24       A.    He is still working, but he doesn't have that job

25   anymore.

1      Q.    Okay.  How about Wayne Phillips?

2      A.    Wayne Phillips is a shift supervisor.

3      Q.    Same as the other gentleman?

4      A.    Yes.

5      Q.    Is he still a shift supervisor there?

6      A.    Yes, he is.

7      Q.    Did these three, or any of these three, ever come

8   to you with a complaint from Cari Goodwine that you recall?

9   A complaint about what's contained in our lawsuit, not just

10  any complaint.

11     A.    Let me just say that somebody came to me.  I don't

12  know who it was.

13     Q.    Okay.

14     A.    It could have been -- I'm sure it wasn't Rex Ryan.

15  It might have been Ron Sayers or it might have -- I think it

16  was Ron Sayers.

17     Q.    When you say someone came to you with a complaint,

18  what -- when was that?

19     A.    When was that?

20     Q.    About.

21     A.    Probably several -- couple of years ago.

22     Q.    And what was the complaint, if you can recall, or

23  best of your knowledge?

24     A.    The complaint was that one of the line foremen

25  supposedly had said something derogatory that was racial.

1      Q.    Do you know who the line foreman was?

2      A.    Yes.

3      Q.    Who?

4      A.    Gary Gebhardt.

5      Q.    Okay.  And do you know what he said, or what they

6      said -- alleged that he said?

7      A.    I will paraphrase what I understand he said, was,

8      we have to get them to work harder.

9      Q.    Okay.  And that was, I would assume taken, since

10     you weren't there, by Cari as meaning "them", meaning black

11     people.

12     A.    That is the way that I understood he took it, yes.

13           MR. LANZILLO:  Just for a point of clarification

14           and an objection at the same time.  I don't

15           believe Cari was there for that comment.  Was he

16           present for that one?

17           MR. CONNELLY:  I don't think so.

18           MR. LANZILLO:  Okay.

19     Q.    Now, Patrick Camp, what is his position?

20     A.    He is a die cast foreman.

21     Q.    All right.  What's the difference between a die

22     cast foreman and a die cast supervisor?

23     A.    Die cast supervisor is in charge of the entire

24     shift.  And the die cast foreman is probably in charge of

25     maybe five or six machines.

1          Q.    So under each die cast supervisor, approximately
2     how many foremen are there?
3          A.    Oh, five or six.
4          Q.    Okay.  And Greg Biebel, what is his position at
5     the -- at PHB?
6          A.    He's an inspector and the union president.
7          Q.    Okay.  When you say inspector, what are his
8     duties?
9          A.    When the castings come off of the machine, they're
10    conveyed to his department, and he visually inspects them
11    and knocks off some excess metal.
12         Q.    Okay.  Gary Gebhardt is no longer working there;
13    is that correct?
14         A.    That is correct.
15         Q.    When was he let go?
16         A.    A year-and-a-half to two years ago.
17         Q.    Okay.  And was it -- well, tell me why.
18         A.    Well --
19         Q.    What the main reason was.
20         A.    The real reason is we came to the conclusion that
21    he was prejudice against minorities.  Based on a number of
22    different things.  One of them was the comments that he had
23    made in relation to Cari Goodwine.  At the time, we could
24    have taken it one way or the other.  Then we heard some
25    other things.  And then it was revealed to us that there was

1    a situation where one of the guys in the plant had invited

2    one of the minority employees to go with them to his camp.

3    And while they were at -- Glen Zomboch (phonetic) is the

4    guy's name, at his camp.

5          I think they made a comment that they might go

6    over and visit Gary Gebhardt's camp while they were in the

7    area.  And he made a comment to the effect that, better not

8    do that, it's private property, if you come over there with

9    a black guy, I'm going to start shooting.  Words to that

10   effect.  Those combination of things led to Gary Gebhardt's

11   being terminated.

12        Q.    What was his position?

13        A.    He was a die cast foreman.

14        Q.    Okay.  How long had he worked there?

15        A.    Probably 30 years.

16        Q.    Okay.  And William Donnell, or Donnell?

17        A.    William Donnell.

18        Q.    Donnell.  What's his position?

19        A.    Right now he is the maintenance supervisor.  At

20   the time, he might have been just a maintenance foreman.  I

21   don't recall the time frame.

22        Q.    And the maintenance foreman or maintenance

23   supervisor, do they -- does he work or did he work -- does

24   he work one shift, or is it -- is he moved around?

25        A.    When he was a foreman, he worked a swing shift.

1    Right now, he works first shift.

2         Q.    Okay.  And who is Robert Barko?

3         A.    Robert Barko is a die cast foreman/process control

4    person.

5         Q.    And the process control would be?

6         A.    They handle the technical aspects of die casting,

7    the parameters of the machine, shot settings, make sure the

8    machine is set up to produce a good casting.

9         Q.    How about William Diehl, what's --

10        A.    He's the chief electrician.

11        Q.    All right.  On William Diehl, what involvement did

12   he have, if you know, regarding Cari?  If there was any

13   involvement.

14        A.    Whatever involvement they had, it had to be casual

15   conversation between the two of them.

16        Q.    Okay.  Had you heard anything, that William Diehl

17   had said or repeated any discriminatory statements or

18   anything that someone else had made?  Or is he just an

19   individual that was spoken to regarding this?

20        A.    I think you better clarify what you just asked me.

21        Q.    Okay.  Did William Diehl ever specifically, to

22   your knowledge, tell anyone that there were any

23   discriminatory statements made to Cari or about Cari?

24        A.    Not other than what I've heard in preparation for

25   these proceedings.

1      Q.    And, well, what would that be, then?

2      A.    Supposedly, there was a comment made by Bill Diehl

3   when -- not Cari, but another employee was wearing a scarf

4   around his head, and he had it tied back behind his head.

5      Q.    Okay.

6      A.    And he said something like, well, you look like

7   Aunt Jemima.

8      Q.    Did you, or do you know if any -- well, let me ask

9   you this.  Did you ever speak to William Diehl about that?

10     A.    Did I?

11     Q.    Yes.

12     A.    I believe I did, and he didn't remember saying it.

13           MR. LANZILLO:  Jeff, just for clarification.

14           That's something that I think was raised for the

15           first time, what, within a week?

16     A.    Oh, probably, yeah.

17           MR. LANZILLO:  It took place sometime I think,

18           what, early '90s is when --

19     A.    I don't really -- I don't have any idea when it

20   took place.

21     Q.    And James Henry, what's his position?

22     A.    James Henry is a die cast utility person.

23     Q.    What does he do?

24     A.    Oh, takes care of labor-type jobs.  He does

25   cleanup.  Odd jobs within the die casting area.

1      Q.    And Peter Lindsley?

2      A.    Peter Lindsley is now a die cast foreman.

3      Q.    Was he just -- during the time period when Cari

4   was working there, was he a -- just a general laborer?

5      A.    At the time Cari was working there, I believe he

6   was a die cast set-up person and a union steward.

7      Q.    Okay.   Jamal Shields.

8      A.    He's a die cast production operator.

9      Q.    Okay.   Is that what Cari was?

10      A.    Yeah.

11      Q.    Okay.   And how about Harlan Tolhurst (phonetic)?

12      A.    Harlan Tolhurst is a metal man.

13      Q.    And what is a metal man?

14      A.    He delivers dies and hot metal to the machine.

15   Takes castings away from the machine, boxes of castings,

16   that kind of thing.

17      Q.    I understand.   How about John Iacobozzi?

18      A.    He's a die cast foreman.

19      Q.    And Loren Smith?

20      A.    He is now a plant engineer.

21      Q.    Was he -- what had he been prior?

22      A.    I've got to think.   He was the die cast manager at

23   one time.   And I think there was another job in between, but

24   it escapes me right now what it was.

25      Q.    Did Cari ever come to you personally with concerns

1    about how he was being treated in terms of his race or his

2    color?

3         A.    I remember talking to Cari one time about a

4    situation involving John Iacobozzi.

5         Q.    And can you tell me what that concerned.

6         A.    He -- Cari thought he was being discriminated

7    against because John had him clean shop monitors.  Rather

8    than have him do something else.

9         Q.    Was there someone that had a specific job to clean

10   those monitors?

11        A.    No.  There's no one specific job.  Lots of people,

12   and probably every die casting -- hourly die casting person

13   out there has done it.

14        Q.    Did you speak to Mr. Iacobozzi about that?

15        A.    Yes.

16        Q.    And what did he have to say?

17        A.    John said that that's what his supervisor wanted

18   Cari to do after his -- he had finished doing whatever he

19   was doing in the first part of his shift.

20        Q.    Who was John's supervisor?

21        A.    Ron Sayers.

22        Q.    Okay.  Did you have a conversation with Mr. Biebel

23   regarding this complaint?

24        A.    I'm just going to say probably, but I don't

25   specifically recall it.

1      Q.    Okay.   Is that the only complaint that personally
2    came to you from Cari, that you can recall?
3      A.    That's the one that sticks out in my mind.
4      Q.    What -- now, your -- PHB has a discrimination
5    policy, or anti-discrimination policy?
6      A.    Yes, we certainly do.
7      Q.    And is it posted anywhere?
8      A.    Yes, it is.
9      Q.    Where?
10     A.    On the bulletin boards.
11     Q.    And how long has it been posted there?
12     A.    Probably a couple of years, the current policy.
13     Q.    Do you know exactly when it was put up there?
14     A.    No, I do not.
15     Q.    Okay.   And who prepared that policy?
16     A.    Dick Zamboldi.
17     Q.    And do you recall why he prepared that policy?
18           MR. LANZILLO:   Let me just interpose an objection
19           at this point to the extent that, Ben, your
20           response would require you to disclose any
21           attorney/client communications.   I caution you not
22           to do that, as those are protected by the
23           attorney/client privilege.
24                In other words, if Dick Zamboldi gave you any
25           type of assessment or opinions regarding

16

```
 1            appropriate action by PHB, you should not reveal
 2            those communications here.  If there are other
 3            reasons for posting or asking him to do that, you
 4            may proceed.
 5       A.   Then I would say I can't answer that question.
 6       Q.   Well, can you tell me who told Mr. Zamboldi to
 7  prepare that policy?
 8       A.   I don't know.
 9       Q.   Okay.  Do you know anyone who would be working --
10  or who would be employed at PHB who would have approved that
11  policy?
12       A.   Sure.
13       Q.   Who?
14       A.   Myself and the chief executive officer.
15       Q.   And you reviewed the policy?
16       A.   Yes.
17       Q.   Okay.  What is the policy?
18       A.   What is the policy?
19       Q.   Yes.
20            MR. LANZILLO:  You would like him to paraphrase?
21            MR. CONNELLY:  Sure.
22       A.   I mean, to put it in simply, we -- it's against
23  company policy to say anything racially against minorities,
24  to discriminate against minorities, to discriminate against
25  females.  I think there's language in there about sexual
```

1    harassment.  And there's reporting --

2          Q.    What are the reporting --

3          A.    -- information.

4          Q.    I'm sorry.  What are the reporting requirements?

5          A.    You can report incidents to your supervisor, or

6    human resources, or both.

7          Q.    Okay.  Do you have any examples of what

8    inappropriate behavior would be under the policy?

9          A.    Sure.

10         Q.    What?

11         A.    Disparaging remarks directed towards minorities,

12   females, Asians, women.

13         Q.    Now, there was a -- you've said that PHB provides

14   training for its employees.

15         A.    Yes.

16         Q.    And in what -- what would be the training that PHB

17   does provide?

18         A.    Well, we provided training for virtually all

19   employees when we instituted -- when we posted this new

20   policy.  We also train all of our new employees how to act,

21   what to say, and what not to say, I guess I would say.

22         Q.    When you say you train them, in what manner?  How

23   is that training facilitated?

24         A.    The policy is reviewed with the employees when

25   they're hired.

1      Q.    Okay.  And who reviews that policy with them?

2      A.    Either myself or Shelly Antolik.  Or I have one

3  other person, Melissa Sutter.

4      Q.    Okay.  Are they given a copy, then, of the policy?

5      A.    Yes.

6      Q.    Do they -- after they get a copy of the policy, do

7  they sign any type of receipt or anything that says that

8  they've received it and received the -- a review of that

9  policy?

10     A.    To be honest, I really don't remember.

11     Q.    Okay.  When Roy Hinton filed a complaint, you say,

12  with the Pennsylvania Human Relations Commission.

13     A.    Yes.

14     Q.    And what was the outcome of that?

15     A.    It was dismissed.

16     Q.    Okay.  And then you state also that there was a

17  problem with -- Tom Thompson made a comment regarding a

18  button.  Can you tell me what that comment was, if you

19  recall it?

20     A.    What I recollect, is he told another employee,

21  what are you doing wearing that nigger button.

22     Q.    How long ago was that?

23     A.    Two, three years ago.

24     Q.    Okay.  And, what -- he was reprimanded?

25     A.    He was reprimanded, something was put in his file.

1    And the other employee was also spoken to, to the effect

2    that -- he didn't follow -- he didn't do what he should have

3    done.  He should have come to me or Shelly so that we could

4    have taken care of the situation rather than gone to who he

5    went to.

6          Q.    Who did he go to?

7          A.    I think he went to Jamal Shields, one of our

8    minority employees.  That's what I recall.

9          Q.    And then Jamal reported it to you, or?

10         A.    I really don't remember who reported it.

11         Q.    All right.  And then David Turner was -- he was

12   suspended, but was that regarding race or was that something

13   else?

14         A.    It was regarding race.

15         Q.    What did he do?

16         A.    David Turner was running a die casting machine.

17   And the metal ran low on the machine.  And he needed one of

18   the metal men to fill up the furnace next to the machine.

19   And he said words to the effect that, where is that lazy

20   black metal man, is he sleeping, words to that effect.

21         Q.    Who would be the man that he would be referring

22   to, do you know?

23         A.    Tim Norton.

24         Q.    And was -- he was -- he was -- reprimanded, or?

25         A.    He was disciplined.  He was suspended.  He was

1    brought back to work under a last-chance agreement, I

2    believe.

3        Q.    Okay.  And then the last one that you list.  You

4    speak of a Mike Potthoff, who made a comment to Shawn Hoyer.

5    What comment did he make, if you recall?

6        A.    You like the dark-skin people, to paraphrase it.

7        Q.    Okay.

8        A.    And he was also given a warning.

9        Q.    When Mr. Gebhardt was supposed to -- was scheduled

10   to go to classes, training classes.

11       A.    Yes.

12       Q.    And then they had been cancelled.

13       A.    Yes.

14       Q.    About how long after those classes had been

15   cancelled was he terminated?

16       A.    I have no idea.

17       Q.    Was -- since he was scheduled to go to classes,

18   and I understand they were terminated, why was he -- why was

19   he then terminated?

20       A.    For the reasons I had stated before.

21       Q.    Did those occur after?

22       A.    Well, one of the situations had occurred before

23   and the other ones were after.

24       Q.    Okay.  Was there any attempt made to schedule

25   Mr. Gebhardt for other training classes?

1       A.    Yes, but we didn't find any.

2       Q.    Where did you look?

3       A.    Various training brochures that we received.

4       Q.    From?

5       A.    From the Manufactures Association, from -- oh,

6    there's a place called Padgett-Thompson that we get

7    information from.  And there's a lot of places that produce

8    seminars.  And I did not see any other seminars on that

9    topic.

10       Q.    Did you contact any of the other universities

11    around here, or colleges?

12       A.    I did not.

13       Q.    Okay.

14       A.    Because we get information from them.

15       Q.    Now, when it says -- it says that Mr. Gebhardt was

16    ordered to take a diversity training class.  Whom ordered?

17       A.    Me.

18       Q.    Okay.  And was that the result of any other action

19    that had been taken concerning PHB, or was that just

20    initiated on your own?

21       A.    That was initiated because of comments that Gary

22    Gebhardt said.  Maybe it could be taken one way, maybe it

23    could be taken the other way.  But to be on the safe side,

24    we wanted to schedule him for the class.

25       Q.    I had been provided a revised harassment training

1    schedule.  I think you're familiar with this.

2        A.    Yes.

3        Q.    That took place in October.  And where you

4    listed -- 2003, where you listed the different training for

5    your employees.  Are you familiar with that?

6        A.    Yes.

7        Q.    Has there been -- after this, this training

8    schedule, has there been any other such training or like

9    training that has been scheduled for your employees?

10        A.    Not exactly like that, no.

11        Q.    Okay.  Was there anything prior to that, that

12    would be similar to this, prior to 2003?

13        A.    Not as complete as that.  There's -- we have --

14    well, I should -- we have departmental meetings involving

15    all employees.  And the topic is raised in some of those

16    meetings.  Not all, but some.

17        Q.    Who runs the meeting, those meetings?

18        A.    The president or the CEO of the company.

19        Q.    How often are those meetings held?

20        A.    Probably twice a year.

21        Q.    Are there notes kept of those meetings?

22        A.    Yes.

23        Q.    Do you have -- or do you have access to those

24    notes, for those meetings for, say, the last four years?

25        A.    I do not believe I do.

```
 1        Q.    Does anyone have access to those?

 2        A.    I don't think so.

 3        Q.    Where are they?

 4        A.    I think they're gone.

 5        Q.    Okay.  Was there ever -- or did PHB ever hire any

 6   outside source to investigate any allegations of racial

 7   discrimination or harassment, or was it all handled

 8   in-house?

 9        A.    Define outside source.

10        Q.    Oh, geez, anybody that isn't a normal employee

11   of -- a regular employee of PHB.

12        A.    Our attorneys.

13        Q.    Oh, okay.

14             MR. LANZILLO:  Objection to form too.  I don't

15             think I quite follow the question.  It may have

16             been because I was dozing.

17             MR. CONNELLY:  Well, basically, an outside

18             source, basically, I was referring to --

19             MR. LANZILLO:  I'm sorry, for what, for handling

20             HR --

21             MR. CONNELLY:  No, no.  To investigate, if they

22             hired anybody to investigate allegations.  An

23             outside source such as an investigator or

24             something like that.

25             MR. LANZILLO:  Sure.  Okay.  Thank you.
```

1          A.    No.

2          Q.    Okay.  There was a lawsuit brought by a

3   Mr. Jackson that was settled a few years ago.

4          A.    Yes.

5          Q.    Are you familiar with that?

6          A.    Yes.

7          Q.    What was the -- the best of your knowledge, what

8   was the outcome of that suit?

9          A.    A settlement was negotiated rather than go to

10  court.

11         Q.    I understand.  What was the settlement?

12         A.    How much?

13         Q.    No, the whole -- what was the -- the whole -- what

14  was the settlement -- what did the settlement entail?  Not

15  just how much, but -- okay, I know how much.  It was, I

16  believe, $10,000, correct?

17         A.    Okay.  Yes.

18         Q.    Was there anything else in the settlement that had

19  to be done by either Mr. Jackson or PHB?

20         A.    I believe we had to post a notice.

21         Q.    A notice.  And what was that notice?

22         A.    I don't recall what the notice said.

23         Q.    Was it posted?

24         A.    Yes.

25         Q.    When, do you remember?

1        A.    Whenever the -- whenever we were supposed to post

2   it.   It was either posted for 30 or 60 days.   I don't

3   remember the time frame.

4        Q.    Who would have been in charge of posting it?

5        A.    I did.

6        Q.    Okay.   Can you give me a copy of that notice.   Or,

7   well, I can get it when I look in the file, probably.

8             MR. LANZILLO:   Yeah.   I could never put my hands

9             on it now.   In fact, I don't know whether --

10            MR. CONNELLY:   Whether it even exists.

11            MR. LANZILLO:   -- I've ever looked for it.

12            MR. CONNELLY:   Okay.

13       Q.    The notice that you had to post, who prepared it?

14       A.    Roger Taft.

15       Q.    Okay.   Have you ever received any -- yourself or

16   your -- PHB -- received any complaints that you recall from

17   Greg Biebel or the union regarding a perception that the

18   union -- or a position that the union took that employees,

19   black employees, were being discriminated against?

20       A.    There was a general grievance filed.

21       Q.    What was -- was the general grievance basically

22   what I just said, that the --

23       A.    Yes.

24       Q.    What was the result of that grievance?   Well, let

25   me ask you this.   When was that?

1      A.    Several years ago.

2      Q.    Okay.

3      A.    We went through the harassment training.

4      Q.    Which we've talked about.

5      A.    Yes.  And the grievance went nowhere.

6      Q.    So after the training, basically, that was --

7      A.    That was it.

8      Q.    Okay.  Would it be accurate to say -- I asked in

9    one of my Interrogatories, No. 9, if the employer, Defendant

10   employer, which is PHB, or any of the Defendant's employer

11   supervisor personnel have knowledge or indications of

12   racially harassing statements, stereotypical comments,

13   ridicule or joking in a workplace.  And I had -- somewhat --

14   I had a response.  But I also had a response that -- that

15   that statement was vague and ambiguous.

16          Are you -- is it your -- is it your position that

17   you think the statement, racially harassing statements, is

18   vague?

19          MR. LANZILLO:  Actually, that's my position and my

20          objection.

21          MR. CONNELLY:  Well, I'm asking if he thinks that

22          it's vague.

23          MR. LANZILLO:  I'm in charge of the objections.

24          MR. CONNELLY:  I know you are.

25          MR. LANZILLO:  And I think the whole objection

```
 1              was -- let me --
 2              MR. CONNELLY:  Overly broad and vague.  Right
 3              there, 9.
 4              MR. LANZILLO:  Overly broad, vague, ambiguous as
 5              to time.  The terms indications of and, quote,
 6              harassing statements, stereotypical comments,
 7              ridicule or joking are so overly broad, vague
 8              and -- are also overly broad and ambiguous.
 9              MR. CONNELLY:  I'm asking if it's his position
10              that that statement is ambiguous.
11       A.   Yes, it is.
12       Q.   Okay.  What --
13       A.   Let me just tell you, if you ask me a particular
14  question about something that you are aware of, I'll be glad
15  to answer it for you.
16       Q.   Well, if you don't -- if you think
17  racially-harassing statements is vague, how would you know
18  when someone made a racially-harassing statement?
19       A.    It's a judgment call at the time, on who made it,
20  what you think their intent was.  After investigating the
21  whole thing, then you can make a decision on what needs to
22  be done.
23       Q.   But if you don't know what that means, how can
24  you make a judgment?
25              MR. LANZILLO:  Let me just clarify the objection.
```

1          We don't know what you mean by that.  And it was
2          to the whole phrase, Jeff.  I mean, you used not
3          just racially-harassing statements --
4          MR. CONNELLY:  I understand.  I'm asking about one
5          of them.
6          MR. LANZILLO:  -- but stereotypical comments --
7          MR. CONNELLY:  I'm asking about one.
8          MR. LANZILLO:  -- joking.
9          MR. CONNELLY:  The general answer was that the
10         whole thing was vague.  And I want to know how
11         racially -- the statement of racially-harassing
12         statements is vague in PHB's view.  What they
13         think that means.  If they don't --
14    A.    Let me answer you this way.  I can tell you my
15    opinion if you tell me some particular statement.
16    Otherwise, I can't.
17    Q.    So, then, the policy regarding racial statements
18    is subjective, not objective, being --
19    A.    Yes.
20    Q.    Okay.  Did Mr. Jackson pass away?  Someone had
21    mentioned that.
22    A.    Yes.
23    Q.    Have you had, let's say in the last year, any
24    problems with the black employees or any complaints that we
25    haven't discussed here, that you're aware of?

1      A.    Clarify what you just asked me.

2      Q.    Has any -- well, has any black employee made a

3   formal or told -- let me put it this.  Advised one of his

4   supervisors, like he's supposed to do under the policy, that

5   he believes someone has made a racial statement or acted

6   discriminatorily towards him, that we haven't discussed

7   here?  If you know.

8      A.    I'm going to say -- I'm going to answer two ways.

9   I'm going to say yes and no.  Because I have had

10  conversations with a minority employee named Jamal Shields.

11     Q.    Okay.

12     A.    Who has told me things that I wasn't aware of

13  until recently.

14     Q.    Okay.  And I would assume that you acted

15  appropriately.

16     A.    We discussed the issue, and he really didn't --

17  these were things that happened years ago.

18     Q.    I see.

19     A.    And he didn't want to make anything of it other

20  than to -- we were just talking in general.

21     Q.    So do you think -- and I'm just asking your

22  opinion now.  That things -- based upon what you know and

23  what you've gone through and the policies that you've

24  initiated, do you think that PHB has made a good faith

25  effort to not allow discrimination or to try to prevent it

1    as well as they can?

2          A.   Absolutely.

3          Q.   And would you say -- are you -- as the

4    personnel -- human resources director, that you are one of

5    the -- one of the leaders in that effort?

6          A.   Yes.

7          Q.   And let me ask you this.  And this is almost a

8    personal question.  Do you think -- are you satisfied with

9    what you've done in terms of the best effort that you can to

10   make sure that this doesn't happen there?

11         A.   I'm never satisfied.

12         Q.   Okay.  All right.  So you're always trying.

13         A.   Yes.

14              MR. CONNELLY:  That's it.

15

16                        CROSS-EXAMINATION

17   BY MR. LANZILLO:

18

19         Q.   Okay.  Let me just ask for one point of

20   clarification.  On the training.

21         A.   Um-hum.

22         Q.   Was there any outside training provided by any

23   sources that would cover sexual, racial harassment,

24   Manufacturers Association?

25         A.   Yes.  I had forgotten about that.  All supervisors

```
 1   go through a series of classes at the Manufacturers

 2   Association.  And I can't specifically tell you which

 3   section it's in, but I think it's a series of five different

 4   classes.  And part of it does deal with discrimination.

 5   Whether it's race, whether it's sex, whether it's sexual

 6   harassment, those kinds of issues.

 7

 8                    REDIRECT EXAMINATION

 9   BY MR. CONNELLY:

10

11       Q.   Are those regular training, or when did that

12   start?

13       A.   Oh, that's been going on probably for 10 or 15

14   years.

15       Q.   Is this a -- like you keep getting updates?  In

16   other words, the supervisors -- same supervisors go each

17   year, or is it --

18       A.   Basically, if we promote somebody from say a die

19   cast operator to a foreman's job.

20       Q.   Then he's there.

21       A.   Then they're going to go.

22

23                    RECROSS-EXAMINATION

24   BY MR. LANZILLO:

25
```

1      Q.    One other point of clarification.

2      A.    Sure.

3      Q.    The most recent harassment/discrimination policy

4  that Attorney Zamboldi prepared you described in response to

5  Attorney Connelly's questions.  Was there a policy in place

6  prior to that?

7      A.    Yeah, there -- yes, there was.

8      Q.    This was the most recent --

9      A.    This was the most recent edition, put it that way.

10

11                FURTHER REDIRECT EXAMINATION

12  BY MR. CONNELLY:

13

14      Q.    Well, then, what was that policy, do you recall?

15      A.    It was basically the same thing.  It was a lot

16  shorter.

17          MR. CONNELLY:  Okay.  I see.  Okay.  Thanks.

18          MR. LANZILLO:  Good enough.

19

20          (Deposition concluded at 2:18 p.m.)

21

22

23

24

25