THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CARI GOODWINE, | ) | Docket No. 04-142E |
| | ) | (Judge Sean J. McLaughlin) |
| Plaintiff | ) | |
| | ) | ELECTRONICALLY FILED PLEADING |
| v. | ) | |
| | ) | JURY TRIAL DEMANDED |
| PHB DIE CASTING | ) | |
| | ) | DEFENDANT'S REPLY BRIEF IN SUPPORT |
| Defendant | ) | OF MOTION FOR SUMMARY JUDGMENT |
| | ) | |
| | ) | Filed on behalf of: PHB Die Casting |
| | ) | |
| | ) | Counsel of record for this party: |
| | ) | Richard A. Lanzillo, Esq. |
| | ) | Knox McLaughlin Gornall |
| | ) | & Sennett, P.C. |
| | ) | 120 West 10th Street |
| | ) | Erie, PA 16501 |
| | ) | Telephone (814) 459-2800 |
| | ) | Facsimile (814) 453-4530 |
| | ) | Email rlanzillo@kmgslaw.com |
| | ) | PA53811 |

**DEFENDANT'S REPLY BRIEF IN SUPPORT
OF MOTION FOR SUMMARY JUDGMENT**

The response of plaintiff, Cari Goodwine, to PHB Die Casting's Motion for Summary Judgment includes certain assertions of fact and propositions of law that necessitate a reply.

    **A.**    **The EEOC file does not support Goodwine's prima facie case.**

Goodwine relies heavily upon the EEOC's investigation in this case to support his claim. However, Goodwine omits any reference to the EEOC's ultimate analysis and findings concerning his claims. The EEOC found in material part as follows:

> This is not a good litigation vehicle for several reasons: (1) [Goodwine] was not actually working during most of the relevant time frame; <u>the finding of a hostile work environment depends on events which allegedly occurred clearly outside the relevant time period; the event which allegedly occurred within the relevant time period is barely sufficient to support a finding of a hostile work environment</u>.  (2) [Goodwine] has a terrible attendance record.  Subsequent to the investigation, Respondent has (1) conducted discrimination training for all supervisors and managers and employees; (2) discharged the supervisor who made the derogatory comments; and (3) investigated and handled subsequent allegations of racial hostility.

Report of Cases Disapproved Under Regional Attorney's Delegated Authority, Goodwine EEOC File, attached hereto as Exhibit A.

    While the EEOC found "reasonable cause to believe that [Goodwine] had been subjected to a racially hostile work environment," it also "found no reasonable cause to believe that he had been subjected to disparate treatment or retaliation."  (<u>Id.</u>)  The EEOC got it right with one exception.  The event that allegedly occurred within the relevant time period was not sufficient, "barely" or otherwise, to support a finding of a hostile work environment.  The record in this case is clear:  During the approximately four years and four months that Goodwine worked at PHB, he never heard any employee use a racial slur and he never observed any racial graffiti in the workplace. (Goodwine Depo. (1/29/05), 83; (2/12/05), 68).  No one ever threatened or intimidated him while he was employed at PHB. (Goodwine Depo. (2/12/05), 68). The event upon which the EEOC found a "bare" basis for a probable cause finding regarding a hostile work environment was the "we"/"them" comment of Gary Gebhart.  On this issue, the EEOC both lacked an adequate record to properly analyze the issue and simply misapplied the law.

While this comment may be capable of a racial interpretation, it is woefully inadequate as evidence of a hostile environment. The Supreme Court has made clear that "'simple teasing,' offhand comments, and isolated incidents (unless extremely serious)" are not actionable under Title VII. Faragher v. City of Boca Raton, 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (internal citation omitted). Nothing about Goodwine's employment experience at PHB could be considered harassment "severe and pervasive" enough to support a finding that it "alter[ed] the conditions of [Goodwine's] employment." See Pennsylvania State Police v. Suders, 542 U.S. 129, 124 S.Ct. 2342, 2347, 159 L.Ed.2d 204 (2004) (quoting Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)).

**B.    Goodwine's characterization of Phillip's comment about opening a valve to a machine is legally irrelevant and factually unsupported.**

Goodwine states that he "was *made aware* of another foreman, Gordy Phillips, making statements as to exposing Goodwine to hot water from a valve with underlying racial overtones and impetus." (Plaintiff's Brief in Opposition to MSJ, pp. 2-3 ( emphasis supplied)). Goodwine's characterization of this hearsay "incident" as having "racial overtones and impetus" is baseless. Goodwine has offered not one shred of evidence to support his characterization. The only evidence of record concerning this exchange demonstrates that it had nothing whatsoever to do with Goodwine's race. From the perspective of a person of reasonable sensibility in Goodwine's position, this incident can only be considered as benign and trivial and devoid of racial overtone. (See Phillips Affidavit, ¶22).

Goodwine admits that he never heard Phillips make any comment concerning the machine in question or Goodwine's proximity to it. (Goodwine Depo. (1/29/05), 78). Similarly, Goodwine acknowledged that Phillips did not open any valve on the machine, spray him with water or do anything else to cause him the slightest inconvenience, let alone expose him to

danger. (Goodwine Depo. (1/29/05), 78-79). This "incident" involved no action or statement that a reasonable person could interpret as racial or consider as harassment or intimidation.

Goodwine's brief regarding the "incident" with Phillips is also defective under F.R.C.P. 56(e). Rule 56(e) requires that materials submitted in opposition to a motion for summary judgment "be made on <u>personal knowledge</u>" and "set forth such facts as would be admissible <u>in evidence</u>." F.R.C.P. 56(e) (emphasis supplied). Goodwine's brief sets forth his characterization of statements that another employee, Ron Sharp, allegedly attributed to Phillips outside of Goodwine's presence. This is classic hearsay and cannot serve as an evidentiary record in opposition to a motion for summary judgment. Goodwine has offered no evidence from Ron Sharp or anyone else who has personal knowledge of any discussion involving Phillips. Thus, Goodwine's characterizations regarding the "incident" with Phillips are unsupported by the record and, even if accepted, legally insufficient to constitute evidence of racial harassment.

  **C.**  **Goodwine's characterization of William Donnell's comment to James Henry is legally irrelevant and illustrates the lack of merit of Goodwine's claim.**

Goodwine's fundamental misunderstanding of what constitutes racial harassment under federal law is further reflected by his reliance upon a statement attributed to employee William Donnell, a Maintenance Supervisor, by James Henry, a die cast utility employee. In his deposition, James Henry confirmed that Donnell has never made a racial or racist comment in his presence or ever threatened violence against anyone. (Henry Depo, 23). Indeed, the record is devoid of any evidence that Donnell has ever taken any action or made any comment based upon a person's race. Nevertheless, Goodwine contends that he experienced racial harassment by Donnell based upon a statement Donnell made to James Henry, another white employee.

According to Henry, on or about January 1, 2004, he asked Donnell about the purpose of a hole that was being excavated in the plant and Donnell responded, "Cari Goodwine, whoops, I shouldn't have said that."[1] (Henry Depo, 19-21). Henry goes on to ascribe to this comment the palpably unreasonable interpretation that Donnell intended the statement as a "death threat" against Goodwine. (Henry Depo, 25). In his deposition, even Goodwine admitted that he has no basis upon which to believe that Donnell's comment was racially motivated. (Goodwine Depo, (1/29/05), 124). Instead, Goodwine believes that Donnell does not like him because, according to Goodwine, Donnell believes that Goodwine has asserted a frivolous claim against PHB. (Goodwine (1/29/05), 123-124).

Goodwine fails to understand that Title VII does not mandate that every one of his fellow employees must like him. Donnell is permitted to hold Goodwine in low regard. There is no evidence in the record that Donnell's feelings concerning Goodwine are based even in part on his race. In contrast, the record is replete with uncontroverted evidence regarding Goodwine's abysmal attendance record to explain why Donnell could reasonably regard Goodwine as a poor employee. However, all of this is really beside the point. *Donnell said and did nothing to Goodwine. He certainly said and did nothing that could be considered harassment under federal law*.

Courts have repeatedly recognized that anti-discrimination laws such as Title VII were not designed to purge all harassing or annoying behavior in the workplace; only that which renders the workplace objectively and subjectively hostile or abusive. Hartsell v. Duplex

---

[1] Counsel for Goodwine originally produced an affidavit from James Henry attributing this statement to William Hilbert, the President of PHB. Henry's original affidavit is attached to this brief as Exhibit B. After Henry admitted in his deposition that he did not write his affidavit and merely had it read to him, and that William Hilbert made no statement about Goodwine, Henry submitted a "corrected" affidavit. This corrected affidavit continued to espouse statements authored by Goodwine's counsel that Henry knew to be baseless. See infra, pp.8-9.

Products Inc., 123 F.3d 766, 773 (4th Cir. 1997) ("Title VII was not designed to create a federal remedy for all offensive language and conduct in the workplace." (citations omitted)). Moreover, the Supreme Court has noted that the "ordinary tribulations of the workplace, 'such as the sporadic use of abusive language, … and occasional teasing' are not actionable." Faragher B. City of Boca Rotan, 524 U.S. 775, 778, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). Here, the statement attributed to Donnell does not even rise to the level of abusive language or teasing. It is what it appears to be; an offhand racially-neutral expression of sarcasm made privately to a fellow employee by a person who is entitled to his opinion.

> D. **The remainder of James Henry's deposition also does not support Goodwine's claim.**

In support of his hostile environment claim, Goodwine also cites the following question and answer from the deposition of James Henry. Question: "has any other employee made a racial slur in your presence?" Answer: "a lot." (Plaintiff's Brief, 4, citing Henry Depo., 29). However, Goodwine's brief omits the fact that, in response to follow-up questions, James Henry could recall one only "joke" of a racial nature at PHB. (See Henry Depo., 32-33). Other than one racial "joke" he attributed to Gordon Phillips, Henry could not recall a single racial or racist remark or comment by any employee during his entire employment at PHB. (Henry Depo., 32).

Furthermore, the racial joke that Henry attributed to Phillips is legally irrelevant in the context of this case. According to Henry, the set-up question and punch-line of the so-called "joke" were as follows: "Do you know why niggers don't have nightmares? The last one that did got shot." Henry acknowledged that no one else was present for this statement. Thus, not only did Goodwine not experience this statement, he did not know that the statement was allegedly made until Henry disclosed it in his deposition. For alleged incidents of racist

behavior to be relevant to showing the existence, severity or pervasiveness of a hostile work environment, the plaintiff must know of them.  Ngeunjuntr v. Metropolitan Life Ins. Co., 146 F.3d 464, 467 (7th Cir.1998) (racial comments made outside employee's presence did not show hostile environment); Johnson v. City of Fort Wayne, 91 F.3d 922, 938 & n. 8 (7th Cir.1996) (harassing conduct must be directed at employee in order to show racially hostile environment); see also Burnett v. Tyco Corp., 203 F.3d 980, 981 (6th Cir.2000) (hostile actions of which plaintiff was unaware were not relevant to her claim of a hostile work environment); Jones v. Billington, 12 F.Supp.2d 1, 12 (D. DC 1997) (evidence of racial comments directed at another employee and evidence of broad and unspecified allegations of race-based comments by co-worker insufficient to show racial motivation or hostile environment); cf. Hardin v. S.C. Johnson & Son, Inc., 167 F.3d 340, 347 (7th Cir.1999) (doubting the admissibility "of odious statements" plaintiff never heard to show racial motive).

    The use of the word "nigger" is offensive, particularly to African Americans.  However, the law rejects the proposition that employers must provide a workplace free of individuals who sometimes make offensive comments.  In this case, Goodwine admitted that, during his entire employment at PHB, **Goodwine never heard any employee use a racial slur and he never observed any racial graffiti in the workplace**.  (Goodwine Depo. (1/29/05), 83; (2/12/05), 68).  The evidence of isolated comments that scant few employees allegedly made outside of Goodwine's presence are miles below the legal threshold that Goodwine must meet to establish a viable hostile environment claim.  The courts routinely find conduct far more offensive than anything alleged in this case insufficient to meet this standard.  See e.g. Peters v. Renaissance Hotel Operating Co., 307 F.3d 535, 552 (7th Cir. 2002)(isolated, indirect incidents of racial harassment, *such as use of the word "nigger" in plaintiff's presence* held not severe and

pervasive enough to alter condition of employment); McLaughlin v. Chicago Transit Authority, 263 F.Supp.2d 1130, 1136-1137 (N.D. Ill. 2003)(holding that racial and gender-based comments outside of plaintiff's presence, two derogatory and inappropriate racial comments by supervisor directly to plaintiff not sufficient to create a hostile working environment under Title VII).

### E. Goodwine has repeatedly used James Henry to offer statements under oath that Henry knew or should have known to be false or factually baseless.

Goodwine has repeatedly used James Henry to make representations under oath that Henry and Goodwine knew to be false or factually baseless. Through counsel, Goodwine originally submitted an affidavit signed by Henry under oath attesting that it was William Hilbert, the President of PHB, rather than William Donnell, who made the statement about Goodwine and the "hole." A copy of Henry's original affidavit is attached to this brief as Exhibit B. In his deposition, Henry admitted that it was Goodwine's counsel who drafted the affidavit and that the reference to William Hilbert was inaccurate. Although Henry initially testified that he actually read the affidavit before he signed it under oath, he later stated that he did not do so, and instead relied upon counsel for Goodwine to read it to him. (Henry Depo, 20-21).

The foregoing is not the worst of Goodwine's use of Henry to proffer false or baseless assertions. In both his original and his "corrected" affidavit, Henry makes the following statement: "At the time Mr. Goodwine was being subjected to *ongoing harassment and retaliation by the company* in terms of being asked to perform tasks of general maintenance and to do work with unsafe machinery, which they know to be dangerous and even deadly." Henry admitted that these words were written by Goodwine's counsel. (Henry Depo., 55) Henry simply signed-off on them. In fact, Henry admitted in his deposition that he never observed any harassment or retaliation against Goodwine:

> Q. And, again, as I told you at the outset, Mr. Henry, I just want to know what information you have, whatever it is. Let me confirm, then. You didn't personally witness any harassment or retaliation against Cari Goodwine; is that correct?
>
> A. No I did not. Correct.

(Henry Depo., 63). Even after Henry provided this testimony, Goodwine proceeded to submit Henry's affidavit, including the assertion that Goodwine had been "subjected to ongoing harassment and retaliation by the company," to this Court in opposition to PHB's motion for summary judgment.

Throughout this case, including in the EEOC proceedings, Goodwine has relied upon vague and unspecified assertions of racial harassment such as those authored by Goodwine's counsel for James Henry. In the EEOC proceedings, these assertions received little scrutiny. When examined factually in the context of this federal court action, however, assertions such as those of James Henry have been exposed as baseless.

    **F.**    **The deposition testimony of George Arrington does not support Goodwine's claim, and Goodwine's brief materially distorts and misrepresents this testimony.**

According to Goodwine's brief, former employee George Arrington "corroborated the existence of a pervasive and continuing climate of racial animus and discrimination in the PHB workplace." (Plaintiff's Brief, p. 5). George Arrington started working for PHB in 1988. His last active day of employment at PHB was June 8, 2001. (Arrington Depo., 7). Arrington had no contact with PHB's facility after June 8, 2001. Goodwine did not leave his job at PHB until July, 2004, more than three years later. While Arrington testified that he had seen racial

graffiti at PHB "over the years," he could not recall when he saw such graffiti.[2]  (Arrington Depo., 9).  In fact, he could not even recall the year he saw any such graffiti.  (Id.).  He similarly could not recall the frequency he observed any such graffiti other than he believed it was "more than once."  (Arrington Depo., 10).  Arrington acknowledged that he never reported the presence of any graffiti to management.  (Id.)  However, Arrington also acknowledged that, when management learned of the presence of graffiti, PHB personnel would paint over it or otherwise remove it.  (Arrington Depo., 12-13).

        Arrington's vague testimony regarding graffiti that may have existed at some unspecified time between 1988 and 2001 does not support that Goodwine was subjected to a racially hostile work environment.  Goodwine, who worked at PHB from March of 2000 to July of 2004, never observed any racial graffiti in the workplace.  (Goodwine Depo. (1/29/05), 83; (2/12/05), 68).  Jamal Shields, an African American who has worked as a die cast production operator since 1996, testified that he never observed a single instance of racial graffiti at PHB during his nine years of employment at PHB.  (Shields Depo., 4-5).  In contrast, Arrington cannot even specify a year during which he allegedly observed racial graffiti.  Thus, Arrington's testimony is completely irrelevant because the finder of fact could only speculate as to when Arrington allegedly observed such graffiti during his 13 years of employment with PHB.  Moreover, Arrington acknowledged that any graffiti he observed was promptly painted-over or otherwise removed by PHB.  Based upon the record in this case, a reasonable jury could only find that racial graffiti was either non-existent in the workplace during the relevant time period or that any such graffiti was truly de minimis and promptly removed.  The record in no way

---

[2]    Although Arrington could not recall when he observed any racial graffiti at PHB, he did remember that it was located inside a bathroom stall and surrounded by other graffiti of a non-racial nature, such as graffiti directed at supervisors.  (Arrington Depo., 12-13).

supports that racial graffiti contributed to a workplace "permeated with 'discriminatory intimidation, ridicule, and insult' that [was] sufficiently severe or pervasive to alter the conditions of [Goodwine's] employment and create an abusive working environment." Nat'l R.R. Passenger Corp v. Morgan, 536 U.S. 101, 115-116 (2002) (*quoting* Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)).

Goodwine's brief also cites Arrington's testimony that there were "rumors" that other PHB employees attended KKK rallies." (Plaintiff's Brief, p. 6, *citing* Arrington Depo., 14). This testimony comes out of left field. It is yet another transparent effort to throw evidentiary garbage at the wall to see what might stick. Goodwine does not attempt to explain what relevance supposed "rumors" about the KKK, which no other employee, including Goodwine ever heard, may have in the context of this case. There is not one shred of evidence that any employee of PHB was ever involved with the KKK. In fact, Arrington testified that the alleged "rumors" were actually part of "joking" banter between Arrington and other employees that Arrington did not find to be offensive. (Arrington Depo., 42-44).

On one occasion, Arrington recalled that, in a moment of anger, another employee used the word "nigger" in his presence. However, he could not recall the year when this occurred and he noted that the employee promptly apologized for the remark. (Arrington Depo., 18). Arrington testified that no one at PHB ever made a comment in his presence that he considered worthy of reporting to the human resources department or that created any ill will that he was unable to resolve with his fellow employee. (Arrington Depo., 46-47).

Goodwine takes great liberties with Arrington's deposition testimony, which is consistently vague and often internally inconsistent or incomprehensible. (See Plaintiff's Brief, pp 6-8). However, Arrington's testimony is clear that the few isolated comments that he vaguely

describes had nothing whatsoever to do with Goodwine. Arrington could not even say whether any comment occurred at a time when Goodwine was employed by PHB and there is no evidence that any comment was made at a time when Goodwine was employed by PHB. Goodwine's testimony is crystal clear that he had no knowledge of any such comment.

G. **Christopher McCullum did not even work at PHB Die Casting.**

In his brief, Goodwine relies on testimony given by Christopher McCullum in Dayved Woodard's workman's compensation case. According to Goodwine, "McCullum corroborates the Plaintiff's assertions of disparate assignment of machines while creating unsafe conditions for him." (Plaintiff's Brief, p. 21). The patently misleading nature of Goodwine's reliance upon McCullum's testimony is remarkable. McCullum did not even work at PHB Die Casting. He worked at PHB Tool and Die Division, an entirely different division in an entirely distinct facility with completely separate operations and management. (Woodard WC Transcript, 1/27/05, 21-22). McCullum has never set foot in PHB Die Casting and has never encountered any PHB Die Casting supervisors or other personnel. (WC Transcript, 22). Moreover, McCullum worked at PHB Tool and Die from only June, 2000 to September, 2000. During that period of time he never heard a racial slur. (WC Transcript, 11). Instead, he felt that he did not receive the level of technical support necessary to do his job. (WC Transcript, 16-18). McCullum identified no action or statement that could rationally or reasonably be considered racial in nature and has no personal knowledge of any facts relevant to Goodwine's case.

H. **The Union Grievance filed at the behest of Goodwine and Woodard and the Jackson settlement have no evidentiary value in this case.**

Goodwine also relies upon a general grievance filed by his Union as evidence of a racially hostile work environment. This grievance includes no substantive evidence or any factual detail to support Goodwine's position. The fact that the Union filed the grievance at the

behest of Goodwine and Dayved Woodard is not evidence of any merit to their claims. The Union did not pursue the grievance and no determination of merit was ever made. Goodwine seems to believe that, if his vague, factually defective claims of harassment and discrimination are repeated enough times, this will serve as an effective substitute for actual evidence of facts to support those claims. However, Goodwine's claims must rise or fall on the actual evidence in this case. When evaluated based on the evidence, Goodwine's claims fail as a matter of law.

Consistent with his pattern of discussing everything except the facts relevant to his own case, Goodwine also invokes PHB's settlement in the Frederick E. Jackson litigation as evidence in opposition to PHB's motion for summary judgment. PHB discharged Jackson from his employment at PHB on March 19, 1999. Goodwine did not join PHB as an employee until March, 2000, approximately one-year after Jackson's termination. More importantly, the complaint in the Jackson case did not even allege that Jackson was subjected to a racially hostile work environment. (See Complaint, EEOC vs PHB, Inc. d/b/a PHB Die Casting, Exhibit 12 to Plaintiff's Brief in Opposition to MSJ). According to the Complaint, Jackson was fired for making threats against a supervisor. The Complaint alleged that similarly situated white employees were not terminated under similar circumstances. PHB disputed this claim, and the case was ultimately settled for $10,000, an amount well below defense trial costs in a case alleging discriminatory discharge. The settlement agreement expressly recited that PHB was making no admission of liability and, in fact, disputed Jackson's allegations. (See Exhibit 14 to Plaintiff's Brief in Opposition to MSJ). PHB fully complied with the settlement agreement. (Hancock Depo., 25-26). Goodwine has produced no evidence to the contrary.

Moreover, Goodwine has made no effort to explain what any of this has to do with his case. Goodwine's use of a nuisance settlement in a disputed case involving distinct and

unrelated allegations by a former employee whose discharge predated Goodwine's employment only serves to further illustrate the lack of merit of his case. This tactic also makes a mockery of the judicial policy favoring settlement and serves as a material deterrent to settlement.

## CONCLUSION

Based upon the evidence of record and for the reasons discussed above and in its principal brief, defendant, PHB Die Casting, is entitled to summary judgment dismissing both counts of plaintiff's Complaint. No genuine issue of fact remains for trial and PHB is entitled to judgment as a matter of law.

Respectfully submitted,

KNOX McLAUGHLIN GORNALL &
SENNETT, P.C.

BY: /s/        Richard A. Lanzillo, Esq.
Richard A. Lanzillo, Esquire
120 West Tenth Street
Erie, PA  16501
Telephone (814) 459-2800
Facsimile (814) 453-4530
Email rlanzillo@kmgslaw.com
PA53811

Attorneys for Defendant,
PHB Die Casting

# 626933