**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| CARI GOODWINE, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>PHB DIE CASTING, )<br>)<br>)<br>Defendant. ) | Civil Action No. 04-142 Erie |

**MEMORANDUM OPINION**

McLAUGHLIN, SEAN J.

  Presently pending before the Court is the Motion for Summary Judgment filed by the Defendant, PHB Die Casting.

### I. BACKGROUND

  Plaintiff, Cari Goodwine ("Goodwine" or "Plaintiff"), started working at PHB Die Casting ("PHB" or "Defendant"), on March 6, 2000. (Complaint ¶ 5). Plaintiff, an African-American male, worked primarily as a Die Cast Punch Operator at PHB's Fairview location. (Complaint ¶ 6). Plaintiff remained at PHB through July, 2004.

  In or around February 2003, Plaintiff's supervisor, Gary Gebhart, directed Plaintiff to undertake a workplace task that Plaintiff was not qualified to perform. Plaintiff objected and summoned another supervisor, Ron Sayers, who informed Gebhart that Plaintiff lacked the requisite training to accomplish the task. According to a white PHB employee, Rob Tolhurst, Gebhart then made the comment, "We have to make them work harder." This comment was not made in Goodwine's presence, but was relayed to him by Tolhurst. (Goodwine Depo. I (1/29/05), Dkt. #27, Exhibit 1, p. 54). Goodwine attributes racial connotations to the remark, interpreting it to mean that Gebhart felt that the white employees ("we") had to make the black employees ("them") work harder. (Goodwine Depo. I, pp. 56-59, 60-62; Complaint ¶ 14). Goodwine reported the comment to Sayers who advised Goodwine that he would look into it. Sayers returned in less than an hour and advised Goodwine that he had arranged a meeting between Goodwine, Gebhardt, Tollhurst, Sayers and a union steward. (Goodwine Depo. I, pp. 56-57).

At the meeting, Gebhardt stated that he did not recall making the comment, but that, whatever he said, he did not intend it to be racial in nature. Gebhardt attempted to apologize to Goodwine and offered his hand, but Goodwine refused to shake his hand and rejected the apology. (Goodwine Depo. I, pp. 57-58). Goodwine indicated that he did not feel the apology was sincere. (Id.) After the meeting, Ben Hancock, PHB's Manager of Human Resources, met with Gebhardt and advised him to be more considerate in his comments and sensitive to how others might perceive them. Hancock also ordered Gebhardt to attend a diversity training class at Edinboro University. (Hancock Affidavit, ¶¶ 12-14). Gebhardt enrolled in the course, but Edinboro University later cancelled it due to insufficient enrollment. (Id.)

After Goodwine complained about Gebhardt, another incident occurred involving Goodwine. Goodwine's machine had malfunctioned, so Goodwine and Ron Sharp, a process control technician, worked on the valves in an attempt to repair it. At some point, while Goodwine was away getting a drink of water, a joke was shared between Supervisor Gordon Phillips and another employee, Jay Lewis, to the effect that they should open the valve and spray Goodwine with water to see how fast he could run. (Goodwine Depo. I, pp. 76-78). Sharp informed Goodwine of Phillips' comment when Goodwine returned from the water fountain and inquired as to why everyone was laughing. (Id.) It is undisputed that no one actually opened the valve or sprayed water on Goodwine, and there is nothing in the record indicating that Phillips' comment had anything to do with Goodwine's race.

Sometime in late 2003 or early 2004, while Goodwine was on leave, a large hole was being excavated on the premises of PHB. Maintenance Supervisor Bill Donnell, when asked as to the purpose of the hole, allegedly responded with words to the effect that "he would like to put Cari Goodwine in it." (Goodwine Depo. I., pp. 122-23; Plaintiff's Brief in Opposition, Dkt. #35, Ex. 2, Henry Aff.). Goodwine was not present when the comment was made, but it was relayed to him by another employee, James Henry. (Id.) Goodwine testified that he did not feel the comment was racially motivated; instead he attributed it to Phillips' anger over Goodwine having asserted what Phillips believed to be a frivolous EEOC claim against PHB. (Goodwine Depo. I, pp 123-24).

In addition to the aforementioned comments, Goodwine asserts that he was constantly subjected to racial slurs from co-employees and supervisors and to racist graffiti in the workplace. Goodwine also suggests that he was subjected to a hostile work environment because he was once

made to "degrease shot monitors," a job that was apparently distasteful to PHB employees. (Complaint, ¶ 39). Although Goodwine alleges in his complaint that this job assignment constitutes evidence of a racially hostile work environment, he later admitted at deposition that the job assignment had nothing to do with his race. (Goodwine Depo. I, pp. 133-135). Rather, Goodwine asserts that Hancock required him to degrease the monitors because he held a grudge against Goodwine for prevailing in an unemployment compensation proceeding. (Goodwine Depo. II (2/12/05), Dkt. #27, Exhibit 2, p. 34-35).

Finally, Goodwine also asserts that, throughout his employment at PHB, he was routinely assigned to "harder" jobs than white employees in his position. Without citing specifics, Goodwine contends that he suffered disparate treatment in his job assignments, primarily by being assigned to "the worst jobs within the workplace" and "routine assignment to the most difficult machines." (Complaint, ¶¶ 9-10). Goodwine contends that assignment to the "difficult" machines occurred "three or four times more often" than his white co-workers. (Id.)

Goodwine filed the underlying complaint on May 26, 2004. PHB filed a motion for summary judgment on May 23, 2005, and Goodwine responded on July 25, 2005. PHB filed a reply on August 11, 2005, and oral argument on the summary judgment motion was held on August 25, 2005. This matter is ripe for review.

## II. STANDARD OF REVIEW

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In order to withstand a motion for summary judgment, the non-moving party must "make a showing sufficient to establish the existence of [each] element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). In evaluating whether the non-moving party has established each necessary element, the Court must grant all reasonable inferences from the evidence to the non-moving party. Knabe v. Boury Corp., 114 F.3d 407, 410, n.4 (3d Cir. 1997) (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986)). "Where the record taken as a whole could not lead a reasonable

trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Id. (quoting Matsushita, 475 U.S. at 587).

### III. HOSTILE ENVIRONMENT

Under Title VII and the PHRA it is unlawful for an employer to discriminate against any individual with respect to this compensation, terms, conditions or privileges of employment because of such individual's race, color, religion, sex or national origin. See Weston v. Commonwealth of Pennsylvania, Dept. of Corrections, 251 F.3d 420, 425 (3rd Cir. 2001), citing 42 U.S.C. § 2000e-2(a)(1).[1]  To establish a claim under Title VII based on an intimidating or offensive work environment, a plaintiff must show: "(1) that he or she suffered intentional discrimination because of race; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same race in that position; and (5) the existence of respondeat superior liability." See Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1081 (3rd Cir.1996). In employing this analysis a court must evaluate the frequency of the conduct, its severity, whether it is physically threatening or humiliating, and whether it unreasonably interferes with an employee's work performance. See Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993). Title VII is not violated by "[m]ere utterance of an ... epithet which engenders offensive feelings in an employee" or by mere "discourtesy or rudeness," unless so severe or pervasive as to constitute an objective change in the conditions of employment. See Faragher v. City of Boca Raton, 524 U.S. 775, 787 (1998) (citations omitted).  Thus, "'simple teasing,' offhand comments, and isolated incidents (unless extremely serious)" are not actionable under Title VII. Id. at 788.

Because we find that Goodwine has failed to present a triable issue of fact with respect to elements two and four of the prima facie case for a hostile environment claim, we shall confine our analysis accordingly.

---

[1] The Third Circuit has consistently applied the same legal standard in analyzing claims brought pursuant to Title VII and the PHRA. Goosby v. Johnson & Johnson Medical, Inc., 228 F.3d 313, 317 n.3 (3rd Cir. 2000); Jones v. School District of Philadelphia, 198 F.3d 403, 409 (3rd Cir. 1999).  Therefore, although we analyze Goodwine's claim under Title VII only, our analysis is equally applicable to his PHRA claim.

*A.     Whether the discrimination was pervasive, regular and severe*

We note at the outset that Title VII is not meant to be a "general civility code for the workplace." Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 81 (1998). To be actionable under Title VII, the harassment must be "sufficiently severe or pervasive to alter the conditions of [the victim's] employment and create an abusive work environment." Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986) (citations and internal quotation marks omitted). As the Supreme Court has made clear, conduct "must be extreme to amount to a change in the terms and conditions of employment." Faragher, 524 U.S. at 788. Harassment is pervasive and regular when "incidents of harassment occur either in concert or with regularity." Andrews, 895 F.2d at 1484. Despite this high standard, however, the Third Circuit has acknowledged that "the advent of more sophisticated and subtle forms of discrimination requires that [courts] analyze the aggregate effect of all evidence and reasonable inferences therefrom, including those concerning incidents of facially neutral mistreatment, in evaluating a hostile work environment claim." Cardenas v. Massey, 269 F.3d 251 (3rd Cir. 2001).

In Cardenas, the defendants subjected a Mexican-American plaintiff to ethnic slurs, including referring to him as "the boy from the barrio" and "*mojado*" (the Spanish word for "wetback"), dealt with disagreements by asking if the plaintiff intended to pull out a switchblade, wrote derogatory messages on the marker board in plaintiff's cubicle, rounded the numbers on all other employee evaluations upward while rounding the plaintiff's numbers downward, disproportionally assigned other minorities and trainees to the plaintiff's unit, gave him knowingly contradictory instructions and impossible-to-perform tasks, and referred to him as "an affirmative-action hire." Cardinas, 269 F.3d 259. The Third Circuit found those activities to be sufficiently severe and pervasive to constitute a hostile work environment. Id. at 263. Similarly, in Aman v. Cort Furniture Rental Corp., 85 F.3d 1074 (3rd Cir. 1996), the Court found a hostile work environment where African-American employees were referred to as "one of them" or "another one," told not to touch or steal anything, made to do menial jobs, screamed at, threatened with termination, had their time cards stolen, were falsely accused of wrongdoing, had information necessary to their jobs withheld, and were given conflicting orders. Additionally, the employer's general manager had stated at a district meeting that "the blacks were against the whites" and that if they did not like it they could leave.

5

Aman, 85 F.3d at 1082-84.

We begin our analysis by noting that none of the three comments nor the assignment to degrease monitors raise an inference of racial animus on their face. Indeed, Goodwine himself acknowledged that the comment by Donnell about putting Goodwine "in the hole" and the assignment to degrease shot monitors[2] had nothing to do with his race. See Goodwine Depo. I, pp 123-24; Goodwine Depo. II, pp. 34-35.

Despite the ambiguity as to the remaining comments, we recognize that "the advent of more sophisticated and subtle forms of discrimination require[] that we analyze the aggregate effect of all evidence and reasonable inferences therefrom, including those concerning incidents of facially neutral mistreatment, in evaluating a hostile environment claim." Cardenas, 269 F.3d 262. Thus, although we are hard pressed to divine a racial intent behind Phillips' comment about opening the water valve on Goodwine, we must view that incident, as well as the "we/them" comment, in the light most favorable to the plaintiff. Even so, Goodwine's showing here still falls appreciably short of the severe and pervasive conduct described in Cardenas and Aman. While the comments and conduct at issue here were unprofessional and insensitive, courts have consistently required a

---

[2] To the extent that Goodwine contends that he was assigned to degrease monitors in retaliation for prevailing against PHB in the unemployment proceeding, we find that a single assignment to a workplace task that, while undesirable, had to be performed, is not sufficiently serious and tangible to constitute a change in the "terms, conditions, or privileges' of employment." Robinson v. City of Pittsburgh, 120 F.3d 1286, 1299 (3rd Cir. 1997). It is undisputed that nearly every employee at PHB has to degrease shot monitors at some point in their tenure. (Phillips Affidavit ¶ 21; Sayers Affidavit ¶ 19; Affidavit of John Iacobozzi, Dkt. #24, ¶¶3-7). In any event, Goodwine cites the assignment to degrease monitors primarily in support of his hostile environment claim:

> The Court:   [A]re you contending that he was put on monitors, to cleaning them, out of retaliation for having previously filed an EEOC claim, or are you claiming he was put on monitors as another example or indicia of hostile environment?
> Mr. Connelly: They kind of intermingle, but I would say a hostile environment, they kind of intermingle.

(Hearing on Defendant's Motion for Summary Judgment, p. 22).

6

stronger showing of egregious conduct than that described by Goodwine.  See, e.g., Sherrod v. Philadelphia Gas Works, 57 Fed. Appx. 68, 75-77 (3rd Cir. 2003) (holding that alleged incidents, including managers making comments that "the way [two African-American employees] were eating at their desks, it must be their culture," and that if such clerks did not do their work, "I'm going to sit at their desks with a whip," were not sufficiently severe and pervasive, even considering the comments in conjunction with other facially neutral alleged mistreatment of the employee); Jackson v. Flint Ink N. Am. Corp., 382 F.3d 869, 870 (8th Cir. 2004) (denying summary judgment where plaintiff was subjected to six racially derogatory comments, including use of the word "nigger" in his presence, and particularly because plaintiff witnessed a physically threatening graffiti depicting his name in conjunction with a burning cross and a KKK sign, but noting that the decision to deny summary judgment "is not altogether free from doubt," and that the facts straddled the "cusp of submissibility."); Woodland v. Joseph T. Ryerson & Son, Inc., 302 F.3d 838, 844 (8th Cir. 2002) (holding that "racist graffiti - drawings of 'KKK,' a swastika, and a hooded figure" on the walls of the plant bathroom, a racially derogatory "poem" strewn about the plant, and three racially derogatory comments made about plaintiff (but out of his presence) were "neither severe nor pervasive. . ."); Peters v. Renaissance Hotel Operating Co., 307 F.3d 535 (7th Cir. 2002) (finding that six incidents, including a reference to black music as "wicka wicka woo music" by a supervisor, a bartender's request to investigate an African-American guest who was allegedly stealing coins from a fountain, other African-American guests being denied additional ice and cups for a party, and one use of the word "nigger" in plaintiffs presence, were not severe or pervasive); Bolden v. PRC, Inc., 43 F.3d 545, 551 (10th Cir. 1994) (holding that two overtly racial remarks directed at plaintiff, including use of the terms "nigger" and "KKK," distribution of an arguably racial cartoon, and general ridicule and harassment were not severe or pervasive).

Unlike in the cases discussed above, the record here reflects that Goodwine himself never heard any racial slurs in the workplace:

Q.   Mr. Goodwine, am I correct that no one in your presence during the course of your employment at PHB ever used a racial slur?

A.   In my presence?

Q.   Yes, sir.

A.   Meaning me hearing it directly?

7

>   Q. Yes, sir.
>
>   A. Correct.

(Goodwine Depo. I, p. 83). This point was reiterated by Goodwine's counsel at oral argument:

>   The Court: Did your client testify or is my recollection correct that your client testified that he never observed any racist graffiti, he never heard any racial slurs directed at him, nor did he ever hear any racial slurs directed at any other person, is that accurate?
>
>   Mr. Connelly: I believe that's accurate in terms of direct contact, yes.

(Hearing on Defendant's Motion for Summary Judgment, 8/25/05, p. 15).

>   Similarly, he acknowledged that he had never seen any racist graffiti in the workplace:
>
>   Q. Am I also correct that during the course of your employment you never observed any graffiti that you perceived to be racist?
>
>   A. That's correct.

(Id. at 83-84).

To the extent that Plaintiff relies on general allegations of racial slurs and graffiti occurring at PHB outside of his presence, these allegations contribute little to his claim. In addition to being contrary to his own testimony, those allegations do not legally support his hostile environment claim. (Complaint ¶ 7). We note, for example, that the affidavits upon which Goodwine primarily relies are conclusory in nature and, in the case of James Henry's affidavit, are inconsistent with the affiant's own deposition testimony.[3] Indeed, the affidavits primarily recount events that purportedly

---

[3] Henry's affidavit contains the conclusory statement that Goodwine "was being subjected to ongoing harassment and retaliation" at PHB. (Henry Affidavit). However, Henry, at deposition, admitted that he had never witnessed any harassment or retaliation against Goodwine. (Brief in Opposition, Ex. 3, Henry Deposition, p. 63).

George Arrington testified to having seen racist graffiti on occasion throughout his 12 years working at PHB, but could not provide any specifics, and could only recall a single incident where the racially offensive word "nigger" was used in his presence. (Brief in Response, Ex. 4, pp. 9-13, 46-47). Considering the lack of specificity throughout Arrington's testimony, and the fact that his tenure at PHB only overlapped Goodwine's for about a one year period, his testimony contributes little to Goodwine's accusation that there was "a pervasive and

took place outside of Goodwine's presence. Although incidents occurring outside of a plaintiff's presence are relevant to a hostile environment claim under the requisite totality of the circumstances analysis, see Schwapp v. Town of Avon, 118 F.3d 106, 108-09 (2nd Cir. 1997) (citing Harris, 510 U.S. at 23), the Third Circuit has held that a plaintiff must, at the least, point to evidence that some of the incidents occurred in plaintiff's presence:

> We note first that no racist comment, written or spoken, was ever directed at [plaintiff] himself. In addition, [plaintiff] does not dispute that he never personally saw any racist graffiti or flyers in the Department; he heard about the graffiti and flyers second-hand. As a threshold matter, [plaintiff] cannot meet the first element of the hostile work environment claim . . . solely by pointing to comments that were directed at other individuals.

Caver v. City of Trenton, 2005 WL 2045715 (3rd Cir. 2005).

Finally, we find that two incidents over a four year and four month period are not sufficiently

---

continuing climate of racial animus and discrimination in the PHB workplace." (Brief in Response, p. 5). Moreover, regardless of what Arrington experienced, there is no contention that Goodwine's experiences were similar, as he has conceded that they were not. (Goodwine Depo. I, p. 83-84; Hearing on Defendant's Motion for Summary Judgment, 8/25/05, p. 15-17). As noted at oral argument:

> The Court: Just as a matter of Title VII law, isn't it true that regardless of what may have happened to Mr. Arrington, Mr. Goodwine can't ride on the coattails of someone else's hostile environment?
> Mr. Connelly: Yes, specifically.
>         *    *    *    *    *    *    *    *
> The Court: There is no evidence that Mr. Goodwine experienced that environment, he didn't testify to it?
> Mr. Connelly: Mr. Goodwine experienced it through the words and the descriptions of other workers.
> The Court: We're going to come to that. But is this fair to say. That in determining whether Mr. Goodwine was subjected to a sufficiently severe and pervasive hostile environment, it is irrelevant as to whether Mr. Arrington may have been subjected to that enviroment?
> Mr. Connelly: Directly speaking about Mr. Goodwine, yes.

(Hearing on Defendant's Motion for Summary Judgment, 8/25/05, p. 16-17).

pervasive to support a hostile environment claim under Title VII. See, e.g., Peters, 307 F.3d at 551-52 (six incidents in a one and a half year period not pervasive); Gharzouzi v. Northwestern Human Services of Pennsylvania, 225 F. Supp. 2d 514, 536 (M.D.Pa. 2002) (six incidents in a three month period not sufficiently pervasive); Keown v. Richford Holdings, 2002 WL 1340311 at *4-5 (E.D.Pa. 2002) (eight or nine sexually explicit pamphlets sent to plaintiff over a four month period not sufficiently pervasive and regular to constitute harassment); Bauder, 2000 WL 340191 at *4 (four incidents over a two month period not pervasive). Rather, the four separate incidents described by Goodwine describe precisely the type of "isolated incidents of racial enmity" that are not actionable under Title VII. See Snell v. Suffolk County, 782 F.2d 1094, 1103 (2nd Cir. 1986).

In sum, we conclude that Goodwine has failed to come forward with sufficient evidence to create a triable issue of fact as to whether his "workplace [was] permeated with discriminatory intimidation, ridicule, and insult, that [was] sufficiently severe or pervasive to alter the conditions of his employment and create an abusive working environment." Harris, 510 U.S. at 21. Consequently, summary judgment is appropriate on this basis.

  B.  *Whether the discrimination would have detrimentally affected a reasonable person of the same race in that position*

We also find that Goodwine has failed to raise a triable issue of fact with respect to the fourth prong set forth in Aman, namely, that the discrimination would have detrimentally affected a reasonable person of the same race in his position. Aman, 85 F.3d at 1081. In considering whether the objective test is met, we are directed to consider "all the circumstances," including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris, 510 U.S. at 23; see also Abramson v. William Patterson College of New Jersey, 260 F.3d 265, 280 (3rd Cir. 2001).

As discussed above, the conduct at issue here was neither frequent nor severe. The incidents described by Goodwine, even assuming that they were indeed racially motivated, are insufficient as a matter of law to establish that the work environment here would have been hostile from the "standpoint of a reasonable person." Consequently, summary judgment is appropriate on this alternative ground.

### IV. DISPARATE TREATMENT

Assertions of disparate treatment are governed by the burden-shifting framework outlined in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973).  Thus, Goodwine bears the initial burden of establishing a prima facie case by a preponderance of the evidence. <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502, 506 (1993).  To establish his prima facie case, Goodwine must demonstrate that: (1) he belongs to a protected class; (2) he was qualified for the position; (3) he was subject to an adverse employment action despite being qualified; and (4) the circumstances of the adverse employment action create an inference of discrimination.  See <u>Sarullo v. United States Postal Serv.</u>, 352 F.3d 789, 797 (3rd Cir. 2003) (citing <u>McDonnell Douglas</u>, 411 U.S. at 802).

When a plaintiff establishes a prima facie case of discrimination, the burden shifts to the employer to "articulate some legitimate, nondiscriminatory reason" for the employer's allegedly adverse action. <u>McDonnell Douglas</u>, 411 U.S. at 802.  If the defendant meets this burden, the plaintiff then must establish by a preponderance of the evidence that the employer's proffered reasons were merely a pretext for discrimination, and not the real motivation for the unfavorable job action. <u>Id</u>. at 804.

Goodwine, an African-American, is a member of a protected class.  Moreover, it is not disputed that Goodwine was qualified for his position as a DCPO at PHB.  Goodwine's claim fails, however, because he had not raised a triable issue of fact as to whether he was subjected to an adverse employment action creating an inference of discrimination.

The Supreme Court has defined an adverse employment action as:

> A tangible employment action consists of a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits. . .  A tangible employment action in most cases inflicts direct economic harm.

<u>Burlington Industries, Inc. v. Ellerth</u>, 524 U.S. 742, 761-62 (1998).  Such an action must be "serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment." <u>Storey v. Burns Int'l Sec. Servs</u>., 390 F.3d 760, 764 (3rd Cir. 2004) (quoting <u>Cardenas</u>, 269 F.3d at 263).

Loss of money or benefits is not required in order for a change in an employee's working conditions to constitute an adverse action; rather, an adverse employment action might consist of changes in location, duties, perks, or other basic aspects of the job. <u>Mondzelewski v. Pathmark</u>

Stores, Inc., 162 F.3d 778, 787 (3rd Cir.1998) (citing Collins v. Illinois, 830 F.2d 692, 703 (7th Cir.1987)). Thus, courts have consistently held that "discriminatory assignments, undermining of work conditions and harassment are exactly the kind of actions that Title VII was designed to prevent." See Ferrell v. Harvard Industries, Inc., 2001 WL 1301461, *20 (E.D. Pa. 2001); Mondzelewski, 162 F.3d at 787 (meat factory worker's reassignment to a shift leaving him less free time and requiring him to work Saturday evenings was sufficient to raise a triable issue as to whether the terms, conditions and privileges of his job were altered in retaliation for discrimination complaint); Hampton v. Borough of Tinton Falls Police Dep't, 98 F.3d 107, 116 (3rd Cir.1996) (under Title VII, appointment to undesirable police assignment sufficient to withstand summary judgment on retaliation claim); Collins, 830 F.2d at 703 (under Title VII, "adverse action" does not require loss of money or benefits but rather may consist of changes in location, duties, perks, or other basic aspects of the job).

Here, Goodwine asserts that he "has consistently been subjected to disparate treatment based upon his race in the form of assignment to the worst jobs within the workplace and . . . routine assignment to the most difficult machines . . .". (Complaint ¶ 9).[4] Goodwine contends that he "has routinely been assigned to the more difficult machines three or four times more often than his white co-workers contrary to the rotation policy that is supposed to be followed." (Complaint ¶ 10). In the abstract, this allegation of racial bias in the assignment of workplace tasks sufficiently implicates the "terms, conditions and privileges of his job" so as to be cognizable under Title VII. See, e.g., Mondzelewski, 162 F.3d at 787. Nonetheless, Goodwine's claim fails because he has not produced sufficient evidence to raise a triable issue of fact as to whether he was assigned to "more difficult"

---

[4] In the Complaint, Goodwine also asserted that his placement on PHB's corrective action list, referred to by PHB employees as the "bad boy" list, constituted disparate treatment. An employee was placed on the corrective action list upon accumulating excessive absences from work during a calender year, as described in the PHB collective bargaining agreement. Goodwine's counsel withdrew this claim at oral argument after conceding that Goodwine's placement on the list for attendance problems was not improper. (See Hearing on Defendant's Motion for Summary Judgment, p. 19).

jobs than white employees at PHB.[5]

In response to Goodwine's allegations, PHB has presented a spreadsheet report identifying each job and machine operated by Goodwine throughout his employment at PHB. PHB's report also identifies, by name and race, the other employees who ran the same job and machine during shifts before and after Goodwine. (Affidavit of Catherine Bernard, Dkt. #22, Ex 1, Goodwine Job Activity Report). The results of the report demonstrate that white employees at PHB were assigned to the same jobs and machines as Goodwine during shifts preceding and following Goodwine's shift. Moreover, PHB has provided affidavits asserting that job assignments at PHB were made on a random basis without regard to race, and that most incidents where an employee worked the same machine more frequently than other employees resulted from temporary production needs, customer priorities, or an employee's expertise and training on an individual machine. (Phillips Affidavit ¶¶ 15-20; Sayers Affidavit ¶ 12-18).

Goodwine argues that PHB's spreadsheet fails to account for several factors that impact on the difficulty of a job assignment beyond simply the machine that is used. These include the size of the parts being placed in the machine, the composition of those parts, and the cycle time of the machine. (Goodwine Depo. I, pp. 69-71). Be that as it may, Goodwine offers no evidence that white employees who worked on the same machines had the luxury of machining parts that were lighter and less cumbersome over a longer period of time.

In sum, Goodwine has not raised a triable issue of fact as to whether he was assigned to difficult jobs more frequently than his white employees. As such, he cannot make out a prima facie case of disparate treatment and summary judgment is appropriate.

### VI. PENNSYLVANIA HUMAN RELATIONS ACT

Claims of race discrimination under the Pennsylvania Human Relations Act, 43 Pa. C.S.A. § 951 et seq., are analyzed under the same framework as a Title VII claim, "as Pennsylvania courts have construed the protection of the two acts interchangeably." Weston v. Pennsylvania, 251 F.3d 420, 425 n. 3 (3rd Cir. 2001); see also Goosby v. Johnson & Johnson Med., Inc., 228 F.3d 313, 317

---

[5] We have serious doubts, in any event, that Goodwine's conclusory allegations of being assigned to "more difficult" jobs, in and of itself, is sufficiently particularized to reasonably support a conclusion that he was subjected to an adverse employment action at all.

(3rd Cir. 2000) (holding that Title VII and PHRA discrimination analyses are identical). Accordingly, for the reasons discussed *supra*, summary judgment is also granted as to Goodwine's PHRA claim.

## VI. CONCLUSION

For the foregoing reasons, PHB's motion for summary judgment is granted. An appropriate Order follows.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CARI GOODWINE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 04-142 Erie |
| ) | |
| PHB DIE CASTING, ) | |
| ) | |
| ) | |
| Defendant. ) | |

## ORDER

AND NOW, this 3rd day of November, 2005, and for the reasons set forth in the accompanying Memorandum Opinion,

IT IS HEREBY ORDERED that the Motion for Summary Judgment filed by Defendant, PHB Die Casting, [Doc. No. 19] is GRANTED.

IT IS FURTHER ORDERED that Judgment is hereby entered in favor of Defendant, PHB Die Casting, and against Plaintiff, Cari Goodwine.

The clerk is hereby directed to mark the case closed.


/s/ Sean J. McLaughlin
Sean J. McLaughlin
United States District Judge

cm: All parties of record. ___